Brenda Szydlo (admitted *pro hac vice*)
bszydlo@pomlaw.com
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Facsimile: (917) 463-1044

Adam M. Apton (SBN 316506)
aapton@zlk.com
LEVI & KORSINSKY, LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
Facsimile: (212) 363-7171

*Counsel for Plaintiffs and*
*Co-Lead Counsel for the Class*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL C. PIZZUTO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HOMOLOGY MEDICINES, INC., ARTHUR O. TZIANABOS, W. BRADFORD SMITH, ALBERT SEYMOUR, THERESA MCNEELY, and JOHN DOES 1-10, <br><br> Defendants. | Case No. 2:22-cv-01968-FLA (JPRx) <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** <br><br> Judge: Hon. Fernando L. Aenlle-Rocha <br> Date: February 17, 2023 <br> Time: 1:30 p.m. <br> Place: Courtroom 6B |

Opp. to Defs.' Mot. to Dismiss Am. Class Action Cplt., No. 2:22-cv-01968-FLA (JPRx)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .......................................................................................2

ARGUMENT ...........................................................................................................6

I.    THE COMPLAINT PLEADS ACTIONABLE FALSE AND
      MISLEADING STATEMENTS ......................................................................6

      A.    Defendants Misled Investors by Disclosing Only the Positive Data from
            Part 1 of the pheNIX Study Without Also Disclosing the Negative Data
            [Statements 1 through 9]..............................................................................7

      B.    The Data from Part 1 of the pheNIX Trial Showed that HMI-102's
            Steroid Regimen Was Unsafe and Not Supportive of Advancing the
            Trial to Part 2 [Statements 10-25]. ..........................................................11

      C.    Plaintiffs' Analyst Reports Disprove Defendants' Argument that Their
            Statements Were Immaterial Opinions or Puffery. [Statements 1, 3, 6-9,
            11, 13, 20-21 and 24-25]...........................................................................13

II.   THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ........16

      A.    The Complaint Pleads Defendants' Scienter ..............................................17

      B.    The Complaint Adequately Pleads Corporate Scienter ..............................21

III.  THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION..............21

IV.   THE COMPLAINT STATES A SECTION 20(a) CLAIM ..............................25

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axonic Cap. LLC v. Gateway One Lending & Fin.*,
2019 WL 4138024 (C.D. Cal. May 22, 2019) ...................................................... 16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................... 6, 13

*BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*,
142 S. Ct. 71 (2021) ................................................................................ 21, 22

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) ........................................................... 23

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) .......................................... 11, 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...................................................................... 14

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .................................................................... 25

*Emps.' Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*,
2021 WL 4459218 (D. Md. Sept. 29, 2021) ................................................... 8

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) .................................................. 17

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013) .................................................. 20

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) .................................................................... 17

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...................................................................... 21

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ...................................................................... 21

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014) ................................................................ 10

*In re FibroGen, Inc., Sec. Litig.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ............................................. 15, 16

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................ 8

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) .................................................................. 7

*In re MannKind Sec. Actions*,
   835 F. Supp. 2d 797 (C.D. Cal. 2011) .............................................................. 11

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ............................................................................ 23

*In re Nuvelo, Inc. Sec. Litig.*,
   668 F. Supp. 2d 1217 (N.D. Cal. 2009) ............................................................ 11

*In re Obalon Therapeutics, Inc. Sec. Litig.*,
   2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) .................................................. 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) .............................................................................. 8

*In re Skechers U.S.A. Sec. Litig.*,
   2005 WL 8168047 (C.D. Cal. Mar. 21, 2005) ............................................. 10, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ....................................................................................... 6, 7

*Merkamerica Inc. v. Glover*,
   2019 WL 8989833 (C.D. Cal. Dec. 3, 2019) .................................................... 15

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .......................................................................... 23

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) .............................................................................. 6

*Mineworkers Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ...............................................................................21, 22, 23

*Mulligan v. Impax Lab'ys., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................................7

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ..................................................................................17

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ....................................................................................17

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ..................................................................................10

*Oh v. Hanmi Fin. Corp.*,
   2022 WL 3405975 (C.D. Cal. Aug. 15, 2022) ..........................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...................................................................................................14

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ....................................................................................17

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..................................................................................15

*S. Ferry LP, # 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ....................................................................................16

*Schechter v. Smith*,
   2011 WL 13174954 (C.D. Cal. Dec. 6, 2011)...........................................................24

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................................................8, 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...............................................................................................6, 16

*Voulgaris v. Array Biopharma Inc.*,
   2020 WL 8367829 (D. Colo. Nov. 24, 2020)............................................................10

*Zhou v. Faraday Future Intell. Elec., Inc.*,
   2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) .........................................................20

## Statutes

15 U.S.C. § 78u-4(b)(1)(B)................................................................................................6

15 U.S.C. § 78u-4(b)(2)(A)..............................................................................................16

15 U.S.C. § 78j(b) .......................................................................................................6, 25

## Rules

Fed. R. Civ. P.9(b) .........................................................................................................21

17 C.F.R. 240.10b-5(b) ....................................................................................................8

**PRELIMINARY STATEMENT**

Homology and its chief officers violated the federal securities laws by providing investors with a materially misleading description of HMI-102, a drug designed to treat phenylketonuria ("PKU"), and the study data they obtained from their "pheNIX" clinical trial. Throughout the Class Period, Defendants told investors that HMI-102 had proven to be safe and effective and supported advancement of the pheNIX trial to subsequent phases. This was untrue. The trial data showed that HMI-102 was not effective and, in fact, prohibitively toxic. Instead of disclosing this information, Defendants concealed it from their public in their own statements and told others too (sell-side analysts) there was nothing to worry about. The truth ultimately came to light when the FDA shutdown the entire trial over critical safety concerns. Unfortunately, for thousands of unsuspecting investors, this decision came too late and only after Defendants used their fraudulent statements to raise millions of dollars in new investor money.

Defendants move to dismiss Plaintiffs' complaint largely on the basis that the challenged statements were not false or misleading. Defendants' argument cannot be squared with Plaintiffs' well-pled facts, which show that Defendants made positive statements regarding clinical trial data while in possession of negative clinical trial data that contradicted those statements. Companies can control what they have to disclose under the securities laws by controlling what they say to the market. But once defendants *choose* to discuss a topic with the public, they are then obligated to do so in a manner that wouldn't mislead investors. Defendants failed to do that here. Defendants also pluck certain parts of statements out of their context and contend that they were sufficiently vague to constitute inactionable corporate optimism. But the statements at issue discussed clinical trial results and the safety profile of the drug and, as a matter of fact, were relied upon by numerous market analysts when evaluating Homology and HMI-102's success. Plaintiffs' allegations in this regard directly refute Defendants' arguments.

Defendants further argue that Plaintiffs have not pled a strong inference of scienter, but there is ample support for scienter when evaluating all the facts alleged. Defendants

had in their possession, at all relevant times, the material, adverse information concerning the trial data. Additionally, Defendants knew that the modifications they had made to the pheNIX study protocol were insufficient, given that they fell short of safety precautions being used by Homology in its other clinical trials. Defendants also actively attempted to conceal negative information from the public by telling sell-side analysts that the data was positive and nothing was amiss. Defendants' equity offerings and partnership announcements bolster the inference of scienter, as they evidence motive and opportunity to commit fraud.

Finally, Defendants contend that Plaintiffs have not adequately alleged loss causation, but Plaintiffs allege that several disclosures operated as a correction to Defendants' false and/or misleading statements during the Class Period and/or a distinct materialization of risks that were concealed by Defendants during the Class Period. Under Ninth Circuit law, that is all that is required to adequately plead loss causation.

Defendants' motion has no merit. Plaintiffs respectfully request that it be denied.

## STATEMENT OF FACTS

**Background.** Homology is a biopharmaceutical company that specializes in genetic therapy. ¶40.[1] Homology's lead drug candidate during the Class Period (March 12, 2020 through February 18, 2022) was HMI-102, a gene therapeutic designed to treat PKU, a genetic condition that can lead to excessive phenylalanine levels and brain damage. ¶45. In June 2019, Homology commenced its first clinical trial for HMI-102 (referred to as the "pheNIX" trial). ¶¶49, 53. The pheNIX trial consisted of two parts: the first part was a "dose-escalation" phase where Homology would test a low-dose, mid-dose, and high-dose of HMI-102 on a very limited number of patients (two patients per dose or cohort) to identify a correct dosage; and then a second part called the "dose-expansion" phase in which Homology would test HMI-102 at a determined dose on a broader population. ¶¶50-51. The primary endpoint for the pheNIX study (or, put differently, how Homology would

---

[1] Citations to "¶__" refer to Plaintiffs' Amended Complaint (ECF No. 46).

evaluate HMI-102's effectiveness) was a "meaningful reduction in phenylalanine levels" without "treatment emergent adverse events." ¶52. The success of the pheNIX study was imperative because Homology intended to use it when seeking approval for HMI-102 with the FDA. ¶¶3, 46, 51.

**December 2019.** By December 2019, Homology was well into the dose-escalation phase of the trial, having already completed the low- and mid-dose cohorts (with two patients in each cohort). ¶54. On December 17, 2019, Homology released initial clinical data for three of the four patients (according to Homology, data from the fourth patient had been unavailable as of the data cutoff date of December 2, 2019). ¶¶54-55. The data at that point, however, was equivocal at best. According to market analysts, the low-doses failed to demonstrate an effective response, or "dose-response effect," in terms of lowering patient phenylalanine levels while the mid-dose data provided only slightly better results but was not determinative. ¶¶56-57. Thus, the success of HMI-102 and the pheNIX trial rested on the remaining mid-dose patient (whose data had not been available) and, to a larger degree, the outcome of the high-dose patients that had yet to come. ¶¶4, 58.

**March and April 2020.** Homology proceeded with the first part of the pheNIX study following its initial data readout in December 2019 by recruiting two additional patients for the high-dose cohort (bringing the total number of patients across all three cohorts to six). ¶58. On March 11, 2020, Homology administered its first high-dose of HMI-102 to "Patient 5." ¶¶59-60. On April 15, 2020, Homology provided Patient 5 with her test results, which showed that HMI-102 (i) did ***not*** lower her phenylalanine levels, (ii) caused significant liver toxicity, and (iii) required immediate intervention with additional steroid medication that had not been part of the pheNIX study's trial protocol. ¶61. Patient 5 posted her results publicly on Facebook. In addition to reporting that HMI-102 had failed to decrease her phenylalanine levels, the post also described a frenetic response from the doctors that had dosed her in response to toxicity readings that were more dangerous than they had expected. ¶62 (the "April 15, 2020 Facebook Post"). Given that HMI-102 had failed to demonstrate efficacy in the low- and mid-dose cohorts, the

market was paying close attention to the high-dose cohort. ¶63. Thus, when Patient 5's Facebook post went public, it sent Homology's stock price into a tailspin declining approximately 25% in the span of just a few hours. ¶¶65, 195.

Homology quickly took note of the post and, without explanation, it was abruptly removed from public view. ¶65. At the same time, Defendant McNeely, Homology's Chief Communications Officer, contacted sell-side analysts to assure them that "[n]othing fundamental changed" for Homology, HMI-102, or the pheNIX trial (which was not true) in an attempt to downplay Patient 5's negative results and stop Homology's stock from falling. ¶¶66, 68. These sell-side analysts, including those from well-known investment banks such as Oppenheimer and Baird, accepted Homology's representations and passed along management's assurances about the study and its data to the public. ¶¶6, 66-67, 69.

**November 2020.** For several months after the April 15, 2020 Facebook Post, Defendants echoed McNeely's false assurances about the pheNIX trial, stating in SEC filings that preliminary safety data showed HMI-102 had been "well-tolerated with no treatment-emergent adverse events" with "efficacy data" showing a "dose-response effect" (*i.e.*, data showing HMI-102 was effective). ¶¶70-71. Then, on November 6, 2020, Homology disclosed the pheNIX data from the dose-escalation phase of the trial. ¶72. The data revealed that HMI-102 was not effective for Patient 4 (the remaining mid-dose patient) and Patient 5 in the high-dose cohort, meaning that HMI-102 was less effective than Defendants had previously let on. ¶72. At the same time, however, Defendants concealed material adverse information about HMI-102, namely adverse safety effects and the need to revise the "steroid regimen" that was part of the pheNIX study protocol. ¶¶73, 125-26. Homology told investors the pheNIX data supported progressing to the dose-expansion phase. ¶¶73, 78. Based on Defendants' statements about the pheNIX data and their decision to advance the study, market analysts largely concluded that HMI-102's efficacy and safety profile remained intact. ¶¶74-77.

On November 9, 2020, just three days later, Homology disclosed a $60 million equity investment from Pfizer Inc. ¶79. Homology's announcement of the investment

reiterated its decision to advance the pheNIX trial into the dose-expansion phase based on "the positive clinical data from the dose-escalation phase." ¶79. Defendants continued in this regard for the next several months, promoting themselves and the company based on what it described was "positive clinical data" from the first phase of the pheNIX study and data showing that HMI-102 had been "well-tolerated" and evidenced "clinically meaningful reductions" in phenylalanine levels, all the while saying nothing about the protocol's "steroid regimen" and the risks it posed to the overall study and safety of the pheNIX patients. ¶¶80-82, 160. Defendants initially told the market they would provide data from the study in late-2021 but ultimately extended that timeframe to the back half of 2022. ¶80. In the absence of that data, investors were left with nothing but Defendants' false representations about the pheNIX data, which analysts relied upon when writing about the company. ¶¶83-84. Homology also used this period as an opportunity to raise an additional $50 million in capital through a follow-on offering to the public. ¶80.

**January 2022.** By January 28, 2022, Defendants had still not released any additional pheNIX data to the market. ¶85. Instead, the company announced a massive deal with Oxford Biomedica plc for an investment of $130 million that successfully extended Homology's "operational runway" by two years into the future all the way to the first quarter of 2023. ¶¶9, 85-86.

**February 2022.** The market eventually found out that Defendants had been lying to them. On February 18, 2022, Homology announced that it was shutting down the pheNIX trial immediately pending a "clinical hold" from the FDA in order to address critical safety concerns relating to HMI-102's toxicity and accompanying steroid regimen. ¶¶88-92, 94. Homology subsequently admitted that it knew HMI-102's "steroid regimen" was insufficient due to the fact that it was using an updated course of treatment in another one of the company's clinical trials, but nevertheless concealed the risks that the pheNIX trial's current steroid regimen posed to the development of HMI-102, Homology, and investors generally. ¶¶10, 94-96. The revelation of the "clinical hold" prompted an immediate decline in Homology's stock price of more than 32%. ¶93. In total, between

the start of the Class Period on March 12, 2020 and the ultimate revelation concerning the FDA's clinical hold on February 18, 2022, Homology's stock price declined from $17.91 per share all the way down to $2.60 per share representing a market capitalization loss of over 85% or over $500 million. ¶11.

## ARGUMENT

Plaintiffs "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (internal quotations omitted). Courts must accept as true all well-pled factual allegations, draw all reasonable inferences in plaintiffs' favor, and determine whether the plaintiffs may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead: "(1) a material misrepresentation or omission…; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Defendants challenge the pleading of misrepresentations or omissions (falsity), scienter, and loss causation. These elements are adequately pled, and Defendants' motion should be denied.

## I. THE COMPLAINT PLEADS ACTIONABLE FALSE AND MISLEADING STATEMENTS

A complaint adequately alleges falsity by "specify[ing] each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). A statement is false or misleading if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). As the Ninth Circuit has acknowledged, even if the statement is not literally false, it may still be misleading if it omits material information. "[T]he disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519

F.3d 879, 886 (9th Cir. 2008). The allegations need only "raise a plausible inference" that a statement was misleading. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014).

Defendants' false and misleading statements fall into two distinct categories. The first contains those that occurred prior to November 2020 wherein Defendants misrepresented the Part 1 data from the pheNIX study in light of Patient 4 and Patient 5's negative safety and efficacy results. *See* ¶¶158-59. These are labeled Statements 1 through 9 in the "Appendix" to Defendants' motion (ECF No. 62-1). The second category contains the statements made after November 2020 in which Defendants falsely claimed that the Part 1 data supported advancement into Part 2 and/or that the steroid regimen it was using alongside HMI-102 was safe. *See* ¶160. These statements comprise Statements 10 through 25 in Defendants' "Appendix."[2]

> ### A.    Defendants Misled Investors by Disclosing Only the Positive Data from Part 1 of the pheNIX Study Without Also Disclosing the Negative Data [Statements 1 through 9].

Defendants contend that the Company "had no duty to disclose *all* clinical trial data as it came into existence, or at any time before it reported results from the next data cut . . . ." (MTD at 13[3]). While there is no affirmative duty to disclose any and all material information (*Matrixx*, 563 U.S. at 44-45), the Complaint alleges that Defendants made positive statements regarding clinical trial data while in possession of material adverse information (*i.e.*, negative clinical trial data from Patients 4 and 5) that contradicted those

---

[2] Plaintiffs do not agree with Defendants' presentation of the "statements" in the "Appendix" because it improperly dissects several of the challenged statements. Statements 2 and 3 appeared together in Homology's annual report for 2019 and, therefore, should be read together and not separate from one another. *See Mulligan v. Impax Lab'ys., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). The same goes for Statements 8 and 9, Statements 10 and 11, Statements 12 and 13, Statements 21 and 22, and Statements 23 and 24. Notwithstanding and without waiving any arguments, Plaintiffs use the numbering for the Court's convenience.

[3] Citations to "MTD at __" refer to Defendants' Motion to Dismiss (ECF No. 62).

statements.[4] Rule 10b-5 forbids omissions of material facts necessary in order to make the statements made not misleading. 17 C.F.R. 240.10b-5(b). "[C]ompanies can control what they have to disclose under [the securities laws] . . . by controlling what they say to the market." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). But once Defendants *chose* to tout the study results here, Defendants had the obligation also to disclose the negative clinical trial data that contradicted those statements. *Orexigen*, 899 F.3d at 1010; *Arena Pharm.*, 840 F.3d at 706.[5] As discussed herein, the Complaint sufficiently alleges that Defendants' failure to disclose the negative clinical trial data under these circumstances made their statements false and/or misleading. *See* ¶¶158-59.[6]

Defendants contend that **Statements 1-9** regarding the Phase 1 results are inactionable because the Statements are true. MTD at 10-11. They are wrong. At the time these statements were made, Homology was in possession of Patient 4's data from Cohort 2, *which failed to show an effective dose-response*. *See*, *e.g.*, ¶¶99-102, 105. Homology dosed Patient 4 between December 2 and 17, 2019. ¶99. Thus, Homology had collected between 12 and 14 phenylalanine measurements from Patient 4 by March 12, 2020, the date of the first alleged misleading statement. ¶99. Each of these measurements (except for the very first one, *i.e.*, Week 1) showed elevated or unchanged levels of phenylalanine.

---

[4] The Court should ignore Defendants' factual argument as to what clinical data was "available" to Defendants as of the data cut for the initial results. *See* MTD at 14. This is a question of fact that is inappropriate on a motion to dismiss. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005). Additionally, Defendants' argument directly contradicts the well-pled allegations in the Complaint. *See* ¶¶99, 116, 119, and 122 (alleging that Patient 4's data was "available" to Defendants).

[5] Defendants' reliance on *Emps.' Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *10-11 (D. Md. Sept. 29, 2021) is misplaced as it states nothing to the contrary.

[6] Defendants' reliance on *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012), is also misplaced. *See* MTD at 13-14. While Defendants direct the Court's attention to a footnote in *Rigel* that states that "a company is not required to disclose every safety-related result from a clinical trial, even if the company discloses some safety-related results" (MTD at 13), they omit the first part of the sentence – "*as long as the omissions do not make the actual statements misleading . . . .*" 697 F.3d at 880 n.8.

¶¶100-28. Moreover, Patient 4 suffered from a "Grade 3 ALT elevation" which indicated increased liver toxicity as a result of the drug. ¶73. By discussing only the favorable data from Cohort 2 (Patient 3) while omitting the negative data, Homology misled investors as to HMI-102's efficacy and safety and, in particular, the Cohort 2 data from the pheNIX study. ¶¶99-102, 105. **Statements 5-9**, in particular, are even more misleading because Defendants had Patient 5's data *in addition to Patient 4's data*. Thus, when Defendants referred to the pheNIX data positively and without exception, they created the false impression that the materially negative data from Patients 4 and 5 did not exist and/or did not contradict the pheNIX study data from Cohorts 1 and 2. ¶¶112, 115, 119, 122.

Contrary to Defendant McNeely's statement to an Oppenheimer analyst on April 16, 2020, that "[n]othing fundamental changed for FIXX" (**Statement 4**), the "fundamental[s]" for the Company, the pheNIX study, and HMI-102 had in fact "changed" materially by the time of this statement. ¶107. The overwhelming majority of the efficacy data from the pheNIX study prior to the time of **Statement 4** had been negative. The Cohort 1 data did not demonstrate an effective dose response and the data from Cohort 2 was questionable given that Patient 3's phenylalanine levels were low to begin with and it appeared to some analysts that Homology had withheld Patient 4's results intentionally to conceal negative data. ¶¶57, 107. Patient 5 in Cohort 3 was the first patient to receive a high-dose of HMI-102 and, contrary to Defendants' statements, the data showed that HMI-102 was both not effective and dangerous. ¶¶62, 107. Specifically, the high-dose of HMI-102 did not lower Patient 5's phenylalanine levels and, therefore, did not demonstrate an efficacious response. As stated in her April 15, 2020 Facebook Post, Patient 5's phenylalanine levels had "been keeping steady," her liver enzymes "came back high" and she was experiencing severe liver toxicity. ¶62. Patient 5 proceeded to receive increased steroids, including Decadron which is a stronger steroid than what Patient 5 was initially prescribed under the pheNIX protocol. ¶62. Thus, contrary to McNeely's statement to the Oppenheimer analyst, the pheNIX data from Patient 5 within Cohort 3 had amounted to a "fundamental change[]" insofar as the study results were now substantially less supportive

of HMI-102's clinical benefit as compared to the data before Patient 5's results were received. ¶108. *See Orexigen*, 899 F.3d at 1010 (by concealing negative information, "25 percent interim results appeared more promising than Orexigen allegedly knew they were"); *Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at *14 (D. Colo. Nov. 24, 2020) ("Defendants may not have made affirmative misrepresentations in connection with the two statements identified above does not excuse the alleged material omissions made about the negative study data that is at issue in this case"); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-33 (S.D.N.Y. 2014) (denying motion to dismiss where defendants misled investors by providing data from "Drug Group" while omitting negative data from "Control Group").

Defendants raise a specific argument with regard to **Statement 5**, claiming that a statement by an analyst who published a report *referencing conversations with management* is not actionable because Plaintiffs have not specified the particular statement made by anyone at Homology to that analyst nor provided any rationale as to why the statement was misleading. MTD at 18. They are wrong. In the Ninth Circuit, statements in analyst reports may be actionable when they clearly originated from defendants and do not represent analyst's projection, interpretation or impression, *even if not exact quotations*. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). Here, the Complaint explains (¶¶109-112) that the statement concerning HMI-102's "risk/reward dynamic" was false and/or materially misleading. The "risk/reward dynamic" referred to whether the pheNIX trial data had thus far demonstrated HMI-102's ability to provide a clinical benefit to patients, meaning that its efficacy outweighed its risks. The Complaint alleges that *Defendants represented to Baird who, in turn, represented to the public, that the trial data collected to date supported HMI-102's clinical benefit*. ¶¶66-69, 111.[7]

---

[7] Most of the cases cited by Defendants pre-date *Oracle* and Defendants' reliance on *Skechers* is particularly misplaced because the court, in a later decision in that case, explained, "[u]nlike the statements at issue in *Oracle, which were based on statements*

**B.    The Data from Part 1 of the pheNIX Trial Showed that HMI-102's Steroid Regimen Was Unsafe and Not Supportive of Advancing the Trial to Part 2 [Statements 10-25].**

Where a drug company misleads the market as to the true risks concerning its operations, liability will follow. *See*, *e.g.*, *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *10-11 (S.D. Cal. Sept. 27, 2022) ("a failure to disclose that the studies were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading"); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 801-02, 819 (C.D. Cal. 2011) (finding liability where, as here, defendants publicly stated they would use a particular regulatory approach that would help with approval but omitted that the regulatory approach substantially increased risk of rejection); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1221, 1230 (N.D. Cal. 2009) (plaintiffs "need not allege that defendants knew SONOMA-2 would fail; [plaintiffs] need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA-2 would fail").

Similar to the defendants in the above-cited cases, Defendants misled the market by concealing known risks concerning the pheNIX data and the study protocol concerning the "steroid regimen" it intended to administer. While Defendants contend that **Statements 10-25** are true and not actionable (MTD at 10, 12), they misled investors by disclosing that the toxicity suffered by the patients in Cohorts 2 and 3 were treated with "increased steroids when necessary" while concealing that the "steroid regimen" being using was insufficient for patient safety, as evidenced by Patient 5's need for increased levels and types of steroids, Homology's use of a different "steroid regimen" in its other trials" and Homology's revision of the "steroid regimen" to match the one used in its other

---

*made during an interview*, the analysts ["*optimistic projections*" in *Skechers*] . . . were based on Defendants' [forward-looking] statements contained in the press releases and made during the conference calls" and were protected by the PSLRA's safe harbor. *In re Skechers U.S.A. Sec. Litig.*, 2005 WL 8168047, at *7 (C.D. Cal. Mar. 21, 2005).

trials following the FDA's "clinical hold." ¶¶125-26, 129, 132, 135, 139, 142, 145, 148, 151, 154, 157. Thus, Defendants created the false impression that the pheNIX data collected to date was supportive of advancing into the dose-expansion phase and/or that Homology was in fact ready to commence the dose-expansion phase of the pheNIX study when, in reality, it was not because the "steroid regimen" in the protocol was known to be insufficient and dangerous. ¶¶64, 160.

Notably, in **Statement 17**, Defendants indicated that Homology had actually seen success with the modified steroid regimen, which was not the case. However, Defendants concealed that their "steroid regimen" was inadequate, and their modified approach of increasing steroids posed severe safety risks for patients and reduced the clinical benefit of HMI-102 and the prospects of being able to use the trial to support a new drug application. ¶139. With respect to **Statement 18**, Defendants disclosed the need to "beef up" their "steroid regimen" but concealed that the initial prophylactic steroid regimen, at potentially the most efficacious dose, had failed and/or was continuing to result in elevated toxicity levels. Defendants created the false impression in the market that Homology sufficiently changed its "steroid regimen" to account for problems encountered in the study. ¶142. Similarly, **Statement 22** disclosed a successful utilization of the prophylactic steroid regimen but concealed the truth of the insufficiency of that steroid regimen, its need for modification (similar to what was already in place for the pheEDIT trial), and the safety issues that had materialized during the study to date. ¶151. Defendants also include a three-sentence argument that **Statements 11, 13, 16, 20, 22, and 24-25**, which "reported on the progression to the dose-expansion phase," are inactionable because they are true. MTD at 12-13. These statements claimed that Homology had seen success with the modified "steroid regimen" when, in reality, it was still insufficient because it posed significant safety risks to the pheNIX study's patients. ¶¶139, 148, 151, 154.

Plaintiffs allege that **Statements 14-15, 19 and 23** are misleading, but not because Homology should have predicted the FDA's clinical hold, as Defendants contend (MTD at 15-16). Instead, Defendants disclosed that the two doses selected for the Part 2 dose

expansion portion of the study were based on the safety and efficacy results observed in Part 1 of the study but concealed that such data did not support their progression into Part 2 of the study. Defendants also disclosed that both doses in Part 2 of the study were well-tolerated and demonstrated meaningful reductions in phenylalanine levels but concealed the fact that HMI-102 was barely efficacious, Homology's initial "steroid regimen" was insufficient, and Homology knew that the pheNIX study "steroid regimen" would need to be modified given the insufficiencies and dangers exhibited to date (as evidenced by the "steroid regimen" already in use for the pheEDIT trial). *See*, *e.g.*, ¶¶132, 135, 145, 154. As a result, Defendants perpetuated the false perception that the Part 1 pheNIX data was positive and supportive of advancing into the Part 2 dose-expansion phase and/or that Homology was, in fact, ready to commence the dose-expansion phase of the pheNIX study. Furthermore, based on the negative study data, Defendants overstated HMI-102's clinical benefit and future prospects by misrepresenting that there was a potential for the pheNIX study to be converted into a registrational trial. *See* ¶¶132, 135, 145.[8]

**C. Plaintiffs' Analyst Reports Disprove Defendants' Argument that Their Statements Were Immaterial Opinions or Puffery. [Statements 1, 3, 6-9, 11, 13, 20-21 and 24-25]**

Defendants contend that **Statements 11, 13 and 25** are opinion statements but admit (as they must) that there can be liability for opinions in certain instances. MTD at 17. For

---

[8] Although the negative efficacy data that Homology had previously concealed was disclosed by this time, the adverse safety data for Patient 5, and in particular, the need to modify its prespecified steroid regimen *to include a different and stronger steroid* (¶64), continued to be concealed. In pertinent part, Homology merely disclosed that Patient 5 exhibited Grade 3 ALTs which were managed with "increased steroids." ¶¶72-73.

Defendants also contend that Plaintiffs' concealed risk theory ignores that Homology repeatedly disclosed that "undesirable side effects … could cause us or regulatory authorities to interrupt, delay or halt clinical trials." MTD at 16. But the language referred to speaks entirely of as-yet-unrealized risks and nothing alerts the market that undesirable side effects *may already have come to fruition*. *Berson*, 527 F.3d at 986; *Orexigen*, 899 F.3d at 1010 (warning "investors that the data might change is different from saying the data already has a high degree of uncertainty and is likely to change.").

example, if the speaker omitted material facts about the basis for the opinion, thereby rendering the opinion misleading to a reasonable person, there can be liability. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). And many courts have found that positive opinion statements regarding study results are actionable where there has been a material omission. *See*, *e.g.*, *Acadia Pharm.*, 2022 WL 4491093, at *10. As explained below, that is exactly what happened here.

The statements identified in **Statement 25** were materially misleading because Defendants disclosed that Homology's vector was safe, given the FDA's heightened regulation of AAV gene therapy, yet concealed the dangers and risks that materialized during the pheNIX study. At the time these statements were made, just three weeks prior to the FDA's clinical hold on the study, Defendants were in possession of the very data that the FDA considered in its determination to halt the study. Defendants knew that the pheNIX study data revealed serious risks and dangers, which could necessitate a clinical hold. Rather than disclosing the true risks associated with the pheNIX study, Defendants touted their FDA clearance as a demonstration of safety and quality while simultaneously concealing the negative study data that would prompt the FDA to place a clinical hold on the study. Consequently, these statements maintained the misleading perception Defendants created in the market as to the safety, efficacy, and risks that were present in the pheNIX study until the truth was fully revealed on February 18, 2022, *i.e.*, the day Homology announced the FDA's clinical hold. ¶157.

**Statements 11 and 13** (which were alleged, and should be read, together with **Statements 10 and 12** in ¶¶124 and 128 of the Complaint, respectively) are actionable. Defendants disclosed that the toxicity suffered by the patients in Cohorts 2 and 3 were treated with "increased steroids when necessary," but concealed that the steroid regimen that Homology had been using was insufficient for patient safety, as evidenced by Patient 5's need for increased levels and types of steroids following her high-dose of HMI-102.

Thus, Defendants created the misleading impression that the pheNIX data collected to date was supportive of advancing into the dose-expansion phase and/or that Homology was in fact ready to commence the dose-expansion phase of the pheNIX study. ¶¶125-26, 129.

Defendants also pluck certain parts of statements out of their context and contend, without any analysis, that the words used, taken per se, are sufficiently vague so as to constitute inactionable corporate optimism. *See* MTD at 17 (regarding **Statements 1, 3, 6-9, 20-21, 24-25**). But whether a statement amounts to puffery is really a question of materiality, and only if the materiality of the statement is so obvious that reasonable minds could not differ is the issue appropriately resolved as a matter of law. *See Orexigen*, 899 F.3d at 1014. Additionally, even general statements of optimism, when taken in context, may be deemed actionable in certain circumstances. *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). "What might be innocuous 'puffery' … standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." For this reason, courts "examine the entire statement and its circumstances to determine if it is actionable." *In re FibroGen, Inc., Sec. Litig.*, 2022 WL 2793032, at *10 (N.D. Cal. July 15, 2022); *see Oh v. Hanmi Fin. Corp.*, 2022 WL 3405975, at *7 (C.D. Cal. Aug. 15, 2022) (Aenlle-Rocha, J.) (finding "Defendants selectively quote[d]" from complaint, "omitting the objectively verifiable portions of" alleged false statements). "The defining question is … whether the statement is so exaggerated or vague that no reasonable investor would rely on it when considering the total mix of available information." *Merkamerica Inc. v. Glover*, 2019 WL 8989833, at *19 (C.D. Cal. Dec. 3, 2019).

Here, Defendants' statements were in the context of discussing the pheNIX clinical trial results and the safety profile of HMI-102. *See* **Statements 1, 3, 6-9, 20-21, 24-25**. For example, **Statement 8** states: "Preliminary safety data from three subjects in Cohorts 1 and 2 showed HMI-102 was *well-tolerated* with no treatment-emergent adverse events or TEAEs, or serious TEAEs, that were related to HM1-102." Similarly, immediately after describing that the drug was "*well-tolerated*" in **Statement 3**, the statement goes on to say

"[t]here were no TEAEs or serious TEAEs. All patients' … ALT, and … AST, levels remained in normal range."[9] Additionally, **Statement 7** states that "[s]ince the Company's initial trial data … Homology continued to observe *encouraging* clinical data that suggest PAH enzymatic activity."[10] *See also* **Statements 6, 8-9, 20-21, 24-25**. The Complaint "is replete with such objective statements" which are actionable. *FibroGen*, 2022 WL 2793032, at *10 (finding statements regarding drug, in the context of discussing safety analyses of existing data, were not puffery). This conclusion if further supported (if not outright proved) by the fact that market analysts relied on these statements when valuing Homology and assessing HMI-102's risks. *See*, *e.g.*, ¶56 (BTIG noting that "initial results" were "supportive of HMI-102's potential"), ¶¶74-75 (RBC and Oppenheimer relying on Defendants' statements concerning support for Part 2 of study), ¶¶83-84 (Oppenheimer and Chardan repeating Defendants' "well-tolerated" statements).

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In its analysis, the Court must determine whether the facts collectively give rise to a strong inference of scienter, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 324; *see also S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "Supreme Court precedent permits a series of less precise allegations to be read together to meet the PSLRA requirement. Even vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter. Therefore, a set of allegations may create an inference of scienter greater than the sum of its parts." *Axonic Cap. LLC v. Gateway One Lending & Fin.*, 2019 WL 4138024, at *10 (C.D. Cal. May 22, 2019) (internal citations and quotations omitted).

In the Ninth Circuit, the "required state of mind" is satisfied by allegations of

---

[9] Statements 1, 3, 6, 8, 20, 24 are similar.

[10] Statements 7 and 9 are similar.

"deliberate recklessness." *Arena Pharm.*, 840 F.3d at 705.  Moreover "[s]cienter can be established by direct or circumstantial evidence." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). There are many ways to plead scienter. "[A]llegations of recklessness have been sufficient where defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *N.M. State Inv. Council v. Ernst & Young LLP,* 641 F.3d 1089, 1098 (9th Cir. 2011). Courts may "impute scienter to individual defendants… where . . . a company's public statements [are] so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014). Allegations of motive and opportunity can also contribute to a strong inference of scienter. *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*15 (C.D. Cal. June 9, 2016).

### A.     The Complaint Pleads Defendants' Scienter

Here, "[w]hen viewed in totality, there is no doubt the allegations … present at least as strong an inference of scienter as any competing innocent inference." *N.M. State Inv. Council*, 641 F.3d at 1102-1103. The Complaint, construed in the light most favorable to Plaintiffs, includes a panoply of scienter allegations collectively giving rise to a strong inference of scienter.[11]

Defendants had in their possession at all relevant times during the Class Period the material, adverse information concerning Patient 4's and Patient 5's pheNIX trial data. The pheNIX trial was an "open-label" study, meaning that both the researchers and participants were aware of the treatment being administered. Further, based on the trial protocol for the pheNIX study, Homology received phenylalanine measurements as they were taken in order to monitor HMI-102's efficacy and safety. As a result of Homology's possession of the trial data, Defendants knew at all relevant times that Patient 4 had failed

---

[11] Although Defendants focus on the purported lack of insider trading, such allegations are not necessary to plead scienter. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

to show a dose-response while also suffering from dangerous liver toxicity. Similarly, Defendants also knew that Patient 5 received the first high-dose of HMI-102 as part of Cohort 3 in the pheNIX trial, that HMI-102 did not result in a dose-response for Patient 5 or otherwise lower Patient 5's phenylalanine levels to meet the primary endpoint for the study, and that HMI-102 produced a dangerous rise in Patient 5's liver toxicity levels. ¶¶162-63. Defendants' knowledge of Patient 4's pheNIX trial data is evidenced by the fact that Homology dosed Patient 4 between December 2 and 17, 2019, *i.e.*, between the data cut-off deadline and the data presentation. Patient 4's phenylalanine measurements, according to Homology's November 2020 data presentation, show that each of Patient 4's measurements (except for Week 1) demonstrated an elevated or unchanged phenylalanine measurement. Similarly, Defendants' knowledge of Patient 5's pheNIX trial data is evidenced by the fact that McNeely was aware of the April 15, 2020 Facebook Post in which Patient 5 described her response to HMI-102 and recounted her conversations with clinicians at Homology's investigation site. McNeely's email dated April 16, 2020 to the Oppenheimer analyst made explicit reference to Patient 5's April 15, 2020 Facebook Post, thereby demonstrating her possession of, and familiarity with, the information contained within it. ¶¶164-65. While in possession of the information contained within Patient 5's Facebook post, McNeely and other Defendants made contradictory public statements to analysts and investors through emails, SEC filings, press releases, and conference calls that created the false and/or materially misleading impression that the pheNIX study data demonstrated a clinical benefit for HMI-102, efficacious results, a positive safety profile, and support for advancing the pheNIX trial to the dose-expansion phase which, in turn, could be converted into a registrational trial with the FDA. ¶166. The fact that Defendants made these false and/or materially misleading statements while in possession of the material, adverse information concerning Patient 5's response to HMI-102, gives rise to a strong, cogent and compelling inference of scienter. ¶167.

Additionally, Defendants made false and/or materially misleading statements about the dose-expansion phase of the pheNIX trial while knowing that the modifications

Homology had made to the steroid regimen for the dose-expansion phase were insufficient in terms of preventing adverse safety events. Defendants modified the steroid regimen initially after completing the dose-escalation phase of the trial by incorporating the use of rescue steroids, *i.e.*, longer post-infusion immunosuppression treatment. However, this was not sufficient to protect patients from dangerous toxicity outcomes. Defendants knew this, as evidenced by Tzianabos' statement during the June 15, 2021 conference call admitting that "we need to beef up a little bit at the front end, the prophylactic steroid regimen." ¶169. When the FDA implemented a clinical hold over the pheNIX trial in February 2022, Defendants ultimately responded by adding an immunosuppressive course of steroids involving the use of a T-cell inhibitor. This was the steroid regimen that Homology had previously incorporated into the trial protocol for pheEDIT, which was approved by the FDA in October 2021. It was also the steroid regimen used by industry peers, such as Rocket Pharmaceuticals and Freeline Therapeutics. ¶170. Defendants knew that the steroid regimen being used in the pheNIX trial was different and less effective than the one approved for the pheEDIT trial yet concealed the risks that it posed to investors in terms of worsening regulatory headwinds. Their conduct in this regard gives rise to a strong inference of scienter concerning the false and/or materially misleading statements they made about the dose-expansion phase of the pheNIX study. ¶173.

Defendants' scienter is further evidenced by their attempt to conceal the information contained in Patient 5's Facebook post. Within a few hours of Patient 5 posting her April 15, 2020 Facebook Post, the post was either taken down or made private so that the public could not view it. Patient 5 had previously been public and completely transparent with her posts and details about treatment. The removal of the April 15, 2020 Facebook Post marked an abrupt change in conduct, which was likely the result of explicit directives from Homology and/or its agents and employees. Once the post was removed from public view, McNeely and others at Homology (including the named John Does) proceeded to materially downplay the adverse information shared by Patient 5 in private conversations with sell-side analysts. McNeely, in particular, concealed the material adverse information

that had previously been shared by Patient 5 by telling analysts at Oppenheimer and Baird that, for example, there had been no "fundamental change[]" for Homology and the pheNIX data even though McNeely knew this was untrue. The effort to conceal, cover-up, and downplay the material, adverse information about the pheNIX study data and HMI-102 demonstrates intent on the part of Defendants and, therefore, strengthens the alleged inference of scienter. ¶¶174-76.

Defendants' scienter is further evidenced by the core operations doctrine which is a relevant factor when considering scienter. *See Zhou v. Faraday Future Intell. Elec., Inc.*, 2022 WL 13800633, at 10 (C.D. Cal. Oct. 20, 2022). Defendants cannot credibly dispute knowledge of the materially adverse, non-public information that contradicted their public statements about HMI-102 and the pheNIX study due to the fact that HMI-102 was Homology's lead drug candidate and the pheNIX study was integral to its plan to commercialize the drug, *i.e.*, convert the pheNIX study into a registrational trial for FDA application purposes. Indeed, analysts routinely focused on HMI-102 as the main driver behind Homology's value. ¶¶186-88.

Although "motive is not required to adequately plead scienter," it adds to the allegations. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013). Here, Defendants raised millions of dollars while in possession of materially adverse, non-public information that contradicted the public statements they were making to investors. Homology first negotiated a deal with Pfizer for $60 million in January 2021. It then conducted a follow-on offering selling stock to the public for net proceeds of $49.7 million. Then, at the very end of the Class Period, Homology closed a deal with Oxford Biomedica for $130 million that extended its cash runway into the future for an additional two years. Homology's deal with Oxford Biomedica bolsters an inference of scienter on the part of Defendants. At that point, Defendants had recently delayed the announcement of the pheNIX data from the dose-expansion phase of the trial. Although investors were unaware of it at the time, Defendants knew internally that the trial was at risk due to the dangerous steroid regimen that it had been prescribing patients. Instead of changing the

protocol voluntarily, Defendants concealed the truth about the steroid regimen long enough to close the deal with Oxford Biomedica and ensure that it would have enough cash to further its drug candidate pipeline without having to access the capital markets under adverse conditions. Defendants' deception during this period demonstrates intent on their part and, in turn, scienter in connection with the false and/or materially misleading statements they made during the Class Period. ¶¶177-85.

### B. The Complaint Adequately Pleads Corporate Scienter

Homology's public statements about HMI-102 and the pheNIX trial were critical to its reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Homology's corporate officials knew of the falsity of the statements at the time of publication. The Individual Defendants (including any John Does) were acting within their normal scopes of employment when making the fraudulent statements described above. Consequently, their scienter is imputed to Homology under the doctrine of *respondeat superior* and common law principles of agency. *See*, *e.g.*, *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 479 (9th Cir. 2015).

### III. THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

In *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), the Ninth Circuit held that the loss causation inquiry "requires no more than the familiar test for proximate cause." The Court explained that "[b]ecause loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 753. Additionally, the Ninth Circuit also recently held that "Rule 9(b)'s particularity requirement usually adds little to the plaintiff's burden" to plead loss causation because "even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020), *cert. denied sub nom. BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021). That "should not prove burdensome." *Id.*

Plaintiffs easily meet this standard. As explained herein, the Complaint alleges five corrective disclosures that support loss causation. *See* ¶¶194-214. *First*, Patient 5's April 15, 2020 Facebook Post disclosed the results of her phenylalanine measurements as well as the fact that her liver toxicity had reached dangerous and severe levels. ¶194. The information contained in the post signaled to investors and analysts that Homology's prior representations about the pheNIX study and HMI-102's efficacy and safety were potentially not entirely accurate. *Id.* Patient 5's Facebook post prompted an immediate decline in Homology's stock price as investors evaluated the truthfulness of Defendants' previous statements. Between April 14, 2020 and April 15, 2020, Homology's stock price declined from $19.34 per share to $13.97 per share on unusually heavy volume. This decline in the price of Homology's stock represented dissipation of the artificial inflation in the stock price that had been created and/or maintained by Defendants' fraudulent statements. ¶195.

*Second*, on August 10, 2020, after market hours, Homology reported its 2Q20 financial results and provided investors with a business update. Absent from Homology's quarterly report or accompanying press release was any further disclosure about the pheNIX trial data, including Patient 4 from Cohort 2 that had missed the previous data cutoff deadline and Patient 5 from Cohort 3 that had been dosed earlier in the year. The absence of any further information concerning the pheNIX data created uncertainty and concern among investors that Homology was hiding negative data the public, as confirmed by analysts from Oppenheimer who "acknowledge[d] some investors may interpret the delay as an indication of a safety signal in the high dose cohort or weak durability from the mid-dose cohort." ¶197. Homology's disclosures on August 10, 2020, prompted an immediate decline in the price of its stock, as investors began to question the pheNIX data and, in particular, whether the data was as positive as Defendants represented. Between August 10, 2020 and August 11, 2020, Homology's stock price declined from $12.64 per share to $11.09 per share on unusually heavy volume. The Company's delay in disclosing further information about the pheNIX trial data, including Patients 4 and 5, supports loss

causation. ¶¶196-98; *see Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140 (D. Conn. 2021) (finding alleged delayed 10-Q filing supported loss causation).[12]

*Third*, on November 6, 2020, Homology presented data from the pheNIX trial at the NECMP annual meeting. While Homology stated that HMI-102's adverse event profile, safety data, and efficacy data "support[ed] advancing to the expansion phase of the trial," it also revealed that HMI-102 was less effective and more dangerous than previously represented. Thus, Homology's presentation on November 6, 2020, constituted a partial corrective disclosure insofar as it partially corrected the false and/or materially misleading statements disseminated to the market prior to that point about the pheNIX data for the patients from Cohorts 2 and 3.[13] The market perceived the information negatively, as evidenced by analysts who noted that "investors may have been spooked by treatment-induced liver toxicities that appeared to abrogate HMI-102's effect in two of four patients" and that Homology left questions "unanswered" concerning HMI-102's steroid regimen. ¶¶200-01. In response to Homology's November 6, 2020 presentation and the curative information it contained, investors reacted accordingly by selling their Homology stock. Between November 5 and 6, 2020, Homology's stock fell from $12 per share to $9.50 per share, a decline of $2.50 per share or 20.8%, on unusually heavy volume. ¶¶199-202.

*Fourth*, on April 6, 2021, after market hours, additional corrective information came to light about Homology and its ability to advance the pheNIX study towards a registrational trial when it announced a follow-on $50 million offering. Homology intended to use the net proceeds from the offering to advance the development of HMI-102 and its pheNIX trial. ¶204. The announcement of the offering came just over three

---

[12] Defendants rely on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008), but *Metzler* does not address whether a delayed disclosure can support loss causation allegations. Moreover, *First Solar*, decided after *Metzler*, adopted a broader approach to loss causation.

[13] This case is distinguishable from *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) in which the court affirmed that loss causation was not properly pled because the disclosure regarding the *integration of study results from two different studies* did not correct or revise previous patient data from one study.

weeks after Homology's annual report which stated that although expenses were expected to increase in "future years in connection with . . . advanc[ing] our Phase 1/2 pheNIX clinical trial with HMI-102," Homology's "existing cash and cash equivalents will enable us to fund our current projected operating expenses and capital expenditure requirements into the third quarter of 2022." Thus, Homology's need to raise cash for the pheNIX trial so shortly after the statements in the annual report signaled to investors and the market in general that Homology faced significant yet undisclosed obstacles in terms of advancing of HMI-102 through the pheNIX trial. ¶205. Investors reacted negatively to the announcement and sold their shares under the belief that material, adverse information existed with respect to the pheNIX study and HMI-102, resulting in a stock price decline of 22.7% in the span of just one day. ¶¶205-07. *See Schechter v. Smith*, 2011 WL 13174954, at *24 (C.D. Cal. Dec. 6, 2011) (finding plaintiff adequately pled loss causation with respect to exchange offer announcement).[14]

*Fifth*, on February 18, 2022, after market close, Homology issued a press release disclosing that the FDA placed a clinical hold on the pheNIX trial "due to the need to modify risk mitigation measures in the study in response to observations of elevated liver functions tests." ¶88. This information starkly contrasted Defendants' previous statements that touted a "well-tolerated" lead drug candidate with "positive" and "encouraging" safety and efficacy data and revealed the very information that Defendants were concealing from investors, which was the risks and dangers of HMI-102, the need to modify its steroid regimen, and its inability to advance the pheNIX trial and commercialize HMI-102. ¶208. Analyst reports confirmed this point, concluding that Homology's disclosure operated as a correction to Defendants' previous false and/or materially misleading statements. ¶¶209-10. As the market promptly digested the gravity of this

---

[14] In *In re Obalon Therapeutics, Inc. Sec. Litig.*, 2019 WL 4729461, at *10 (S.D. Cal. Sept. 25, 2019), cited by Defendants (MTD at 25), the court stated that allegations of an offering announcement taken together with additional announcements and the immediate drop in stock price following each announcement, are enough to show corrective disclosures. Here, Plaintiffs allege far more than an offering announcement.

disclosure, it resulted in an immediate, dramatic decline in Homology's stock price. Between February 18, 2022 and February 22, 2022 (the next trading day), Homology's stock price plunged from $3.86 per share to $2.60 per share on unusually heavy volume, representing a decline of $1.26 per share or 32.64%. ¶¶208-11.[15]

## IV.    THE COMPLAINT STATES A SECTION 20(a) CLAIM

By alleging a primary violation of Section 10(b) and Defendants' control over Homology (¶33), Plaintiffs also allege a control person claim. *See Orexigen*, 899 F.3d at 1018. Because Defendants incorrectly assume that Plaintiffs have not pled a predicate violation (MTD at 1), their motion to dismiss the Section 20(a) claim necessarily fails.

### CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied in its entirety.  In the alternative, Plaintiffs request any dismissal be without prejudice, so that Plaintiffs may seek leave to amend to cure any deficiencies. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated:  December 13, 2022                    Respectfully submitted,

                                            POMERANTZ LLP

                                            By: */s/ Brenda Szydlo*
                                            Brenda Szydlo (admitted *pro hac vice*)
                                            Dean Ferrogari (admitted *pro hac vice*)
                                            600 Third Avenue, 20th Floor
                                            New York, NY 10016
                                            Tel.: (212) 661-1100

---

[15] Defendants argue that this announcement cannot establish loss causation because the clinical hold "was a materialization of a risk Homology specifically warned of" (MTD at 25). Defendants miss the point. They knew that the steroid regimen for the dose-expansion phase was insufficient, as evidenced by, *inter alia,* Homology's use of an updated course of treatment in another one of the company's clinical trials, but nevertheless concealed the risks that it posed to the pheNIX trial and the development of HMI-102. ¶10. The Complaint adequately alleges that Defendants' false and misleading statements concealed a risk that materialized.

Facsimile: (917) 463-1044
bszydlo@pomlaw.com
dferrogari@pomlaw.com

Pomerantz LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel.: (310) 405-7190
jpafiti@pomlaw.com

LEVI & KORSINSKY, LLP
Adam M. Apton (SBN 316506)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290
Facsimile: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Plaintiffs and
Co-Lead Counsel for the Class*

PORTNOY LAW FIRM
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Tel.: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Jason Rofeh*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties who have appeared by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

Executed on this 13 day of December, 2022.

/s/ Brenda Szydlo
Brenda Szydlo