**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL C. PIZZUTO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HOMOLOGY MEDICINES, INC., ARTHUR O. TZIANABOS, W. BRADFORD SMITH, ALBERT SEYMOUR, THERESA MCNEELY, and JOHN DOES 1-10, <br><br> Defendants. | Civil Action No.: 1:23-cv-10858-AK <br><br> **Leave to File 25-Page Memo Granted on 5/9/2023** |

**DEFENDANTS HOMOLOGY MEDICINES, INC., ARTHUR O. TZIANABOS, W. BRADFORD SMITH, ALBERT SEYMOUR, AND THERESA MCNEELY'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 3

        A.      Homology's Mission Is to Cure Disease and Transform Lives ............................ 3

        B.      Clinical Trials for AAV Gene Therapies Are Increasing in Number ................... 4

        C.      Homology Launches the pheNIX Trial ................................................................ 5

                1.      Homology Discloses Results From an Initial Data Cut ............................ 6

                2.      Plaintiffs Allege That Patient 5 Shared Her Treatment Data .................... 6

                3.      Homology Announces Phase 1 Results Based on a New
                        Data Cut and Progression to Phase 2 ........................................................ 7

                4.      Risks Associated With the pheNIX Trial Were Fully
                        Disclosed .................................................................................................. 8

        D.      The FDA Temporarily Places the pheNIX Trial on Clinical Hold,
                Then Lifts the Hold Within Three Months ........................................................... 9

III.    LEGAL STANDARD ......................................................................................... 9

IV.     ARGUMENT ..................................................................................................... 10

        A.      Plaintiffs Have Not Pled a False or Misleading Statement ................................ 10

                1.      Homology's Statements Were True .......................................................... 10

                2.      Plaintiffs Have Not Pled Any Actionable Omission ............................... 14

                        a.      Homology Had No Duty to Disclose Every Piece of
                                Patient Data in Real Time ............................................................. 14

                        b.      Homology Had No Duty to Predict FDA Actions ........................ 15

                3.      The Challenged Statements of Corporate Optimism,
                        Opinion Statements, and Statements Made to Analysts Are
                        Not Actionable ........................................................................................ 18

        B.      Plaintiffs Have Not Pled a Strong Inference of Scienter ................................... 19

                1.      Plaintiffs Fail to Establish That Defendants Acted With an
                        Intent to Deceive or a High Degree of Recklessness ............................... 20

                2.      Generic Allegations of Motive and Knowledge Are
                        Insufficient to Plead Scienter .................................................................. 22

                3.      The Non-Fraudulent Inference Is More Compelling ............................... 23

C.     Plaintiffs Have Not Pled Facts Establishing Loss Causation.............................. 24

V.     CONCLUSION.......................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
 512 F.3d 46 (1st Cir. 2008)......................................................................................9, 20, 22

*In re Ariad Pharms., Inc. Sec. Litig.*,
 842 F.3d 744 (1st Cir. 2016).........................................................................................20, 21

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
 2017 WL 5635422 (C.D. Cal. Dec. 21, 2017) ......................................................................24

*Berlinger v. Bienaime*,
 2023 WL 322899 (N.D. Cal. Jan. 19, 2023) ........................................................................17

*In re Biogen IDEC, Inc. Sec. Litig.*,
 2007 WL 9602250 (D. Mass. Oct. 25, 2007)........................................................................15

*In re Biogen Inc. Sec. Litig.*,
 193 F. Supp. 3d 5 (D. Mass. 2016) .....................................................................................23

*In re Biogen Inc. Sec. Litig.*,
 857 F.3d 34 (1st Cir. 2017)................................................................................................21

*In re Boston Sci. Corp. Sec. Litig.*,
 2022 WL 17823837 (D. Mass. Dec. 20, 2022).....................................................................22

*In re Boston Sci. Corp. Sec. Litig.*,
 686 F.3d 21 (1st Cir. 2012)......................................................................................9, 10, 14

*Brennan v. Zafgen, Inc.*,
 199 F. Supp. 3d 444 (D. Mass. 2016), *aff'd*, 853 F.3d 606
 (1st Cir. 2017) ...........................................................................................................16, 23

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
 752 F.3d 82 (1st Cir. 2014)................................................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
 632 F.3d 751 (1st Cir. 2011)..............................................................................................19

*City of Edinburgh Council v. Pfizer, Inc.*,
 754 F.3d 159 (3d Cir. 2014)...............................................................................................12

*Corban v. Sarepta Therapeutics, Inc.*,
 2015 WL 1505693 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir.
 2017) ..................................................................................................................... *passim*

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ..................................................................................24, 25

*Crihfield v. CytRx Corp.*,
    2017 WL 2819834 (C.D. Cal. June 14, 2017) ...........................................................................17

*Emps.' Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*,
    2021 WL 4459218 (D. Md. Sept. 29, 2021) ..............................................................................15

*Fire & Police Pension Ass'n of Colo. v. Simon*,
    778 F.3d 228 (1st Cir. 2015)........................................................................................10, 21, 22

*Ganem v. InVivo Therapeutics Holdings Corp.*,
    845 F.3d 447 (1st Cir. 2017)........................................................................................10, 13, 16

*In re Genzyme Corp.*,
    2012 WL 1076124 (D. Mass. Mar. 30, 2012)......................................................................16, 24

*Harrington v. Tetraphase Pharms. Inc*,
    2017 WL 1946305 (D. Mass. May 9, 2017)........................................................................18, 19

*Kader v. Sarepta Therapeutics, Inc.*,
    2016 WL 1337256 (D. Mass. Apr. 5, 2016)........................................................................13, 16

*Karth v. Keryx Biopharmaceuticals, Inc.*,
    6 F.4th 123 (1st Cir. 2021)......................................................................................................16

*In re Karyopharm Therapeutics Inc. Sec. Litig.*,
    552 F. Supp. 3d 77 (D. Mass. 2021) .......................................................................................22

*Lake v. Zogenix, Inc.*,
    2020 WL 3820424 (N.D. Cal. Jan. 27, 2020).........................................................................16

*Leavitt v. Alnylam Pharms., Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020) ...............................................................................19, 24

*Leung v. bluebird bio, Inc.*,
    599 F. Supp. 3d 49, 70 (D. Mass. 2022) .................................................................................25

*Lirette v. Shiva Corp.*,
    27 F. Supp. 2d 268 (D. Mass. 1998) .......................................................................................19

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*,
    838 F.3d 76 (1st Cir. 2016).....................................................................................................23

*Maldonado v Fontanes*,
    568 F.3d 263 (1st Cir. 2009)...................................................................................................12

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013)...................................................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................................14

*Mehta v. Ocular Therapeutix, Inc.*,
    955 F.3d 194 (1st Cir. 2020)....................................................................................3, 20

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    305 F. Supp. 3d 181 (D. Mass. 2018), *aff'd*, 928 F.3d 151
    (1st Cir. 2019) ...............................................................................................13, 14, 21, 23

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)....................................................................................4, 20, 21

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ....................................................................................25

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
    51 F. Supp. 2d 1 (D. Mass. 1999) ...........................................................................19

*In re Obalon Therapeutics, Inc.*,
    2019 WL 4729461 (S.D. Cal. Sept. 25, 2019)........................................................25

*Okla. Firefighters Pension & Ret. Sys. v. Biogen Inc.*,
    2023 WL 2693793 (D. Mass. Mar. 29, 2023)....................................................10, 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................18, 19

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)....................................................................................25

*Quinones v. Frequency Therapeutics, Inc.*,
    2023 WL 2693901 (D. Mass. Mar. 29, 2023)....................................................10, 21, 23

*In re Regulus Therapeutics Inc. Sec. Litig.*,
    406 F. Supp. 3d 845 (S.D. Cal. 2019)....................................................................23

*Shash v. Biogen Inc.*,
    2022 WL 4134479 (D. Mass. Sept. 12, 2022) .............................................10, 18, 19, 24

*Shaw v. Dig. Equip. Corp.*,
    82 F. 3d 1194 (1st Cir. 1996)...................................................................................4

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)................................................................................................19

*Thant v. Karyopharm Therapeutics, Inc.*,
    43 F.4th 214 (1st Cir. 2022)..............................................................................14, 18

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)......................................................................................12, 16

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F. 4th 611 (9th Cir. 2022) ..............................................................................................16

*Yan v. ReWalk Robotics Ltd.*,
  973 F.3d 22 (1st Cir. 2020)................................................................................................18

## STATUTES

15 U.S.C.
  § 78u-4(b)(1)(B)....................................................................................................................10
  § 78u-4(b)(2).........................................................................................................................19
  § 78u-4(b)(2)(A) ...................................................................................................................10

## RULES

Fed. R. Civ. P. 9(b) ...................................................................................................................9, 10

## REGULATIONS

21 C.F.R.
  § 312.21(a) .............................................................................................................................12
  § 312.21(a)(1) ..........................................................................................................................4
  § 312.21(b)...............................................................................................................................4
  § 312.32..............................................................................................................................7, 13
  § 312.42....................................................................................................................................9

## I.    INTRODUCTION

Homology Medicines, Inc. ("Homology") is a biopharmaceutical company and leader in genetic medicines.  Gene therapies can theoretically work in many ways, including by introducing working copies of a gene that is defective, or by replacing a defective or missing gene in a patient's cells.  In recent years, gene therapy has become a new frontier in medicine.  As research and development focuses on these novel treatments, gene therapies have become subject to increased scrutiny by the Food & Drug Administration ("FDA").

Homology's approach to gene therapy utilizes a proprietary platform called an adeno-associated virus vector, or "AAV" vector, to deliver functional genes into patients with rare diseases.  Homology's first-ever human clinical trial was the 2019 pheNIX trial of a drug called HMI-102, a potential one-time treatment for adult patients with phenylketonuria ("PKU").  PKU is a rare, inherited disease that renders patients unable to metabolize phenylalanine ("Phe"), an amino acid ingested with protein.  PKU patients can suffer from a toxic build-up of Phe, which can cause severe neurological impairment.

The primary goal of the pheNIX trial was to test how patients reacted to different, one-time doses of HMI-102 by observing side effects, including potential immune responses and liver toxicity commonly associated with AAV gene therapy, and observing reductions in Phe (if any).  Published FDA guidance has recognized the difficulty of selecting a dose for novel gene therapies because higher doses, while potentially more effective, may be accompanied by more severe side effects.  Consistent with this FDA guidance, the pheNIX trial consisted of two phases:  (1) Phase 1, a dose-escalation phase, which focused on identifying a dose of HMI-102 that is safe (and might be effective); and (2) Phase 2, a dose-expansion phase, which would test potential doses on a broader patient population.  From the outset, Homology treated patients in the trial with a precautionary steroid regimen to help mitigate known side effects of AAVs.

Homology disclosed results from Phase 1 of the pheNIX trial in two parts, based on pre-planned data cut-off points.  A data cut-off identifies a subset of clinical trial data to be analyzed and subjected to quality-control procedures, so that the data can then be accurately reported.  On December 17, 2019, Homology disclosed preliminary results from the first three patients whose

1

data had been collected as of the first data cut, December 2, 2019. Then, on November 6, 2020, Homology disclosed detailed results that included efficacy and safety data for all six patients as of the second data cut, October 19, 2020. Based on that data, Homology informed investors that it would proceed to Phase 2 to test two doses of HMI-102, and that it would modify its patient-screening criteria and steroid regimen to attempt to further mitigate potential side effects.

On February 18, 2022, before any Phase 2 data had been disclosed, Homology announced that the FDA had placed a clinical hold on the pheNIX trial based on "the need to modify risk mitigation measures in the study in response to observations of elevated liver function tests." On this news, Homology's stock price dropped. Notwithstanding Homology's many disclosures that warned investors of this exact risk, Plaintiffs filed this lawsuit. After the lawsuit was filed, the FDA lifted the clinical hold, less than three months after the hold was implemented. Yet, Plaintiffs now claim that Homology's failure to disclose real-time clinical trial results or to predict the FDA's clinical hold amounts to securities fraud. It does not, under settled law.

First, Plaintiffs have not alleged particularized facts establishing that any of Homology's statements were false. Plaintiffs do not claim that Homology's statements reporting results from Phase 1, its modification of the steroid regimen based on those results, or its expansion to Phase 2 were inaccurate. Instead, Plaintiffs claim that these statements were somehow misleading because they have a different, negative characterization data—that it showed HMI-102 was not effective and toxic. That characterization ignores the disclosed purpose of Phase 1, which was not to establish that HMI-102 was effective, but test whether certain, escalating doses could be safe for humans (and could be used in for further development in Phase 2). In all events, claims based on Plaintiffs' differing interpretation of publicly disclosed data fail as a matter of law.

Unable to establish that any statement was affirmatively misleading, Plaintiffs offer two omissions theories: that Homology should have disclosed patient data from Phase 1 earlier, and that Homology concealed that its steroid regimen was somehow insufficient and would prompt the FDA to issue a clinical hold. But Plaintiffs cannot dispute that Homology disclosed the purportedly negative data—patients' experiences with a known side effect of AAV gene

2

therapies—based on data as of the planned cut-off date. Homology did not have a duty to disclose patient data in real time as it was collected. Plaintiffs also fail to identify any serious adverse events (as statutorily defined) or any undisclosed data at all from Phase 2 that could support the theory that Defendants knew the modified steroid regimen was insufficient for patient safety (and then did nothing to modify it further). Moreover, no specific facts support Plaintiffs' conclusion that there was any concealed risk that the FDA would implement a clinical hold, above and beyond Homology's express warnings of this exact risk. Plaintiffs simply assume that because the FDA issued a clinical hold, Defendants must have been hiding something. Such speculative fraud by hindsight is not sufficient to plead securities fraud.

Second, Plaintiffs fail to identify facts that would support a strong inference of scienter. No pled facts suggest that Defendants "were aware or warned by others" that they were withholding vital information that rendered their statements misleading. *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 207 (1st Cir. 2020). Plaintiffs' generic allegations that Homology concealed the truth so it could raise money to fund its development programs have been rejected by courts time and again as inadequate and illogical. Plaintiffs also fail to allege any facts establishing that any of the Defendants acted with the requisite mental state to conceal any of the trial data. The more compelling inference is that Defendants spent considerable time and resources to develop HMI-102 in the first-ever human trial of its proprietary platform and for the first-ever gene therapy for PKU, timely disclosed available patient data, and warned investors of significant risks associated with investing in Homology's development.

Third, Plaintiffs' loss causation allegations rest on the premise that any information that moves the stock price down is corrective. This is not the law. Rather, Plaintiffs must identify new information that reveals fraud. They have not done so. The Complaint should be dismissed.

## II.    BACKGROUND

### A.    Homology's Mission Is to Cure Disease and Transform Lives

Homology is a clinical-stage genetic medicines company dedicated to transforming the lives of patients who suffer from rare genetic diseases and have significant unmet medical needs.

AC ¶¶ 3, 40-42, 45.  Gene therapy is designed to cure diseases by altering or correcting the genetic cause.  *Id.* ¶¶ 40-41.  Homology's gene therapies utilize AAV vectors, which means that a non-disease-causing virus is used to introduce a properly functioning version of a defective gene into a patient's cells.  *Id.* ¶¶ 40-42.

**B.     Clinical Trials for AAV Gene Therapies Are Increasing in Number**

In order to conduct clinical trials in humans, companies or "sponsors" must first receive FDA approval of an Investigational New Drug Application ("IND").  *Id.* ¶ 81.  Once an IND has been approved, clinical trials for a pharmaceutical or treatment are generally divided into three phases.  *Id.* ¶ 48.  Phase 1 trials are generally "designed to determine how the drug works in humans and the side effects associated with increasing doses."  *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 39 (1st Cir. 2008) (citing 21 C.F.R. § 312.21 (a)(1)).  Phase 2 trials begin "to evaluate the effectiveness of the drug for a particular indication" typically by comparing patients who receive the treatment with another group of patients who receive a different treatment or placebo, to "determine the common short-term side effects and risks."  21 C.F.R. § 312.21(b).  Finally, Phase 3 trials are large-scale human trials intended to gather information necessary for FDA approval.  AC ¶ 48; 21 C.F.R. § 312.21(b).

The number of clinical studies using AAV gene therapy has increased rapidly in the last decade, based on the potential of these therapies to treat "rare diseases with unmet medical needs."  Ex. 1 at 1.[1]  With new technology, however, comes new risks.  Indeed, FDA Guidance published in 2015 recognized that gene therapies "may pose substantial risks to subjects" that differ from standard pharmaceuticals, and that preclinical studies conducted before trials in humans may not predict those risks.  *Id.* at 2.  Thus, for gene therapies, the primary objective of early-phase (Phase 1 and 2) clinical trials "should be an evaluation of safety" including "an assessment of the nature and frequency of potential adverse reactions and an estimation of the

---

[1] The exhibits submitted with this motion reflect the "relevant entirety of a document integral to or explicitly relied upon" in the Complaint.  *Shaw v. Dig. Equip. Corp.*, 82 F. 3d 1194, 1220 (1st Cir. 1996).  Plaintiffs previously did not oppose that these exhibits were appropriate for consideration at the pleading stage.  While they argued that two exhibits were not "incorporated by reference" under Ninth Circuit law, they did not dispute that the court could take judicial notice of their contents as "what existed in the public realm."  ECF. No. 67.

relationship to [changes in] dose"— i.e., how much of the gene therapy to administer. *Id.* at 6. FDA Guidance further recognizes that when a gene therapy has never been used in humans, "a major trial objective might be to identify the maximum tolerated dose . . . that can be given with acceptable toxicity." *Id.* at 7. An acknowledgement that "toxicities may be expected and acceptable" is particularly applicable to rare and life-threatening diseases with no other treatment options. *Id.*; *see also* Ex. 2 at 6-7. Therefore, early-phase trials of gene therapies consist of a "dose escalation phase"—testing the safety of increasing doses on a small number of participants—and then proceed to a "dose expansion phase," testing with a selected dose or doses on a larger population of trial participants. Ex. 1 at 15-16.

### C.    Homology Launches the pheNIX Trial

Homology has multiple development programs testing its AAV gene therapies to treat genetic diseases. AC ¶¶ 81, 137, 187. In 2019, Homology received clearance from the FDA for its IND for HMI-102. Ex. 3 at 45. In June 2019, Homology announced and began the pheNIX trial of HMI-102, the first-ever clinical trial of a gene therapy to treat PKU (and first-ever of Homology's proprietary AAV platform). AC ¶ 49. HMI-102 delivers to the liver functioning "PAH" genes, which then may convert Phe to another amino acid (tyrosine or "Tyr"), as would occur naturally without the gene defect causing PKU. *Id.* ¶¶ 3, 45, 104.

Phase 1 of the pheNIX trial was a dose-escalation phase designed to evaluate ascending doses of HMI-102 to enable the selection of a dose for Phase 2. *Id.* ¶ 50. In essence, Homology was seeking to identify doses that could potentially reduce Phe, while avoiding some of the severe side effects known to be associated with AAV gene therapies. *See id.* As Homology disclosed, these known side effects include the immune system attacking (or rejecting) the treatment, and liver inflammation or damage—first indicated by elevated liver enzymes, such as alanine transaminase ("ALTs")—which can escalate to drug-induced liver injury and permanent liver damage. Ex. 4 at 9; Ex. 5 at 16; Ex. 3 at 13, 40. Homology was therefore investigating how to mitigate these side effects, which, in previous trials of AAV gene therapies, had been treated with steroids. AC ¶ 52; *see also* Ex. 2.

Homology disclosed that it initially planned to test three doses, in three "cohorts," each of which had two patients. AC ¶ 50. Homology explained that after two patients in a cohort were dosed, a decision could be made to escalate to the next higher dose, expand the cohort, or investigate additional doses. *Id.* Homology also disclosed that indications that HMI-102 may be effective would include a reduction in Phe levels, an increase in Tyr, and a reduction in the Phe/Tyr ratio. Ex. 4 at 8; Ex. 6.

### 1.    Homology Discloses Results From an Initial Data Cut

Homology reported preliminary results from the first three patients at the end of 2019, based on a pre-planned data cut-off date. AC ¶¶ 54-55. On December 17, 2019, Homology reported initial data from two patients receiving the low dose (Patients 1 and 2 in Cohort 1) and one patient receiving the mid-dose (Patient 3 in Cohort 2), showing that "[p]reliminary safety data . . . showed HMI-102 was well-tolerated." AC ¶ 55. Homology explained that the two low-dose patients in Cohort 1 did not show any meaningful reduction in Phe, and the first mid-dose patient in the Cohort 2 did experience a Phe reduction and a rise in Tyr. *Id.* Based on disclosed metrics from Patient 3, Homology informed investors that it believed the initial efficacy data suggested that HMI-102 was delivering the PAH gene and "suggest[ed] increased PAH enzyme activity." *Id.* But, Homology made clear that the disclosed data was limited to results available as of the pre-planned data cut in December 2019, and that as a result, data from a fourth patient (Patient 4 in Cohort 2) who had been treated with the mid-dose after the cut-off date was not included in this initial data cut. *Id.* And, Homology cautioned that the reported data was "interim 'top-line' or preliminary data" and therefore was "subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues" and "should be viewed with caution until the final data are available." Ex. 6 at 2.

### 2.    Plaintiffs Allege That Patient 5 Shared Her Treatment Data

After this disclosure of preliminary data, two patients in the high-dose group (Patients 5 and 6 in Cohort 3) received HMI-102. AC ¶ 58. On April 15, 2020, an individual (which Plaintiffs allege is Patient 5) posted her confidential treatment data on Facebook, including test

results showing high Phe levels and elevated liver enzymes, and that she had been prescribed additional steroids. *Id.* ¶ 61. The post said the patient's doctor had explained that "this increase in liver enzymes is completely expected." *Id.* ¶ 62. The post was removed a few hours later, but Homology's stock price declined. *Id.* ¶ 65.

The next day, April 16, 2020, an Oppenheimer analyst emailed Homology's Chief Communications Officer, Theresa McNeely, inquiring about Homology's stock price drop. *Id.* ¶ 66. McNeely responded in general terms, stating "[n]othing fundamental changed for [Homology] but unfortunately, our stock price." *Id.* ¶ 67.

### 3. Homology Announces Phase 1 Results Based on a New Data Cut and Progression to Phase 2

In November 2020, Homology and its principal medical investigator for the pheNIX trial presented detailed data from Phase 1 during a scientific conference, the annual meeting of the New England Consortium of Metabolic Programs ("NECMP"). Ex. 7; Ex. 4. The NECMP presentation included data through a new October 19, 2020 data cut, and provided detailed data regarding the efficacy results and side effects for each patient. Ex. 7. The second patient in the mid-dose cohort (Patient 4 in Cohort 2) did not show a marked reduction in Phe. Ex. 7 at 10; Ex. 4 at 14. Of the high-dose patients, Patient 6 experienced a reduction in Phe, but Patient 5 did not. Ex. 7 at 11; Ex. 4 at 15. The presentation noted that Patients 4 and 5 had pre-existing immune conditions, and each experienced a Grade 3 elevation in ALTs, which may have inhibited HMI-102's efficacy. Ex. 7 at 7; Ex. 4 at 11, 19; Ex. 8 at 7. Homology disclosed that side effects were managed "with increased steroids when necessary." Ex. 8 at 7, 10. And, it confirmed that there were no treatment-related serious adverse events (*id.*), which are defined by FDA regulations (*see* 21 C.F.R. § 312.32).

Based on these results, Homology reported that the safety and efficacy data supported advancing to the dose-expansion phase. Ex. 8 at 6. Homology selected two doses to test and made clear that it planned to incorporate learnings from the disclosed data, including adjusting its steroid regimen and excluding patients with preexisting immune conditions in an attempt to mitigate elevated ALTs (liver enzymes) observed in Patients 4 and 5. *Id.* at 6-7.

**4.      Risks Associated With the pheNIX Trial Were Fully Disclosed**

Although AAVs differ in how they work on a genetic level and by disease, there are common and known safety risks.  FDA publications before and during the alleged class period emphasized the "substantial risks" associated with gene therapy (Ex. 1), and reported that, based on previous clinical trials, "the 'most common adverse event' associated with intravenous AAV vectors was hepatoxicity (liver damage)," which could range in severity "from elevated liver enzymes [ALTs], drug-induced liver injury, [liver] failure, and death."  Ex. 2 at 146.

To mitigate these risks, the pheNIX clinical trial protocol initially prescribed the use of a "prophylactic [steroid] regimen," with steroids administered prior to the patient's receiving HMI-102.  AC ¶ 138.  Homology did not promise the steroid treatment would prevent known side effects (and no company developing AAVs could).  Instead, Homology repeatedly reminded investors that pheNIX was the first-ever human trial of Homology's proprietary gene therapy (a specific "AAV platform") and that AAV therapies have known side effects, including liver toxicity.  Ex. 5 at 16; Ex. 3 at 40.  Homology also emphasized the uncertain regulatory landscape as the FDA scrutinized clinical trials of novel gene therapies, including by holding a public advisory committee meeting with a panel of experts to specifically discuss "the toxicity risks of AAV vector-based gene therapy products" in September 2021 (the "AAV AdCom Meeting") and issuing "a number of clinical holds," including halting another gene therapy trial in PKU (sponsored by Homology's competitor BioMarin) in September 2021.  AC ¶¶ 171-172; Ex. 9 at 9 (referencing "BioMarin's clinical hold"); Ex. 10 at 17 ("FDA is focused on" gene therapy treatments, issuing "a number of clinical holds right now"); *see also* Ex. 2 (expert discussion of hepatotoxicity (liver damage) observed in clinical trials and potential mitigation strategies).

Consistent with the information available on AAV gene therapies and its own clinical research, throughout the class period Homology further cautioned investors that "[s]erious adverse events or ***undesirable side effects*** caused by our product candidates could ***cause us or regulatory authorities to interrupt, delay or halt clinical trials*** . . . ," "[r]esults of our clinical trials could reveal a high and unacceptable severity and prevalence of side effects, toxicities or unexpected characteristics," and that Homology "could encounter delays if a clinical trial is

suspended or terminated . . . by the FDA . . . due to a number of factors, . . . ***resulting in the imposition of a clinical hold*** . . . .”  Ex. 3 at 43, 48 (emphases added); *see also* Ex. 5 at 50, 55; Ex. 11 at 48, 49; Ex. 12 at 42.

### D. The FDA Temporarily Places the pheNIX Trial on Clinical Hold, Then Lifts the Hold Within Three Months

On February 18, 2022, while Phase 2 was still ongoing, Homology issued a press release announcing that the FDA had placed the pheNIX trial on clinical hold “due to the need to modify risk mitigation measures in the study in response to observations of elevated liver function tests.” Ex. 13 at 2 (AC ¶ 88).  A clinical hold is an order to delay or suspend a clinical trial for a variety of reasons, until the sponsor responds to or remedies issues identified by the FDA.  21 C.F.R. § 312.42.  After this announcement, Homology’s stock price dropped $1.26 per share.  AC ¶ 93.

In its next quarterly filing, Homology reported that it was providing further information to the FDA, and elevated liver enzymes had been resolved for all affected patients without hospitalization.  *Id.* ¶ 94.  Homology explained it was working on additional risk mitigation measures, including a more targeted immunosuppressive regimen.  *Id.*  Plaintiffs filed this lawsuit on March 25, 2022.  ECF No. 1.  By June 13, the FDA lifted the clinical hold.  Ex. 14.

## III.    LEGAL STANDARD

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiffs must adequately plead (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  Such claims are subject to the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 (“PSLRA”) and Federal Rule of Civil Procedure 9(b).  *See In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27, 30 (1st Cir. 2012).  A plaintiff must “specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[]” and “state with particularity facts giving rise to a strong inference that the defendant” acted with scienter.  15 U.S.C. § 78u-4(b)(1)(B), (2)(A).  Rule 9(b) requires Plaintiffs to “state with particularity the circumstances constituting fraud,” *Ganem v. InVivo Therapeutics*

*Holdings Corp.*, 845 F.3d 447, 455 (1st Cir. 2017), including facts demonstrating "how and why these specific statements were misleading ***at the time*** they were made." *Quinones v. Frequency Therapeutics, Inc.*, 2023 WL 2693901, at *8 (D. Mass. Mar. 29, 2023) (emphasis added).

## IV.  ARGUMENT

### A.  Plaintiffs Have Not Pled a False or Misleading Statement

"For their complaint to survive a motion to dismiss, a securities plaintiff must show that 'defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'" *Okla. Firefighters Pension & Ret. Sys. v. Biogen Inc.*, 2023 WL 2693793, at *7 (D. Mass. Mar. 29, 2023) (citing *Ganem*, 845 F.3d at 455). A fact or omission is material where "there is a substantial likelihood that a reasonable investor would have viewed it as significantly altering the total mix of information made available." *Fire & Police Pension Ass'n of Colo. v. Simon*, 778 F.3d 228, 240 (1st Cir. 2015) (internal quotations omitted). "But even where the omitted 'information is material, there is no liability . . . unless there was a duty to disclose it.'" *Shash v. Biogen Inc.*, 2022 WL 4134479, at *7 (D. Mass. Sept. 12, 2022). Indeed, it is well-settled that Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information," but rather just what is necessary to prevent statements, when viewed "in the light of the circumstances under which they were made," from being "so incomplete as to mislead." *Boston Sci. Corp.*, 686 F.3d at 27.

Plaintiffs challenge twenty-five statements that fall into three overlapping categories: (1) sixteen statements describing safety data and initial efficacy signs from Phase 1, the dose-escalation phase (Appx. A, Stmts. 1-10, 12, 14-15, 19, 21, 23); (2) five statements describing the steroid regimen for patients in the trial and changes to it (Stmts. 10, 12, 17-18, 22); and (3) seven statements reporting on the progression to Phase 2, the dose-expansion phase (Stmts. 11, 13, 16, 20, 22, 24-25). None was false or misleading.

### 1.  Homology's Statements Were True

Homology's statements were true and supported by detailed public disclosures of the pheNIX trial results. No pled facts establish otherwise.

Phase 1 Data Statements.  First, no pled facts suggest that Homology did not accurately report preliminary data from the first three patients in Phase 1 on December 17, 2019, based on the December 2, 2019 data cut.  That disclosure expressly defined the parameters of the disclosed results, including that the data was preliminary, was based on data collected as of the pre-planned cut-off date, and was subject to change.  Ex. 6 (data "subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues" and "should be viewed with caution until the final data are available").  Most of Homology's statements before the next data cut (in November 2020) summarized the disclosed results from the first three patients and reiterated these same express limitations.  Stmts. 1-3, 6, 8.  And the only two challenged statements made before November 2020 that even referenced more recent data were general, stating that additional patients had been enrolled and dosed, Homology "continued to observe encouraging clinical data that suggest PAH enzymatic activity," and "no treatment-related serious adverse events were reported."  Stmts. 7, 9.  All of those facts were confirmed when the full results of Phase 1 were published in November 2020.  Exs. 4, 7.  Plaintiffs also fail to allege any facts establishing that the results from the second data cut Homology reported on November 6, 2020, which included all six patients in Phase 1, were not accurate.  Exs. 4, 6, 8.  Statements characterizing those fully disclosed results, reporting that HMI-102 was "generally well-tolerated," and the pheNIX trial had shown "evidence of biologic activity," were based on *fully disclosed patient data* (Stmts. 1, 3, 8, 10-12) or specifically referred back to that data (Stmts. 14-15, 21).  Thus, the statements were not misleading.  *See Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *11 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017) (finding statements reflecting defendants' interpretation of disclosed clinical efficacy results were not misleading).

Plaintiffs' conclusory allegations that these statements were misleading because the results somehow "showed that HMI-102 was both not effective and dangerous" or "more toxic and dangerous than anticipated" (*e.g.*, AC ¶¶ 107, 119) ignore the fully disclosed patient data and the regulatory context.  Homology never promised that its first-ever human trial would

demonstrate that HMI-102 was effective, or that Homology could eliminate the known side effects of AAVs. Ex. 8 at 6, 10; Ex. 15 at 3-4. To the contrary, Homology specifically warned of the risk that HMI-102 may not be safe or effective. Ex. 3 at 42-43; Ex. 5 at 49-50. And, consistent with FDA guidance for gene therapies, Phase 1 of the pheNIX trial was not intended to establish efficacy in all patients, but rather to evaluate the safety of HMI-102, and select doses for further testing. Ex. 3 at 13; Ex. 5 at 15; *see* 21 C.F.R. § 312.21 (a). No reasonable investor would expect that a first-ever human trial of Homology's proprietary AAV gene therapy could eliminate known side effects—something no gene therapy trial has been able to accomplish. *See* Ex. 3 at 13; Ex. 5 at 16.

At bottom, Plaintiffs' conclusory assertions that the published results were somehow negative are insufficient to plead fraud. *See Maldonado v Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) ("conclusory statements are 'not entitled to the assumption of truth'"). Courts in the First Circuit (and across the country) have repeatedly rejected such claims that are, at best, based on a different interpretation of the import of publicly disclosed data. *See, e.g.*, *Corban*, 2015 WL 1505693, at *11 (rejecting plaintiffs' claim which "boil[ed] down to their disagreement with Defendants' interpretation of [a different company's drug's] failed trial results" and impact on defendants' ongoing trials); *Tongue v. Sanofi*, 816 F.3d 199, 211, 214 (2d Cir. 2016) ("statements were not misleading simply because the FDA disagreed with Defendants' interpretation of the data"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170-71 (3d Cir. 2014) (disagreements with scientific conclusions from "[i]interpretations of clinical trial data" are non-actionable).

Steroid Treatment Statements. Second, Plaintiffs claim statements regarding Homology's steroid regimen (Stmts. 10, 12, 17-18, 22) were somehow misleading because the steroid regimen was "known to be insufficient" and posed "severe safety risks." AC ¶¶ 10, 92, 125, 129, 132, 139. Not only does this theory ignore the context in which the statements were made, but there are no specific allegations that support it. Homology never said its steroid regimen would be able to eliminate all side effects. To the contrary, Homology disclosed the

12

observation of elevated ALTs (which are "common in AAV-based gene therapy"); that those increases "were managed with increased steroids when necessary"; and that it was adjusting its steroid regimen and dosing to try to mitigate those side effects further. Stmts. 10, 12; Ex. 11 at 24, Ex. 15 at 4. No pled facts contradict Homology's statement that its steroid regimen had been successful in Phase 1 in "mitigating any kind of ***untoward*** safety profile"—meaning, severe side effects caused by other gene therapies that Plaintiffs do not and cannot claim occurred in pheNIX. Stmt. 22; Ex. 9 at 5 (referencing "increases in bilirubin, innate immune activation, platelet activation"). In fact, Plaintiffs have not identified any serious adverse events—which is a statutorily defined and specific term (21 C.F.R.§ 312.32)—suffered by ***any patient*** in the pheNIX trial. Plaintiffs' conclusory allegations that the steroid regimen was somehow insufficient—without any explanation or detail—fail to manufacture fraud. *See Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at \*14 (D. Mass. Apr. 5, 2016) (no falsity where "the bareness of the factual allegations makes clear that the plaintiff is merely speculating"); *Ganem*, 845 F.3d at 457 (affirming dismissal where claims "amount[ed] to nothing more than unsupported speculation").

Progression to Phase 2 Statements. Third, no pled facts contradict Homology's statements that it planned to and did progress to Phase 2, the dose-expansion phase (Stmts. 4, 10, 11, 13, 16, 20, 22, 24-25), or its statements that in Phase 2, "both doses . . . have been generally well-tolerated and have shown evidence of biological activity" (Stmts. 20, 24). Similarly, the statement to an analyst that "[n]othing fundamental had changed" (made after a Facebook post allegedly reporting results from Patient 5) (Stmt. 4) was accurate. No pled facts suggest that the observation of known side effects of AAVs (elevated ALTs) in one patient changed Homology's development plan; and, it did not. Homology progressed to Phase 2, just as it told investors it would, after incorporating learnings from Phase 1 into its plan for Phase 2. Plaintiffs do not allege otherwise. As to statements about the progress of Phase 2, Plaintiffs do not identify any results from Phase 2 at all, let alone contemporaneous negative data that contradicted Homology's statements. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 207

(D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019) (dismissing claims where "[p]laintiffs have not provided any data that contradicts defendants' statements").

### 2.    Plaintiffs Have Not Pled Any Actionable Omission

Unable to identify any false statement, Plaintiffs allege that all of the challenged statements were misleading by omission because Homology (1) did not disclose patient data as it developed in real time, and (2) concealed data or risks related to the trial's steroid regimen that purportedly prompted the FDA to issue a clinical hold and rendered pheNIX "unlikely to be converted into a registrational trial." *See, e.g.*, AC ¶¶ 101, 125, 129, 135, 139, 142, 145, 148, 151, 154, and 157.  Both theories fail as a matter of law.

### a.    Homology Had No Duty to Disclose Every Piece of Patient Data in Real Time

Plaintiffs' first omissions theory is that any statements regarding the initial results from the pheNIX trial that were reported on December 2019 were misleading because they did not disclose real-time efficacy and safety data for patients.  AC ¶¶ 99, 115, 116, 119, 122.  This argument is contrary to black-letter law and ignores the statements themselves.

The federal securities laws "do not create an affirmative duty to disclose." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Indeed, the First Circuit has "conclusively established that a company is not, by virtue of making some disclosure about its products, obligated to disclose all potentially interesting information." *Thant v. Karyopharm Therapeutics, Inc.*, 43 F.4th 214, 226 (1st Cir. 2022).  To establish a duty to disclose, Plaintiffs must plead that the allegedly omitted information contradicted the statements made or rendered them "so incomplete as to mislead." *Boston Sci. Corp.*, 686 F.3d at 27; *Metzler*, 928 F.3d at 159 (rejecting omissions claim where nothing about communications or research findings "contradicts the statements that the complaint alleges [were] made"); *Biogen*, 2023 WL 2693793, at *9 (dismissing claims where plaintiff failed to allege statement was "otherwise inconsistent with the Individual Defendants' subsequent declarations").

Homology explained that its initial data report reflected patient data collected as of December 2, 2019, which only included data for the first three patients, and further that the

14

disclosed results "should be viewed with caution" as "outcomes may materially change" with more patients and more data. Ex. 3 at 54; *see also Emps.' Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *2 n.5, *10 (D. Md. Sept. 29, 2021) ("cut-off" point is when the data is "effectively locked for analytical purposes"). The challenged statements that discussed specific patient data (before Homology reported on the next data cut containing the allegedly omitted data from Patients 4 and 5 (Ex. 16 at 22)) merely reiterated the "preliminary" data disclosed in December 2019, along with its clear limitations. *See, e.g.*, AC ¶¶ 115, 116, 119, 122; Stmts. 1, 2, 3, 6, 8. Where, as here, statements are expressly limited to specific data, they cannot be rendered misleading by "clinical data that occurred after that cut-off date." *In re Biogen IDEC, Inc. Sec. Litig.*, 2007 WL 9602250, at *12 (D. Mass. Oct. 25, 2007); *see also Corban*, 2015 WL 1505693, at *6 (dismissing claims where disclosures made "clear that the market and scientific community was informed that the company was basing its more favorable results on [a subset of the patient] population"). That is, statements discussing initial data from Patients 1, 2, and 3 do not suggest anything favorable or unfavorable about the patients *not* mentioned, Patients 4, 5, and 6.

Plaintiffs' remaining challenge to two general statements that were not expressly tied to the first data cut or the initial report in December 2019 also fails. Those limited, general statements report "encouraging" data and no "serious adverse events." Stmts. 7, 9. No pled facts (or anything in the patient data later disclosed by Homology) contradict those statements.

### b.      Homology Had No Duty to Predict FDA Actions

Plaintiffs' remaining omissions theory is that Homology failed to disclose information that prompted the FDA to issue a clinical hold and rendered the pheNIX trial "unlikely to be converted into a registrational trial." AC ¶¶ 135, 145, 157, 158; Stmts. 14, 15, 19, 23. This argument too fails as a matter of law.

First, there is a gaping hole in Plaintiffs' omissions theory because they identify no patient data from the dose-expansion phase at all, let alone undisclosed data, that allegedly increased the risk the FDA would impose a clinical hold beyond what Homology disclosed or

showed the steroid regimen modified for Phase 2 was "known to be insufficient" and posed "severe safety risks." AC ¶¶ 10, 92, 125, 129, 132, 139. Again, courts regularly reject unsupported assertions of falsity because "speculation and conjecture . . . cannot substitute for well-pleaded facts." *Ganem*, 845 F.3d at 456 (1st Cir. 2017); *Kader*, 2016 WL 1337256, at *14. The only purportedly negative data Plaintiffs identify is from Phase 1 (*e.g.*, AC ¶ 145) and was disclosed in November 2020, more than a year before the FDA's clinical hold in February 2022. Exs. 4, 8, 11. While Plaintiffs speculate that the Phase 2 data must have been negative, no pled facts support that Defendants should have known at the time of the challenged statements that the FDA would impose a clinical hold, or require any modification to the steroid regimen. *See Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 462 (D. Mass. 2016), *aff'd*, 853 F.3d 606 (1st Cir. 2017) (no falsity without specific allegations identifying omitted information); *see also Weston Fam. P'ship LLLP v. Twitter, Inc.,* 29 F. 4th 611, 621 (9th Cir. 2022) ("It is simply not enough to assume or implausibly infer that the defendants must have known about these issues").

Stripped of speculation, Plaintiffs' claim is based on impermissible hindsight. *See Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 135 (1st Cir. 2021) ("a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud"). Courts have repeatedly rejected claims based on the failure to predict the FDA's actions. *See*, *e.g.*, *Tongue*, 816 F.3d at 211, 214 ("statements were not misleading simply because the FDA disagreed"); *In re Genzyme Corp.*, 2012 WL 1076124, at *11 (D. Mass. Mar. 30, 2012) (no falsity based on FDA's later conclusion because claims "amount[ed] to fraud by hindsight"); *see also Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 27, 2020) ("were plaintiffs' version of falsity the law, a pharmaceutical company could be sued for securities fraud each and every time it received [any] rejection from the FDA").

Second, Plaintiffs' "concealed risk" theory ignores the fact that Homology repeatedly disclosed the exact risks of which Plaintiffs complain. Homology warned investors that "undesirable side effects caused by our product candidates could cause us or regulatory authorities to interrupt, delay or halt clinical trials," and that it "may receive feedback from

16

regulatory authorities that require[d] [it] to modify the design of [its] clinical trials." Ex. 12 at 42; Ex. 16 at 41. Homology also disclosed that AAV gene therapy was the subject of intense FDA scrutiny (that had resulted in clinical holds of other Phase 1-2 trials for serious adverse events and even a trial in PKU by its direct competitor based on uncertainty around long term safety). Ex. 9 at 7. And, other published information underscored the unpredictable regulatory landscape and risks around AAV gene therapy. *Supra* at II.B. Plaintiffs do not identify what else Homology should have said about these risks or identify any undisclosed facts—like clinical trial data or communications with the FDA—that rendered these disclosed risks more likely to materialize. In fact, the only communication referenced in the complaint regarding these risks was from the September 2021 Advisory Committee Meeting (AC ¶ 171), but that meeting provided no clarity on measures to reduce the risk of liver injury. Ex. 2 at 6.

Ultimately, Defendants never guaranteed FDA approval, or even any particular results in the pheNIX trial—they did the opposite, calling out the risks and uncertainties involved with the first-ever clinical trial of Homology's proprietary gene therapy. *See Corban*, 868 F.3d at 42 (affirming dismissal of claim based on "uncertain terrain of [] approval for a gene therapy"). That "[c]linical trials do not always go as planned" is not a basis for a securities fraud claim, and courts have repeatedly rejected claims liked this based on clinical holds for gene therapies. *See, e.g.*, *Crihfield v. CytRx Corp.*, 2017 WL 2819834, at *16 (C.D. Cal. June 14, 2017) (dismissing claim where FDA later lifted its partial clinical hold because nothing "indicat[ed] that Defendants were made aware that the hold . . . would materially alter their [clinical trial] projections"); *Berlinger v. Bienaime*, 2023 WL 322899, at *4 (N.D. Cal. Jan. 19, 2023) (dismissing claims where plaintiff failed to provide "any factual allegations" from which a hold could be predicted such as "when BioMarin received data from the study, when BioMarin began analyzing the data, how long that analysis took, . . . and when and how that information was communicated to the individual defendants.").

17

### 3.     The Challenged Statements of Corporate Optimism, Opinion Statements, and Statements Made to Analysts Are Not Actionable

Statements of Corporate Optimism.  Plaintiffs challenge several statements reflecting Defendants' optimism about the pheNIX trial results, including that HMI-102 was "well-tolerated," the results were "encouraging," and the safety profile of HMI-102 was "a tribute [to] the quality, manufacturing and safety of Homology's vectors."  Stmts. 1, 3, 6-9, 20-21, 24-25. These sort of "upbeat statements of optimism and puffing about [a] company's prospects are not actionable and thus cannot constitute material misstatements." *Thant*, 43 F.4th at 223 (internal citations and quotations omitted).  Indeed, "[s]uch vague optimism about a product's future, even when touting 'successful' or 'compelling' clinical support, cannot constitute a material misstatement for purposes of the pleading requirements set by the PSLRA." *Id.* (dismissing "an important milestone" and "a significant step in establishing the efficacy and safety of [the drug] as a new treatment option for patients with myeloma" as nonactionable puffery); *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 32 (1st Cir. 2020) (affirming that "compelling clinical data" and "breakthrough product" were unactionable puffery).

Opinion Statements.  Certain of the challenged statements are expressions of opinion reflecting what Defendants "believe[d]" regarding a dose's "potential to improve Phe reductions" and the interpretation of the safety profile of HMI-102.  Stmts. 11, 13, 25.  These statements contain phrases like, "we believe" and "I think," which are quintessential opinion statements. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-88 (2015).  Opinions, like those here, are actionable *only if* they are "without any reasonable basis or objectively false." *Harrington v. Tetraphase Pharms. Inc*, 2017 WL 1946305, at *5 (D. Mass. May 9, 2017).  No pled facts establish Defendants did not have a reasonable basis for these opinions or that they were objectively false.

Likewise, "even where no qualifying language is used" (*i.e.*, "we believe," or "I think"), other statements Plaintiffs challenge are nonactionable because "the substance and context of a statement [] indicate[s] an opinion." *Shash*, 2022 WL 4134479, at *8 (citation omitted); Stmts. 1-3, 6, 8, 20, 24.  For example, "clinically meaningful" and "well-tolerated" are nonactionable

18

statements of opinion because they "express [Homology's] view, not a certainty" regarding the clinical results. *See Shash*, 2022 WL 4134479, at \*8 ("Biogen's statements 'express a view, not a certainty' about the meaning of the phase III data, the court treats them as opinions.") (citing *Omnicare*, 575 U.S. at 185). Indeed, courts reject claims that opinions interpreting clinical trial results were false, where (as here) the only support is an alternate interpretation. *See Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020) ("Although the FDA interpreted trial results differently . . . those facts alone do not render the statements fraudulent or misleading."); *Harrington*, 2017 WL 1946305, at \*5 ("scientific opinions are just that: opinions").

Statements by Analysts. Plaintiffs' challenge to a statement made by a Baird analyst fails because none of the Homology Defendants made the statement. Stmt. 5. The statement—"we continue to favor the risk reward dynamic"—is the analyst's opinion and cannot lead to liability for Defendants because Plaintiffs have not specified any statement made to that analyst, as required to plead a claim. *See Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 280 (D. Mass. 1998) (rejecting challenge to statements in analyst reports "because the Complaint fails to specify the time, place, and speaker of the statements"). Unparticularized allegations that the analyst "spoke" with management before publishing his own statements are insufficient. *See In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 31 (D. Mass. 1999) ("general allegations of a 'pattern of continuous interactions among'" management fail to "clear the Rule 9(b) hurdle").

## B.   Plaintiffs Have Not Pled a Strong Inference of Scienter

Plaintiffs fail to plead particularized facts giving rise to a strong inference of scienter. *See* 15 U.S.C. §78u-4(b)(2). To meet this burden, Plaintiffs must allege particularized facts showing Defendants (i) had a conscious intent "to deceive or defraud investors" or (ii) "acted with a high degree of recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011). The inference of fraud must be "cogent and at least as compelling as any opposing inference," requiring the Court to consider "plausible, nonculpable explanations for the defendant's conduct." *Tellabs, Inc. v. Makor Issues & Rts.,*

19

*Ltd.*, 551 U.S. 308, 323-24 (2007).  The pleading standard for scienter is "notably strict and rigorous," *ACA Fin. Guar. Corp.*, 512 F.3d at 58 n.7, and the court "must consider the complaint in its entirety" and ask "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Mehta*, 955 F.3d at 206 (quoting *Tellabs*, 551 U.S. at 322-23).

### 1.    Plaintiffs Fail to Establish That Defendants Acted With an Intent to Deceive or a High Degree of Recklessness

Plaintiffs' scienter theory assumes Defendants knew at the time of the challenged statements that (1) HMI-102 was more "dangerous" and "less effective" than the disclosed trial results suggested; (2) Homology's steroid regimen was insufficient to mitigate serious adverse events; and based on both, (3) the FDA would issue a clinical hold on Phase 2.  But pleading scienter requires facts, not assumptions, showing that at the time of the challenged statements, "the defendant[s] were aware that they were withholding vital information or at least were warned by others that this was so."  *Mehta*, 955 F.3d at 207 (quotations omitted); *Biogen IDEC*, 537 F.3d at 45 ("A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it.").  Plaintiffs do not come close to meeting this burden.  They do not identify a single document, meeting, statement, conversation, confidential witness, or other circumstantial evidence suggesting that any Defendant knew or was reckless as to whether the challenged statements were false or misleading.  And, there is no logical explanation for why Homology would conceal purportedly negative data from an early-stage clinical trial and proceed to the next phase of that trial, if it believed that the trial was somehow doomed to fail (as Plaintiffs suggest).

First, Plaintiffs assert that Defendants knew HMI-102 was more dangerous and less effective than they disclosed because they became aware of results for Patients 4 and 5 after the announcement of the first data cut and before the announcement of the second data cut.  AC ¶¶ 54-55, 72-73.  But Plaintiffs fail to identify what data was known, and when, from Patients 4 and 5.  *See In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 754 (1st Cir. 2016) (no scienter

20

when "complaint fails to indicate when the adverse events occurred, let alone when defendants became aware of them"); *Biogen IDEC*, 537 F.3d at 49 (no scienter without allegations regarding "when defendants had information" on adverse events or "sufficiently suggest[ing]" a causal relationship such that statements were misleading). At most, Plaintiffs speculate that Homology (temporarily) concealed confidential patient data by causing a Facebook post allegedly reporting data from Patient 5 to be removed. AC ¶ 174. This is mere speculation that cannot support scienter. *See Quinones*, 2023 WL 2693901, at *15. Far from hiding data, Defendants disclosed all of the purportedly negative patient data from Phase 1, including from Patients 4 and 5, on November 6, 2020. AC ¶¶ 72-73. Homology disclosed the very information that Plaintiffs allege it wanted to conceal. *See Metzler*, 305 F. Supp. 3d at 222 (disclosure of "PML death" during trial was "not the action[] of a company bent on deceiving investors" on drug's success); *Abiomed, Inc.*, 778 F.3d at 244 (defendants' disclosures "undercut any inference of scienter").

Second, Plaintiffs claim in hindsight that because Homology made further modification to its steroid regimen after the FDA issued the clinical hold, Defendants must have known that the steroid regimen Homology modified for Phase 2 was insufficient for patient safety. AC ¶¶ 168, 179-180. This argument makes no sense. No serious adverse events occurred in Phase 1, yet Homology modified the steroid regimen in an effort to mitigate the elevated ALTs observed at higher doses (and did not use the highest dose), as it informed investors. AC ¶ 169; Ex. 4 at 20; Ex. 8 at 10. Plaintiffs identify no data from patients after the steroid regimen was modified, let alone any serious adverse events from which Defendants could have predicted the clinical hold. This is a textbook "fraud by hindsight" argument that courts routinely reject. *See Ariad Pharms*, 842 F.3d at 751 (plaintiffs "impermissibly seek to establish fraud by hindsight, suggesting . . . the defendants must have known about adverse events" earlier); *In re Biogen Inc. Sec. Litig*., 857 F.3d 34, 44 (1st Cir. 2017) (no scienter where allegations "do not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements").

Third, Plaintiffs' unsupported assertion that Defendants somehow knew the FDA would issue a clinical hold on Phase 2 falls apart in view of Homology's repeated disclosures of the

21

uncertainty and risks inherent in novel gene therapies, including repeated disclosures of FDA scrutiny and clinical holds on other trials, and the specific risk that it "may receive feedback from regulatory authorities that require [it] to modify the design of [its] clinical trials."  Ex. 12 at 42; Ex. 16 at 41; *see Abiomed,* 778 F.3d at 243 (scienter "undercut by the fact that Abiomed explicitly warned investors both that" FDA might disagree with its assessment and could take enforcement action).  In this context, the failure to disclose every side effect observed in real time—none of which Plaintiffs allege qualified as "serious adverse events" under FDA regulations—was not so "highly unreasonable" that it could qualify as deliberate recklessness. *In re Karyopharm Therapeutics Inc. Sec. Litig.*, 552 F. Supp. 3d 77, 90 (D. Mass. 2021) (omission of toxicity data not "highly unreasonable" where "any representation as to the safety and tolerability of such a treatment" would be viewed in context of "very ill patient cohort").

### 2.    Generic Allegations of Motive and Knowledge Are Insufficient to Plead Scienter

Plaintiffs' generic allegations of motive and knowledge have repeatedly been rejected as insufficient to support a securities fraud claim.  Plaintiffs first point to a desire to raise capital (AC ¶¶ 179-180), but this is a routine corporate objective for any development-stage pharmaceutical company.  *See Corban*, 868 F.3d at 41 (courts "require something more than the ever-present desire to improve" capital to support scienter); *In re Boston Sci. Corp. Sec. Litig.*, 2022 WL 17823837, at *25 (D. Mass. Dec. 20, 2022) (rejecting "generic claim that Defendants had a motive to inflate stock values before conducting public equity offering").  There are no allegations that any defendant would be "personally enrich[ed]" by their actions, rendering Plaintiffs' motive theory on further "shaky grounds." *ACA Fin. Guar. Corp.*, 512 F.3d at 67.

Similarly, Plaintiffs rely on a "core operations" theory (AC ¶¶ 186-188) to support their speculative assumptions that Homology (and each Individual Defendant) knew and concealed unidentified information that somehow increased the risk of a clinical hold.  But, the "core operations" doctrine cannot save a pleading that fails itself to adequately allege that anyone at the company had such information or knowledge.  *Metzler*, 928 F. 3d at 165; *Quinones*, 2023 WL 2693901, at *16 ("[T]he core operation doctrine cannot itself bootstrap an otherwise

insufficient complaint above the high pleading standard imposed by the PSLRA."); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 51 (D. Mass. 2016) (rejecting "core operations" allegations without other evidence of intent or recklessness).

### 3.   The Non-Fraudulent Inference Is More Compelling

Viewing the allegations holistically, Plaintiffs' theory of scienter rests on the implausible proposition that Homology would expend enormous resources conducting and expanding the pheNIX trial despite purportedly knowing that the FDA would never approve HMI-102, simply to raise capital or keep its stock price high in the short-term. *See* AC ¶¶ 162-190.  This District and courts across the country have rejected this precise theory.  *E.g.*, *Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*, 838 F.3d 76, 81 (1st Cir. 2016); *Brennan*, 853 F.3d at 616 (rejecting inference that defendants had motive to "shade the truth" regarding adverse events because "all of the company's hopes . . . hinged on [the drug's] success"); *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 862 (S.D. Cal. 2019) (inference that company "test[ed] an experimental drug, encountered unexpected issues (as many pharmaceutical companies do)," and informed "the market and the FDA" once "it identified a possible answer" were "significantly more cogent and compelling" than the inference of fraud).  For example, in *Vertex*, the First Circuit rejected implausible inference that defendants were motivated to "turn a blind eye" to issues in the clinical trial results to keep the stock price high, finding that, as in "many studies of new pharmaceutical products," the fact that "Vertex made the investment necessary to design and perform a study" showed "Vertex must have thought that positive results were possible, even if not probable."  835 F.3d at 81.

The theory of scienter is even more implausible here.  As Homology informed investors, the pheNIX trial was the first-ever human trial of Homology's proprietary AAV gene therapy; while the initial results were promising, the technology was not without risk, and Homology was learning along the way.  Ex. 8 at 6-7.  The only logical inference is that, "as many pharmaceutical companies do," *Regulus*, 406 F. Supp. 3d at 862, Homology made changes to the steroid regimen it believed were appropriate based on the data it had, and could not have

predicted whether or when the FDA would implement a clinical hold. *See Leavitt*, 525 F. Supp. 3d at 267 ("more compelling inference is that the FDA merely disagreed" with what defendants anticipated and "fairly believed was warranted"); *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *12 (C.D. Cal. Dec. 21, 2017) (inference that defendant believed drug was "well-tolerated by humans" was "at least as compelling" as inference that it concealed toxicity levels to "finance the testing of a drug it knew could never be approved by the FDA"); *In re Genzyme Corp.*, 2012 WL 1076124, at *12 (D. Mass. Mar. 30, 2012) (inference more compelling that company was developing a biologic in a manner they "considered to be beneficial and that they believed was progressing. . . [and] reasonably did not expect [] the setbacks the company experienced").

### C.    Plaintiffs Have Not Pled Facts Establishing Loss Causation

Plaintiffs' claims may also be dismissed because they fail to plead loss causation, an element that requires plaintiffs to plead that a corrective disclosure was "a 'substantial' cause of their losses." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237–39 (1st Cir. 2013) (citation omitted). "'It is not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other'; the complaint must allege facts to demonstrate the trading loss was caused by information that corrects the alleged misstatements." *Shash*, 2022 WL 4134479, at *18 (quoting *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013)). Here, Plaintiffs point to five purported corrective disclosures (AC ¶¶ 194, 196, 199, 204, 208), but none supports loss causation.

First, the April 15, 2020 Facebook post allegedly made by Patient 5 did not correct any of Homology's statements made before the post, because all were limited to results from the first data cut in December 2019—*i.e.*, results for Patients 1, 2 and 3, *not* Patient 5. AC ¶¶ 60-61, 97-105. Public disclosure of new data is not a revelation of fraud. *See Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 70 (D. Mass. 2022) (no loss causation where disclosure "updated the Company's projection based upon new information"); *see also In re Nektar Therapeutics Sec.*

*Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (no loss causation where disclosure "did not correct or revise previous patient data," but "merely integrated newly collected data").

Second, Plaintiffs admit that Homology's August 10, 2020 financial report did not contain "any further disclosure about the pheNIX trial data." AC ¶¶ 196-197. The absence of a disclosure is not corrective because it does not reveal any new information that contradicts the challenged statements. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014) ("Any claim that an event moved the stock price when the event was not actually a new disclosure will necessarily fail.").

Third, Homology's November 6, 2020 announcement of Phase 1 results (AC ¶¶ 199-200) disclosed new patient data, based on a new data cut. Again, new data that does not "correct or revise any previous results" does not support loss causation. *Nektar*, 34 F.4th at 838-39.

Fourth, Homology's April 6, 2021 announcement of a stock offering (AC ¶¶ 204-205) is not corrective because it did not reveal any new information about the pheNIX trial. *See Bricklayers*, 752 F.3d at 89; *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *10 (S.D. Cal. Sept. 25, 2019) (offering signaling desire to raise capital was not a corrective disclosure).

Fifth, Homology's February 18, 2022 announcement of the FDA's clinical hold on the pheNIX trial (AC ¶¶ 208-209) was a materialization of a disclosed risk. Homology never claimed that it had been able to eliminate known side effects of AAVs, and repeatedly disclosed the risk of a clinical hold on its novel gene therapies. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (no loss causation when the market reacts to materialization of known risks); *see also Coyne*, 943 F. Supp. 2d at 275 (no loss causation where stock price fell "as a result of . . . a risk [defendant] repeatedly and regularly disclosed").

## V.    CONCLUSION

Defendants respectfully request that the Court grant the Motion to Dismiss with prejudice.

Dated:  June 8, 2023

Respectfully submitted,

/s/ Michele D. Johnson
Michele D. Johnson (*pro hac vice*)
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626-1925
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
michele.johnson@lw.com

William J. Trach (BBO# 661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

Colleen C. Smith (*pro hac vice*)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
colleen.smith@lw.com

Meryn C. N. Grant (*pro hac vice*)
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Facsimile: (424) 653-5501
meryn.grant@lw.com

*Attorneys for Defendants Homology Medicines, Inc., Arthur O. Tzianabos, W. Bradford Smith, Albert Seymour, and Theresa McNeely*

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent on June 8, 2023 to those identified as non-registered participants.

/s/ Michele D. Johnson
Michele D. Johnson