# EXHIBIT 11

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2020**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 001-38433**

# Homology Medicines, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **47-3468154** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **One Patriots Park** | |
| **Bedford, MA** | **01730** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(781) 301-7277**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name, former address, and former fiscal year, if changed since last report)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | FIXX | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
    YES ☒    NO ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    YES ☒    NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    YES ☐    NO ☒

As of November 2, 2020, the registrant had 45,264,419 shares of common stock, $0.0001 par value per share, outstanding.

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements other than statements of historical facts contained in this Quarterly Report, including statements regarding our future results of operations and financial position, the anticipated impact of the novel coronavirus ("COVID-19") pandemic on our business, business strategy, prospective products, product approvals, research and development costs, anticipated timing and likelihood of success of clinical trials, expected timing of the release of clinical trial data, the plans and objectives of management for future operations, future results of anticipated products, the closing of the Pfizer private placement, and the sufficiency of our cash and cash equivalents to fund our operations are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expect," "plan," "anticipate," "could," "intend," "target," "project," "contemplate," "believe," "estimate," "predict," "potential", or "continue" or the negative of these terms or other similar expressions. The forward-looking statements in this Quarterly Report are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements speak only as of the date of this Quarterly Report and are subject to a number of important factors that could cause actual results to differ materially from those in the forward-looking statements, including the factors described under the sections in this Quarterly Report titled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Moreover, we operate in an evolving environment. New risk factors and uncertainties may emerge from time to time, and it is not possible for management to predict all risk factors and uncertainties.

You should read this Quarterly Report and the documents that we reference in this Quarterly Report completely and with the understanding that our actual future results may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained herein, whether as a result of any new information, future events, changed circumstances or otherwise.

2

**Summary Risk Factors**

Our business is subject to numerous risks and uncertainties, including those described in Part II, Item 1A. "Risk Factors" in this Quarterly Report on Form 10-Q. You should carefully consider these risks and uncertainties when investing in our ordinary shares. The principal risks and uncertainties affecting our business include the following:

- we have incurred significant losses since inception and anticipate that we will incur continued losses for the foreseeable future. We are not currently profitable, and we may never achieve or sustain profitability;

- we will require additional capital to fund our operations, and if we fail to obtain necessary financing, we may not be able to complete the development and commercialization of our product candidates;

- we have a limited operating history and no history of commercializing genetic medicine products, which may make it difficult to evaluate the prospects for our future viability;

- we are heavily dependent on the success of HMI-102, our most advanced product candidate, and if HMI-102 does not receive regulatory approval or is not successfully commercialized, our business may be harmed;

- we intend to identify and develop product candidates based on our novel genetic medicines platform, which makes it difficult to predict the time and cost of product candidate development. No products that utilize gene editing technology have been approved in the United States or in Europe, and there have only been a limited number of human clinical trials involving a gene editing product candidate;

- the clinical trial and regulatory approval processes are lengthy, time consuming and inherently unpredictable, and we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates;

- the COVID-19 pandemic could adversely impact our business, including our preclinical studies and clinical trials.

- our product candidates may cause serious adverse events, side effects, toxicities or have other properties which may delay or prevent their regulatory approval, limit the commercial profile of an approved label or result in significant negative consequences following marketing approval, if any;

- adverse public perception of genetic medicine, and gene editing in particular, may negatively impact regulatory approval of, or demand for, our potential products;

- we and our contract manufacturers are subject to significant regulation with respect to manufacturing our products, and the manufacturing facilities on which we rely may not continue to meet regulatory requirements and have limited capacity;

- even if we obtain FDA approval for our product candidates in the United States, we may never obtain approval for or commercialize it in any other jurisdiction, which would limit our ability to realize its full market potential;

- our existing collaborations are important to our business and future licenses may also be important to us, and if we are unable to maintain any of these collaborations, or if these arrangements are not successful, our business could be adversely affected; and

- if we are unable to adequately protect our proprietary technology, or obtain and maintain issued patents which are sufficient to protect our product candidates, others could compete against us more directly, which would negatively impact our business.

**Table of Contents**

| | | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | 5 |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 5 |
| | Condensed Consolidated Balance Sheets as of September 30, 2020 and December 31, 2019 (Unaudited) | 5 |
| | Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2020 and 2019 (Unaudited) | 6 |
| | Condensed Consolidated Statements of Comprehensive Loss for the three and nine months ended September 30, 2020 and 2019 (Unaudited) | 7 |
| | Condensed Consolidated Statements of Stockholders' Equity for the three and nine months ended September 30, 2020 and 2019 (Unaudited) | 8 |
| | Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2020 and 2019 (Unaudited) | 9 |
| | Notes to Condensed Consolidated Financial Statements (Unaudited) | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 4. | Controls and Procedures | 40 |
| | | |
| **PART II.** | **OTHER INFORMATION** | 41 |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 41 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 86 |
| Item 3. | Defaults Upon Senior Securities | 86 |
| Item 4. | Mine Safety Disclosures | 86 |
| Item 5. | Other Information | 86 |
| Item 6. | Exhibits | 87 |
| Signatures | | 89 |

4

PART I—FINANCIAL INFORMATION

**Item 1. Financial Statements.**

**HOMOLOGY MEDICINES, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share amounts)**
**(UNAUDITED)**

| | As of | |
|---|---|---|
| | September 30, 2020 | December 31, 2019 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 178,003 | $ 53,774 |
| Short-term investments | — | 208,614 |
| Prepaid expenses and other current assets | 3,252 | 4,189 |
| Total current assets | 181,255 | 266,577 |
| Property and equipment, net | 39,684 | 42,716 |
| Right-of-use assets | 6,149 | — |
| Restricted cash | 1,274 | 1,274 |
| Total assets | $ 228,362 | $ 310,567 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,316 | $ 2,608 |
| Accrued expenses and other liabilities | 8,426 | 7,644 |
| Operating lease liabilities | 2,497 | — |
| Deferred rent | — | 1,313 |
| Deferred revenue | 2,939 | 809 |
| Total current liabilities | 17,178 | 12,374 |
| Non-current liabilities: | | |
| Operating lease liabilities, net of current portion | 13,540 | — |
| Deferred rent, net of current portion | — | 9,544 |
| Deferred revenue, net of current portion | 27,422 | 30,142 |
| Total liabilities | 58,140 | 52,060 |
| Commitments and contingencies (Note 7) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value, 10,000,000 shares authorized; no shares issued and outstanding | — | — |
| Common stock, $0.0001 par value; 200,000,000 shares authorized; 45,263,849 and 45,138,408 shares issued as of September 30, 2020 and December 31, 2019, respectively; and 45,259,747 and 45,116,742 shares outstanding as of September 30, 2020 and December 31, 2019, respectively | 4 | 4 |
| Additional paid-in capital | 468,795 | 457,994 |
| Accumulated other comprehensive gain | — | 183 |
| Accumulated deficit | (298,577) | (199,674) |
| Total stockholders' equity | 170,222 | 258,507 |
| Total liabilities and stockholders' equity | $ 228,362 | $ 310,567 |

*See notes to condensed consolidated financial statements.*

**HOMOLOGY MEDICINES, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except share and per share amounts)**
**(UNAUDITED)**

| | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| Collaboration revenue | $ 567 | $ 441 | $ 1,722 | $ 1,103 |
| Operating expenses: | | | | |
| Research and development | 20,417 | 25,691 | 77,197 | 69,056 |
| General and administrative | 8,423 | 6,038 | 24,986 | 16,431 |
| Total operating expenses | 28,840 | 31,729 | 102,183 | 85,487 |
| Loss from operations | (28,273) | (31,288) | (100,461) | (84,384) |
| Other income: | | | | |
| Interest income | 41 | 1,661 | 1,558 | 4,635 |
| Total other income | 41 | 1,661 | 1,558 | 4,635 |
| Net loss | $ (28,232) | $ (29,627) | $ (98,903) | $ (79,749) |
| Net loss per share-basic and diluted | $ (0.62) | $ (0.67) | $ (2.19) | $ (1.92) |
| Weighted-average common shares outstanding-basic and diluted | 45,227,231 | 43,904,812 | 45,196,459 | 41,503,545 |

*See notes to condensed consolidated financial statements.*

6

**HOMOLOGY MEDICINES, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(in thousands)**
**(UNAUDITED)**

| | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| Net loss | $ (28,232) | $ (29,627) | $ (98,903) | $ (79,749) |
| Other comprehensive gain (loss): | | | | |
| Change in unrealized gain (loss) on available for sale securities, net | (11) | 68 | (183) | 331 |
| Total other comprehensive gain (loss) | (11) | 68 | (183) | 331 |
| Comprehensive loss | $ (28,243) | $ (29,559) | $ (99,086) | $ (79,418) |

*See notes to condensed consolidated financial statements.*

7

**HOMOLOGY MEDICINES, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(in thousands, except share and per share amounts)**
**(UNAUDITED)**

| | Common Stock $0.0001 Par Value | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance at January 1, 2019** | 37,358,526 | $ 3 | $ 292,187 | $ (77) | $ (95,758) | $ 196,355 |
| Vesting of common stock from option exercises | 31,584 | — | 18 | — | — | 18 |
| Issuance of common stock from option exercises | 18,876 | — | 21 | — | — | 21 |
| Issuance of common stock pursuant to employee stock purchase plan | 28,311 | — | 396 | — | — | 396 |
| Stock-based compensation | — | — | 1,243 | — | — | 1,243 |
| Other comprehensive gain | — | — | — | 83 | — | 83 |
| Net loss | — | — | — | — | (23,852) | (23,852) |
| **Balance at March 31, 2019** | 37,437,297 | $ 3 | $ 293,865 | $ 6 | $ (119,610) | $ 174,264 |
| Issuance of common stock in follow-on offering, net of discounts and issuance costs | 6,388,889 | 1 | 134,524 | — | — | 134,525 |
| Vesting of common stock from option exercises | 31,024 | — | 18 | — | — | 18 |
| Issuance of common stock from option exercises | 12,404 | — | 55 | — | — | 55 |
| Stock-based compensation | — | — | 1,970 | — | — | 1,970 |
| Other comprehensive gain | — | — | — | 180 | — | 180 |
| Net loss | — | — | — | — | (26,270) | (26,270) |
| **Balance at June 30, 2019** | 43,869,614 | $ 4 | $ 430,432 | $ 186 | $ (145,880) | $ 284,742 |
| Vesting of common stock from option exercises | 16,104 | — | 11 | — | — | 11 |
| Issuance of common stock from option exercises | 43,429 | — | 209 | — | — | 209 |
| Issuance of common stock pursuant to employee stock purchase plan | 26,923 | — | 433 | — | — | 433 |
| Stock-based compensation | — | — | 1,986 | — | — | 1,986 |
| Other comprehensive gain | — | — | — | 68 | — | 68 |
| Net loss | — | — | — | — | (29,627) | (29,627) |
| **Balance at September 30, 2019** | 43,956,070 | $ 4 | $ 433,071 | $ 254 | $ (175,507) | $ 257,822 |

| | Common Stock $0.0001 Par Value | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance at January 1, 2020** | 45,116,742 | $ 4 | $ 457,994 | $ 183 | $ (199,674) | $ 258,507 |
| Vesting of common stock from option exercises | 15,542 | — | 12 | — | — | 12 |
| Issuance of common stock from option exercises | 34,311 | — | 135 | — | — | 135 |
| Issuance of common stock pursuant to employee stock purchase plan | 39,471 | — | 537 | — | — | 537 |
| Stock-based compensation | — | — | 2,883 | — | — | 2,883 |
| Other comprehensive loss | — | — | — | (202) | — | (202) |
| Net loss | — | — | — | — | (35,331) | (35,331) |
| **Balance at March 31, 2020** | 45,206,066 | $ 4 | $ 461,561 | $ (19) | $ (235,005) | $ 226,541 |
| Vesting of common stock from option exercises | 1,011 | — | 4 | — | — | 4 |
| Issuance of common stock from option exercises | 3,576 | — | 16 | — | — | 16 |
| Stock-based compensation | — | — | 3,453 | — | — | 3,453 |
| Other comprehensive gain | — | — | — | 30 | — | 30 |
| Net loss | — | — | — | — | (35,340) | (35,340) |
| **Balance at June 30, 2020** | 45,210,653 | $ 4 | $ 465,034 | $ 11 | $ (270,345) | $ 194,704 |
| Vesting of common stock from option exercises | 1,011 | — | 5 | — | — | 5 |
| Issuance of common stock from option exercises | 3,706 | — | 9 | — | — | 9 |
| Issuance of common stock pursuant to employee stock purchase plan | 44,377 | — | 401 | — | — | 401 |
| Stock-based compensation | — | — | 3,346 | — | — | 3,346 |
| Other comprehensive gain | — | — | — | (11) | — | (11) |
| Net loss | — | — | — | — | (28,232) | (28,232) |
| **Balance at September 30, 2020** | 45,259,747 | $ 4 | $ 468,795 | $ — | $ (298,577) | $ 170,222 |

*See notes to condensed consolidated financial statements.*

**HOMOLOGY MEDICINES, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**
**(UNAUDITED)**

| | Nine months ended September 30, | |
|---|---|---|
| | 2020 | 2019 |
| Cash flows from operating activities: | | |
| Net loss | $ (98,903) | $ (79,749) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 5,909 | 4,599 |
| Noncash lease expense | 686 | — |
| Stock-based compensation expense | 9,682 | 5,199 |
| Amortization of premium on short-term investments | (197) | (1,601) |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses and other current assets | 938 | 2,541 |
| Accounts payable | 486 | 1,511 |
| Accrued expenses and other liabilities | 924 | 2,121 |
| Deferred revenue | (590) | (379) |
| Deferred rent | — | 733 |
| Operating lease liabilities | (1,655) | — |
| Net cash used in operating activities | (82,720) | (65,025) |
| Cash flows from investing activities: | | |
| Purchases of short-term investments | (19,991) | (257,389) |
| Maturities of short-term investments | 228,620 | 243,725 |
| Purchases of property and equipment | (2,778) | (18,108) |
| Net cash provided by (used in) investing activities | 205,851 | (31,772) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock in follow-on public offering, net of discounts and issuance costs | — | 134,524 |
| Proceeds from issuance of common stock pursuant to employee stock purchase plan | 938 | 829 |
| Proceeds from issuance of common stock from option exercises | 160 | 285 |
| Net cash provided by financing activities | 1,098 | 135,638 |
| Net change in cash, cash equivalents and restricted cash | 124,229 | 38,841 |
| Cash, cash equivalents and restricted cash, beginning of period | 55,048 | 39,992 |
| Cash, cash equivalents and restricted cash, end of period | $ 179,277 | $ 78,833 |
| Supplemental disclosures of noncash investing and financing activities: | | |
| Reclassification of liability for common stock vested | $ 21 | $ 47 |
| Property and equipment additions included in accounts payable | $ 677 | $ 682 |
| Property and equipment additions included in accrued expenses and other liabilities | $ 126 | $ 705 |
| Unrealized (loss) gain on available for sale securities, net | $ (183) | $ 331 |

*See notes to condensed consolidated financial statements.*

9

HOMOLOGY MEDICINES, INC.

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share amounts)
(UNAUDITED)

## 1. NATURE OF BUSINESS AND BASIS OF PRESENTATION

**Nature of Business**—Homology Medicines, Inc. (the "Company") is a clinical stage biopharmaceutical company dedicated to translating proprietary gene editing and gene therapy technology into novel treatments for patients with rare genetic diseases with significant unmet medical needs by curing the underlying cause of the disease. The Company was founded in March 2015 as a Delaware corporation. Its principal offices are in Bedford, Massachusetts.

Since its inception, the Company has devoted substantially all of its resources to recruiting personnel, developing its technology platform and advancing its pipeline of product candidates, developing and implementing manufacturing processes, building out manufacturing and research and development space, and maintaining and building its intellectual property portfolio. The Company is subject to a number of risks similar to those of other companies conducting high-risk, early-stage research and development of product candidates. Principal among these risks are dependency on key individuals and intellectual property, competition from other products and companies, and the technical risks associated with the successful research, development and manufacturing of its product candidates. The Company's success is dependent upon its ability to continue to raise additional capital in order to fund ongoing research and development, obtain regulatory approval of its products, successfully commercialize its products, generate revenue, meet its obligations, and, ultimately, attain profitable operations.

On April 2, 2018, the Company completed its initial public offering ("IPO") with the sale of 10,350,000 shares of its common stock, including shares issued upon the exercise in full of the underwriters' over-allotment option, at a public offering price of $16.00 per share, resulting in net proceeds of $150.8 million, after deducting underwriting discounts and commissions and offering expenses. Upon the closing of the IPO, all of the Company's outstanding shares of convertible preferred stock automatically converted into 24,168,656 shares of common stock at the applicable conversion ratio then in effect.

On April 12, 2019, the Company completed a follow-on public offering of its common stock. The Company sold 5,555,556 shares of its common stock at a public offering price of $22.50 per share and received net proceeds of $116.9 million, after deducting underwriting discounts and commissions and offering expenses. In addition, on April 26, 2019 and May 7, 2019, in connection with the exercise in full of the underwriters' option to purchase additional shares, the Company issued an aggregate of 833,333 shares of its common stock at a public offering price of $22.50 per share and received net proceeds of $17.6 million, after deducting underwriting discounts and commissions.

On March 12, 2020, the Company filed a Registration Statement on Form S-3 (File No. 333-237131) (the "Shelf") with the Securities and Exchange Commission ("SEC") in relation to the registration of common stock, preferred stock, debt securities, warrants and/or units of any combination thereof for a period up to three years from the date of the filing. The Shelf became effective on March 12, 2020. The Company also simultaneously entered into a sales agreement with Cowen and Company, LLC ("Cowen"), as sales agent, providing for the offering, issuance and sale by the Company of up to an aggregate $150.0 million of its common stock from time to time in "at-the-market" offerings under the Shelf (the "ATM"). The Company did not sell any shares of common stock pursuant to the ATM during the nine months ended September 30, 2020. At September 30, 2020, there remained $150.0 million of common stock available for sale under the ATM. Simultaneous with the filing of the Shelf, the previous Registration Statement on Form S-3 (File No. 333-230664) filed with the SEC on April 1, 2019, and a prior sales agreement with Cowen providing for the offering, issuance and sale by the Company of up to an aggregate $100.0 million of its common stock from time to time in "at-the-market" offerings, with $76.8 million of remaining capacity, were terminated.

To date, the Company has not generated any revenue from product sales and does not expect to generate any revenue from the sale of product in the foreseeable future. Through September 30, 2020, the Company has financed its operations primarily through public offerings of its common stock, the issuance of convertible preferred stock, and with proceeds from its collaboration and license agreement with Novartis Institutes of BioMedical Research, Inc. ("Novartis") (see Note 10). During the nine months ended September 30, 2020, the Company incurred a net loss of $98.9 million and as of September 30, 2020, had $298.6 million in accumulated deficit. The Company expects to incur additional operating losses and negative operating cash flows for the foreseeable future.

10

Based on current projections, management now believes that existing cash and cash equivalents, together with the anticipated proceeds of $60.0 million from the Pfizer Inc. private placement (see Note 11), will enable the Company to continue its operations into the third quarter of 2022. In the absence of a significant source of recurring revenue, the continued viability of the Company beyond that point is dependent on its ability to continue to raise additional capital to finance its operations. There can be no assurance that the Company will be able to obtain sufficient capital to cover its costs on acceptable terms, if at all.

**Basis of Presentation**— The accompanying unaudited condensed consolidated financial statements have been prepared by the Company in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") and pursuant to the rules and regulations of the SEC for interim financial statements. Certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted pursuant to such rules and regulations. However, the Company believes that the disclosures are adequate to make the information presented not misleading. These condensed consolidated financial statements should be read in conjunction with the Company's audited consolidated financial statements and the notes thereto for the year ended December 31, 2019, included in the Company's Annual Report on Form 10-K on file with the SEC.

The unaudited interim condensed consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements. In the opinion of management, the accompanying unaudited interim condensed consolidated financial statements contain all adjustments which are necessary for a fair statement of the Company's financial position as of September 30, 2020, and consolidated results of operations for the three and nine months ended September 30, 2020 and 2019, and cash flows for the nine months ended September 30, 2020 and 2019. Such adjustments are of a normal and recurring nature. The results of operations for the three and nine months ended September 30, 2020 are not necessarily indicative of the results of operations that may be expected for the year ending December 31, 2020.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Principles of Consolidation**—The Company's condensed consolidated financial statements include the accounts of the Company and its subsidiary, Homology Medicines Securities Corporation, a wholly owned Massachusetts corporation, for the sole purpose of buying, selling, and holding securities on the Company's behalf. All intercompany balances and transactions have been eliminated in the condensed consolidated financial statements.

**Use of Estimates**—The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, and expenses, and the disclosure of contingent assets and liabilities as of and during the reporting period. The Company bases its estimates and assumptions on historical experience when available and on various factors that it believes to be reasonable under the circumstances. Significant estimates and assumptions reflected in these condensed consolidated financial statements include, but are not limited to, revenue recognition, accrued research and development expenses and useful lives assigned to property and equipment. The Company assesses estimates on an ongoing basis; however, actual results could materially differ from those estimates.

**Comprehensive Income (Loss)** —Comprehensive income (loss) is defined as the change in equity of a business enterprise during a period from transactions and other events and circumstances from non-owner sources. The Company's only element of other comprehensive income (loss) is unrealized gains and losses on available-for-sale investments.

**Cash and Cash Equivalents and Restricted Cash**—Cash and cash equivalents consist of standard checking accounts, money market accounts and certain investments. The Company considers all highly liquid investments with original or remaining maturities at the time of purchase of 90 days or less to be cash equivalents. Restricted cash consists of cash serving as collateral for letters of credit issued for security deposits for the Company's facility leases in Bedford, Massachusetts.

The following table provides a reconciliation of cash, cash equivalents and restricted cash to amounts shown in the condensed consolidated statements of cash flows:

|  | September 30, | |
|  | 2020 | 2019 |
|  | (in thousands) | |
| Cash and cash equivalents | $ 178,003 | $ 77,559 |
| Restricted cash | 1,274 | 1,274 |
| Total cash, cash equivalents and restricted cash | $ 179,277 | $ 78,833 |

11

**Short-Term Investments**—Short-term investments represent holdings of available-for-sale marketable securities in accordance with the Company's investment policy and cash management strategy. Short-term investments mature within one-year from the balance sheet date. Investments in marketable securities are recorded at fair value, with any unrealized gains and losses reported within accumulated other comprehensive income as a separate component of stockholders' equity until realized or until a determination is made that an other-than-temporary decline in market value has occurred. Any premium or discount arising at purchase is amortized and/or accreted to interest income and/or expense over the life of the of the underlying security. Such amortization and accretion, together with interest on securities, are included in interest income on the Company's condensed consolidated statements of operations. The cost of marketable securities sold is determined based on the specific identification method and any realized gains or losses on the sale of investments are reflected as a component of other income.

**Deferred Offering Costs**—The Company capitalizes incremental legal, professional accounting and other third-party fees that are directly associated with equity financings as other current assets until the transactions are completed. After equity financings are complete, these costs are recorded in stockholders' equity as a reduction of additional paid-in capital generated as a result of the offering.

**Leases**— In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-02, *Leases* (Topic 842) ("ASU 2016-02"), which eliminated the tests for lease classification under prior U.S. GAAP and requires lessees to recognize right-of-use assets and related lease liabilities on the balance sheet. The FASB subsequently issued the following amendments to ASU 2016-02 that have the same effective date and transition date: ASU No. 2018-01 - *Leases* (Topic 842): *Land Easement Practical Expedient for Transition to Topic 842*, ASU No. 2018-10 - *Codification Improvements to Topic 842*, *Leases*, ASU No. 2018-11 – *Leases* (Topic 842): *Targeted Improvements*, ASU No. 2018-20 – *Leases* (Topic 842): *Narrow-Scope Improvements for Lessors*, and ASU No. 2019-01 – *Leases* (Topic 842): *Codification Improvements*. The Company adopted these amendments with ASU 2016-02 (collectively, the new leasing standards) effective January 1, 2020.

The Company adopted the new leasing standards using the modified retrospective approach, as of January 1, 2020, with no restatement of prior periods or cumulative adjustments to retained earnings. The Company elected the package of practical expedients permitted under the transition guidance within the new standard, which, among other things, allows the Company to carry forward the historical lease classification. In addition, the Company elected the practical expedient not to apply the recognition requirements in the leasing standards to short-term leases (a lease that at commencement date has a lease term of 12 months or less and does not contain a purchase option that it is reasonably certain to exercise) and the practical expedient that permits lessees to make an accounting policy election (by class of underlying asset) to not separate lease components of a contract from non-lease components.

The Company determines if an arrangement is a lease at contract inception. The Company's contracts are determined to contain a lease when all of the following criteria based on the specific circumstances of the arrangement are met: (1) there is an identified asset for which there are no substantive substitution rights; (2) the Company has the right to obtain substantially all of the economic benefits from the identified asset; and (3) the Company has the right to direct the use of the identified asset.

At the commencement date, operating lease liabilities and their corresponding right-of-use assets are recorded based on the present value of future lease payments over the expected lease term. The Company's lease agreements do not provide an implicit rate. As a result, the Company utilizes an estimated incremental borrowing rate to discount lease payments, which is based on the rate of interest the Company would have to pay to borrow a similar amount on a collateralized basis over a similar term. Certain adjustments to the right-of-use asset may be required for items such as initial direct costs paid or lease incentives received. Operating lease cost is recognized over the expected term on a straight-line basis. Variable lease cost is recognized as incurred.

The Company acts as sublessor related to a sublease of the Company's former headquarters. Fixed sublease payments received are recognized on a straight-line basis over the sublease term. Right-of-use assets are periodically evaluated for impairment.

The expected lease term for those leases commencing prior to January 1, 2020 did not change with the adoption of the new leasing standards. The expected lease term for leases commencing after the adoption of the new leasing standards includes noncancelable lease periods and, when applicable, periods covered by an option to extend the lease if the Company is reasonably certain to exercise that option, as well as periods covered by an option to terminate the lease if the Company is reasonably certain not to exercise that option.

12

As a result of the adoption of the new leasing standards, on January 1, 2020, the Company recorded non-cash transactions to recognize a right-of-use asset of $6.8 million, operating lease liabilities of $17.7 million and the derecognition of deferred rent of $10.9 million originally accounted for under legacy guidance. The adoption did not have a material impact on the condensed consolidated statement of operations. For additional information on the adoption of the new leasing standards, refer to Note 7.

| | January 1, 2020 (in thousands) | | |
| | Prior to adoption of new leasing standards | Adjustment for adoption of new leasing standards | As Adjusted |
|---|---|---|---|
| Right-of-use assets (1)(2) | $ — | $ 6,835 | $ 6,835 |
| Deferred rent (2) | $ 1,313 | $ (1,313) | $ — |
| Deferred rent, net of current portion (2) | $ 9,544 | $ (9,544) | $ — |
| Operating lease liabilities (3) | $ — | $ 2,251 | $ 2,251 |
| Operating lease liabilities, net of current portion (3) | $ — | $ 15,441 | $ 15,441 |

(1)    Represents capitalization of operating right-of-use assets
(2)    Represents reclassification of deferred rent and incentives as a reduction to operating right-of-use assets
(3)    Represents recognition of operating lease liabilities

**Research and Development Costs**—Research and development costs are charged to expense as incurred. Research and development expense consists of expenses incurred in performing research and development activities, including salaries and benefits, materials and supplies, preclinical and clinical expenses, stock-based compensation expense, depreciation of equipment, contract services, and other outside expenses.

Costs for certain development activities are recognized based on an evaluation of the progress to completion of specific tasks using information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the pattern of costs incurred, and are reflected in the consolidated financial statements as prepaid expense or accrued research and development expense.

**Revenue Recognition—**Revenue is recognized in accordance with FASB Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). On January 1, 2019, the Company adopted ASC 606 using the full retrospective transition method.

Under ASC 606, the Company recognizes revenue when its customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine the appropriate amount of revenue to be recognized for arrangements determined to be within the scope of ASC 606, the Company performs the following five steps: (i) identification of the promised goods or services in the contract; (ii) determination of whether the promised goods or services are performance obligations including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) the Company satisfies each performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect consideration it is entitled to in exchange for the goods or services it transfers to the customer.

The promised goods or services in the Company's arrangements would likely consist of a license, rights to the Company's intellectual property or research, development and manufacturing services. Performance obligations are promised goods or services in a contract to transfer a distinct good or service to the customer and are considered distinct when (i) the customer can benefit from the good or service on its own or together with other readily available resources and (ii) the promised good or service is separately identifiable from other promises in the contract. In assessing whether promised goods or services are distinct, the Company considers factors such as the stage of development of the underlying intellectual property, the capabilities of the customer to develop the intellectual property on its own or whether the required expertise is readily available and whether the goods or services are integral or dependent to other goods or services in the contract.

The Company estimates the transaction price based on the amount expected to be received for transferring the promised goods or services in the contract. The consideration may include fixed consideration and variable consideration. At the inception of each arrangement that includes variable consideration, the Company evaluates the amount of consideration to which the Company expects to be entitled to. The Company utilizes either the most likely amount method or expected value method to estimate the amount expected to be received based on which method best predicts the amount expected to be received. The amount of variable consideration that is included in the transaction price may be constrained and is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period.

The Company's contracts may include development and regulatory milestone payments that are assessed under the most likely amount method and constrained until it is probable that a significant revenue reversal would not occur. Milestone payments that are not within the Company's control, such as regulatory approvals, are not considered probable of being achieved until those approvals are received. At the end of each reporting period, the Company re-evaluates the probability of achievement of such development and regulatory milestones and any related constraint, and if necessary, adjust its estimate of the overall transaction price. Any such adjustments are recorded on a cumulative catch-up basis, which would affect collaboration revenue in the period of adjustment.

For arrangements that include sales-based royalties, including milestone payments based on the level of sales, and the license is deemed to be the predominant item to which the royalties relate, the Company recognizes revenue at the later of (i) when the related sales occur, or (ii) when the performance obligation to which some or all of the royalty has been allocated has been satisfied (or partially satisfied). To date, the Company has not recognized any royalty revenue resulting from the Company's collaboration arrangement.

The Company allocates the transaction price based on the estimated standalone selling price of each performance obligation. The Company must develop assumptions that require judgment to determine the stand-alone selling price for each performance obligation identified in the contract. The Company utilizes key assumptions to determine the stand-alone selling price, which may include other comparable transactions, pricing considered in negotiating the transaction and the estimated costs. Variable consideration is allocated specifically to one or more performance obligations in a contract when the terms of the variable consideration relate to the satisfaction of the performance obligation and the resulting amounts allocated are consistent with the amounts the Company would expect to receive for the satisfaction of each performance obligation.

The consideration allocated to each performance obligation is recognized as revenue when control is transferred for the related goods or services. For performance obligations which consist of licenses and other promises, the Company utilizes judgment to assess the nature of the combined performance obligation to determine whether the combined performance obligation is satisfied over time or at a point in time and, if over time, the appropriate method of measuring progress. The Company evaluates the measure of progress for its over-time arrangements at each reporting period and, if necessary, updates the measure of progress and revenue recognized.

**Net Loss per Share—**Basic net loss per share is computed by dividing net loss by the weighted-average number of common shares outstanding during the period. Diluted net loss per share is computed using the weighted-average number of common shares outstanding during the period and, if dilutive, the weighted-average number of potential shares of common stock. The weighted-average number of common shares included in the computation of diluted net loss gives effect to all potentially dilutive common equivalent shares, including outstanding stock options and unvested shares of common stock.

Common stock equivalent shares are excluded from the computation of diluted net loss per share if their effect is antidilutive. In periods in which the Company reports a net loss attributable to common stockholders, diluted net loss per share attributable to common stockholders is generally the same as basic net loss per share attributable to common stockholders since dilutive common shares are not assumed to have been issued if their effect is anti-dilutive.

**Recent Accounting Pronouncements**—The Jumpstart Our Business Startups Act of 2012 permits an emerging growth company to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies until those standards would otherwise apply to private companies. As an emerging growth company, the Company has elected to take advantage of this extended transition period.

In February 2016, the FASB issued new leasing standards to increase transparency and comparability among organization related to their leasing activities. For additional information on the adoption of the new leasing standards, please refer to section titled "Leases" above, and Note 7.

14

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13") to improve financial reporting by requiring more timely recording of credit losses on loans and other financial instruments held by financial institutions and other organizations. ASU 2016-13 requires the measurement of all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions and reasonable and supportable forecasts. ASU 2016-13 also requires enhanced disclosures to help investors and other financial statement users better understand significant estimates and judgments used in estimating credit losses, as well as the credit quality and underwriting standards of an organization's portfolio. ASU 2016-13 is effective for the Company beginning January 1, 2023, with early application permitted. The Company is currently evaluating the impact the adoption of this standard will have on its condensed consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, *Compensation—Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting* ("ASU 2018-07"), which changes certain aspects of the accounting for share-based payments granted to nonemployees. Under ASU 2018-07, most of the guidance on such payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. The Company adopted ASU 2018-07 on January 1, 2020. The adoption of ASU 2018-07 did not have a material impact on the Company's condensed consolidated financial statements and related disclosures.

## 3. SHORT-TERM INVESTMENTS

The Company invests its excess cash in fixed income instruments denominated and payable in U.S. dollars including U.S. treasury securities, commercial paper, corporate debt securities and asset-backed securities in accordance with the Company's investment policy that primarily seeks to maintain adequate liquidity and preserve capital.

The Company has designated all investments as available-for-sale and therefore such investments are reported at fair value. Unrealized gains or losses on investments are recorded in accumulated other comprehensive income or loss, a component of stockholders' equity, on the Company's condensed consolidated balance sheets.

The following table summarizes the Company's investments, which are included in cash equivalents and short-term investments:

| As of September 30, 2020 | Amortized Cost | | Unrealized Gains | | Unrealized Losses | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | | |
| Money market mutual funds | $ | 177,753 | $ | — | $ | — | $ | 177,753 |
| Total | $ | 177,753 | $ | — | $ | — | $ | 177,753 |

| As of December 31, 2019 | Amortized Cost | | Unrealized Gains | | Unrealized Losses | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | | |
| Repurchase agreements | $ | 14,000 | $ | — | $ | — | $ | 14,000 |
| Asset-backed securities | | 14,866 | | 10 | | — | | 14,876 |
| Money market mutual funds | | 39,524 | | — | | — | | 39,524 |
| Commercial paper | | 41,259 | | — | | — | | 41,259 |
| U.S. Treasury securities | | 59,926 | | 45 | | — | | 59,971 |
| Corporate debt securities | | 92,380 | | 128 | | — | | 92,508 |
| Total | $ | 261,955 | $ | 183 | $ | — | $ | 262,138 |

The Company utilizes the specific identification method in computing realized gains and losses. The Company had no realized gains and losses on its available-for-sale securities for the three and nine months ended September 30, 2020 and 2019. The contractual maturity dates of all of the Company's investments are less than one year.

15

**4. FAIR VALUE MEASUREMENTS**

The Company's financial instruments consist of cash and cash equivalents, short-term investments, restricted cash and accounts payable. The carrying amount of cash, restricted cash and accounts payable are each considered a reasonable estimate of fair value due to the short-term maturity.

Assets measured at fair value on a recurring basis were as follows:

| Description | September 30, 2020 | | Quoted Prices (Unadjusted) in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | | |
| *Cash equivalents:* | | | | | | | | |
| Money market mutual funds | $ | 177,753 | $ | 177,753 | $ | — | $ | — |
| Total cash equivalents | $ | 177,753 | $ | 177,753 | $ | — | $ | — |

| Description | December 31, 2019 | | Quoted Prices (Unadjusted) in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | | |
| *Cash equivalents:* | | | | | | | | |
| Money market mutual funds | $ | 39,524 | $ | 39,524 | $ | — | $ | — |
| Repurchase agreements | | 14,000 | | — | | 14,000 | | — |
| Total cash equivalents | $ | 53,524 | $ | 39,524 | $ | 14,000 | $ | — |
| *Short-term investments:* | | | | | | | | |
| Asset-backed securities | $ | 14,876 | $ | — | $ | 14,876 | $ | — |
| Commercial paper | | 41,259 | | — | | 41,259 | | — |
| U.S. Treasury securities | | 59,971 | | — | | 59,971 | | — |
| Corporate debt securities | | 92,508 | | — | | 92,508 | | — |
| Total short-term investments | $ | 208,614 | $ | — | $ | 208,614 | $ | — |
| Total financial assets | $ | 262,138 | $ | 39,524 | $ | 222,614 | $ | — |

Short-term securities are valued using models or other valuation methodologies that use Level 2 inputs. These models are primarily industry-standard models that consider various assumptions, including time value, yield curve, volatility factors, default rates, current market and contractual prices for the underlying financial instruments, as well as other relevant economic measures. Substantially all of these assumptions are observable in the marketplace, can be derived from observable data or are supported by observable levels at which transactions are executed in the marketplace.

There were no transfers between fair value measure levels during the three and nine months ended September 30, 2020 and 2019.

16

**5. PROPERTY AND EQUIPMENT, NET**

Property and equipment, net consists of the following:

| | As of | | |
|---|---|---|---|
| | September 30, 2020 | | December 31, 2019 |
| | (in thousands) | | |
| Laboratory equipment | $ | 11,991 | $ | 10,837 |
| Manufacturing equipment | | 7,754 | | 4,911 |
| Computers and purchased software | | 1,596 | | 640 |
| Furniture and fixtures | | 1,363 | | 1,363 |
| Leasehold improvements | | 29,960 | | 30,862 |
| Assets not yet in service | | 1,339 | | 2,513 |
| Property and equipment, at cost | | 54,003 | | 51,126 |
| Less: accumulated depreciation and amortization | | (14,319) | | (8,410) |
| Property and equipment, net | $ | 39,684 | $ | 42,716 |

Depreciation expense for the three and nine months ended September 30, 2020 was approximately $2.0 million and $5.9 million, respectively, compared to $1.7 million and $4.6 million, respectively for the three and nine months ended September 30, 2019. There were no disposals of property and equipment during the three and nine months ended September 30, 2020 and 2019. Leasehold improvements consist primarily of costs associated with the buildout of the Company's research and development, manufacturing and general office space in Bedford, Massachusetts.

**6. ACCRUED EXPENSES AND OTHER LIABILITIES**

Accrued expenses and other liabilities consist of the following:

| | As of | | |
|---|---|---|---|
| | September 30, 2020 | | December 31, 2019 |
| | (in thousands) | | |
| Accrued compensation and benefits | $ | 5,641 | $ | 4,551 |
| Accrued research and development expenses | | 1,997 | | 2,258 |
| Accrued professional fees | | 461 | | 542 |
| Accrued unvested common stock subject to repurchase | | 16 | | 37 |
| Accrued other | | 311 | | 256 |
| Total accrued expenses and other liabilities | $ | 8,426 | $ | 7,644 |

**7. COMMITMENTS AND CONTINGENCIES**

**Operating Leases**—In September 2016, the Company entered into a noncancelable operating lease beginning in November 2016 for office, laboratory and manufacturing space in Bedford, Massachusetts, that expires in October 2021, with an option for an additional three-year term. On August 13, 2018, the Company entered into a sublease agreement for the entire leased premises. The rent commencement date of the sublease was December 2018, and the sublease will terminate on the scheduled termination date of the original lease. Under the terms of the sublease, the subtenant is obligated to pay the Company aggregate base rent of approximately $2.7 million over the term of the sublease in addition to passthrough of operating expenses and real estate taxes charged by the landlord.

In December 2017, the Company entered into a noncancelable operating lease for approximately 67,000 square feet of research and development, manufacturing and general office space in Bedford, Massachusetts. The lease expires in February 2027 with an option for an additional five-year term. Rent became due under the lease in two phases; rent on the first 46,000 square feet started in September 2018 and rent on the remaining 21,000 square feet started in March 2019. The initial annual base rent is $39.50 per square foot and will increase by three percent annually. The Company is obligated to pay, on a pro-rata basis, real estate taxes and operating costs related to the premises. The lease agreement entered into in December 2017 allowed for a tenant improvement allowance not to exceed $10.9 million, which the Company received in full, to be applied to the total cost of tenant improvements to the leased premises. The unamortized balance of the tenant improvement allowance was included in deferred rent and has been recorded as a reduction to the operating right-of-use asset upon the adoption of the new leasing standards.

The Company maintains letters of credit, secured by restricted cash, for security deposits totaling $1.3 million as of September 30, 2020 and December 31, 2019, respectively, in conjunction with its current leases.

The following table summarizes operating lease costs as well as sublease income for the nine months ended September 30, 2020:

| Nine months ended September 30, 2020 | | Amount (in thousands) |
|---|---|---|
| Operating lease costs | $ | 1,869 |
| Sublease income | | (685) |
| Net lease cost | $ | 1,184 |

Rent expense, net of amortization of the deferred rent incentives was $0.4 million and $1.0 million, respectively, for the three and nine months ended September 30, 2019.

The maturities of our operating lease liabilities and minimum lease payments as of September 30, 2020 were as follows:

| For the Years Ending December 31, | | Amount (in thousands) |
|---|---|---|
| 2020 | $ | 969 |
| 2021 | | 3,834 |
| 2022 | | 2,987 |
| 2023 | | 3,077 |
| 2024 | | 3,169 |
| Thereafter | | 7,197 |
| Total undiscounted lease payments | $ | 21,233 |
| Less: imputed interest | | (5,196) |
| Present value of operating lease liabilities | $ | 16,037 |

The following table summarizes the lease term and discount rate as of September 30, 2020:

| | As of September 30, 2020 |
|---|---|
| Weighted-average remaining lease term (years) | |
| Operating leases | 6.0 |
| Weighted-average discount rate | |
| Operating leases | 9.9% |

The following table summarizes cash paid for amounts included in the measurement of the Company's operating lease liabilities for the nine months ended September 30, 2020.

| | Nine months ended September 30, 2020 (in thousands) |
|---|---|
| **Cash paid for amounts included in the measurement of lease liabilities** | |
| Operating cash flows from operating leases | $ 2,838 |

18

**8. STOCK INCENTIVE PLANS**

*2015 Stock Incentive Plan*

In December 2015, the Company's Board of Directors adopted the 2015 Stock Incentive Plan (the "2015 Plan"), which provided for the grant of qualified incentive and nonqualified stock options or restricted stock awards to the Company's employees, officers, directors, advisors, and outside consultants. Stock options generally vest over a four-year period and expire ten years from the date of grant. Certain options provide for accelerated vesting if there is a change in control, as defined in the 2015 Plan. At September 30, 2020, there were no additional shares available for future grant under the 2015 Plan.

*2018 Incentive Award Plan*

In March 2018, the Company's Board of Directors adopted and the Company's stockholders approved the Homology Medicines, Inc. 2018 Incentive Award Plan (the "2018 Plan" and, together with the 2015 Plan, the "Plans"), which became effective on the day prior to the first public trading date of the Company's common stock. Upon effectiveness of the 2018 Plan, the Company ceased granting new awards under the 2015 Plan.

The 2018 Plan provides for the grant of incentive stock options, nonqualified stock options, restricted stock awards, restricted stock units, stock appreciation rights and other stock or cash-based awards to employees and consultants of the Company and directors of the Company. The number of shares of common stock initially available for issuance under the 2018 Plan was 3,186,205 shares of common stock plus the number of shares subject to awards outstanding under the 2015 Plan that expire, terminate or are otherwise surrendered, cancelled, forfeited or repurchased by the Company on or after the effective date of the 2018 Plan. In addition, the number of shares of common stock available for issuance under the 2018 Plan is subject to an annual increase on the first day of each calendar year beginning on January 1, 2019 and ending on and including January 1, 2028 equal to the lesser of (i) 4% of the Company's outstanding shares of common stock on the final day of the immediately preceding calendar year and (ii) such smaller number of shares of common stock as determined by the Company's Board of Directors, provided that not more than 20,887,347 shares of common stock may be issued under the 2018 Plan upon the exercise of incentive stock options. Therefore, on January 1, 2020, an additional 1,804,670 shares were added to the 2018 Plan, representing 4% of total common shares outstanding at December 31, 2019. At September 30, 2020, there were 2,430,357 shares available for future grant under the 2018 Plan.

*2018 Employee Stock Purchase Plan*

In March 2018, the Company's Board of Directors adopted and the Company's stockholders approved the Homology Medicines, Inc. 2018 Employee Stock Purchase Plan (the "2018 ESPP"). The 2018 ESPP allows employees to buy Company stock through after-tax payroll deductions at a discount from market value. The 2018 ESPP is intended to qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code. The number of shares of common stock initially available for issuance under the 2018 ESPP was 353,980 shares of common stock plus an annual increase on the first day of each calendar year beginning on January 1, 2019 and ending on and including January 1, 2028 equal to the lesser of (i) 1% of the Company's outstanding shares of common stock on the final day of the immediately preceding calendar year and (ii) such smaller number of shares of common stock as determined by the Company's Board of Directors, provided that not more than 4,778,738 shares of common stock may be issued under the 2018 ESPP. Therefore, on January 1, 2020, an additional 451,167 shares were added to the 2018 ESPP, representing 1% of total common shares outstanding at December 31, 2019. At September 30, 2020, there were 1,039,651 shares available for future issuance under the 2018 ESPP.

Under the 2018 ESPP, employees may purchase common stock through after-tax payroll deductions at a price equal to 85% of the lower of the fair market value on the first trading day of an offering period or the last trading day of an offering period. The 2018 ESPP generally provides for offering periods of six months in duration that end on the final trading day of each February and August. In accordance with the Internal Revenue Code, no employee will be permitted to accrue the right to purchase stock under the 2018 ESPP at a rate in excess of $25,000 worth of shares during any calendar year during which such a purchase right is outstanding (based on the fair market value per share of the Company's common stock as of the first day of the offering period).

During the nine months ended September 30, 2020, 83,848 shares were issued under the 2018 ESPP for aggregate proceeds to the Company of $0.9 million. During the nine months ended September 30, 2019, 55,234 shares were issued under the 2018 ESPP for aggregate proceeds to the Company of $0.8 million. Pursuant to the 2018 ESPP, the Company recorded stock-based compensation of $0.1 million during the three and nine months ended September 30, 2020, and $0.1 million during the three and nine months ended September 30, 2019.

*Stock-based compensation expense*

The Company recognizes compensation expense for awards to employees based on the grant date fair value of stock-based awards on a straight-line basis over the period during which an award holder provides service in exchange for the award, which is generally the vesting period. The fair value of each option award is estimated on the date of grant using the Black-Scholes option- pricing model, with the assumptions noted in the table below. Expected volatility for the Company's common stock was determined based on an average of the historical volatility of a peer group of publicly traded companies that are similar to the Company. The expected term of options granted to employees was calculated using the simplified method, which represents the average of the contractual term of the option and the weighted-average vesting period of the option. The Company uses the simplified method because it does not have sufficient historical option exercise data to provide a reasonable basis upon which to estimate expected term. The contractual life of the options was used for the expected term of options granted to non-employees. The assumed dividend yield is based upon the Company's expectation of not paying dividends in the foreseeable future. The risk-free rate is based on the U.S. Treasury yield curve in effect at the time of grant for periods commensurate with the expected term of the award. The Company recognizes forfeitures as they occur.

The assumptions used in the Black-Scholes option pricing model are as follows:

|  | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2020 | 2019 | 2020 | 2019 |
| Expected volatility | 64.6% — 65.2% | 62.4% — 63.2% | 63.2% — 65.4% | 62.4% — 64.7% |
| Weighted-average risk-free interest rate | 0.31% — 0.40% | 1.36% — 1.94% | 0.31% — 1.73% | 1.36% — 2.60% |
| Expected dividend yield | — % | — % | — % | — % |
| Expected term (in years) | 6.0-6.25 | 6.25 | 5.5-6.25 | 6.25 |
| Underlying common stock fair value | $10.10 — $16.48 | $15.92 — $21.45 | $10.10 — $21.75 | $15.92 — $30.34 |

The Company recorded stock-based compensation expense related to stock options and shares purchased under the 2018 ESPP as follows:

|  | Three months ended September 30, | | | | Nine months ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2020 | | 2019 | | 2020 | | 2019 | |
|  | (in thousands) | | | | | | | |
| Research and development | $ | 1,572 | $ | 1,124 | $ | 4,640 | $ | 2,786 |
| General and administrative |  | 1,774 |  | 863 |  | 5,042 |  | 2,413 |
|  | $ | 3,346 | $ | 1,987 | $ | 9,682 | $ | 5,199 |

As of September 30, 2020, there was $32.6 million of unrecognized compensation expense related to unvested employee and non-employee share-based compensation arrangements granted under the Plans. The unrecognized compensation expense is estimated to be recognized over a period of 2.6 years at September 30, 2020.

A summary of option activity under the Plans during the nine months ended September 30, 2020 is as follows:

|  | Number of Options | Weighted-Average Exercise Price per Share | | Weighted-Average Remaining Contractual Term (in Years) | Aggregate Intrinsic Value | |
| --- | --- | --- | --- | --- | --- | --- |
|  |  |  |  |  | (in thousands) | |
| Outstanding at January 1, 2020 | 4,843,018 | $ | 14.78 | 8.5 | $ | 33,809 |
| Granted | 1,200,650 | $ | 18.43 |  |  |  |
| Exercised | (41,593) | $ | 3.84 |  |  |  |
| Cancelled/Forfeited | (189,243) | $ | 23.31 |  |  |  |
| Outstanding at September 30, 2020 | 5,812,832 | $ | 15.33 | 8.1 | $ | 11,299 |
| Vested and expected to vest at September 30, 2020 | 5,812,832 | $ | 15.33 | 8.1 | $ | 11,299 |
| Exercisable at September 30, 2020 | 2,574,662 | $ | 11.70 | 7.3 | $ | 9,618 |

20

The total intrinsic value of options exercised during the nine months ended September 30, 2020 and 2019 was $0.5 million and $1.4 million, respectively. The weighted-average grant date fair value per share of options granted during the nine months ended September 30, 2020 and 2019 was $10.73 and $14.70, respectively.

Stock options granted pursuant to the 2015 Plan permit option holders to elect to exercise unvested options in exchange for unvested common stock. Options granted under the 2015 Plan that are exercised prior to vesting will continue to vest according to the respective option agreement, and such unvested shares are subject to repurchase by the Company at the optionee's original exercise price in the event the optionee's service with the Company voluntarily or involuntarily terminates.

A summary of the Company's unvested common stock from early exercises that is subject to repurchase by the Company is as follows:

|  | Shares |
|---|---|
| Unvested shares - January 1, 2020 | 21,666 |
| Vested | (17,564) |
| Issued | — |
| Repurchased | — |
| Unvested shares - September 30, 2020 | 4,102 |

As of September 30, 2020 and December 31, 2019, 4,102 shares and 21,666 shares, respectively, remained subject to a repurchase right by the Company, with a related liability included in accrued expenses and other liabilities in the condensed consolidated balance sheets of less than $0.1 million as of September 30, 2020 and December 31, 2019.

## 9. NET LOSS PER SHARE

The Company's potential dilutive securities, which include unvested common stock from the early-exercise of stock options and outstanding common stock options, have been excluded from the computation of diluted net loss per share as the effect would be to reduce the net loss per share. Therefore, the weighted average number of common shares outstanding used to calculate both basic and diluted net loss per share attributable to common stockholders is the same. The Company excluded the following potential common shares, presented based on amounts outstanding at September 30, 2020 and 2019, from the computation of diluted net loss per share attributable to common stockholders because including them would have had an anti-dilutive effect:

|  | As of September 30, | |
|---|---|---|
|  | 2020 | 2019 |
| Unvested common stock from early exercise of options | 4,102 | 72,577 |
| Stock options to purchase common stock | 5,812,832 | 3,876,428 |
| Total | 5,816,934 | 3,949,005 |

## 10. COLLABORATION AND LICENSE AGREEMENT

*Summary of Agreement*

In November 2017, the Company entered into a collaboration and license agreement with Novartis (as amended, the "Collaboration Agreement") for the research, development, manufacturing and commercialization of products using the Company's gene-editing technology for the treatment of certain ophthalmic targets and sickle cell disease. In February 2019, Novartis elected to discontinue the sickle cell disease program under the Collaboration Agreement effective in August 2019. In May 2020, Novartis confirmed an ophthalmic target for a therapeutic editing program. Together, the companies are focusing their resources on advancing this program to development candidate selection. Additionally, in accordance with the terms of the Collaboration Agreement, Novartis' right to substitute other ophthalmic targets expired. The Company also continues to work with Novartis on identifying new targets for the collaboration based on the existing exploratory research component of the agreement, which was extended for an additional six months through an amendment to the Collaboration Agreement executed in October 2020.

Under the terms of the Collaboration Agreement, the Company granted Novartis a research license, a development and commercialization license, and a manufacturing license, under certain of its intellectual property rights to research, develop, manufacture and commercialize ophthalmic targets. Upon entering into the Collaboration Agreement, the Company received an upfront, nonrefundable payment of $35.0 million and issued additional shares of its Series B preferred stock to Novartis for consideration of $10.0 million. The Company recorded the Series B preferred stock at its estimated fair value of $11.7 million, including $1.7 million of the upfront payment, and allocated the remaining $33.3 million of the upfront payment to the Collaboration Agreement.

The Collaboration Agreement consists of a research term, where the Company and Novartis are collaborating to perform research and conduct preclinical development to identify candidates that modulate ophthalmic targets. The Collaboration Agreement also includes exploratory work on the applicability of the gene-editing technology with respect to other gene targets. The Company's obligation to perform such exploratory research has been extended pursuant to the October 2020 amendment to the Collaboration Agreement and now concludes in May 2021. Taking into account the expiration of Novartis' rights to substitute other ophthalmic targets, the Company and Novartis will focus resources on the confirmed ophthalmic target. The Company is responsible for the manufacturing of proprietary research grade human hematopoietic stem cell derived adeno-associated virus vectors ("AAVHSCs") during the research term. Research activities performed by the Company are being reimbursed at a full-time equivalent rate ("FTE") and manufacturing activities will be reimbursed at cost, up to a maximum of $17.0 million during the research term, as specified and defined in the Collaboration Agreement. Novartis is required to pay the Company a target fee of $5.0 million if the target meets certain success criteria during the research term (the "target fee trigger date"). The research term will continue for five years from the effective date of the Collaboration Agreement. Pursuant to the Collaboration Agreement, the Company will also participate on a joint steering committee and a joint manufacturing subcommittee, with equal representation from both the Company and Novartis.

Novartis has the exclusive right to develop and commercialize one ophthalmic candidate or product arising from the research activities. Subject to certain limitations pursuant to the terms of the Collaboration Agreement, Novartis will fund all development and commercialization costs. The Company will be responsible for manufacturing candidates and products for Novartis during the development and commercialization terms. The Company's manufacturing activities will be reimbursed at cost during the development term and at cost plus a margin during the commercialization term, as defined in the Collaboration Agreement. If the Company is not able to manufacture candidates or products that meet the quality or quantity requirements of Novartis, then Novartis shall have the right to designate a third-party contract manufacturer or manufacture such candidates or products itself.

In accordance with the Collaboration Agreement, taking into consideration Novartis' election to discontinue the sickle cell disease program and the expiration of Novartis' rights to make substitutions of an ophthalmic target, the Company is also eligible to receive up to a total of $265.0 million in milestone payments, including up to $90.0 million in development milestone payments, up to $85.0 million in regulatory milestone payments and up to $90.0 million in commercial milestone payments, with respect to the licensed products. The Company is also eligible to earn tiered royalties on net sales of licensed products by Novartis, its affiliates or sublicensees, ranging from mid single-digit, to sub-teen double-digit percentages, and such royalties are potentially subject to various reductions and offsets. If any of the exploratory research efforts are advanced into formal research and development programs, the parties will negotiate the economics including potential milestone payments for such programs at that time.

Unless earlier terminated, the Collaboration Agreement will continue on a target-by-target basis until the expiration of all applicable royalty terms with respect to all products that modulate such target on a country-by-country-basis. Either party may terminate the agreement on a target-by-target basis for the other party's material breach with respect to such target, or in the event of the other party's bankruptcy. Novartis may terminate the agreement for convenience on a target-by-target basis. The Company may terminate the agreement if Novartis files, or joins a third party in filing or maintaining, a patent challenge against certain of the patent rights licensed to Novartis under the terms of the agreement. There are no performance, cancellation, termination or refund provisions in the arrangement that contain material financial consequences to the Company.

*Revenue Recognition*

The Company determined that the (1) research, development and commercialization and manufacturing licenses, (2) the research activities performed by the Company (3) service on the joint committees and (4) manufacturing during the research and development terms represented a single performance obligation under the Collaboration Agreement. Since the option for Novartis to obtain manufacturing during the commercialization term from the Company is at a price that would reflect the standalone selling price, the option does not provide Novartis with a material right and is therefore not a performance obligation under the contract.

The Company has concluded that the research, development and commercialization and manufacturing licenses are not distinct from the research activities and manufacturing during the research and development term as Novartis cannot benefit from the licenses without the Company performing the research and manufacturing services. These services are so specialized and rely on the Company's expertise in gene editing technologies not available in the marketplace. As a result, these licenses have been combined with the research activities, service on the joint committees and the manufacturing during the research and development terms as a single performance obligation.

22

The transaction price consists of the $33.3 million non-refundable upfront payment, net of amounts classified as equity, and projected reimbursable research and manufacturing activities, which have been estimated using the expected value method. None of the target fees or development and regulatory milestone payments have been included in the transaction price, as all are fully constrained. As part of the evaluation of the constraint, the Company considered numerous factors, including the fact that achievement of the milestones is outside of the Company's control and is contingent upon the success of the Company's preclinical studies, clinical trials, Novartis' efforts and the receipt of regulatory approval. In addition, the Company has determined that the commercial milestones and sales-based royalties will be recognized when the related sales occur as they were determined to relate predominately to the licenses transferred to Novartis, and therefore have also been excluded from the transaction price. The Company will re-evaluate the transaction price, including estimated variable consideration included in the transaction price and all constrained amounts, in each reporting period and as uncertain events are resolved or other changes in circumstances occur.

The Company identified only one performance obligation in the Collaboration Agreement. Therefore, the Company will allocate the transaction price at the onset of the contract to the single performance obligation.

The Company recognizes revenue over time using a cost-to-cost method, which it believes best depicts the transfer of control to the customer. Under the cost-to-cost method, the extent of progress towards completion is measured based on the ratio of actual costs incurred to the total estimated costs expected upon satisfying the identified performance obligation. Under this method, revenue is recorded over the performance period as a percentage of the estimated transaction price based on the extent of progress towards completion. As of September 30, 2020, the aggregate amount of the transaction price related to the unsatisfied portion of the performance obligation is $30.4 million, and the Company will recognize this revenue as the research and manufacturing activities are performed, which is expected to occur over a period of time that is estimated will conclude in 2027. The Company does not expect collaboration revenue to be recognized evenly over this period as it will be recognized on a percentage of completion basis as the Company performs the research, development and manufacturing services, which will likely vary from period to period.

In estimating the total costs to satisfy its single performance obligation pursuant to the Novartis agreement, the Company is required to make significant estimates including the expected time it will take to fulfill the performance obligation, which currently is expected to be approximately ten years from the date the Collaboration Agreement was entered into, and the expected costs associated with manufacturing during the research and development terms for a novel manufacturing process as well as the probability of success of a target to move into the development phase. The Company has made estimates of such costs utilizing its experience with similar product candidates, however not identical to those in the Collaboration Agreement. In making such estimates, significant judgment is required to evaluate those key assumptions related to cost estimates. The cumulative effect of revisions to the total estimated costs to complete the Company's single performance obligation will be recorded in the period in which the changes are identified and amounts can be reasonably estimated. While such revisions will have no impact on the Company's reported cash flows, a significant change in these assumptions and estimates could have a material impact on the timing and amount of revenue recognized in future periods.

During the three and nine months ended September 30, 2020, the Company recognized revenue under the Collaboration Agreement of $0.6 million and $1.7 million, respectively, of which $0.2 million and $0.6 million was included in deferred revenue at the beginning of each period. During the three and nine months ended September 30, 2019, the Company recognized revenue under the Collaboration Agreement of $0.4 million and $1.1 million, respectively, of which $0.2 million and $0.4 million, respectively, was included in deferred revenue at the beginning of each period. As of September 30, 2020 and December 31, 2019, there was approximately $30.4 million and $31.0 million of deferred revenue related to the Collaboration Agreement, respectively. In addition, as of September 30, 2020 and December 31, 2019, the Company has recorded accounts receivable of $0.4 million related to reimbursable research and development costs under the Collaboration Agreement, which are included in prepaid expenses and other current assets on the condensed consolidated balance sheets as of each such date.

## 11. SUBSEQUENT EVENTS

On November 9, 2020, the Company entered into a stock purchase agreement (the "Stock Purchase Agreement") with Pfizer Inc. ("Pfizer"), pursuant to which Pfizer has agreed to purchase 5,000,000 shares of the Company's common stock through a private placement transaction (the "Private Placement") at a purchase price of $12.00 per share, for an aggregate purchase price of $60.0 million. Under the Stock Purchase Agreement, Pfizer was granted an exclusive right of first refusal ("ROFR") for a 30-month period (the "ROFR Period") beginning on the date of the closing of the Private Placement (collectively, the "ROFR Provision"), to negotiate a potential collaboration on the development and commercialization of HMI-102 and HMI-103. Pfizer may exercise its right of first refusal under the ROFR Provision one time for each of HMI-102 and HMI-103 during the ROFR period. Additionally during the ROFR period, Pfizer has the right to designate a member to join the Company's Scientific Advisory Board to participate in matters related to the development of these programs.

* * * * * *

23

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing elsewhere in this Quarterly Report on Form 10-Q. Some of the information contained in this discussion and analysis or set forth elsewhere in this Quarterly Report on Form 10-Q, including information with respect to our plans and strategy for our business, includes forward-looking statements that involve risks and uncertainties. As a result of many important factors, including those set forth in the "Risk Factors" section of this Quarterly Report on Form 10-Q, our actual results could differ materially from the results described in, or implied, by these forward-looking statements.*

## Overview

We are a genetic medicines company dedicated to transforming the lives of patients suffering from rare genetic diseases with significant unmet medical needs by curing the underlying cause of the disease. Our proprietary platform is designed to utilize our human hematopoietic stem cell derived adeno-associated virus vectors, or AAVHSCs, to precisely and efficiently deliver single administration genetic medicines *in vivo* either through gene therapy or nuclease-free gene editing across a broad range of genetic disorders. Our diverse set of AAVHSCs allows us to precisely target, via a single injection, a wide range of disease-relevant tissues, including the liver, central nervous system, or CNS, peripheral nervous system, or PNS, bone marrow, muscle and eye. Our genetic medicines platform is designed to provide us the flexibility to choose the method we believe is best suited from either gene therapy or gene editing for each disease we pursue, based on such factors as the targeted disease biology, the biodistribution of our AAVHSCs to key tissues, and the rate of cell division the tissues exhibit. Our product development strategy is to continue to develop in parallel both gene therapy and gene editing, while initially leveraging the experience from our gene therapy product candidates to further advance our gene editing. We believe our dual technology platform will allow us to provide transformative cures using either modality.

The unique properties of our proprietary suite of 15 novel AAVHSCs enable us to focus on a method of gene editing called gene integration, through the replacement of an entire diseased gene in the genome with a whole functional copy by harnessing the naturally occurring deoxyribonucleic acid, or DNA, repair process of homologous recombination, or HR. We believe our HR-driven gene editing approach will allow us to efficiently perform gene editing at therapeutic levels without unwanted on- and off-target modifications, and to directly measure and confirm those modifications in an unbiased manner to ensure only the intended changes are made. By utilizing the body's natural mechanism of correcting gene defects, we also avoid the need for exogenous nucleases, or bacteria-derived enzymes used in other gene editing approaches to cut DNA, that are known to significantly increase the risk of unwanted modifications.

### HMI-102 for Treatment of PKU in Adult Patients

In June 2019, we commenced enrollment of our Phase 1/2 pheNIX clinical trial with our first and lead product candidate, HMI-102, a gene therapy for the treatment of adults with phenylketonuria, or PKU. The pheNIX trial is designed to evaluate the safety and efficacy of HMI-102 in a dose-escalation, randomized, concurrently-controlled study in adult patients with PKU. During the dose-escalation portion of the trial, we evaluated safety and efficacy and sought to determine a dose to bring forward to the expansion phase. As of the data cutoff date of October 19, 2020, six patients in the dose-escalation phase of the pheNIX trial had received HMI-102 across three dose cohorts (low-dose Cohort 1, n=2; mid-dose Cohort 2, n=2; high-dose Cohort 3, n=2). Cohorts included males and females, with an age range of 21-49 and time in study ranging from 13 weeks to 52 weeks (end of study).

Safety data from these six patients as of the cutoff date showed HMI-102 was generally well-tolerated, and there were no treatment-related serious adverse events. There was one serious adverse event of Herpes zoster (shingles) assessed by a principal investigator of the pheNIX trial as not related to treatment with HMI-102. There were no clinically significant changes in electrocardiogram or vital signs and no clinical signs of complement activation. In Cohorts 2 and 3, Grade 1 and 3 alanine aminotransferases, or ALTs, (ALT Grades based on Common Terminology Criteria for Adverse Events Version 5), which are common in adeno-associated virus-based gene therapy, were observed and managed with increased steroids when necessary. Each of the two patients who experienced Grade 3 ALTs had pre-existing underlying immune conditions. An independent data monitoring committee, which provided guidance throughout the pheNIX clinical trial, supported the conclusion that there were no safety concerns related to bilirubin, and that ALT elevations may be associated with reduced therapeutic activity.

Efficacy data from the two patients in Cohort 1 did not show any meaningful reductions in plasma phenylalanine, or Phe, throughout the study, which they have completed. We believe this first and lowest dose in this dose-escalation study was insufficient to impact Phe levels.



**Figure 1. Preliminary data from Cohort 1 (low-dose) in the dose-escalation phase of the pheNIX clinical trial as of the data cutoff date of October 19, 2020.**

In Cohort 2, one patient experienced a marked Phe reduction from baseline level of 1,010 µmol/L, and recorded five plasma Phe values <360 µmol/L, and many of <600 µmol/L. The mean percentage change from baseline for this patient are reported in three categories: Phe; tyrosine, or Tyr, and the Phe/Tyr ratio. For patients with PKU, the goal for a therapy is to lower Phe values, increase Tyr values and lower the overall Phe/Tyr ratio. As of the cutoff date, this patient's mean percentage change from baseline showed a 48.6% reduction in plasma Phe, an 81.1% increase in Tyr and a 70.8% decrease in the Phe/Tyr ratio. We believe these results are consistent with an increase in phenylalanine hydroxylase enzymatic activity and increased Phe metabolism. These results were observed even while the patient self-liberalized diet, including a mean percent change from baseline of more than a 100% increase in dietary Phe intake.

25

The other patient in Cohort 2 did not experience a similar reduction in plasma Phe, but this patient had pre-existing immune conditions and experienced Grade 3 ALT elevation, which we believe may have affected the results. As of the cutoff date, this patient had a mean percentage change from baseline of 13% increase in plasma Phe, with a 131.1% increase in Tyr and a 45.5% decrease in the Phe/Tyr ratio. This also occurred while the patient self-liberalized diet with a mean percent change from baseline of 140.5% more dietary intact protein, 289% more dietary Phe intake and 75.6% decreased dietary Tyr intake. We believe the findings in this patient may be suggestive of phenylalanine hydroxylase enzymatic activity sufficient to increase the patient's tyrosine concentration from its low baseline, but not sufficient to reduce this patient's Phe.



**Figure 2. Interim data from Cohort 2 (mid-dose) in the dose-escalation phase of the pheNIX clinical trial as of the data cutoff date of October 19, 2020.**

26

In Cohort 3, one patient showed a marked reduction in Phe from baseline level of 1,060 µmol/L, and recorded one plasma Phe value <360 µmol/L and several plasma Phe values <600 µmol/L through the 13 weeks of observation as of the cutoff date. The mean percentage change from baseline was a 31.4% reduction in plasma Phe, a 40.3% increase in Tyr and a 52.4% decrease in the Phe/Tyr ratio. These results were observed while the patient self-liberalized diet, including a mean percent change from baseline of more than 45.4% increase in dietary intact protein and a 41.8% increase in dietary Phe. In contrast, the other patient in Cohort 3 did not experience a similar reduction in plasma Phe, but similar to the second patient in Cohort 2, had pre-existing underlying immune conditions and experienced Grade 3 ALT elevation, which we believe may have affected the results. As of the cutoff date, this patient experienced an increase in the mean percentage change from baseline in Tyr of 22.6% and a reduction in the mean percentage change from baseline in the Phe/Tyr ratio of 25.4%. We believe the findings in this patient may also be suggestive of phenylalanine hydroxylase enzymatic activity, which was enough to improve Tyr, but not enough to reduce Phe.



**Figure 3. Interim data from Cohort 3 (high-dose) in the dose-escalation phase of the pheNIX clinical trial as of the data cutoff date of October 19, 2020.**

Based on the safety and efficacy results observed in the dose-escalation phase as of the cutoff date, we intend to advance to the randomized, concurrently controlled, expansion phase of the pheNIX trial in early 2021, which has the potential to be converted to a registrational trial. We have selected two doses for the expansion phase: the mid-dose from Cohort 2 and a dose between the doses in Cohorts 2 and 3, which we believe has the potential to improve Phe reductions while reducing overall steroid exposure.

*Other Product Candidate Updates*

We are in later-stage IND-enabling studies with HMI-202, our lead gene therapy CNS product development candidate for the treatment of metachromatic leukodystrophy, or MLD. This represents our first CNS program and we have generated preclinical data that demonstrates that a single I.V. administration of HMI-202 crossed the blood-brain-barrier and blood-nerve-barrier and led to durable reduction of sulfatides in all brain regions of the disease model. HMI-202 was superior to an AAV9-based MLD gene therapy construct in terms of human ARSA enzyme activity, vector genome copies and biodistribution in the peripheral and central nervous systems of the disease model.

In October 2020, we announced a new *in vivo* gene therapy development program for the treatment of mucopolysaccharidosis type II (MPS II, or Hunter syndrome). Development candidate HMI-203 is a potential one-time AAVHSC treatment designed to deliver functional copies of the *IDS* gene to multiple target organs, including the PNS and CNS, following a single I.V. administration. We have initiated IND-enabling studies and scaled the new construct up to 500 liters by leveraging our commercial manufacturing platform.

We are in later-stage IND-enabling studies with HMI-103, our lead gene editing product development candidate for the treatment of PKU in pediatric patients. We have generated *in vivo* preclinical data, using quantitative molecular methods, that demonstrated achievement of gene integration efficiencies in the liver that corresponded with Phe correction in a PKU murine model, are significantly greater than other adeno-associated virus, or AAV, based approaches and we believe are at a therapeutic level in the preclinical model. These findings were peer-reviewed and published in *PLOS ONE* in May 2020.

In November 2017, we entered into a collaboration and license agreement with Novartis, pursuant to which we agreed to collaborate on researching, developing, and commercializing novel genome editing products that modulate certain gene targets. In May 2020, based on positive preclinical gene editing data in retinal cells, Novartis confirmed an ophthalmic target for a therapeutic editing program. Together, we are working on advancing this program to development candidate selection. We also continue to work with Novartis on identifying new targets for the collaboration based on the exploratory research component of the agreement, which was extended for an additional six months pursuant to an amendment to the agreement executed in October 2020, with such obligations now concluding in May 2021.

We have fully integrated process development and Good Manufacturing Practice, or GMP, manufacturing capabilities that support the full breadth and flexibility of our AAVHSC capsid library. Our process development expertise covers all classical gene development functions and incorporates deep characterization and understanding of vector design and their consequences. Our manufacturing process is a versatile system that rapidly delivers high quality vector at scale. The manufacturing capacity within our 25,000 square foot GMP manufacturing facility includes multi-suite and multi-product capabilities to support our clinical development programs in both gene therapy and gene editing. Our platform process is a commercial manufacturing process that has successfully produced several of our product candidates. We are currently operating three 500-liter bioreactors in our internal manufacturing facility and have successfully produced GMP material at the 500-liter scale for multiple pipeline candidates. Additionally, we have executed our manufacturing platform with multiple product candidates at the 2,000-liter bioreactor scale.

Our management team has a successful track record of discovering, developing and commercializing therapeutics with a particular focus on rare diseases. We have a robust intellectual property portfolio with issued composition of matter patents in the United States for our suite of 15 AAVHSCs and we believe the breadth and depth of our intellectual property is a strategic asset that has the potential to provide us with a significant competitive advantage. We continue to build on our intellectual property estate through our ongoing product and platform development efforts.

Since our inception in 2015 through September 30, 2020, we have raised approximately $444.2 million in aggregate net proceeds through our initial public offering, or IPO, in April 2018, a follow-on public offering of common stock in April 2019, proceeds from the sale of common stock under an "at-the-market" sales agreement and preferred stock financings. We received $50.0 million from Novartis, our collaboration partner, including an up-front payment of $35.0 million and a $15.0 million equity investment. We will require additional capital in order to advance HMI-102 and our other product candidates through clinical development and commercialization. We believe that our compelling preclinical data, positive clinical data with HMI-102, scientific expertise, product development strategy, manufacturing capabilities, and robust intellectual property position us as a leader in the development of genetic medicines.

On November 9, 2020, we entered into a stock purchase agreement, or the Stock Purchase Agreement, with Pfizer Inc., or Pfizer, pursuant to which Pfizer has agreed to purchase 5,000,000 shares of our common stock through a private placement transaction at a purchase price of $12.00 per share, for an aggregate purchase price of $60.0 million. Under the Stock Purchase Agreement, Pfizer was granted an exclusive right of first refusal, or ROFR, for a 30-month period beginning on the date of the closing of the private placement to negotiate a potential collaboration on the development and commercialization of HMI-102 and HMI-103. Pfizer may

exercise its right of first refusal under the ROFR one time for each of HMI-102 and HMI-103 during the ROFR period. Additionally during the ROFR period, Pfizer has the right to designate a member to join our Scientific Advisory Board to participate in matters related to the development of these programs. See "Liquidity and Capital Resources."

We were incorporated and commenced operations in 2015. Since our incorporation, we have devoted substantially all of our resources to organizing and staffing our company, business planning, raising capital, developing our technology platform, advancing our lead product candidate, HMI-102 for the treatment of PKU, through IND-enabling studies and into a Phase 1/2 clinical trial, advancing HMI-103, HMI-202 and HMI-203 into IND-enabling studies, researching and identifying additional product candidates, developing and implementing manufacturing processes and internal manufacturing capabilities, building out our manufacturing and research and development space, enhancing our intellectual property portfolio, and providing general and administrative support for these operations. To date, we have financed our operations primarily through the sale of common stock, through the sales of preferred stock, and through funding from our collaboration partner.

To date, we have not generated any revenue from product sales and do not expect to generate any revenue from the sale of products in the foreseeable future, if at all. We recognized $0.6 million and $1.7 million in collaboration revenue for the three and nine months ended September 30, 2020, respectively, and $0.4 million and $1.1 million for the three and nine months ended September 30, 2019, respectively. Since inception, we have incurred significant operating losses. Our net losses for the three and nine months ended September 30, 2020 were $28.2 million and $98.9 million, respectively. Our net losses for the three and nine months ended September 30, 2019 were $29.6 million and $79.7 million, respectively. As of September 30, 2020 and December 31, 2019, we had an accumulated deficit of $298.6 million and $199.7 million, respectively.

Our total operating expenses were $28.8 million and $102.2 million for the three and nine months ended September 30, 2020, respectively, and $31.7 million and $85.5 million for the three and nine months ended September 30, 2019, respectively. Our operating expenses for the nine months ended September 30, 2020 included substantial advance purchases of raw materials procured for future manufacturing needs to mitigate any possible supply chain interruptions as a result of the COVID-19 pandemic. We expect our operating expenses to continue to increase in connection with our ongoing development activities related to our product candidates. Specifically, we anticipate that our expenses will increase substantially due to costs associated with our Phase 1/2 pheNIX clinical trial with HMI-102, development activities including IND-enabling studies associated with our other product candidates, including HMI-202, our gene therapy product candidate for MLD, HMI-203, our gene therapy product candidate for Hunter syndrome, and HMI-103, our gene editing product candidate for PKU, research activities in additional therapeutic areas to expand our pipeline, hiring additional personnel in manufacturing, research, clinical and regulatory, quality and other functional areas, increased expenses incurred with contract manufacturing organizations, or CMOs, to supply us with product for our clinical studies, costs to manufacture product for preclinical and clinical studies in our internal manufacturing facility and other costs including the maintenance and expansion of our intellectual property portfolio. In addition, we expect to continue to incur additional costs associated with operating as a public company.

We have incurred significant capital expenditures for the buildout of a facility we have leased, including research and development labs, office space and manufacturing suites and the procurement of equipment and furniture for this facility and in support of our product development candidates and research initiatives. We expect to incur additional capital expenditures in support of our research and development activities and our manufacturing facility.

Because of the numerous risks and uncertainties associated with the development of our current and any future product candidates and our platform and technology and because the extent to which we may enter into collaborations with third parties for development of any of our product candidates is unknown, we are unable to predict the timing and amount of increased operating expenses and capital expenditures associated with completing the research and development of our product candidates. Our future capital requirements will depend on many factors, including:

- the costs, timing, and results of our ongoing research and development efforts, including clinical trials, for HMI-102;

- the costs, timing, and results of our ongoing research and development efforts for HMI-103, HMI-202 and HMI-203, all of which are in IND-enabling studies;

- the costs, timing, and results of our research and development efforts for current and future product candidates in our gene therapy and gene editing pipeline;

- the costs and timing of process development and manufacturing scale-up activities, and the adequacy of supply of our product candidates for preclinical studies and clinical trials through CMOs and internal manufacturing;

- the costs and timing of capital expenditures for potential additional manufacturing capacity and related equipment and furniture;

29

- the costs and timing of preparing, filing, and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending any intellectual property-related claims, including any claims by third parties that we are infringing upon their intellectual property rights;

- the effect of competitors and market developments; and

- our ability to establish and maintain strategic collaborations, licensing or other agreements and the financial terms of such agreements for our product candidates.

We now believe that our existing cash and cash equivalents, together with the anticipated proceeds of $60.0 million from the Pfizer private placement, will enable us to fund our current projected operating expenses and capital expenditure requirements into the third quarter of 2022 including, subject to the impact of the COVID-19 pandemic on our business, additional development activities related to our Phase 1/2 pheNIX clinical trial with HMI-102, the advancement of HMI-103, our lead gene editing product candidate for PKU, HMI-203, our newly announced gene therapy product candidate for Hunter syndrome, and HMI-202, our lead CNS gene therapy product candidate, the scale-up of our manufacturing processes and the expansion of our intellectual property portfolio. We have based these estimates on assumptions that may prove to be imprecise, and we may use our available capital resources sooner than we currently expect. See "Liquidity and Capital Resources." Adequate additional funds may not be available to us on acceptable terms, or at all. For example, the trading prices for our and other biopharmaceutical companies' stock have been highly volatile as a result of the COVID-19 pandemic. As a result, we may face difficulties raising capital through sales of our common stock and any such sales may be on unfavorable terms. See "Risk Factors—The COVID-19 pandemic caused by the novel strain of coronavirus could adversely impact our business, including our preclinical studies and clinical trials." in Part II, Item 1A of this Quarterly Report on Form 10-Q. To the extent that we raise additional capital through the sale of equity or convertible debt securities, the ownership interests of our shareholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect rights as a shareholder. Any future debt financing or preferred equity or other financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends and may require the issuance of warrants, which could potentially dilute the ownership interests of our shareholders.

If we raise additional funds through collaborations, strategic alliances, or licensing arrangements with third parties, we may have to relinquish valuable rights to our technologies, future revenue streams, research programs or product candidates or grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce, or terminate our product development programs or any future commercialization efforts or grant rights to develop and market product candidates that we would otherwise prefer to develop and market ourselves.

Because of the numerous risks and uncertainties associated with drug development, we are unable to predict when or if we will be able to achieve or maintain profitability. Even if we are able to generate revenue from product sales, we may not become profitable. If we fail to become profitable or are unable to sustain profitability on a continuing basis, then we may be unable to continue our operations at planned levels and be forced to reduce or terminate our operations.

**Impact of COVID-19 Pandemic**

We are closely monitoring how the spread of the COVID-19 pandemic is affecting our employees, Phase 1/2 pheNIX clinical trial, preclinical studies, manufacturing and overall operations. In response to the spread of COVID-19, we have taken steps to minimize the impact on our operations.

**Operations –** To protect the health of our employees and the third parties with whom we interact, most office-based employees continue to work from home, while essential staffing levels in our operations remain in place, including key personnel in our laboratories and manufacturing facility. For those employees on-site, we have developed shift schedules for our laboratories and manufacturing facility and a modified office layout and traffic flow pattern to increase spacing capabilities, reduce inter-office risks and allow for business continuity. We have increased cleaning protocols throughout our entire facility, limited visitors to only those who are critical to our ongoing operations and have cancelled all business travel. In addition, we have developed our own on-site COVID-19 surveillance testing for employees to help promote health and safety.

**Phase 1/2 pheNIX clinical trial –** We are currently continuing our Phase 1/2 pheNIX clinical trial and are working with trial sites to mitigate potential COVID-19-related disruptions in order to help ensure the safety of patients and healthcare professionals. In addition, we have deployed home-health services which include home visits for patient monitoring and reporting, as well as the utilization of a centralized laboratory for testing enrolled patients. Despite our best efforts, disruptions caused by the COVID-19 pandemic have resulted, and may continue to result, in delays in enrolling our Phase 1/2 pheNIX clinical trial. In addition, we could experience additional disruptions in conducting or completing this trial or other planned clinical trials and the incurrence of unforeseen costs as a result of these delays. We will continue to evaluate the impact of the ongoing global pandemic on the pheNIX trial and will make adjustments, as needed.

30

**Preclinical studies –** IND-enabling studies are continuing in support of our HMI-103, HMI-202 and HMI-203 programs and we have made operational changes to mitigate the risk of potential disruptions caused by the COVID-19 pandemic. All of our ongoing and planned preclinical studies at external CROs are progressing and we have accelerated shipments of reagents and supplies to avoid any disruption of activities. However, it is possible that the COVID-19 pandemic may have an impact in the future on our CROs' ability to complete critical studies required for the progression of these programs. In addition, any planned or potential meetings with the FDA or other regulatory authorities about any of our development programs could be delayed as these regulatory bodies respond to the ongoing pandemic.

**Manufacturing –** We continue to operate our manufacturing facility at or near normal levels. We have on-hand all of the drug product needed for the expansion phase of the pheNIX clinical trial. In addition, during the first quarter of 2020, we accelerated the procurement of raw materials for future manufacturing, research and development needs to minimize potential supply chain interruptions. While we currently do not anticipate any interruptions in our manufacturing process, it is possible that the COVID-19 pandemic and response efforts may have an impact in the future on our and/or our third-party suppliers and CMOs' ability to manufacture our product candidates or materials needed for our preclinical studies and clinical trials.

At this time, there is significant uncertainty relating to the trajectory of the COVID-19 pandemic and impact of related responses and as a result, we expect that the COVID-19 pandemic may impact our business, revenues, results of operations and financial condition. The impact of COVID-19 on our future results will largely depend on future developments, which are highly uncertain and cannot be predicted with confidence, such as the duration of the pandemic, travel restrictions and social distancing in the United States and other countries, business closures or business disruptions, the ultimate impact of COVID-19 on financial markets and the global economy, and the effectiveness of actions taken in the United States and other countries to contain and treat the disease. See "Risk Factors— The COVID-19 pandemic caused by the novel strain of coronavirus could adversely impact our business, including our preclinical studies and clinical trials." in Part II, Item 1A of this Quarterly Report on Form 10-Q.

## Components of Our Results of Operations

### Revenue

To date, we have not generated any revenue from product sales and do not expect to generate any revenue from the sale of products in the foreseeable future. We recorded $1.7 million in collaboration revenue for the nine months ended September 30, 2020 (see Note 10 to our condensed consolidated financial statements included elsewhere in this Quarterly Report on Form 10-Q for additional information regarding Novartis revenue recognition discussion).

### Operating Expenses

Our operating expenses since inception have consisted solely of research and development costs and general and administrative costs.

#### Research and Development Expenses

Research and development expenses consist primarily of costs incurred for our research activities, including our discovery efforts, and the development of our product candidates, and include:

- salaries, benefits and other related costs, including stock-based compensation expense, for personnel engaged in research and development functions;

- expenses incurred under agreements with third parties, including contract research organizations, or CROs, and other third parties that conduct research, preclinical activities and clinical trials on our behalf as well as CMOs and our internal technical operations team that manufacture our product candidates for use in our preclinical testing, our Phase 1/2 pheNIX clinical trial and additional potential future clinical trials;

- costs of outside consultants, including their fees and related travel expenses;

- the costs of laboratory supplies and acquiring, developing and manufacturing preclinical study and clinical trial materials; and

- facility-related expenses, which include direct depreciation costs and allocated expenses for rent and maintenance of facilities and other operating costs.

We expense research and development costs as incurred.

31

We typically use our employee and infrastructure resources across our development programs. We track outsourced development costs by product candidate or development program, but we do not allocate personnel costs, license payments made under our licensing arrangements or other internal costs to specific development programs or product candidates. These costs are included in other research and development expenses in the table below.

The following table summarizes our research and development expenses by product candidate or development program:

| (in thousands) | Three months ended September 30, | | | | | Nine months ended September 30, | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | Change | 2020 | | 2019 | | Change |
| HMI-102 external development costs | $ | 5,317 | $ | 9,912 | $ (4,595) | $ | 28,139 | $ | 26,234 | $ 1,905 |
| Other development-stage programs' external development costs | | 5,101 | | 3,785 | 1,316 | | 18,325 | | 9,890 | 8,435 |
| Employee-related costs | | 9,515 | | 7,355 | 2,160 | | 29,038 | | 20,812 | 8,226 |
| Other research and development costs | | 484 | | 4,639 | (4,155) | | 1,695 | | 12,120 | (10,425) |
| Total research and development expenses | $ | 20,417 | $ | 25,691 | $ (5,274) | $ | 77,197 | $ | 69,056 | $ 8,141 |

Research and development activities are central to our business model. We expect that our research and development expenses will continue to increase substantially for the foreseeable future as we advance clinical trials of HMI-102 for the treatment of PKU, including our Phase 1/2 pheNIX clinical trial, continue to advance HMI-103, HMI-202 and HMI-203 through IND-enabling studies and into clinical trials and continue to discover and develop additional product candidates.

We cannot determine with certainty the duration and costs of future clinical trials of HMI-102 and IND-enabling studies and future clinical trials of our other product candidates in development or any other future product candidate we may develop or if, when, or to what extent we will generate revenue from the commercialization and sale of any product candidate for which we obtain marketing approval. We may never succeed in obtaining marketing approval for any product candidate. The duration, costs and timing of clinical trials and development of HMI-102, our other product candidates in development and any other future product candidate we may develop will depend on a variety of factors, including:

- the scope, rate of progress, expense and results of clinical trials of HMI-102, HMI-103, HMI-202 and HMI-203, as well as of any future clinical trials of other product candidates and other research and development activities that we may conduct;

- uncertainties in clinical trial design and patient enrollment rates;

- any delays in clinical trials as a result of the COVID-19 pandemic;

- the actual probability of success for our product candidates, including the safety and efficacy results, early clinical data, competition, manufacturing capability and commercial viability;

- significant and changing government regulation and regulatory guidance;

- the timing and receipt of any marketing approvals; and

- the expense of filing, prosecuting, defending and enforcing any patent claims and other intellectual property rights.

A change in the outcome of any of these variables with respect to the development of a product candidate could mean a significant change in the costs and timing associated with the development of that product candidate. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we anticipate will be required for the completion of clinical development of a product candidate, or if we experience significant delays in our clinical trials due to patient enrollment or other reasons, we would be required to expend significant additional financial resources and time on the completion of clinical development.

32

*General and Administrative Expenses*

General and administrative expenses consist primarily of salaries and other related costs, including stock-based compensation, for personnel in our executive, finance, human resources, business development and administrative functions. General and administrative expenses also include legal fees relating to intellectual property and corporate matters; professional fees for accounting, auditing, tax and consulting services; insurance costs; travel expenses; and facility-related expenses, which include direct depreciation costs, rent expense, maintenance of facilities and other operating costs.

We expect that our general and administrative expenses will increase in the future as we increase our personnel headcount to support increased research and development activities relating to HMI-102, HMI-103, HMI-202, HMI-203 and any other product candidate we may develop. We also have incurred and expect to continue to incur increased expenses associated with being a public company, including costs of accounting, audit, compliance with the Sarbanes-Oxley Act of 2002, legal, regulatory and tax-related services associated with maintaining compliance with Nasdaq and SEC requirements; director and officer insurance costs; and investor and public relations costs.

*Interest Income*

Interest income consists of interest income earned on our cash, cash equivalents and short-term investments. Our interest income has decreased due to lower yields on invested funds as well as lower invested balances during the nine months ended September 30, 2020 as compared to the same period in 2019. Market volatility resulting from the COVID-19 pandemic has and may continue to adversely impact our interest income.

**Critical Accounting Policies and Use of Estimates**

This discussion and analysis of our financial condition and results of operations is based on our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States. The preparation of our consolidated financial statements and related disclosures requires us to make estimates, assumptions and judgements that affect the reported amount of assets, liabilities, revenue, costs and expenses, and related disclosures. We base our estimates on historical experience, known trends and events and various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. We evaluate our estimates and assumptions on an ongoing basis. Our actual results may differ from these estimates under different assumptions or conditions.

Our critical accounting policies are described under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations— Critical Accounting Policies and Significant Judgments and Estimates" in our Annual Report on Form 10-K for the year ended December 31, 2019 and the notes to the condensed consolidated financial statements appearing elsewhere in this Quarterly Report on Form 10-Q. There were no material changes to our critical accounting policies during the three months ended September 30, 2020 from those discussed in our Annual Report on Form 10-K for the year ended December 31, 2019.

**Results of Operations**

*Comparison of Three Months Ended September 30, 2020 and 2019*

The following table summarizes our results of operations for the periods presented:

| (in thousands) | Three months ended September 30, | | Change |
| | 2020 | 2019 | |
| --- | --- | --- | --- |
| Collaboration revenue | $ 567 | $ 441 | 126 |
| Operating expenses: | | | |
| Research and development | 20,417 | 25,691 | (5,274) |
| General and administrative | 8,423 | 6,038 | 2,385 |
| Total operating expenses | 28,840 | 31,729 | (2,889) |
| Loss from operations | (28,273) | (31,288) | 3,015 |
| Other income: | | | |
| Interest income | 41 | 1,661 | (1,620) |
| Net loss | $ (28,232) | $ (29,627) | $ 1,395 |

33

*Collaboration Revenue*

Collaboration revenue for the three months ended September 30, 2020 was $0.6 million, compared to $0.4 million for the three months ended September 30, 2019. The increase of $0.1 million is attributable to increased activities under our collaboration agreement with Novartis. We recognize revenues consistent with the pattern of performance of our research and development activities under this agreement, taking into consideration all upfront payments and research funding payments under this arrangement together as a single performance obligation. We expect the level of effort to substantially increase when and if we begin manufacturing during the development term of the collaboration agreement, which is dependent on the success of the research and Novartis' decision to take a candidate into development. Collaboration revenue recognized in a given period is based on actual costs incurred during that period as a percentage of total estimated costs to complete the single performance obligation under the arrangement. We would not expect collaboration revenue to be consistent period to period as it will fluctuate as we perform the research, development and manufacturing services over the term of our collaboration agreement with Novartis.

*Research and Development Expenses*

| (in thousands) | Three months ended September 30, | | | | | Change | |
|---|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | | |
| HMI-102 external development costs | $ | 5,317 | $ | 9,912 | $ | (4,595) | |
| Other development-stage programs' external development costs | | 5,101 | | 3,785 | | 1,316 | |
| Employee-related costs | | 9,515 | | 7,355 | | 2,160 | |
| Other research and development costs | | 484 | | 4,639 | | (4,155) | |
| Total research and development expenses | $ | 20,417 | $ | 25,691 | $ | (5,274) | |

Research and development expenses for the three months ended September 30, 2020 were $20.4 million, compared to $25.7 million for the three months ended September 30, 2019. The decrease of $5.3 million was due to a decrease of $4.6 million in direct research expenses for HMI-102 related to the transition of the manufacturing of clinical trial materials for our Phase 1/2 pheNIX trial from a CMO to our internal GMP facility in 2020, which reduced costs with our CMOs compared to the prior year period. Additionally, there was a $4.2 million decrease in other research and development costs related to laboratory supplies and research materials for our early-stage research programs. Partially offsetting these decreases was a $2.2 million increase in employee-related costs due to additional employee headcount to support our ongoing development programs, research initiatives, technology platform and manufacturing capabilities resulting in increases in salaries, payroll taxes, stock-based compensation expense and recruiting costs, as well as a $1.3 million increase in direct research expenses related to our newly announced HMI-203 program for Hunters syndrome.

*General and Administrative Expenses*

General and administrative expenses for the three months ended September 30, 2020 were $8.4 million, compared to $6.0 million for the three months ended September 30, 2019. The increase of $2.4 million was primarily due to an increase in employee-related expenses of $1.5 million, which included $0.9 million of increased stock-based compensation expense, an increase in audit and legal costs of $0.3 million, an increase in market research costs of $0.3 million, an increase in facility costs of $0.2 million and an increase in taxes of $0.2 million.

*Interest Income*

Interest income for the three months ended September 30, 2020 was less than $0.1 million, compared to $1.7 million for the three months ended September 30, 2019. The decrease was the result of lower invested balances in cash, cash equivalents and short-term investments for the three months ended September 30, 2020 compared to the three months ended September 30, 2019, as well as lower yields on invested funds.

*Net Loss*

Net loss for the three months ended September 30, 2020 was $28.2 million, compared to $29.6 million for the three months ended September 30, 2019. The decrease in net loss was primarily due to the decreases in research and development expenses discussed above.

### Comparison of Nine Months Ended September 30, 2020 and 2019

The following table summarizes our results of operations for the periods presented:

| (in thousands) | Nine months ended September 30, | | Change |
| | 2020 | 2019 | |
| --- | --- | --- | --- |
| Collaboration revenue | $ 1,722 | $ 1,103 | 619 |
| Operating expenses: | | | |
| Research and development | 77,197 | 69,056 | 8,141 |
| General and administrative | 24,986 | 16,431 | 8,555 |
| Total operating expenses | 102,183 | 85,487 | 16,696 |
| Loss from operations | (100,461) | (84,384) | (16,077) |
| Other income: | | | |
| Interest income | 1,558 | 4,635 | (3,077) |
| Net loss | $ (98,903) | $ (79,749) | $ (19,154) |

*Collaboration Revenue*

Collaboration revenue for the nine months ended September 30, 2020 was $1.7 million, compared to $1.1 million for the nine months ended September 30, 2019. The increase of $0.6 million is attributable to increased activities under our collaboration agreement with Novartis. See "Comparison of Three Months Ended September 30, 2020 and 2019—Collaboration Revenue" for additional information.

*Research and Development Expenses*

| (in thousands) | Nine months ended September 30, | | Change |
| | 2020 | 2019 | |
| --- | --- | --- | --- |
| HMI-102 external development costs | $ 28,139 | $ 26,234 | $ 1,905 |
| Other development-stage programs' external development costs | 18,325 | 9,890 | 8,435 |
| Employee-related costs | 29,038 | 20,812 | 8,226 |
| Other research and development costs | 1,695 | 12,120 | (10,425) |
| Total research and development expenses | $ 77,197 | $ 69,056 | $ 8,141 |

Research and development expenses for the nine months ended September 30, 2020 were $77.2 million, compared to $69.1 million for the nine months ended September 30, 2019. The increase of $8.1 million was primarily due to an increase of $1.9 million in direct research expenses, including costs related to manufacturing clinical trial materials, as well as costs incurred with our CRO to conduct and manage our Phase 1/2 pheNIX clinical trial, an $8.4 million increase in direct research expenses related to HMI-202, HMI-203 and HMI-103 external development costs as we advance through IND-enabling studies and an $8.2 million increase in employee-related costs due to additional employee headcount to support our ongoing development programs, research initiatives, technology platform and manufacturing capabilities resulting in increases in salaries, payroll taxes, stock-based compensation expense and recruiting costs. Partially offsetting these increases was a $10.4 million decrease in other research and development costs related to laboratory supplies, research materials and services for our early-stage research programs.

35

*General and Administrative Expenses*

General and administrative expenses for the nine months ended September 30, 2020 were $25.0 million, compared to $16.4 million for the nine months ended September 30, 2019. The increase of $8.6 million was due to an increase in employee-related expenses of $3.9 million, which included $2.6 million of increased stock-based compensation expense, an increase in consulting expense of $1.4 million, an increase in facility costs of $1.1 million, an increase in market research costs of $0.8 million, an increase in insurance costs of $0.4 million, an increase in recruiting costs of $0.5 million and an increase in software expense of $0.3 million.

*Interest Income*

Interest income for the nine months ended September 30, 2020 was $1.6 million, compared to $4.6 million for the nine months ended September 30, 2019. The decrease was the result of lower invested balances in cash, cash equivalents and short-term investments for the nine months ended September 30, 2020 compared to the nine months ended September 30, 2019, as well as lower yields on invested funds.

*Net Loss*

Net loss for the nine months ended September 30, 2020 was $98.9 million, compared to $79.7 million for the nine months ended September 30, 2019. The increase in net loss was primarily due to the increases in research and development and general and administrative expenses discussed above.

**Liquidity and Capital Resources**

Since our inception, we have incurred significant operating losses. We expect to incur significant expenses and operating losses for the foreseeable future as we advance the preclinical and clinical development of our product candidates. We expect that our research and development and general and administrative costs and our capital expenditures will increase in connection with conducting preclinical studies and clinical trials for our product candidates, contracting with CMOs and producing material in our internal manufacturing facility to support preclinical studies and clinical trials, expanding our research and development laboratories, expanding our intellectual property portfolio, and providing general and administrative support for our operations. As a result, we will need additional capital to fund our operations, which we may obtain from additional equity or debt financings, collaborations, licensing arrangements, or other sources.

We do not currently have any approved products and have never generated any revenue from product sales. To date, we have financed our operations primarily through the sale of common stock, and the sale of preferred stock and through an up-front payment from a collaboration partner. Since our inception in 2015 through September 30, 2020, we have raised approximately $444.2 million in aggregate net proceeds through our IPO, a follow-on public offering of common stock in April 2019, proceeds from the sale of common stock under an "at-the-market" sales agreement and preferred stock financings. We received an up-front payment of $50.0 million from a collaboration partner, comprised of $35.0 million in cash and a $15.0 million equity investment, the latter of which is included in the proceeds from the sale of preferred stock. As of September 30, 2020, we had $179.3 million in cash, cash equivalents and restricted cash and an accumulated deficit of $298.6 million.

In April 2019, we completed a follow-on public offering of our common stock. We sold 5,555,556 shares of our common stock at a public offering price of $22.50 per share and received net proceeds of $116.9 million, after deducting underwriting discounts and commissions and offering expenses. In addition, in April and May 2019, in connection with the exercise in full of the underwriters' option to purchase additional shares, we issued an aggregate of 833,333 shares of our common stock at a public offering price of $22.50 per share and received net proceeds of $17.6 million, after deducting underwriting discounts and commissions.

In March 2020, we entered into a sales agreement, or the Sales Agreement, with Cowen and Company, LLC, or Cowen, as sales agent, pursuant to which we may, from time to time, issue and sell common stock with an aggregate value of up to $150 million in "at-the-market" offerings, or the ATM, under our Registration Statement on Form S-3 (File No. 333-237131) filed with the SEC on March 12, 2020. Sales of common stock, if any, pursuant to the Sales Agreement, may be made in sales deemed to be an "at the market offering" as defined in Rule 415(a) of the Securities Act, including sales made directly through the Nasdaq Global Market or on any other existing trading market for our common stock. No securities were issued pursuant to the Sales Agreement during the nine months ended September 30, 2020. As of September 30, 2020, there was $150.0 million of common stock remaining available for sale under the ATM. Simultaneous with the filing of the registration statement in March 2020, our previous Registration Statement on Form S-3 (File No. 333-230664) filed with the SEC on April 1, 2019 and our prior sales agreement with Cowen providing for the offering, issuance and sale of up to an aggregate $100.0 million of our common stock from time to time in "at-the-market" offerings were terminated.

On November 9, 2020, we entered into the Stock Purchase Agreement with Pfizer, pursuant to which Pfizer has agreed to purchase 5,000,000 shares of our common stock through a private placement transaction at a purchase price of $12.00 per share, for an aggregate purchase price of $60.0 million. The closing of the private placement is expected to occur on or about November 10, 2020, subject to the satisfaction of customary closing conditions.

*Cash Flows*

Our cash, cash equivalents and restricted cash totaled $179.3 million and $263.7 million as of September 30, 2020 and December 31, 2019, respectively. We had no indebtedness as of September 30, 2020 and December 31, 2019.

The following table summarizes our sources and uses of cash for each of the periods presented:

| | Nine months ended September 30, | |
| --- | --- | --- |
| (in thousands) | 2020 | 2019 |
| Net cash used in operating activities | $ (82,720) | $ (65,025) |
| Net cash provided by (used in) investing activities | 205,851 | (31,772) |
| Net cash provided by financing activities | 1,098 | 135,638 |
| Net change in cash, cash equivalents and restricted cash | $ 124,229 | $ 38,841 |

*Cash Flows for the Nine Months ended September 30, 2020*

*Operating Activities*

Net cash used in operating activities for the nine months ended September 30, 2020 was $82.7 million, driven primarily by our net loss of $98.9 million as we incurred expenses associated with research and development activities on HMI-102, HMI-103, HMI-202 and HMI-203, including the Phase 1/2 pheNIX trial for our HMI-102 program, and research activities on other applications for our technology and a decrease in operating lease liabilities of $1.7 million. These items were partially offset by net non-cash expenses of $16.1 million, which includes $9.7 million of stock-based compensation expense and $5.9 million of depreciation expense, and a decrease in working capital of $2.3 million.

*Investing Activities*

Net cash provided by investing activities for the nine months ended September 30, 2020 was $205.9 million, attributable to maturities of short-term investments of $228.6 million, partially offset by purchases of short-term investments of $20.0 million and purchases of property and equipment of $2.8 million.

*Financing Activities*

Net cash provided by financing activities for the nine months ended September 30, 2020 was $1.1 million, primarily due to proceeds from the issuance of common stock pursuant to the employee stock purchase plan.

*Cash Flows for the Nine Months ended September 30, 2019*

*Operating Activities*

Net cash used in operating activities for the nine months ended September 30, 2019 was $65.0 million, driven primarily by our net loss of $79.7 million as we incurred expenses associated with research and development activities on HMI-102, HMI-103 and HMI-202, including the Phase 1/2 pheNIX trial for our HMI-102 program, and research activities on other applications for our technology. The funding of our net loss was partially offset by net non-cash expenses of $8.2 million, an increase in deferred rent of $0.7 million and an increase in working capital of $6.2 million.

*Investing Activities*

Net cash used in investing activities for the nine months ended September 30, 2019 was $31.8 million, attributable to purchases of short-term investments of $257.4 million and purchases of property and equipment of $18.1 million, partially offset by maturities of short-term investments of $243.7 million.

*Financing Activities*

Net cash provided by financing activities for the nine months ended September 30, 2019 was $135.6 million, primarily due to the receipt of $134.5 million in net proceeds from the issuance of common stock in a public offering in April 2019.

### Funding Requirements

Our operating expenses increased substantially in 2019 and during the first nine months of 2020 and are expected to increase for the remainder of 2020 and in future years in connection with our ongoing activities, particularly as we advance our Phase 1/2 pheNIX clinical trial with HMI-102, advance our preclinical activities including IND-enabling studies, scale-up manufacturing processes, engage with CMOs, manufacture materials for preclinical and clinical activities in our internal manufacturing facility and initiate additional human clinical trials. In addition, we have incurred, and expect to continue to incur additional costs associated with operating as a public company. We also expect our capital expenditures to increase substantially as we expand our operations.

Specifically, our operating expenses and capital expenditures will increase as we:

- pursue the preclinical and clinical development of HMI-102, including the ongoing pheNIX Phase 1/2 clinical trial, HMI-103, HMI-202 and HMI-203;

- pursue the preclinical and clinical development of other product candidates based on our gene therapy and gene editing technology;

- further scale-up our internal manufacturing processes and capabilities, manufacture materials in our internal manufacturing facility and contract with CMOs to support our preclinical studies and clinical trials of our product candidates;

- further expand our manufacturing capacity;

- operate our business in our facility with expanded research and development labs and manufacturing suites and purchase additional equipment for our operations;

- in-license or acquire the rights to other products, product candidates or technologies;

- maintain, expand and protect our intellectual property portfolio;

- hire additional personnel in research, manufacturing and regulatory and clinical development as well as management personnel; and

- expand our operational, financial and management systems and increase personnel, including personnel to support our operations as a public company.

We now believe that our existing cash and cash equivalents, together with the anticipated proceeds of $60.0 million from the Pfizer private placement, will enable us to fund our current projected operating expenses and capital expenditure requirements into the third quarter of 2022, including, subject to the impact of the COVID-19 pandemic on our business, additional development activities related to our Phase 1/2 pheNIX clinical trial with HMI-102, the advancement of our lead gene editing product candidate, HMI-103, our lead CNS gene therapy product candidate, HMI-202 and our newly announced gene therapy product candidate for Hunter syndrome, HMI-203, the scale-up of our manufacturing processes and the expansion of our intellectual property portfolio. We have based these estimates on assumptions that may prove to be imprecise, and we could utilize our available capital resources sooner than we expect.

Because of the numerous risks and uncertainties associated with research, development and commercialization of pharmaceutical drugs, it is difficult to estimate with certainty the amount of our working capital requirements. Our future funding requirements will depend on many factors, including:

- the progress, costs and results of our preclinical development and initial clinical trials for HMI-102 including the pheNIX Phase 1/2 clinical trial, HMI-103, HMI-202 and HMI-203;

38

- the progress, costs and results of our additional research and preclinical development programs in gene therapy and gene editing;

- the costs and timing of internal process development and manufacturing scale-up activities, the production of materials in our internal manufacturing facility, and outsourcing activities with CMOs associated with our lead product development programs and other programs we advance through preclinical and clinical development;

- our ability to establish and maintain strategic collaborations, licensing or other agreements and the financial terms of such agreements;

- the scope, progress, results and costs of any product candidates that we may derive from our platform technology or any other product candidates that we may develop;

- the extent to which we in-license or acquire rights to other products, product candidates or technologies; and

- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and protecting our intellectual property rights and defending against any intellectual property-related claims.

In addition, the magnitude and duration of the COVID-19 pandemic and its impact on our liquidity and future funding requirements is uncertain as of the filing date of this Quarterly Report on Form 10-Q, as the pandemic continues to evolve globally. See "Impact of COVID-19 Pandemic" above and "Risk Factors— The COVID-19 pandemic caused by the novel strain of coronavirus could adversely impact our business, including our preclinical studies and clinical trials." in Part II, Item 1A of this Quarterly Report on Form 10-Q for a further discussion of the possible impact of the COVID-19 pandemic on our business.

Until such time, if ever, that we can generate product revenue sufficient to achieve profitability, we expect to finance our cash needs through a combination of equity offerings, debt financings, collaboration agreements, other third-party funding, strategic alliances, licensing arrangements and marketing and distribution arrangements.

To the extent that we raise additional capital through the sale of equity or convertible debt securities, the ownership interests of our shareholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect the rights of our shareholders as common stockholders. Debt financing and preferred equity financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends. If we raise additional funds through other third-party funding, collaboration agreements, strategic alliances, licensing arrangements or marketing and distribution arrangements, we may have to relinquish valuable rights to our technologies, future revenue streams, research programs or product candidates or grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce or terminate our product development or future commercialization efforts or grant rights to develop and market products or product candidates that we would otherwise prefer to develop and market ourselves. We currently have no credit facility or committed sources of capital.

## Contractual Obligations

There have been no material changes to our contractual obligations during the nine months ended September 30, 2020 from those previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2019.

## Off-Balance Sheet Arrangements

We have not entered into any off-balance sheet arrangements and do not have any holdings in variable interest entities.

## Item 3. Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to market risks in the ordinary course of our business. These risks primarily include interest rate sensitivities. Our interest-earning assets consist of cash and cash equivalents of $178.0 million, or 77.9% of our total assets at September 30, 2020, and $262.4 million, or 84.5% of our total assets at December 31, 2019. Interest income earned on these assets was $1.6 million and $4.6 million for the nine months ended September 30, 2020 and 2019, respectively. Our interest income is sensitive to changes in the general level of interest rates, primarily U.S. interest rates. If a 10% change in interest rates were to have immediately occurred on September 30, 2020, this change would not have had a material effect on the fair value of our investment portfolio as of that date. At September 30, 2020, our cash equivalents consisted of bank deposits and money market funds. Such interest-earning instruments carry

a degree of interest rate risk; however, historical fluctuations in interest income have not been significant for us. We had no debt outstanding as of September 30, 2020 and December 31, 2019.

## Item 4. Controls and Procedures.

### Limitations on Effectiveness of Controls and Procedures

In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period covered by this Quarterly Report on Form 10-Q, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on such evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2020.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the three months ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II—OTHER INFORMATION

**Item 1. Legal Proceedings.**

We are not party to any material legal proceedings.

**Item 1A. Risk Factors.**

*Investing in our common stock involves a high degree of risk. You should consider carefully the risks described below, together with the other information included or incorporated by reference in this Quarterly Report on Form 10-Q. If any of the following risks occur, our business, financial condition, results of operations and future growth prospects could be materially and adversely affected. In these circumstances, the market price of our common stock could decline. Other events that we do not currently anticipate or that we currently deem immaterial may also affect our business, prospects, financial condition and results of operations.*

**Risks Related to Our Financial Position and Need for Additional Capital**

***We have incurred significant losses since inception and anticipate that we will incur continued losses for the foreseeable future. If we are unable to achieve and sustain profitability, the market value of our common stock will likely decline. We may never achieve or maintain profitability.***

We are a clinical-stage genetic medicines company with a limited operating history. We have never been profitable and do not expect to be profitable in the foreseeable future. We have incurred net losses in each year since beginning to develop our product candidates, including net losses of approximately $98.9 million and $79.7 million for the nine months ended September 30, 2020 and 2019, respectively. As of September 30, 2020, we had an accumulated deficit of approximately $298.6 million. In addition, we have not commercialized any products and have never generated any revenue from product sales. We have devoted most of our financial resources to research and development, including our preclinical development activities.

We expect to continue to incur significant additional operating losses for the foreseeable future as we seek to advance product candidates through preclinical and clinical development, expand our research and development activities, develop new product candidates, complete clinical trials, seek regulatory approval and, if we receive FDA approval, commercialize our products. Furthermore, the costs of advancing product candidates into each succeeding clinical phase tend to increase substantially over time. The total costs to advance any of our product candidates to marketing approval in even a single jurisdiction would be substantial. Because of the numerous risks and uncertainties associated with genetic medicine product development, we are unable to accurately predict the timing or amount of increased expenses or when, or if, we will be able to begin generating revenue from the commercialization of products or achieve or maintain profitability. Our expenses will also increase substantially if and as we:

- continue our current research programs and our preclinical development of product candidates from our current research programs;

- seek to identify, assess, acquire and/or develop additional research programs and additional product candidates;

- initiate preclinical testing and clinical trials for any product candidates we identify and develop;

- establish a sales, marketing and distribution infrastructure to commercialize any product candidates for which we may obtain marketing approval;

- maintain, expand and protect our intellectual property portfolio;

- further develop our genetic medicines platform;

- hire additional clinical, scientific and commercial personnel;

- add operational, financial and management information systems and personnel, including personnel to support our product development and planned future commercialization efforts, as well as to support our operations as a public reporting company;

- acquire or in-license other commercial products, product candidates and technologies;

- make royalty, milestone or other payments under current and any future in-license agreements; and

- further expand our GMP manufacturing capacity.

41

Furthermore, our ability to successfully develop, commercialize and license our products and generate product revenue is subject to substantial additional risks and uncertainties. Each of our programs and product candidates will require additional preclinical and clinical development, potential regulatory approval in multiple jurisdictions, securing manufacturing supply, capacity and expertise, building of a commercial organization, substantial investment and significant marketing efforts before we generate any revenue from product sales. These risks are further described under "—Risks Related to Discovery, Development, Clinical Testing, Manufacturing and Regulatory Approval" and "—Risks Related to Commercialization." As a result, we expect to continue to incur net losses and negative cash flows for the foreseeable future. These net losses and negative cash flows have had, and will continue to have, an adverse effect on our stockholders' equity and working capital. The amount of our future net losses will depend, in part, on the rate of future growth of our expenses and our ability to generate revenues. If we are unable to develop and commercialize one or more of our product candidates either alone or with collaborators, or if revenues from any product candidate that receives marketing approval are insufficient, we will not achieve profitability. Even if we do achieve profitability, we may not be able to sustain or increase profitability. If we are unable to achieve and then maintain profitability, the value of our equity securities will be materially and adversely affected.

***We will require additional capital to fund our operations, and if we fail to obtain necessary financing, we may not be able to complete the development and commercialization of our product candidates.***

We expect to spend substantial amounts to complete the development of, seek regulatory approvals for and commercialize our lead product candidate, HMI-102. We will require additional capital, which we may raise through equity offerings, debt financings, marketing and distribution arrangements and other collaborations, strategic alliances and licensing arrangements or other sources to enable us to complete the development and potential commercialization of HMI-102, HMI-103, HMI-202, HMI-203 and any other product candidates. In addition, we may not be able to enter into any collaborations that will generate significant cash. Adequate additional financing may not be available to us on acceptable terms, or at all. Our failure to raise capital as and when needed would have a negative effect on our financial condition and our ability to pursue our business strategy. In addition, attempting to secure additional financing may divert the time and attention of our management from day-to-day activities and harm our product candidate development efforts.

Based upon our current operating plan, we now believe that our existing cash and cash equivalents, together with the anticipated proceeds of $60.0 million from the Pfizer private placement, will enable us to fund our operating expenses and capital expenditure requirements into the third quarter of 2022, including, subject to the impact of the COVID-19 pandemic on our business, additional development activities related to our Phase 1/2 pheNIX clinical trial with HMI-102, the advancement of our lead gene editing product candidate, HMI-103, and our gene therapy product candidates, HMI-202 and HMI-203, the scale-up of our manufacturing processes and the expansion of our intellectual property portfolio. This estimate is based on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we currently expect. Changing circumstances could cause us to consume capital significantly faster than we currently anticipate, and we may need to spend more than currently expected because of circumstances beyond our control. Because the length of time and activities associated with successful development of HMI-102, HMI-103, HMI-202, HMI-203 and any other product candidates is highly uncertain, we are unable to estimate the actual funds we will require for development and any approved marketing and commercialization activities. Our future funding requirements, both near and long-term, will depend on many factors, including, but not limited to:

- the initiation, progress, timing, costs and results of our planned clinical trials for HMI-102 and our other product candidates;

- the outcome, timing and cost of meeting regulatory requirements established by the FDA and other comparable foreign regulatory authorities;

- the cost of filing, prosecuting, defending and enforcing our patent claims and other intellectual property rights;

- the cost of defending potential intellectual property disputes, including patent infringement actions brought by third parties against us or HMI-102, HMI-103, HMI-202, HMI-203 or any of our product candidates;

- the effect of competing technological and market developments;

- the cost and timing of completion of commercial-scale manufacturing activities;

- the costs of operating as a public company;

- the extent to which we in-license or acquire other products and technologies;

42

- the cost of establishing sales, marketing and distribution capabilities for HMI-102, HMI-103, HMI-202, HMI-203 or any of our product candidates in regions where we choose to commercialize our products; and

- the initiation, progress, timing and results of our commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any of our product candidates, if approved for commercial sale.

We cannot be certain that additional funding will be available on acceptable terms, or at all. Moreover, market volatility resulting from the COVID-19 pandemic or other factors could also adversely impact our ability to access capital as and when needed. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we may have to significantly delay, scale back or discontinue the development or commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or other product candidates or potentially discontinue operations.

*Raising additional capital may cause dilution to our stockholders, restrict our operations or require us to relinquish rights to our technologies or product candidates.*

Until such time, if ever, as we can generate substantial revenue, we may finance our cash needs through a combination of equity offerings, debt financings, marketing and distribution arrangements and other collaborations, strategic alliances and licensing arrangements. We do not currently have any committed external source of funds. In addition, we may seek additional capital due to favorable market conditions or strategic considerations, even if we believe that we have sufficient funds for our current or future operating plans.

To the extent that we raise additional capital through the sale of equity or convertible debt securities, including under our effective Registration Statement on Form S-3, the ownership interests of our shareholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect the rights of our common stockholders. Debt financing and preferred equity financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or declaring dividends. If we raise additional funds through collaborations, strategic alliances or marketing, distribution or licensing arrangements with third parties, we may be required to relinquish valuable rights to our technologies, future revenue streams or product candidates or grant licenses on terms that may not be favorable to us. If we are unable to raise additional funds through equity or debt financings when needed, we may be required to delay, limit, reduce or terminate our product development or future commercialization efforts or grant rights to develop and market product candidates that we would otherwise prefer to develop and market ourselves.

*We have a limited operating history and no history of commercializing genetic medicine products, which may make it difficult to evaluate the prospects for our future viability.*

We were established and began operations in 2015. Our operations to date have been limited to financing and staffing our company, developing our technology and identifying and developing our product candidates. We have not yet demonstrated an ability to successfully complete any clinical trials, including large-scale, pivotal clinical trials, obtain marketing approval, manufacture a commercial scale product, or arrange for a third party to do so on our behalf, or conduct sales and marketing activities necessary for successful product commercialization. Typically, it takes about six to ten years to develop a new drug from the time it enters Phase 1 clinical trials to when it is approved for treating patients, but in many cases, it may take longer. Consequently, predictions about our future success or viability may not be as accurate as they could be if we had a longer operating history or a history of successfully developing and commercializing genetic medicine products.

In addition, as a business with a limited operating history, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown factors. We will eventually need to transition from a company with a research focus to a company capable of supporting commercial activities. We may not be successful in such a transition.

As we continue to build our business, we expect our financial condition and operating results may fluctuate significantly from quarter to quarter and year to year due to a variety of factors, many of which are beyond our control. Accordingly, you should not rely upon the results of any particular quarterly or annual period as indications of future operating performance.

43

***We are heavily dependent on the success of HMI-102, our most advanced product candidate, and if HMI-102 does not receive regulatory approval or is not successfully commercialized, our business may be harmed.***

To date, we have invested a significant portion of our efforts and financial resources in the development of HMI-102. Our future success and ability to generate product revenue is substantially dependent on our ability to successfully develop, obtain regulatory approval for and successfully commercialize this product candidate. We currently have no products that are approved for commercial sale and may never be able to develop marketable products. We expect that a substantial portion of our efforts and expenditures over the next few years will be devoted to HMI-102, which will require additional clinical development, management of clinical and manufacturing activities, regulatory approval in multiple jurisdictions, securing manufacturing supply, building of a commercial organization, substantial investment and significant marketing efforts before we can generate any revenues from any commercial sales. Accordingly, our business currently depends heavily on the successful development, regulatory approval and commercialization of HMI-102, which may never occur if HMI-102 is ultimately shown to not be associated with phenylalanine hydroxylase enzymatic activity and increased Phe metabolism, or if HMI-102 were associated with serious adverse events, or if it were found to not be efficacious. Therefore, we cannot be certain that HMI-102 will be successful in our current Phase 1/2 pheNIX trial or future clinical trials, receive regulatory approval or be successfully commercialized even if we receive regulatory approval. Even if we receive approval to market HMI-102 from the FDA or other regulatory bodies, we cannot be certain that our product candidate will be successfully commercialized, widely accepted in the marketplace or more effective than other commercially available alternatives. Additionally, the research, testing, manufacturing, labeling, approval, sale, marketing and distribution of genetic medicine products are and will remain subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries that each have differing regulations. We are not permitted to market HMI-102 in the United States until it receives approval of a biologics license application, or BLA from the FDA, or in any foreign countries until it receives the requisite approval from such countries.

We have not submitted a BLA to the FDA or comparable applications to other regulatory authorities and do not expect to be in a position to do so for the foreseeable future.

HMI-102 is our most advanced product candidate, and because our other product candidates are based on similar technology, if HMI-102 shows unexpected adverse events or a lack of efficacy in the indications we intend to treat, or if we experience other regulatory or developmental issues, our development plans and business could be significantly harmed. Further, competitors may be developing products with similar technology and may experience problems with their products that could identify problems that would potentially harm our business.

***We may not be successful in our efforts to identify additional product candidates.***

Part of our strategy involves identifying novel product candidates. The process by which we identify product candidates may fail to yield product candidates for clinical development for a number of reasons, including those discussed in these risk factors and also:

- we may not be able to assemble sufficient resources to acquire or discover additional product candidates;

- competitors may develop alternatives that render our potential product candidates obsolete or less attractive;

- potential product candidates we develop may nevertheless be covered by third parties' patents or other exclusive rights;

- potential product candidates may, on further study, be shown to have harmful side effects, toxicities or other characteristics that indicate that they are unlikely to be products that will receive marketing approval and achieve market acceptance;

- potential product candidates may not be effective in treating their targeted diseases;

- the market for a potential product candidate may change so that the continued development of that product candidate is no longer reasonable;

- a potential product candidate may not be capable of being produced in commercial quantities at an acceptable cost, or at all; or

- the regulatory pathway for a potential product candidate is too complex and difficult to navigate successfully or economically.

44

In addition, we may choose to focus our efforts and resources on a potential product candidate that ultimately proves to be unsuccessful. As a result, we may fail to capitalize on viable commercial products or profitable market opportunities, be required to forego or delay pursuit of opportunities with other product candidates or other diseases that may later prove to have greater commercial potential, or relinquish valuable rights to such product candidates through collaboration, licensing or other royalty arrangements in cases in which it would have been advantageous for us to retain sole development and commercialization rights. If we are unable to identify additional suitable product candidates for clinical development, this would adversely impact our business strategy and our financial position and share price and could potentially cause us to cease operations.

***We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.***

As of November 1, 2020, we had 206 employees. We will need to significantly expand our organization, and we may have difficulty identifying, hiring and integrating new personnel. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities. We may not be able to effectively manage the expansion of our operations, which may result in weaknesses in our infrastructure, give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Our expected growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenues could be reduced, and we may not be able to implement our business strategy. Our future financial performance and our ability to commercialize our product candidates and compete effectively will depend, in part, on our ability to effectively manage any future growth.

Many of the biotechnology companies that we compete against for qualified personnel and consultants have greater financial and other resources, different risk profiles and a longer history in the industry than we do. If we are unable to continue to attract and retain high-quality personnel and consultants, the rate and success at which we can discover and develop product candidates and operate our business will be limited.

***We may be required to make significant payments in connection with our license agreements with each of the City of Hope and the California Institute of Technology.***

Under our license agreements with each of City of Hope Medical Center, or COH, and California Institute of Technology, or Caltech, we are subject to significant obligations, including payment obligations upon achievement of specified milestones and royalties on product sales, as well as other material obligations, including potential payments to COH if we were to sublicense the COH technology to additional strategic collaborators. If these payments become due, we may not have sufficient funds available to meet our obligations or we may have to direct funds from other development efforts, and as a result, our development efforts may be materially harmed.

**Risks Related to Discovery, Development, Clinical Testing, Manufacturing and Regulatory Approval**

***We intend to identify and develop product candidates based on our novel genetic medicines platform, which makes it difficult to predict the time and cost of product candidate development. No products that utilize gene editing technology have been approved in the United States or in Europe, and there have only been a limited number of human clinical trials involving a gene editing product candidate. Moreover, none of those trials has involved our nuclease-free gene editing technology.***

We have concentrated our research and development efforts on our genetic medicines platform, which uses both nuclease-free gene editing and gene therapy technologies. Our future success depends on the successful development of this novel therapeutic approach. To date, no product that utilizes gene editing has been approved in the United States or Europe. There have been a limited number of clinical trials of gene editing technologies, however no product candidates have been approved, and none of these clinical trials involved product candidates that utilize our novel gene correction editing technology. In addition, because our programs are all in the research, preclinical or early-clinical stage, we have not yet been able to fully assess safety in humans, and there may be long-term effects from treatment with any of our future product candidates that we cannot predict at this time. Any gene correction editing product candidates we may develop will act at the level of DNA, and, because animal DNA differs from human DNA, it will be difficult for us to test our future product candidates in animal models for either safety or efficacy. Also, animal models may not exist for some of the diseases we expect to pursue. Our genetic medicines platform is based on a suite of 15 proprietary AAVHSCs which we can deploy with either gene editing or gene therapy constructs. Both applications rely on a unique ability of our AAVHSCs to

45

efficiently target multiple tissues in the body. The mechanism of action by which these vectors target particular tissues is still not completely understood. Therefore, it is difficult for us to determine that our vectors will be able to properly integrate corrective DNA in or deliver gene transfer constructs to enough tissue cells to reach therapeutic levels. We cannot be certain that our AAVHSCs will be able to meet safety and efficacy levels needed to be therapeutic in humans or that they will not cause significant adverse events or toxicities. Furthermore, recent work conducted by a third party in non-human primates suggests that intravenous delivery of certain AAV vectors at very high doses may result in severe toxicity. To date, we have not observed the severe toxicities described in these publications after intravenous administration in non-human primates with our naturally occurring AAVHSC vectors, and we have not seen these toxicities in our product candidates. However, we cannot be certain that we will be able to avoid triggering toxicities in our future preclinical or clinical studies. Any such results could impact our ability to develop a product candidate. As a result of these factors, it is more difficult for us to predict the time and cost of product candidate development, and we cannot predict whether the application of our genetic medicines platform, or any similar or competitive gene therapy or gene editing platforms, will result in the identification, development, and regulatory approval of any medicines, or that other genetic medicine technologies will not be considered better or more attractive for the development of medicines. There can be no assurance that any development problems we experience in the future related to our genetic medicines platform or any of our research programs will not cause significant delays or unanticipated costs, or that such development problems can be solved. We may also experience delays in developing a sustainable, reproducible, and scalable manufacturing process or transferring that process to commercial partners. Any of these factors may prevent us from completing our preclinical studies or any clinical trials that we may initiate or commercializing any product candidates we may develop on a timely or profitable basis, if at all.

***Because gene therapy and gene editing are novel and the regulatory landscape that governs any product candidates we may develop is uncertain and continues to change, we cannot predict the time and cost of obtaining regulatory approval, if we receive it at all, for any product candidates we may develop.***

Regulatory requirements governing products created with genome editing technology or involving gene therapy treatment have changed frequently and will likely continue to change in the future. Approvals by one regulatory agency may not be indicative of what any other regulatory agency may require for approval, and there is substantial, and sometimes uncoordinated, overlap in those responsible for regulation of gene therapy products, cell therapy products and other products created with genome editing technology. For example, the FDA established the Office of Tissues and Advanced Therapies within its Center for Biologics Evaluation and Research, or CBER, with responsibility for the review of gene therapy and related products, and the Cellular, Tissue and Gene Therapies Advisory Committee to advise CBER on its review. These and other regulatory review agencies, committees and advisory groups and any requirements and guidelines they promulgate may lengthen the regulatory review process, require us to perform additional preclinical studies or clinical trials, increase our development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of these treatment candidates or lead to significant post-approval limitations or restrictions.

Additionally, under the National Institutes of Health, or NIH, Guidelines for Research Involving Recombinant DNA Molecules, or NIH Guidelines, supervision of human gene transfer trials includes evaluation and assessment by an institutional biosafety committee, or IBC, a local institutional committee that reviews and oversees research utilizing recombinant or synthetic nucleic acid molecules at that institution. The IBC assesses the safety of the research and identifies any potential risk to public health or the environment, and such review may result in some delay before initiation of a clinical trial. While the NIH Guidelines are not mandatory unless the research in question is being conducted at or sponsored by institutions receiving NIH funding of recombinant or synthetic nucleic acid molecule research, many companies and other institutions not otherwise subject to the NIH Guidelines voluntarily follow them.

In the European Union, the European Medicines Agency, or the EMA, has a Committee for Advanced Therapies, or CAT, that is responsible for assessing the quality, safety and efficacy of advanced therapy medicinal products. Advanced-therapy medical products include gene therapy medicine, somatic-cell therapy medicines and tissue-engineered medicines. The role of the CAT is to prepare a draft opinion on an application for marketing authorization for a gene therapy medicinal candidate that is submitted to the EMA. In the European Union, the development and evaluation of a gene therapy medicinal product must be considered in the context of the relevant European Union guidelines. The EMA may issue new guidelines concerning the development and marketing authorization for gene therapy medicinal products and require that we comply with these new guidelines. Similarly complex regulatory environments exist in other jurisdictions in which we might consider seeking regulatory approvals for our product candidates, further complicating the regulatory landscape. As a result, the procedures and standards applied to gene therapy products and cell therapy products may be applied to any of our gene therapy or genome editing product candidates, but that remains uncertain at this point.

46

The clinical trial requirements of the FDA, the EMA and other regulatory authorities and the criteria these regulators use to evaluate the safety and efficacy of a product candidate vary substantially according to the type, complexity, novelty and intended use and market of the potential products. The regulatory approval process for product candidates created with novel genome editing technology such as ours can be more lengthy, rigorous and expensive than the process for other better known or more extensively studied product candidates and technologies. Since we are developing novel treatments for diseases in which there is little clinical experience with new endpoints and methodologies, there is heightened risk that the FDA, the EMA or comparable regulatory bodies may not consider the clinical trial endpoints to provide clinically meaningful results, and the resulting clinical data and results may be more difficult to analyze. This may be a particularly significant risk for many of the genetically defined diseases for which we may develop product candidates alone or with collaborators due to small patient populations for those diseases, and designing and executing a rigorous clinical trial with appropriate statistical power is more difficult than with diseases that have larger patient populations. Regulatory agencies administering existing or future regulations or legislation may not allow production and marketing of products utilizing genome editing technology in a timely manner or under technically or commercially feasible conditions. Even if our product candidates obtain required regulatory approvals, such approvals may later be withdrawn as a result of changes in statute or regulations or the interpretation of new available data by applicable regulatory agencies.

Changes in applicable regulatory guidelines may lengthen the regulatory review process for our product candidates, require additional studies or trials, increase development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of such product candidates, or lead to significant post-approval limitations or restrictions. Additionally, adverse developments in clinical trials conducted by others of gene therapy products or products created using genome editing technology, or adverse public perception of the field of genome editing, may cause the FDA, the EMA and other regulatory bodies to revise the requirements for approval of any product candidates we may develop or limit the use of products utilizing genome editing technologies, either of which could materially harm our business. Furthermore, regulatory action or private litigation could result in expenses, delays or other impediments to our research programs or the development or commercialization of current or future product candidates.

As we advance product candidates, we will be required to consult with these regulatory and advisory groups and comply with all applicable guidelines, rules and regulations. If we fail to do so, we may be required to delay or terminate development of such product candidates. Delay or failure to obtain, or unexpected costs in obtaining, the regulatory approval necessary to bring a product candidate to market could decrease our ability to generate sufficient product revenue to maintain our business.

*Clinical trials are expensive, time-consuming, difficult to design and implement, and involve an uncertain outcome.*

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials. A number of companies in the biotechnology and genetic medicine industries have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials. Even if our current and future clinical trials are completed as planned, we cannot be certain that their results will support the safety and effectiveness of HMI-102 for PKU or any other potential indication. Our current and future clinical trial results may not be successful.

To date, we have not completed any clinical trials required for the approval of HMI-102 or any of our product candidates. Although we have initiated our Phase 1/2 pheNIX trial for HMI-102, we may experience delays in conducting any clinical trials and we do not know whether planned clinical trials will begin on time, need to be redesigned, recruit and enroll patients on time or be completed on schedule, or at all. Clinical trials can be delayed or terminated for a variety of reasons, including delays or failures related to:

- the FDA or comparable foreign regulatory authorities disagreeing as to the design or implementation of our clinical studies;

- obtaining regulatory approval to commence a trial;

- reaching an agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- obtaining institutional review board, or IRB, approval at each site;

- recruiting suitable patients to participate in a trial;

- developing and validating the companion diagnostic to be used in a clinical trial, if applicable;

47

- having patients complete a trial or return for post-treatment follow-up;

- clinical sites deviating from trial protocol or dropping out of a trial;

- addressing patient safety concerns that arise during the course of a trial;

- adding a sufficient number of clinical trial sites; or

- manufacturing sufficient quantities of product candidate for use in clinical trials.

We may experience numerous unforeseen events during, or as a result of, clinical trials that could delay or prevent our ability to receive marketing approval or commercialize our product candidates or significantly increase the cost of such trials, including:

- we may receive feedback from regulatory authorities that requires us to modify the design of our clinical trials;

- clinical trials of our product candidates may produce negative safety and/or efficacy data or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical trials or abandon development programs;

- the number of patients required for clinical trials of our product candidates may be larger than we anticipate, enrollment in these clinical trials may be slower than we anticipate or participants may drop out of these clinical trials at a higher rate than we anticipate;

- our third-party contractors may fail to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;

- we or our investigators might have to suspend or terminate clinical trials of our product candidates for various reasons, including non-compliance with regulatory requirements, a finding that our product candidates have undesirable side effects or other unexpected characteristics, or a finding that the participants are being exposed to unacceptable health risks;

- the cost of clinical trials of our product candidates may be greater than we anticipate and we may not have funds to cover the costs;

- the supply or quality of our product candidates or other materials necessary to conduct clinical trials of our product candidates may be insufficient or inadequate;

- regulators may revise the requirements for approving our product candidates, or such requirements may not be as we anticipate; and

- any future collaborators that conduct clinical trials may face any of the above issues, and may conduct clinical trials in ways they view as advantageous to them but that are suboptimal for us.

If we are required to conduct additional clinical trials or other testing of our product candidates beyond those that we currently contemplate, if we are unable to successfully complete clinical trials of our product candidates or other testing, if the results of these trials or tests are not positive or are only modestly positive or if there are safety concerns, we may:

- incur unplanned costs;

- be delayed in obtaining marketing approval for our product candidates or not obtain marketing approval at all;

- obtain marketing approval in some countries and not in others;

- obtain marketing approval for indications or patient populations that are not as broad as intended or desired;

- obtain marketing approval with labeling that includes significant use or distribution restrictions or safety warnings, including boxed warnings;

- be subject to additional post-marketing testing requirements; or

- have the product removed from the market after obtaining marketing approval.

In addition, disruptions caused by the COVID-19 pandemic may increase the likelihood that we encounter such difficulties or delays in initiating, enrolling, conducting or completing our planned and ongoing clinical trials. For example, we have experienced, and may continue to experience, delays in enrolling our Phase 1/2 pheNIX trial as a result of the COVID-19 pandemic. We could encounter delays if a clinical trial is suspended or terminated by us, by the IRBs of the institutions in which such trials are being conducted, by the Data Safety Monitoring Board, or DSMB, for such trial or by the FDA or other regulatory authorities. Such authorities may impose such a suspension or termination due to a number of factors, including failure to conduct the clinical trial in

accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial. Furthermore, we may rely on CROs and clinical trial sites to ensure the proper and timely conduct of clinical trials and while we would have agreements governing their committed activities, we would have limited influence over their actual performance, as described in "—Risks Related to Our Dependence on Third Parties."

Our most advanced product candidate, HMI-102, will require extensive clinical testing before we are prepared to submit a BLA for regulatory approval. We cannot predict with any certainty if or when we might complete the development of HMI-102 and submit a BLA for regulatory approval of HMI-102 or whether any such BLA will be approved by the FDA. We may seek feedback from the FDA or other regulatory authorities on our clinical development program, and the FDA or such regulatory authorities may not provide such feedback on a timely basis, or such feedback may not be favorable, which could further delay our development programs.

If we experience delays in the commencement or completion of our clinical trials, or if we terminate a clinical trial prior to completion, the commercial prospects of HMI-102 could be harmed, and our ability to generate revenues from HMI-102 may be delayed. In addition, any delays in our clinical trials could increase our costs, slow down the development and approval process and jeopardize our ability to commence product sales and generate revenues. Any of these occurrences may harm our business, financial condition and results of operations. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates.

***Adverse public perception of genetic medicine, and gene editing in particular, may negatively impact regulatory approval of, or demand for, our potential products.***

Some of our potential therapeutic products involve editing the human genome. The clinical and commercial success of our potential products will depend in part on public acceptance of the use of gene editing and gene therapy for the prevention or treatment of human diseases. Public attitudes may be influenced by claims that gene therapy and gene editing are unsafe, unethical, or immoral, and, consequently, our products may not gain the acceptance of the public or the medical community. Adverse public attitudes may adversely impact our ability to enroll clinical trials. Moreover, our success will depend upon physicians prescribing, and their patients being willing to receive, treatments that involve the use of product candidates we may develop in lieu of, or in addition to, existing treatments with which they are already familiar and for which greater clinical data may be available.

In addition, gene editing technology is subject to public debate and heightened regulatory scrutiny due to ethical concerns relating to the application of gene editing technology to human embryos or the human germline. For example, in April 2015, Chinese scientists reported on their attempts to edit the genome of human embryos to modify the gene for hemoglobin beta. This is the gene in which a mutation occurs in patients with the inherited blood disorder beta thalassemia. Although this research was purposefully conducted in embryos that were not viable, the work prompted calls for a moratorium or other types of restrictions on gene editing of human eggs, sperm, and embryos. The Alliance for Regenerative Medicine in Washington, D.C. has called for a voluntary moratorium on the use of gene editing technologies in research that involved altering human embryos or human germline cells. Similarly, the NIH has announced that it would not fund any use of gene editing technologies in human embryos, noting that there are multiple existing legislative and regulatory prohibitions against such work, including the Dickey-Wicker Amendment, which prohibits the use of appropriated funds for the creation of human embryos for research purposes or for research in which human embryos are destroyed. Laws in the United Kingdom prohibit genetically modified embryos from being implanted into women, but embryos can be altered in research labs under license from the Human Fertilisation and Embryology Authority. Research on embryos is more tightly controlled in many other European countries.

Although we do not use our technologies to edit human embryos or the human germline, such public debate about the use of gene editing technologies in human embryos and heightened regulatory scrutiny could prevent or delay our development of product candidates. More restrictive government regulations or negative public opinion would have a negative effect on our business or financial condition and may delay or impair our development and commercialization of product candidates or demand for any products we may develop. Adverse events in our preclinical studies or clinical trials or those of our competitors or of academic researchers utilizing gene therapy or gene editing technologies, even if not ultimately attributable to product candidates we may discover and develop, and the resulting publicity could result in increased governmental regulation, unfavorable public perception, potential regulatory delays in the testing or approval of potential product candidates we may identify and develop, stricter labeling requirements for those product candidates that are approved, a decrease in demand for any such product candidates and a suspension or withdrawal of approval by regulatory authorities of our product candidates.

49

***A Breakthrough Therapy Designation by the FDA, even if granted for any of our product candidates, may not lead to a faster development or regulatory review or approval process and it does not increase the likelihood that our product candidates will receive marketing approval.***

We may seek a Breakthrough Therapy Designation for our product candidates if the clinical data support such a designation for one or more product candidates. A breakthrough therapy is defined as a drug or biologic that is intended, alone or in combination with one or more other drugs or biologics, to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the drug, or biologic in our case, may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. For product candidates that have been designated as breakthrough therapies, interaction and communication between the FDA and the sponsor of the trial can help to identify the most efficient path for clinical development while minimizing the number of patients placed in ineffective control regimens. Biologics designated as breakthrough therapies by the FDA may also be eligible for priority review.

Designation as a breakthrough therapy is within the discretion of the FDA. Accordingly, even if we believe one of our product candidates meets the criteria for designation as a breakthrough therapy, the FDA may disagree and instead determine not to make such designation. In any event, the receipt of a Breakthrough Therapy Designation for a product candidate may not result in a faster development process, review or approval compared to drugs considered for approval under non-expedited FDA review procedures and does not assure ultimate approval by the FDA. In addition, even if one or more of our product candidates qualify as breakthrough therapies, the FDA may later decide that the product no longer meets the conditions for qualification or decide that the time period for FDA review or approval will not be shortened.

***A Fast Track Designation by the FDA, even if granted for any of our product candidates, may not lead to a faster development or regulatory review or approval process, and does not increase the likelihood that our product candidates will receive marketing approval.***

On May 1, 2019, we received Fast Track Designation for HMI-102 for the prevention or treatment of neurocognitive defects due to phenylalanine hydroxylase deficiency through normalization of circulating phenylalanine levels, and we intend to seek such designation for some or all of our other product candidates. If a drug or biologic, in our case, is intended for the treatment of a serious or life-threatening condition and the biologic demonstrates the potential to address unmet medical needs for this condition, the biologic sponsor may apply for FDA Fast Track Designation. The sponsor of a Fast Track product candidate has opportunities for more frequent interactions with the applicable FDA review team during product development and, once a BLA is submitted, the product candidate may be eligible for priority review. A Fast Track product candidate may also be eligible for rolling review, where the FDA may consider for review sections of the BLA on a rolling basis before the complete application is submitted, if the sponsor provides a schedule for the submission of the sections of the BLA, the FDA agrees to accept sections of the BLA and determines that the schedule is acceptable, and the sponsor pays any required user fees upon submission of the first section of the BLA.  The FDA has broad discretion whether or not to grant this designation. Even if we believe a particular product candidate is eligible for this designation, we cannot assure you that the FDA would decide to grant it. Even if we do receive Fast Track Designation, we may not experience a faster development process, review or approval compared to conventional FDA procedures. The FDA may withdraw Fast Track Designation if it believes that the designation is no longer supported by data from our clinical development program. Many biologics that have received Fast Track Designation have failed to obtain approval.

We may also seek accelerated approval for products that have obtained Fast Track Designation. Under the FDA's accelerated approval program, the FDA may approve a biologic for a serious or life-threatening illness that provides meaningful therapeutic benefit to patients over existing treatments based upon a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity or prevalence of the condition and the availability or lack of alternative treatments. For biologics granted accelerated approval, post-marketing confirmatory trials are required to describe the anticipated effect on irreversible morbidity or mortality or other clinical benefit. These confirmatory trials must be completed with due diligence and, in some cases, the FDA may require that the trial be designed and/or initiated prior to approval. Moreover, the FDA may withdraw approval of any product candidate or indication approved under the accelerated approval pathway if, for example:

- the trial or trials required to verify the predicted clinical benefit of the product candidate fail to verify such benefit or do not demonstrate sufficient clinical benefit to justify the risks associated with the biologic;

- other evidence demonstrates that the product candidate is not shown to be safe or effective under the conditions of use;

- we fail to conduct any required post-approval trial of the product candidate with due diligence; or

- we disseminate false or misleading promotional materials relating to the product candidate.

50

*We have received orphan drug designation for HMI-102 and HMI-202, and we intend to seek orphan drug designation for our other product candidates, but any orphan drug designations we receive may not confer marketing exclusivity or other expected benefits.*

We have received orphan drug designation for HMI-102 in the United States and Europe for the use of AAVHSC15 expressing *PAH* for the treatment of PAH deficiency. In addition, we have received orphan drug designation for HMI-202 in the United States and Europe for the use of AAVHSC15 expressing human arylsulfatase A for the treatment of metachromatic leukodystrophy. In the United States, orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. In addition, if a product that has orphan drug designation subsequently receives the first FDA approval for the disease for which it has such designation, the product is entitled to orphan drug exclusivity. Orphan drug exclusivity in the United States provides that the FDA may not approve any other applications, including a full NDA, to market the same drug for the same indication for seven years, except in limited circumstances. The applicable exclusivity period is ten years in Europe. The European exclusivity period can be reduced to six years if a drug no longer meets the criteria for orphan drug designation or if the drug is sufficiently profitable so that market exclusivity is no longer justified.

Even if we, or any future collaborators, obtain orphan drug designation for a product candidate, we, or they, may not be able to obtain or maintain orphan drug exclusivity for that product candidate. We may not be the first to obtain marketing approval of any product candidate for which we have obtained orphan drug designation for the orphan-designated indication due to the uncertainties associated with developing pharmaceutical products. In addition, exclusive marketing rights in the United States may be limited if we seek approval for an indication broader than the orphan-designated indication or may be lost if the FDA later determines that the request for designation was materially defective or if we are unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition. Further, even if we, or any future collaborators, obtain orphan drug exclusivity for a product, that exclusivity may not effectively protect the product from competition because different drugs with different active moieties may be approved for the same condition. Even after an orphan drug is approved, the FDA can subsequently approve the same drug with the same active moiety for the same condition if the FDA concludes that the later drug is clinically superior in that it is shown to be safer, more effective or makes a major contribution to patient care or the manufacturer of the product with orphan exclusivity is unable to maintain sufficient product quantity. Orphan drug designation neither shortens the development time or regulatory review time of a drug nor gives the drug any advantage in the regulatory review or approval process, nor does it prevent competitors from obtaining approval of the same product candidate as ours for indications other than those in which we have been granted orphan drug designation.

*We have received rare pediatric disease designation for HMI-202, and we may seek rare pediatric disease designation for our other product candidates, however, there is no guarantee that we will obtain such designation, and even if we do, there is no guarantee that FDA approval will result in a priority review voucher.*

In 2012, Congress authorized the FDA to award priority review vouchers to sponsors of certain rare pediatric disease product applications. This program is designed to encourage development of new drug and biological products for prevention and treatment of certain rare pediatric diseases. Specifically, under this program, a sponsor who receives an approval for a drug or biologic for a "rare pediatric disease" that meets certain criteria may qualify for a voucher that can be redeemed to receive a priority review of a subsequent marketing application for a different product. The sponsor of a rare pediatric disease drug product receiving a priority review voucher may transfer (including by sale) the voucher to another sponsor. The voucher may be further transferred any number of times before the voucher is used, as long as the sponsor making the transfer has not yet submitted the application. The FDA may also revoke any priority review voucher if the rare pediatric disease drug for which the voucher was awarded is not marketed in the U.S. within one year following the date of approval.

We have received rare pediatric disease designation for HMI-202, and we may seek rare pediatric disease designation for our other product candidates; however, we may not be able to obtain such designation. If we are able to obtain rare pediatric disease designation for our other product candidates, there is no guarantee that we will be able to obtain a priority review voucher, even if the designated product candidate is approved by the FDA. Moreover, Congress included a sunset provision in the statute authorizing the rare pediatric disease priority review voucher program. Specifically, FDA may not award the voucher to sponsors of marketing applications approved after December 11, 2020 unless either (i) the drug has received rare pediatric disease designation as of December 11, 2020, and is then approved by the FDA no later than December 11, 2022; or (ii) Congress reauthorizes the program, for which legislation has been proposed in the current Congress. If Congress does not reauthorize the rare pediatric disease priority review program in its current form, and if we do not receive rare pediatric disease designation before December 11, 2020, we will not be issued a voucher upon any approval that we receive. Moreover, even if we receive rare pediatric disease designation by the current statutory deadline of December 11, 2020, we may not receive the voucher if we do not obtain approval by December 11, 2022. Even if legislation is enacted that extends the date by which approval of the rare pediatric disease-designated drug must obtain approval to receive a priority review voucher, we may not obtain approval by that date, and even if we do, we may not obtain a priority review voucher.

51

*A Regenerative Medicine Advanced Therapy designation by the FDA, even if granted for any of our product candidates, may not lead to a faster development or regulatory review or approval process and does not increase the likelihood that our product candidates will receive marketing approval.*

We may seek a Regenerative Medicine Advanced Therapy, or RMAT, designation for HMI-102 or our other product candidates. In 2017, the FDA established the RMAT designation as part of its implementation of the 21st Century Cures Act. An investigational drug is eligible for RMAT designation if: (1) it meets the definition of a regenerative medicine therapy, which is defined as a cell therapy, therapeutic tissue engineering product, human cell and tissue product, or any combination product using such therapies or products, with limited exceptions; (2) it is intended to treat, modify, reverse, or cure a serious disease or condition; and (3) preliminary clinical evidence indicates that the investigational drug has the potential to address unmet medical needs for such disease or condition. In a February 2019 final guidance, the FDA also stated that certain gene therapies that lead to a sustained effect on cells or tissues may meet the definition of a regenerative medicine therapy. RMAT designation provides potential benefits that include more frequent meetings with FDA to discuss the development plan for the product candidate, and eligibility for rolling review of BLAs and priority review. Product candidates granted RMAT designation may also be eligible for accelerated approval on the basis of a surrogate or intermediate endpoint reasonably likely to predict long-term clinical benefit, or reliance upon data obtained from a meaningful number of sites, including through expansion to additional sites, as appropriate. RMAT-designated product candidates that receive accelerated approval may, as appropriate, fulfill their post-approval requirements through the submission of clinical evidence, clinical studies, patient registries, or other sources of real world evidence (such as electronic health records); through the collection of larger confirmatory data sets; or via post-approval monitoring of all patients treated with such therapy prior to approval of the therapy.

RMAT designation does not change the standards for product approval, and there is no assurance that such designation or eligibility for such designation will result in expedited review or approval or that the approved indication will not be narrower than the indication covered by the RMAT designation. Additionally, RMAT designation can be revoked if the criteria for eligibility cease to be met as clinical data emerges.

*We and our contract manufacturers are subject to significant regulation with respect to manufacturing our products. The manufacturing facilities on which we rely may not continue to meet regulatory requirements and have limited capacity.*

We currently have relationships with a limited number of suppliers for the manufacturing of our viral vectors and product candidates. We completed the build-out of a GMP manufacturing facility to support our clinical development programs in both gene therapy and gene editing and commenced manufacturing activities in April 2019. However, if we experience delays or are unable to scale our internal manufacturing capabilities, we will need to contract with manufacturers that can produce the preclinical, clinical and commercial supply of our products. Each supplier may require licenses to manufacture such components if such processes are not owned by the supplier or in the public domain and we may be unable to transfer or sublicense the intellectual property rights we may have with respect to such activities.

All entities involved in the preparation of therapeutics for clinical studies or commercial sale, including our existing contract manufacturers for our product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical studies must be manufactured in accordance with cGMP. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our product candidates that may not be detectable in final product testing. We or our contract manufacturers must supply all necessary documentation in support of a BLA on a timely basis and must adhere to the FDA's current good laboratory practices, or GLP, and GMP regulations enforced by the FDA through its facilities inspection program. Some of our contract manufacturers have not produced a commercially-approved product and therefore have not obtained the requisite FDA approvals to do so. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities do not pass a pre-approval plant inspection, FDA approval of the products will not be granted.

The regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical study or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business.

If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biologic product, or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. An alternative manufacturer would need to be qualified through a BLA supplement which could result in further delay. The regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

These factors could cause the delay of clinical studies, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing our products successfully. Furthermore, if our suppliers fail to meet contractual requirements, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical studies may be delayed or we could lose potential revenue.

*If we encounter difficulties enrolling patients in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected.*

The timely completion of clinical trials in accordance with their protocols depends, among other things, on our ability to enroll a sufficient number of patients who remain in the study until its conclusion. We may encounter delays in enrolling, or be unable to enroll, a sufficient number of patients to complete any of our clinical trials, and even once enrolled we may be unable to retain a sufficient number of patients to complete any of our trials. The enrollment of patients depends on many factors, including:

- the patient eligibility criteria defined in the protocol;

- the size of the patient population required for analysis of the trial's primary endpoints;

- the proximity of patients to study sites;

- the design of the trial;

- our ability to recruit clinical trial investigators with the appropriate competencies and experience;

- clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies, including any new products that may be approved for the indications we are investigating;

- our ability to obtain and maintain patient consents; and

- the risk that patients enrolled in clinical trials will drop out of the trials before completion.

In addition, our clinical trials will compete with other clinical trials for product candidates that are in the same therapeutic areas as our product candidates, and this competition will reduce the number and types of patients available to us, because some patients who might have opted to enroll in our trials may instead opt to enroll in a trial being conducted by one of our competitors. Since the number of qualified clinical investigators is limited, we expect to conduct some of our clinical trials at the same clinical trial sites that some of our competitors use, which will reduce the number of patients who are available for our clinical trials in such clinical trial site.

Delays or failures in planned patient enrollment or retention may result in increased costs, program delays or both, which could have a harmful effect on our ability to develop HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidates, or could render further development impossible.

53

*Our product candidates may cause serious adverse events or undesirable side effects or have other properties which may delay or prevent their regulatory approval, limit the commercial profile of an approved label, or, result in significant negative consequences following marketing approval, if any.*

Serious adverse events or undesirable side effects caused by our product candidates could cause us or regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay or denial of regulatory approval by the FDA or other comparable foreign authorities. Results of our clinical trials could reveal a high and unacceptable severity and prevalence of side effects, toxicities or unexpected characteristics, including death. A significant risk in any gene editing product is that the edit will be "off-target" (or "on-target," but unwanted) and cause serious adverse events, undesirable side effects, toxicities or unexpected characteristics. For example, off-target cuts could lead to disruption of a gene or a genetic regulatory sequence at an unintended site in the DNA, or, in those instances where we also provide a segment of DNA to serve as a repair template, it is possible that following off-target cut events, DNA from such repair template could be integrated into the genome at an unintended site, potentially disrupting another important gene or genomic element. We cannot be certain that off-target editing will not occur in any of our planned or future clinical studies. There is also the potential risk of delayed adverse events following exposure to gene editing therapy, due to the potential for persistent biological activity of the genetic material or other product components used to carry the genetic material.

If unacceptable side effects arise in the development of our product candidates, we, the FDA, the IRBs at the institutions in which our studies are conducted or DSMB, could suspend or terminate our clinical trials or the FDA or comparable foreign regulatory authorities could order us to cease clinical trials or deny approval of our product candidates for any or all targeted indications. Treatment-related side effects could also affect patient recruitment or the ability of enrolled patients to complete the trial or result in potential product liability claims. In addition, these side effects may not be appropriately recognized or managed by the treating medical staff. We expect to have to train medical personnel using our product candidates to understand the side effect profiles for our clinical trials and upon any commercialization of any of our product candidates. Inadequate training in recognizing or managing the potential side effects of our product candidates could result in patient injury or death. Any of these occurrences may harm our business, financial condition and prospects significantly.

If any of our product candidates receives marketing approval, and we or others later identify undesirable side effects caused by any such product, including during any long-term follow-up observation period recommended or required for patients who receive treatment using our products, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw approvals of such product;

- we may be required to recall a product or change the way such product is administered to patients;

- additional restrictions may be imposed on the marketing of the particular product or the manufacturing processes for the product;

- regulatory authorities may require additional warnings on the label, such as a "black box" warning or contraindication;

- we may be required to implement a Risk Evaluation and Mitigation Strategy, or REMS, or create a medication guide outlining the risks of such side effects for distribution to patients;

- the product could become less competitive;

- we could be sued and held liable for harm caused to patients; and

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the particular product candidate, if approved, and could significantly harm our business, results of operations and prospects.

*The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.*

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations, or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. We have not obtained regulatory approval for any product candidate and it is possible that neither HMI-102, HMI-103, HMI-202, HMI-203, nor any other product candidates we may seek to develop in the future will ever obtain regulatory approval. Neither we nor any future collaborator is

54

permitted to market any of our product candidates in the United States until we receive regulatory approval of a BLA from the FDA. It is possible that the FDA may refuse to accept for substantive review any biologic license applications, or BLAs, that we submit for our product candidates or may conclude after review of our data that our application is insufficient to obtain marketing approval of our product candidates.

Prior to obtaining approval to commercialize a product candidate in the United States or abroad, we or our collaborators must demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA or foreign regulatory agencies, that such product candidates are safe and effective, or in the case of biologics, safe, pure, and potent, for their intended uses. Results from nonclinical studies and clinical trials can be interpreted in different ways. Even if we believe the nonclinical or clinical data for our product candidates are promising, such data may not be sufficient to support approval by the FDA and other regulatory authorities. The FDA may also require us to conduct additional preclinical studies or clinical trials for our product candidates either prior to or post-approval, or it may object to elements of our clinical development program. Depending on the extent of these or any other FDA-required studies, approval of any BLA or application that we submit may be delayed by several years, or may require us to expend significantly more resources than we have available.

Of the large number of potential products in development, only a small percentage successfully complete the FDA or foreign regulatory approval processes and are commercialized. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may not approve the price we intend to charge for our products, may grant approval contingent on the performance of costly post-marketing clinical trials, including Phase 4 clinical trials, and/or the implementation of a REMS, which may be required to ensure safe use of the drug after approval. The FDA or the applicable foreign regulatory agency also may approve a product candidate for a more limited indication or patient population than we originally requested, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

***Disruptions at the FDA and other government agencies caused by funding shortages or global health concerns could hinder their ability to hire, retain or deploy key leadership and other personnel, or otherwise prevent new or modified products from being developed, approved or commercialized in a timely manner or at all, which could negatively impact our business.***

The ability of the FDA to review and or approve new products can be affected by a variety of factors, including government budget and funding levels, statutory, regulatory, and policy changes, the FDA's ability to hire and retain key personnel and accept the payment of user fees, and other events that may otherwise affect the FDA's ability to perform routine functions. Average review times at the agency have fluctuated in recent years as a result. In addition, government funding of other government agencies that fund research and development activities is subject to the political process, which is inherently fluid and unpredictable. Disruptions at the FDA and other agencies may also slow the time necessary for new drugs and biologics to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. For example, over the last several years, including for 35 days beginning on December 22, 2018, the U.S. government has shut down several times and certain regulatory agencies, such as the FDA, have had to furlough critical FDA employees and stop critical activities.

Separately, in response to the global pandemic of COVID-19, on March 10, 2020 the FDA announced its intention to postpone most foreign inspections of manufacturing facilities and products through April 2020, and subsequently, on March 18, 2020, the FDA temporarily postponed routine surveillance inspections of domestic manufacturing facilities. Subsequently, on July 10, 2020 the FDA announced its intention to resume certain on-site inspections of domestic manufacturing facilities subject to a risk-based prioritization system. The FDA intends to use this risk-based assessment system to identify the categories of regulatory activity that can occur within a given geographic area, ranging from mission critical inspections to resumption of all regulatory activities. Regulatory authorities outside the United States may adopt similar restrictions or other policy measures in response to the COVID-19 pandemic. If a prolonged government shutdown occurs, or if global health concerns continue to prevent the FDA or other regulatory authorities from conducting their regular inspections, reviews, or other regulatory activities, it could significantly impact the ability of the FDA or other regulatory authorities to timely review and process our regulatory submissions, which could have a material adverse effect on our business.

***Even if we obtain FDA approval for HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidates in the United States, we may never obtain approval for or commercialize it in any other jurisdiction, which would limit our ability to realize its full market potential.***

In order to market any products in any particular jurisdiction, we must establish and comply with numerous and varying regulatory requirements on a country-by-country basis regarding safety and efficacy. Approval by the FDA in the United States does not ensure approval by regulatory authorities in other countries or jurisdictions. However, the failure to obtain approval in one jurisdiction may negatively impact our ability to obtain approval elsewhere. In addition, clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not guarantee regulatory approval in any other country.

Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and increased costs for us and require additional preclinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. We do not have any product candidates approved for sale in any jurisdiction, including in international markets, and we do not have experience in obtaining regulatory approval in international markets. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approvals in international markets are delayed, our target market will be reduced and our ability to realize the full market potential of any product we develop will be unrealized.

***Even if we receive regulatory approval of our product candidates, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense, and we may be subject to penalties if we fail to comply with regulatory requirements or experience unanticipated problems with our product candidates.***

Any product candidate for which we obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, packaging, distribution, adverse event reporting, storage, recordkeeping, export, import, advertising and promotional activities for such product, among other things, will be subject to extensive and ongoing requirements of and review by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, establishment registration and drug listing requirements, continued compliance with GMP requirements relating to manufacturing, quality control, quality assurance and corresponding maintenance of records and documents, requirements regarding the distribution of samples to physicians and recordkeeping and GCP requirements for any clinical trials that we conduct post-approval.

The FDA closely regulates the post-approval marketing and promotion of genetic medicines to ensure they are marketed only for the approved indications and in accordance with the provisions of the approved labeling. The FDA imposes stringent restrictions on manufacturers' communications regarding off-label use and if we market our products for uses beyond their approved indications, we may be subject to enforcement action for off-label marketing. Violations of the U.S. federal Food, Drug, and Cosmetic Act, or FDCA, relating to the promotion of prescription drugs may lead to FDA enforcement actions and investigations alleging violations of federal and state health care fraud and abuse laws, as well as state consumer protection laws.

In addition, later discovery of previously unknown adverse events or other problems with our products, manufacturers or manufacturing processes, including adverse events of unanticipated severity or frequency, or with our third-party manufacturers or manufacturing processes, or failure to comply with regulatory requirements, may yield various results, including:

- restrictions on manufacturing such products;
- restrictions on the labeling or marketing of a product;
- restrictions on product distribution or use;
- requirements to conduct post-marketing studies or clinical trials;
- warning letters or holds on clinical trials;
- withdrawal of the products from the market;
- refusal to approve pending applications or supplements to approved applications that we submit;
- recall of products;
- fines, restitution or disgorgement of profits or revenues;
- suspension or withdrawal of marketing approvals;

56

- refusal to permit the import or export of our products;

- product seizure or detention; or

- injunctions or the imposition of civil or criminal penalties.

The FDA's policies may change and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained which would adversely affect our business, prospects and ability to achieve or sustain profitability.

We also cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative or executive action, either in the United States or abroad. For example, certain policies of the Trump administration may impact our business and industry, to the extent they remain in effect. Namely, the Trump administration has taken several executive actions, including the issuance of a number of Executive Orders, that could impose significant burdens on, or otherwise materially delay, FDA's ability to engage in routine regulatory and oversight activities such as implementing statutes through rulemaking, issuance of guidance, and review and approval of marketing applications. It is difficult to predict whether these requirements will be implemented, and, if so, the extent to which they will impact the FDA's ability to exercise its regulatory authority. If these or other executive actions impose constraints on FDA's ability to engage in oversight and implementation activities in the normal course, our business may be negatively impacted.

***Potential product liability lawsuits against us could cause us to incur substantial liabilities and limit commercialization of any products that we may develop.***

The use of our product candidates, including HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, in clinical trials and the sale of any products for which we obtain marketing approval exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products. On occasion, large judgments have been awarded in class action lawsuits based on products that had unanticipated adverse effects. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation and significant negative media attention;

- withdrawal of participants from our clinical trials;

- significant costs to defend the related litigation and related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- inability to commercialize HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate;

- product recalls, withdrawals or labeling, marketing or promotional restrictions;

- decreased demand for HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, if approved for commercial sale; and

- loss of revenue.

***Our insurance policies are expensive and protect us only from some business risks, which leaves us exposed to significant uninsured liabilities.***

We do not carry insurance for all categories of risk that our business may encounter. Some of the policies we currently maintain include general liability, employment practices liability, property, auto, workers' compensation, umbrella, and directors' and officers' insurance.

Any additional product liability insurance coverage we acquire in the future, may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. If we obtain marketing approval for HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, we intend to acquire insurance coverage to include the sale of commercial products; however, we may be unable to obtain product liability insurance on commercially reasonable terms or in adequate amounts. A successful product liability claim or series of claims brought against us could cause our share price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business, including preventing or limiting the commercialization of any product candidates we develop. We do not carry specific biological or hazardous waste insurance coverage, and our property, casualty and general liability insurance policies specifically exclude coverage for damages and fines arising from biological or hazardous waste exposure or contamination. Accordingly, in the event of contamination or injury, we could be held liable for damages or be penalized with fines in an amount exceeding our resources, and our clinical trials or regulatory approvals could be suspended.

We also expect that operating as a public company will continue to make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, it may be more difficult for us to attract and retain qualified people to serve on our board of directors, our board committees or as executive officers. We do not know if we will be able to maintain existing insurance with adequate levels of coverage. Any significant uninsured liability may require us to pay substantial amounts, which would adversely affect our cash position and results of operations.

***Our employees and independent contractors, including principal investigators, CROs, consultants, vendors, and any third parties we may engage in connection with development and commercialization may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements, which could have a material adverse effect on our business.***

Misconduct by our employees and independent contractors, including principal investigators, CROs, consultants, vendors, and any third parties we may engage in connection with development and commercialization, could include intentional, reckless or negligent conduct or unauthorized activities that violate: (i) the laws and regulations of the FDA, EMA rules and regulations and other similar regulatory requirements, including those laws that require the reporting of true, complete and accurate information to such authorities; (ii) manufacturing standards; (iii) data privacy, security, fraud and abuse and other healthcare laws and regulations; or (iv) laws that require the reporting of true, complete and accurate financial information and data. Specifically, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Activities subject to these laws could also involve the improper use or misrepresentation of information obtained in the course of clinical trials, creation of fraudulent data in preclinical studies or clinical trials or illegal misappropriation of drug product, which could result in regulatory sanctions and cause serious harm to our reputation. It is not always possible to identify and deter misconduct by employees and other third parties, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with such laws or regulations. Additionally, we are subject to the risk that a person or government could allege such fraud or other misconduct, even if none occurred. If any such actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have a significant impact on our business and results of operations, including the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, disgorgements, possible exclusion from participation in Medicare, Medicaid, other U.S. federal healthcare programs or healthcare programs in other jurisdictions, individual imprisonment, other sanctions, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations.

***Our business and operations would suffer in the event of system failures.***

Our computer systems, as well as those of our CROs and other contractors and consultants, are vulnerable to damage from computer viruses, unauthorized access, natural disasters (including hurricanes), terrorism, war and telecommunication and electrical failures. If such an event were to occur and cause interruptions in our operations, it could result in a material disruption of our product candidate development programs. For example, the loss of preclinical or clinical trial data from completed, ongoing or planned trials could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of or damage to our data or applications, or inappropriate disclosure of personal, confidential or proprietary information, we could incur liability and the further development of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate could be delayed.

In the ordinary course of our business, we collect and store sensitive data, including intellectual property, clinical trial data, proprietary business information, personal data and personally identifiable information of our clinical trial subjects and employees, in our data centers and on our networks. The secure processing, maintenance and transmission of this information is critical to our operations. Despite our security measures, our information technology and infrastructure may be vulnerable to attacks by hackers or internal bad actors, or breached due to employee error, a technical vulnerability, malfeasance or other disruptions. Although, to our knowledge, we have not experienced any such material security breach to date, any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws that protect the privacy of personal information, significant regulatory penalties, and such an event could disrupt our operations, damage our reputation, and cause a loss of confidence in us and our ability to conduct clinical trials, which could adversely affect our reputation and delay our clinical development of our product candidates.

***Initial, "top-line" and preliminary data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we publicly disclose initial, top-line or preliminary data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the initial, top-line or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. For example, we recently disclosed preliminary safety and efficacy data from the Phase 1/2 pheNIX clinical trial for HMI-102, which disclosure included our preliminary beliefs, assumptions and conclusions with respect to the preliminary data which may differ from future results from the pheNIX clinical trial. Initial, top-line or preliminary data also remain subject to audit and verification procedures that may result in the final data being materially different from the initial, top-line or preliminary data we previously published. As a result, initial, top-line and preliminary data should be viewed with caution until the final data are available.

From time to time, we also disclose data from our preclinical studies and clinical trials. Initial or preliminary data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Adverse differences between initial or preliminary data and final data could significantly harm our business prospects. Further, disclosure of initial or preliminary data by us or by our competitors could result in volatility in the price of our common stock.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

If the top-line or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition.

***We may expend our limited resources to pursue a particular product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

Because we have limited financial and managerial resources, we focus on research programs and product candidates that we identify for specific indications. As a result, we may forego or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to timely capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and product candidates for specific indications may not yield any commercially viable products. If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate.

**Risks Related to Healthcare Laws and Other Legal Compliance Matters**

*Enacted and future healthcare legislation may increase the difficulty and cost for us to obtain marketing approval of and commercialize our product candidates and may affect the prices we may set.*

In the United States, the EU and other jurisdictions, there have been, and we expect there will continue to be, a number of legislative and regulatory changes and proposed changes to the healthcare system that could affect our future results of operations. In particular, there have been and continue to be a number of initiatives at the U.S. federal and state levels that seek to reduce healthcare costs and improve the quality of healthcare. For example, in March 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act, or collectively the ACA, was enacted, which substantially changed the way healthcare is financed by both governmental and private insurers. Among the provisions of the ACA, those of greatest importance to the pharmaceutical and biotechnology industries include the following:

- an annual, non-deductible fee payable by any entity that manufactures or imports certain branded prescription drugs and biologic agents (other than those designated as orphan drugs), which is apportioned among these entities according to their market share in certain government healthcare programs;

- a new Medicare Part D coverage gap discount program, in which manufacturers must agree to offer point-of-sale discounts off negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;

- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13.0% of the average manufacturer price for branded and generic drugs, respectively;

- a new methodology by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected;

- extension of a manufacturer's Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations;

- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to certain individuals with income at or below 133% of the federal poverty level, thereby potentially increasing a manufacturer's Medicaid rebate liability;

- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research; and

- establishment of a Center for Medicare Innovation at the Centers for Medicare & Medicaid Services, or CMS, to test innovative payment and service delivery models to lower Medicare and Medicaid spending, potentially including prescription drug spending.

Since its enactment, there have been judicial and Congressional challenges to certain aspects of the ACA, and we expect there will be additional challenges and amendments to the ACA in the future. For example, on December 14, 2018, a U.S. District Court Judge in the Northern District of Texas, or Texas District Court Judge, ruled that the entire ACA is invalid based primarily on the fact that the Tax Cuts and Jobs Act of 2017 repealed the tax-based shared responsibility payment imposed by the ACA, on certain individuals who fail to maintain qualifying health coverage for all or part of a year, which is commonly referred to as the "individual mandate". On December 18, 2019, the U.S. Court of Appeals for the 5th Circuit upheld the district court's decision that the individual mandate was unconstitutional but remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. It is unclear how these decisions, subsequent appeals, if any, and other efforts to challenge, repeal or replace the ACA or our business or financial condition.

In addition, other legislative changes have been proposed and adopted in the United States since the ACA was enacted. For example, the Budget Control Act of 2011 resulted in aggregate reductions of Medicare payments to providers of 2% per fiscal year, which went into effect in April 2013 and, due to subsequent legislative amendments to the statute, will remain in effect through 2029 unless additional action is taken by Congress. In January 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things, further reduced Medicare payments to several types of providers, including hospitals, imaging centers and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws or any other similar laws introduced in the future may result in additional reductions in Medicare and other health care funding, which could negatively affect our customers and accordingly, our financial operations.

Moreover, payment methodologies may be subject to changes in healthcare legislation and regulatory initiatives. For example, CMS may develop new payment and delivery models, such as bundled payment models. In addition, recently there has been heightened governmental scrutiny over the manner in which manufacturers set prices for their marketed products. We expect that additional U.S. federal healthcare reform measures will be adopted in the future, any of which could limit the amounts that the U.S. federal government will pay for healthcare products and services, which could result in reduced demand for our product candidates or additional pricing pressures.

Individual states in the United States have also become increasingly active in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Legally-mandated price controls on payment amounts by third-party payors or other restrictions could harm our business, results of operations, financial condition and prospects. In addition, regional healthcare authorities and individual hospitals are increasingly using bidding procedures to determine what pharmaceutical products and which suppliers will be included in their prescription drug and other healthcare programs. This could reduce the ultimate demand for our product candidates or put pressure on our product pricing.

In the EU, similar political, economic and regulatory developments may affect our ability to profitably commercialize our product candidates, if approved. In addition to continuing pressure on prices and cost containment measures, legislative developments at the EU or member state level may result in significant additional requirements or obstacles that may increase our operating costs. The delivery of healthcare in the EU, including the establishment and operation of health services and the pricing and reimbursement of medicines, is almost exclusively a matter for national, rather than EU, law and policy. National governments and health service providers have different priorities and approaches to the delivery of health care and the pricing and reimbursement of products in that context. In general, however, the healthcare budgetary constraints in most EU member states have resulted in restrictions on the pricing and reimbursement of medicines by relevant health service providers. Coupled with ever-increasing EU and national regulatory burdens on those wishing to develop and market products, this could prevent or delay marketing approval of our product candidates, restrict or regulate post-approval activities and affect our ability to commercialize our product candidates, if approved.

In markets outside of the United States and EU, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies.

We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action in the United States, the EU or any other jurisdiction. If we or any third parties we may engage are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we or such third parties are not able to maintain regulatory compliance, our product candidates may lose any regulatory approval that may have been obtained and we may not achieve or sustain profitability.

***Our business operations and current and future relationships with investigators, healthcare professionals, consultants, third-party payors, patient organizations and customers will be subject to applicable healthcare regulatory laws, which could expose us to penalties.***

Our business operations and current and future arrangements with investigators, healthcare professionals, consultants, third-party payors, patient organizations and customers, may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations. These laws may constrain the business or financial arrangements and relationships through which we conduct our operations, including how we research, market, sell and distribute our product candidates, if approved. Such laws include:

- the U.S. federal Anti-Kickback Statute, which prohibits, among other things, persons or entities from knowingly and willfully soliciting, offering, receiving or providing any remuneration (including any kickback, bribe, or certain rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce or reward, or in return for, either the referral of an individual for, or the purchase, lease, order or recommendation of, any good, facility, item or service, for which payment may be made, in whole or in part, under U.S. federal and state healthcare programs such as Medicare and Medicaid. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;

61

- the U.S. federal false claims and civil monetary penalties laws, including the civil False Claims Act, which, among other things, impose criminal and civil penalties, including through civil whistleblower or qui tam actions, against individuals or entities for knowingly presenting, or causing to be presented, to the U.S. federal government, claims for payment or approval that are false or fraudulent, knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, or from knowingly making a false statement to avoid, decrease or conceal an obligation to pay money to the U.S. federal government. In addition, the government may assert that a claim including items and services resulting from a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act;

- the U.S. federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false statement, in connection with the delivery of, or payment for, healthcare benefits, items or services; similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 and its implementing regulations, which also imposes certain obligations, including mandatory contractual terms, with respect to safeguarding the privacy, security and transmission of individually identifiable health information without appropriate authorization by covered entities subject to the rule, such as health plans, healthcare clearinghouses and healthcare providers as well as their business associates that perform certain services involving the use or disclosure of individually identifiable health information;

- the FDCA, which prohibits, among other things, the adulteration or misbranding of drugs, biologics and medical devices;

- the U.S. Public Health Service Act, which prohibits, among other things, the introduction into interstate commerce of a biological product unless a biologics license is in effect for that product;

- the U.S. federal legislation commonly referred to as the Physician Payments Sunshine Act, enacted as part of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologics and medical supplies that are reimbursable under Medicare, Medicaid, or the Children's Health Insurance Program to report annually to the government information related to certain payments and other transfers of value to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors), certain health care professionals beginning in 2022, and teaching hospitals, as well as ownership and investment interests held by the physicians described above and their immediate family members;

- analogous U.S. state laws and regulations, including: state anti-kickback and false claims laws, which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements and claims involving healthcare items or services reimbursed by any third-party payor, including private insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the U.S. federal government, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; state laws and regulations that require drug manufacturers to file reports relating to pricing and marketing information, which requires tracking gifts and other remuneration and items of value provided to healthcare professionals and entities; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts. For example, California recently enacted legislation, the California Consumer Privacy Act, or CCPA, which went into effect January 1, 2020. The CCPA, among other things, creates new data privacy obligations for covered companies and provides new privacy rights to California residents, including the right to opt out of certain disclosures of their information. The CCPA also creates a private right of action with statutory damages for certain data breaches, thereby potentially increasing risks associated with a data breach. Although the law includes limited exceptions, including for "protected health information" maintained by a covered entity or business associate, it may regulate or impact our processing of personal information depending on the context; and

- similar healthcare laws and regulations in the EU and other jurisdictions, including reporting requirements detailing interactions with and payments to healthcare providers and laws governing the privacy and security of certain protected information, such as the General Data Protection Regulation ("GDPR"), which imposes obligations and restrictions on the collection and use of personal data relating to individuals located in the European Union (including health data). In addition, the United Kingdom leaving the EU could also lead to further legislative and regulatory changes. It remains unclear how the United Kingdom data protection laws or regulations will develop in the medium to longer term and how data transfer to the United Kingdom from the EU will be regulated, especially following the United Kingdom's departure from the EU on January 31, 2020 without a deal. However, the United Kingdom has transposed the GDPR into domestic law with the Data Protection Act 2018, which remains in force following the United Kingdom's departure from the EU.

Ensuring that our internal operations and future business arrangements with third parties comply with applicable healthcare laws and regulations will involve substantial costs. It is possible that governmental authorities will conclude that our business practices do not comply with current or future statutes, regulations, agency guidance or case law involving applicable fraud and abuse or other healthcare laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that may apply to us, we may be subject to significant penalties, including civil, criminal and administrative penalties, damages, fines, exclusion from government-funded healthcare programs, such as Medicare and Medicaid or similar programs in other countries or jurisdictions, disgorgement, individual imprisonment, contractual damages, reputational harm, diminished profits and the curtailment or restructuring of our operations. If any of the physicians or other providers or entities with whom we expect to do business are found to not be in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs and imprisonment, which could affect our ability to operate our business. Further, defending against any such actions can be costly, time-consuming and may require significant personnel resources. Therefore, even if we are successful in defending against any such actions that may be brought against us, our business may be impaired.

***We are subject to environmental, health and safety laws and regulations, and we may become exposed to liability and substantial expenses in connection with environmental compliance or remediation activities.***

Our operations, including our development, testing and manufacturing activities, are subject to numerous environmental, health and safety laws and regulations. These laws and regulations govern, among other things, the controlled use, handling, release and disposal of and the maintenance of a registry for, hazardous materials and biological materials, such as chemical solvents, human cells, carcinogenic compounds, mutagenic compounds and compounds that have a toxic effect on reproduction, laboratory procedures and exposure to blood-borne pathogens. If we fail to comply with such laws and regulations, we could be subject to fines or other sanctions.

As with other companies engaged in activities similar to ours, we face a risk of environmental liability inherent in our current and historical activities, including liability relating to releases of or exposure to hazardous or biological materials. Environmental, health and safety laws and regulations are becoming more stringent. We may be required to incur substantial expenses in connection with future environmental compliance or remediation activities, in which case, the production efforts of our third-party manufacturers or our development efforts may be interrupted or delayed.

**Risks Related to Commercialization**

***We face significant competition in an environment of rapid technological change, and there is a possibility that our competitors may achieve regulatory approval before us or develop therapies that are safer or more advanced or effective than ours, which may harm our financial condition and our ability to successfully market or commercialize any product candidates we may develop.***

The development and commercialization of new genetic medicine products is highly competitive. Moreover, the gene editing field is characterized by rapidly changing technologies, significant competition, and a strong emphasis on intellectual property. We will face competition with respect to any product candidates that we may seek to develop or commercialize in the future from major pharmaceutical companies, specialty pharmaceutical companies, and biotechnology companies worldwide. Potential competitors also include academic institutions, government agencies, and other public and private research organizations that conduct research, seek patent protection, and establish collaborative arrangements for research, development, manufacturing, and commercialization.

There are a number of large pharmaceutical and biotechnology companies that currently market and sell products or are pursuing the development of products for the treatment of the disease indications for which we have research programs, including PKU, metachromatic leukodystrophy, hemoglobinopathies and ophthalmological diseases. Some of these competitive products and therapies are based on scientific approaches that are similar to our approach, and others are based on entirely different approaches.

Our platform and product focus is the development of genetic medicines using our proprietary AAVHSCs *in vivo* either through the gene therapy or nuclease-free gene editing modality. If our current programs are approved for the indications for which we are currently planning clinical trials, they may compete with other products currently under development, including gene editing and gene therapy products or other types of therapies, such as small molecule, antibody or protein therapies. If our PKU treatments are approved, they may compete with therapies from American Gene Technologies, BioMarin, Censa Pharmaceuticals, Generation Bio, Nestlé Health Science, Sangamo Therapeutics and Synlogic. However, we believe that only gene therapy or gene editing approaches have the potential to restore the normal Phe biochemical pathway with a single administration. If our MLD treatment is approved, it may compete with therapies from Orchard Therapeutics and/or Shire. *In vivo* gene therapy approaches provide potential advantages over *ex vivo* approaches. There are a number of companies developing nuclease-based gene editing technologies using CRISPR/Cas9, TALENs, meganucleases, Mega-TALs and ZFNs, including but not limited to Beam Therapeutics, bluebird bio, Caribou Biosciences, Cellectis, CRISPR Therapeutics, Editas Medicine, Intellia Therapeutics, Precision BioSciences, Prime Therapeutics and Sangamo Therapeutics and non-nuclease-based technology, including LogicBio Therapeutics.

Many of our current or potential competitors, either alone or with their collaboration partners, have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals, and marketing approved products than we do. Mergers and acquisitions in the pharmaceutical, biotechnology, and gene therapy industries may result in even more resources being concentrated among a smaller number of our competitors. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs. Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient, or are less expensive than any products that we may develop or that would render any products that we may develop obsolete or non-competitive. Our competitors also may obtain FDA or other regulatory approval for their products more rapidly than we may obtain approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market. Additionally, technologies developed by our competitors may render our potential product candidates uneconomic or obsolete, and we may not be successful in marketing any product candidates we may develop against competitors.

In addition, as a result of the expiration or successful challenge of our patent rights, we could face more litigation with respect to the validity and/or scope of patents relating to our competitors' products. The availability of our competitors' products could limit the demand, and the price we are able to charge, for any products that we may develop and commercialize.

*The successful commercialization of our product candidates will depend in part on the extent to which governmental authorities and health insurers establish adequate coverage, reimbursement levels and pricing policies. Failure to obtain or maintain coverage and adequate reimbursement for our product candidates, if approved, could limit our ability to market those products and decrease our ability to generate revenue.*

The availability and adequacy of coverage and reimbursement by governmental healthcare programs such as Medicare and Medicaid, private health insurers and other third-party payors are essential for most patients to be able to afford prescription medications such as our product candidates, assuming FDA approval. Our ability to achieve acceptable levels of coverage and reimbursement for products by governmental authorities, private health insurers and other organizations will have an effect on our ability to successfully commercialize our product candidates. Assuming we obtain coverage for our product candidates by a third-party payor, the resulting reimbursement payment rates may not be adequate or may require co-payments that patients find unacceptably high. Moreover, for drugs and biologics administered under the supervision of a physician, obtaining coverage and adequate reimbursement may be particularly difficult because of the higher prices often associated with such products. We cannot be sure that coverage and reimbursement in the United States, the EU or elsewhere will be available for our product candidates or any product that we may develop, and any reimbursement that may become available may be decreased or eliminated in the future.

64

Third-party payors increasingly are challenging prices charged for pharmaceutical products and services, and many third-party payors may refuse to provide coverage and reimbursement for particular drugs or biologics when an equivalent generic drug, biosimilar or a less expensive therapy is available. It is possible that a third-party payor may consider our product candidates as substitutable and only offer to reimburse patients for the less expensive product. Even if we show improved efficacy or improved convenience of administration with our product candidates, pricing of existing third-party therapeutics may limit the amount we will be able to charge for our product candidates. These payors may deny or revoke the reimbursement status of a given product or establish prices for new or existing marketed products at levels that are too low to enable us to realize an appropriate return on our investment in our product candidates. For products administered under the supervision of a physician, obtaining coverage and adequate reimbursement may be particularly difficult because of the higher prices often associated with such drugs. Additionally, separate reimbursement for the product itself or the treatment or procedure in which the product is used may not be available, which may impact physician utilization. If reimbursement is not available or is available only at limited levels, we may not be able to successfully commercialize our product candidates, and may not be able to obtain a satisfactory financial return on our product candidates.

There is significant uncertainty related to the insurance coverage and reimbursement of newly-approved products. In the United States, third-party payors, including private and governmental payors, such as the Medicare and Medicaid programs, play an important role in determining the extent to which new drugs and biologics will be covered. The Medicare and Medicaid programs increasingly are used as models in the United States for how private payors and other governmental payors develop their coverage and reimbursement policies for drugs and biologics. Some third-party payors may require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. We cannot predict at this time what third-party payors will decide with respect to the coverage and reimbursement for our product candidates.

No uniform policy for coverage and reimbursement for products exists among third-party payors in the United States. Therefore, coverage and reimbursement for products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that will require us to provide scientific and clinical support for the use of our product candidates to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Furthermore, rules and regulations regarding reimbursement change frequently, in some cases on short notice, and we believe that changes in these rules and regulations are likely.

Outside the United States, international operations are generally subject to extensive governmental price controls and other market regulations, and we believe the increasing emphasis on cost-containment initiatives in Europe and other countries have and will continue to put pressure on the pricing and usage of our product candidates. In many countries, the prices of medical products are subject to varying price control mechanisms as part of national health systems. Other countries allow companies to fix their own prices for medical products, but monitor and control company profits. Additional foreign price controls or other changes in pricing regulation could restrict the amount that we are able to charge for our product candidates. Accordingly, in markets outside the United States, the reimbursement for our product candidates may be reduced compared with the United States and may be insufficient to generate commercially-reasonable revenue and profits.

Moreover, increasing efforts by governmental and third-party payors in the United States and abroad to cap or reduce healthcare costs may cause such organizations to limit both coverage and the level of reimbursement for newly approved products and, as a result, they may not cover or provide adequate payment for our product candidates. We expect to experience pricing pressures in connection with the sale of our product candidates due to the trend toward managed health care, the increasing influence of health maintenance organizations and additional legislative changes. The downward pressure on healthcare costs in general, particularly prescription drugs and biologics and surgical procedures and other treatments, has become intense. As a result, increasingly high barriers are being erected to the entry of new products.

***Even if HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate receives marketing approval, it may fail to achieve market acceptance by physicians, patients, third-party payors or others in the medical community necessary for commercial success.***

If HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate receives marketing approval, it may nonetheless fail to gain sufficient market acceptance by physicians, patients, third-party payors and others in the medical community. If it does not achieve an adequate level of acceptance, we may not generate significant product revenues or become profitable. The degree of market acceptance of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, if approved for commercial sale, will depend on a number of factors, including but not limited to:

- the safety, efficacy and potential advantages compared to alternative treatments;

- effectiveness of sales and marketing efforts;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- our ability to offer our products for sale at competitive prices;

- the convenience and ease of administration compared to alternative treatments;

- the willingness of the target patient population to try new therapies and of physicians to prescribe these therapies;

- the strength of marketing and distribution support;

- the timing of market introduction of competitive products;

- the availability of third-party coverage and adequate reimbursement;

- product labeling or product insert requirements of the FDA, EMA or other regulatory authorities, including any limitations or warnings contained in a product's approved labeling;

- the prevalence and severity of any side effects; and

- any restrictions on the use of our product together with other medications.

Because we expect sales of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, if approved, to generate substantially all of our product revenues for a substantial period, the failure of this product to find market acceptance would harm our business and could require us to seek additional financing.

***If we are unable to establish sales, marketing and distribution capabilities either on our own or in collaboration with third parties, we may not be successful in commercializing HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, if approved. Moreover, provisions in our agreements with Pfizer may inhibit our ability to enter into future collaborations with third parties.***

We do not have any infrastructure for the sales, marketing or distribution of our products, and the cost of establishing and maintaining such an organization may exceed the cost-effectiveness of doing so.

We expect to build a focused sales, distribution and marketing infrastructure to market HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate in the United States and European Union, if approved. There are significant expenses and risks involved with establishing our own sales, marketing and distribution capabilities, including our ability to hire, retain and appropriately incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel, and effectively manage a geographically dispersed sales and marketing team. Any failure or delay in the development of our internal sales, marketing and distribution capabilities could delay any product launch, which would adversely impact the commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate. Additionally, if the commercial launch of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate for which we recruit a sales force and establish marketing capabilities is delayed or does not occur for any reason, we would have prematurely or unnecessarily incurred these commercialization expenses. This may be costly, and our investment would be lost if we cannot retain or reposition our sales and marketing personnel.

We do not anticipate having the resources in the foreseeable future to allocate to the sales and marketing of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidates in certain markets overseas. Therefore, our future sales in these markets will largely depend on our ability to enter into and maintain collaborative relationships for such capabilities, the collaborator's strategic interest in the product and such collaborator's ability to successfully market and sell the product. We intend to pursue collaborative arrangements regarding the sale and marketing of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, if approved, for certain markets overseas; however, we cannot assure that we will be able to establish or maintain such collaborative arrangements, or if able to do so, that they will have effective sales forces.

If we are unable to build our own sales force or negotiate a collaborative relationship for the commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, we may be forced to delay the potential commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate or reduce the scope of our sales or marketing activities for HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate. If we elect to increase our expenditures to fund commercialization activities ourselves, we will need to obtain additional capital, which may not be available to us on acceptable terms, or at all. We could enter into arrangements with collaborative partners at an earlier stage than otherwise would be ideal and we may be required to relinquish rights to HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate or otherwise agree to terms unfavorable to us, any of which may have an adverse effect on our business, operating results and prospects.

Moreover, we have granted Pfizer a right of first refusal to acquire rights (whether through license, asset sale or otherwise) to develop or commercialize HMI-102 and/or HMI-103. This right of first refusal provision may inhibit our ability to enter into future collaborations with third parties.

If we are unable to establish adequate sales, marketing and distribution capabilities, either on our own or in collaboration with third parties, we will not be successful in commercializing HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate, and may not become profitable and may incur significant additional losses. We will be competing with many companies that currently have extensive and well-funded marketing and sales operations. Without an internal team or the support of a third party to perform marketing and sales functions, we may be unable to compete successfully against these more established companies.

*If we obtain approval to commercialize any products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.*

If HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate is approved for commercialization, we intend to enter into agreements with third parties to market it in certain jurisdictions outside the United States. We expect that we will be subject to additional risks related to international pharmaceutical operations, including:

- different regulatory requirements for drug and biologic approvals and rules governing drug and biologic commercialization and country-specific regulations of gene therapies in foreign countries;

- complex and restrictive import/export regulations;

- reduced protection for intellectual property rights;

- foreign reimbursement, pricing and insurance regimes;

- potential noncompliance with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act 2010 and similar anti-bribery and anticorruption laws in other jurisdictions; and

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad.

We have no prior experience in these areas. In addition, there are complex regulatory, tax, labor and other legal requirements imposed by both the European Union and many of the individual countries in Europe with which we will need to comply. Many U.S.-based biotechnology companies have found the process of marketing their own products in Europe to be very challenging.

*Any product candidates for which we intend to seek approval as biologic products may face competition sooner than anticipated.*

The Patient Protection and Affordable Care Act, signed into law on March 23, 2010, includes a subtitle called the Biologics Price Competition and Innovation Act of 2009, or BPCIA, which created an abbreviated approval pathway for biological products that are biosimilar to or interchangeable with an FDA-licensed reference biological product. Under the BPCIA, an application for a biosimilar product may not be submitted to the FDA until four years following the date that the reference product was first licensed by the FDA. In addition, the approval of a biosimilar product may not be made effective by the FDA until 12 years from the date on which the reference product was first licensed. During this 12-year period of exclusivity, another company may still market a competing version of the reference product if the FDA approves a full BLA for the competing product containing the sponsor's own preclinical data and data from adequate and well-controlled clinical trials to demonstrate the safety, purity and potency of their product. The law is complex and is still being interpreted and implemented by the FDA. As a result, its ultimate impact, implementation, and meaning are subject to uncertainty. While it is uncertain when such processes intended to implement BPCIA may be fully adopted by the FDA, any such processes could have a material adverse effect on the future commercial prospects for our biological products.

There is a risk that any of our product candidates approved as a biological product under a BLA would not qualify for the 12-year period of exclusivity or that this exclusivity could be shortened due to congressional action or otherwise, or that the FDA will not consider our product candidates to be reference products for competing products, potentially creating the opportunity for generic competition sooner than anticipated. Other aspects of the BPCIA, some of which may impact the BPCIA exclusivity provisions, have also been the subject of recent litigation. Moreover, the extent to which a biosimilar, once approved, will be substituted for any one of our reference products in a way that is similar to traditional generic substitution for non-biological products is not yet clear, and will depend on a number of marketplace and regulatory factors that are still developing.

**Risks Related to Our Dependence on Third Parties**

*We currently contract with third parties for the manufacture of certain materials for our research programs, preclinical and clinical studies. This reliance on third parties increases the risk that we will not have sufficient quantities of such materials, product candidates, or any medicines that we may develop and commercialize, or that such supply will not be available to us at an acceptable cost or in compliance with regulatory requirements, which could delay, prevent, or impair our development or commercialization efforts.*

We currently rely on third-party manufacturers for the manufacture of certain materials for research programs, preclinical and clinical studies. We do not have long-term supply agreements with all of the third-party manufacturers, and we purchase our required supply on a purchase order basis. We recently completed the build-out of a GMP manufacturing facility to support our clinical development programs in both gene therapy and gene editing and commenced manufacturing activities in 2019. However, if we experience delays or are unable to scale our internal manufacturing capabilities, we will need to contract with manufacturers that can produce the clinical and commercial supply of our product candidates.

We may be unable to establish any agreements with third-party manufacturers or to do so on acceptable terms. Even if we are able to establish agreements with third-party manufacturers, reliance on third-party manufacturers entails additional risks, including:

- the possible breach of the manufacturing agreement by the third party;

- the possible termination or nonrenewal of the agreement by the third party at a time that is costly or inconvenient for us; and

- reliance on the third party for regulatory compliance, quality assurance, safety, and pharmacovigilance and related reporting.

Third-party manufacturers may not be able to comply with GMP regulations or similar regulatory requirements outside the United States. Our failure, or the failure of our third-party manufacturers, to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocations, seizures or recalls of product candidates or medicines, operating restrictions, and criminal prosecutions, any of which could significantly and adversely affect supplies of our medicines and harm our business, financial condition, results of operations, and prospects. Moreover, as a result of the COVID-19 pandemic, third-party manufacturers may be affected, which could disrupt their activities and as a result we could face difficulty sourcing key components necessary to produce supply of our product candidates, which may negatively affect our preclinical and clinical development activities.

Any medicines that we may develop may compete with other product candidates and products for access to manufacturing facilities. There are a limited number of manufacturers that operate under GMP regulations and that might be capable of manufacturing for us. Any performance failure on the part of our existing or future manufacturers could delay clinical development or marketing approval.

Our current and anticipated future dependence upon others for the manufacture of any product candidates we may develop or medicines may adversely affect our future profit margins and our ability to commercialize any medicines that receive marketing approval on a timely and competitive basis.

*We intend to continue to rely on third parties to conduct, supervise and monitor our clinical trials. If those third parties do not successfully carry out their contractual duties, or if they perform in an unsatisfactory manner, it may harm our business.*

We intend to continue to rely on CROs and clinical trial sites to ensure the proper and timely conduct of our clinical trials, and we expect to have limited influence over their actual performance.

We intend to continue to rely upon CROs to monitor and manage data for our clinical programs, as well as the execution of future nonclinical studies. Our reliance on CROs for clinical development activities limits our control over these activities, but we will remain responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities.

We and our CROs will be required to comply with GLP and GCP, which are regulations and guidelines enforced by the FDA and are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Conference on Harmonization guidelines for any of our product candidates that are in preclinical and clinical development. The Regulatory authorities enforce GCP through periodic inspections of trial sponsors,

68

principal investigators and clinical trial sites. If we or our CROs fail to comply with GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP requirements. In addition, our clinical trials must be conducted with product produced under GMP regulations. Accordingly, if our CROs fail to comply with these regulations or fail to recruit a sufficient number of subjects, we may be required to repeat clinical trials, which would delay the regulatory approval process.

Our CROs will not be our employees, and we will not control whether or not they devote sufficient time and resources to our future clinical and nonclinical programs. These CROs may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials, or other product development activities which could harm our competitive position. We face the risk of potential unauthorized disclosure or misappropriation of our intellectual property by CROs, which may reduce our trade secret protection and allow our potential competitors to access and exploit our proprietary technology. If our CROs do not successfully carry out their contractual duties or obligations or fail to meet expected deadlines, including as a result of the impact of the COVID-19 pandemic, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for any other reasons, our clinical trials may be extended, delayed or terminated, and we may not be able to obtain regulatory approval for, or successfully commercialize any product candidate that we develop. As a result, our financial results and the commercial prospects for any product candidate that we develop would be harmed, our costs could increase, and our ability to generate revenues could be delayed.

If our relationship with any CROs terminate, we may not be able to enter into arrangements with alternative CROs or do so on commercially reasonable terms. Switching or adding additional CROs involves substantial cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we intend to carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have an adverse impact on our business, financial condition and prospects.

***We may collaborate with third parties for the development and commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate. We may not succeed in establishing and maintaining collaborative relationships, which may significantly limit our ability to develop and commercialize HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate successfully, if at all.***

We may seek collaborative relationships for the development and commercialization of HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate. Failure to obtain a collaborative relationship for HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate may significantly impair the potential for the product candidate. We also will need to enter into collaborative relationships to provide funding to support our other research and development programs. The process of establishing and maintaining collaborative relationships is difficult, time-consuming and involves significant uncertainty, such as:

- a collaboration partner may shift its priorities and resources away from our product candidates due to a change in business strategies, or a merger, acquisition, sale or downsizing;

- a collaboration partner may seek to renegotiate or terminate their relationships with us due to unsatisfactory clinical results, manufacturing issues, a change in business strategy, a change of control or other reasons;

- a collaboration partner may cease development in therapeutic areas which are the subject of our strategic collaboration;

- a collaboration partner may not devote sufficient capital or resources towards our product candidates;

- a collaboration partner may change the success criteria for a product candidate thereby delaying or ceasing development of such candidate;

- a significant delay in initiation of certain development activities by a collaboration partner will also delay payment of milestones tied to such activities, thereby impacting our ability to fund our own activities;

- a collaboration partner could develop a product that competes, either directly or indirectly, with our product candidate;

- a collaboration partner with commercialization obligations may not commit sufficient financial or human resources to the marketing, distribution or sale of a product;

- a collaboration partner with manufacturing responsibilities may encounter regulatory, resource or quality issues and be unable to meet demand requirements;

- a collaboration partner may terminate a strategic alliance;

- a dispute may arise between us and a partner concerning the research, development or commercialization of a product candidate resulting in a delay in milestones, royalty payments or termination of an alliance and possibly resulting in costly litigation or arbitration which may divert management attention and resources; and

- a partner may use our products or technology in such a way as to invite litigation from a third party.

If any collaborator fails to fulfill its responsibilities in a timely manner, or at all, our research, clinical development, manufacturing or commercialization efforts related to that collaboration could be delayed or terminated, or it may be necessary for us to assume responsibility for expenses or activities that would otherwise have been the responsibility of our collaborator. If we are unable to establish and maintain collaborative relationships on acceptable terms or to successfully transition terminated collaborative agreements, we may have to delay or discontinue further development of one or more of our product candidates, undertake development and commercialization activities at our own expense or find alternative sources of capital. Moreover, any collaborative partners we enter into agreements with in the future may shift their priorities and resources away from our product candidates or seek to renegotiate or terminate their relationships with us. For example, Novartis can terminate our collaboration agreement for convenience on a target-by-target basis and, in February 2019, Novartis elected to discontinue the sickle cell disease program under our collaboration agreement effective in August 2019.

***We do not have multiple sources of supply for all of the components used in HMI-102 and our other product candidates. If we were to lose a supplier, it could have a material adverse effect on our ability to complete the development of HMI-102. If we obtain regulatory approval for HMI-102, we would need to expand the supply of its components in order to commercialize them.***

We do not have multiple sources of supply for all of the components used in the manufacturing of HMI-102. We also do not have long-term supply agreements with any of our component suppliers. We are currently evaluating manufacturers that will commercially manufacture HMI-102. It is our expectation that we will only qualify one initial supplier that will need to be approved by the FDA. If for any reason we are unable to obtain product from the manufacturer we select, we would have to qualify new manufacturers. We may not be able to establish additional sources of supply for our product candidates, or may be unable to do so on acceptable terms. Manufacturing suppliers are subject to GMP quality and regulatory requirements, covering manufacturing, testing, quality control and record keeping relating to our product candidates and subject to ongoing inspections by the regulatory agencies. Failure by any of our suppliers to comply with applicable regulations may result in long delays and interruptions in supply. Manufacturing suppliers are also subject to local, state and federal regulations and licensing requirements. Failure by any of our suppliers to comply with all applicable regulations and requirements may result in long delays and interruptions in supply.

The number of suppliers of the raw material components of our product candidates is limited. In the event it is necessary or desirable to acquire supplies from alternative suppliers, we might not be able to obtain them on commercially reasonable terms, if at all. It could also require significant time and expense to redesign our manufacturing processes to work with another company.

As part of any marketing approval, a manufacturer of HMI-102 is required to be licensed by the FDA prior to commercialization. This licensing process normally includes inspections by regulatory authorities that must be successful prior to them being licensed. Failure of manufacturing suppliers to successfully complete these regulatory inspections will result in delays. If supply from the approved supplier is interrupted, there could be a significant disruption in commercial supply. An alternative vendor would need to be qualified through a BLA amendment or supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if a new supplier is relied upon for commercial production. Switching vendors may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

If we are unable to obtain the supplies we need at a reasonable price or on a timely basis, it could have a material adverse effect on our ability to complete the development of HMI-102 and our other product candidates or, if we obtain regulatory approval for HMI-102 or our other product candidates, to commercialize them.

***If we fail to comply with our obligations in the agreements under which we in-license or acquire development or commercialization rights to products, technology or data from third parties, including those for HMI-102, we could lose such rights that are important to our business.***

We are a party to agreements with Caltech for certain AAV vector-related patents owned by Caltech for human therapeutic applications, or the Caltech License, and City of Hope for certain AAV vector-related patents and know-how, and we may enter into additional agreements, including license agreements, with other parties in the future that impose diligence, development and commercialization timelines, milestone payments, royalties, insurance and other obligations on us.

70

For example, in exchange for the rights granted to us under the Caltech License, we are obligated to pay Caltech up to a total of $7.2 million in milestone payments for the first licensed product, royalties, in the low single-digit percentages, on net sales of licensed products subject to a certain annual minimum royalty, and mid single- to high single-digit percentages of sublicensing revenues. If we fail to comply with our obligations under the Caltech License, or any of our other collaborators, our counterparties may have the right to terminate these agreements, in which event we might not be able to develop, manufacture or market any product candidate that is covered by these agreements, which could materially adversely affect the value of the product candidate being developed under any such agreement. Termination of these agreements or reduction or elimination of our rights under these agreements may result in our having to negotiate new or reinstated agreements with less favorable terms, or cause us to lose our rights under these agreements, including our rights to important intellectual property or technology.

**Risks Related to Our Intellectual Property**

***If we are unable to obtain and maintain patent protection for our technology and products or if the scope of the patent protection obtained is not sufficiently broad, we may not be able to compete effectively in our markets.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our proprietary technologies, product candidate development programs and product candidates. Our success depends in large part on our ability to secure and maintain patent protection in the United States and other countries with respect to HMI-102, HMI-103, HMI-202, HMI-203 and any future product candidates. We seek to protect our proprietary position by filing or collaborating with our licensors to file patent applications in the United States and abroad related to our proprietary technologies, development programs and product candidates. The patent prosecution process is expensive and time-consuming, and we may not be able to file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner.

It is also possible that we will fail to identify patentable aspects of our research and development output before it is too late to obtain patent protection. The patent applications that we own or in-license may fail to result in issued patents with claims that cover our proprietary products and technology, including HMI-102, HMI-103, HMI-202, HMI-203 or any other product candidate in the United States or in other foreign countries, in whole or in part. Alternately, our existing patents and any future patents we obtain may not be sufficiently broad to prevent others from using our technology or from developing competing products and technologies. There is no assurance that all potentially relevant prior art relating to our patents and patent applications has been found, which can prevent a patent from issuing from a pending patent application or later invalidate or narrow the scope of an issued patent. Even if patents do successfully issue and even if such patents cover HMI-102, HMI-103, HMI-202, HMI-203 or any future product candidate, third parties may challenge their validity, enforceability or scope thereof, which may result in such patents being narrowed, invalidated, or held unenforceable. Any successful challenge to these patents or any other patents owned by or licensed to us could deprive us of rights necessary for the successful commercialization of any product candidates or companion diagnostic that we may develop. Further, if we encounter delays in regulatory approvals, the period of time during which we could market a product candidate and companion diagnostic under patent protection could be reduced.

If the patent applications we hold or have in-licensed with respect to our development programs and product candidates fail to issue, if their validity, breadth or strength of protection is threatened, or if they fail to provide meaningful exclusivity for HMI-102, HMI-103, HMI-202, HMI-203 or any future product candidate, it could dissuade companies from collaborating with us to develop product candidates, encourage competitors to develop competing products or technologies and threaten our ability to commercialize future product candidates. Any such outcome could have a materially adverse effect on our business.

The patent position of biotechnology and pharmaceutical companies is highly uncertain, involves complex legal and factual questions, and is characterized by the existence of large numbers of patents and frequent litigation based on allegations of patent or other intellectual property infringement or violation. In addition, the laws of jurisdictions outside the United States may not protect our rights to the same extent as the laws of the United States. For example, European patent law restricts the patentability of methods of treatment of the human body more than United States law does. Changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our patents or narrow the scope of our patent protection. Since patent applications in the United States and other jurisdictions are confidential for a period of time after filing, we cannot be certain that we were the first to file for patents covering our inventions. As a result, the issuance, scope, validity, enforceability and commercial value of our patent rights are highly uncertain. Our pending and future patent applications may not result in the issuance of patents, or may result in the issuance of patents which fail to protect our technology or products, in whole or in part, or which fail to effectively prevent others from commercializing competitive technologies and products.

71

The issuance of a patent is not conclusive as to its inventorship, scope, validity or enforceability, and our owned and licensed patents may be challenged in the courts or patent offices in the United States and abroad. Such challenges may result in loss of exclusivity or freedom to operate or in patent claims being narrowed, invalidated or held unenforceable, in whole or in part, which could limit our ability to stop others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. Thus, even if our patent applications issue as patents, they may not issue in a form that will provide us with meaningful protection, prevent competitors from competing with us or otherwise provide us with any competitive advantage. Moreover, patents have a limited lifespan. In the United States, the natural expiration of a patent is generally 20 years after it is filed. Various extensions may be available; however, the life of a patent, and the protection it affords, is limited. Without patent protection for our current or future product candidates, we may be open to competition from generic versions of such products. Given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

***Third parties may assert claims against us alleging infringement of their patents and proprietary rights, or we may need to become involved in lawsuits to defend or enforce our patents, either of which could result in substantial costs or loss of productivity, delay or prevent the development and commercialization of our product candidates, prohibit our use of proprietary technology or sale of products or put our patents and other proprietary rights at risk.***

Our commercial success depends, in part, upon our ability to develop, manufacture, market and sell our product candidates without alleged or actual infringement, misappropriation or other violation of the patents and proprietary rights of third parties. Litigation relating to infringement or misappropriation of patent and other intellectual property rights in the pharmaceutical and biotechnology industries is common, including patent infringement lawsuits, interferences, oppositions and reexamination proceedings before the U.S. Patent and Trademark Office, or USPTO, and corresponding foreign patent offices. The various markets in which we plan to operate are subject to frequent and extensive litigation regarding patents and other intellectual property rights. In addition, many companies in intellectual property-dependent industries, including the biotechnology and pharmaceutical industries, have employed intellectual property litigation as a means to gain an advantage over their competitors. Numerous United States, EU and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we are developing product candidates, and as the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the intellectual property rights of third parties. Some claimants may have substantially greater resources than we do and may be able to sustain the costs of complex intellectual property litigation to a greater degree and for longer periods of time than we could. In addition, patent holding companies that focus solely on extracting royalties and settlements by enforcing patent rights may target us.

We may be subject to third-party claims including infringement, interference or derivation proceedings, post-grant review and inter partes review before the USPTO or similar adversarial proceedings or litigation in other jurisdictions. Even if such claims are without merit, a court of competent jurisdiction could hold that these third-party patents are valid, enforceable and infringed, and the holders of any such patents may be able to block our ability to commercialize the applicable product candidate unless we obtained a license under the applicable patents, or until such patents expire or are finally determined to be invalid or unenforceable. Similarly, if any third-party patents were held by a court of competent jurisdiction to cover aspects of our compositions, formulations, or methods of treatment, prevention or use, the holders of any such patents may be able to prohibit our use of those compositions, formulations, methods of treatment, prevention or use or other technologies, effectively blocking our ability to develop and commercialize the applicable product candidate until such patent expires or is finally determined to be invalid or unenforceable or unless we obtained a license.

In addition, defending such claims would cause us to incur substantial expenses and, if successful, could cause us to pay substantial damages if we are found to be infringing a third party's patent rights. These damages potentially include increased damages and attorneys' fees if we are found to have infringed such rights willfully. Further, if a patent infringement suit is brought against us or our third-party service providers, our development, manufacturing or sales activities relating to the product or product candidate that is the subject of the suit may be delayed or terminated. As a result of patent infringement claims, or in order to avoid potential infringement claims, we may choose to seek, or be required to seek, a license from the third party, which may require payment of substantial royalties or fees, or require us to grant a cross-license under our intellectual property rights. These licenses may not be available on reasonable terms or at all. Even if a license can be obtained on reasonable terms, the rights may be nonexclusive, which would give our competitors access to the same intellectual property rights. If we are unable to enter into a license on acceptable terms, we could be prevented from commercializing one or more of our product candidates, or forced to modify such product candidates, or to cease some aspect of our business operations, which could harm our business significantly. We might also be forced to redesign or modify our product candidates so that we no longer infringe the third-party intellectual property rights, which may result in significant cost or delay to us, or which redesign or modification could be impossible or technically infeasible. Even if we

72

were ultimately to prevail, any of these events could require us to divert substantial financial and management resources that we would otherwise be able to devote to our business. In addition, if the breadth or strength of protection provided the patents and patent applications we own or in-license is threatened, it could dissuade companies from collaborating with us to license, develop or commercialize current or future product candidates.

If we or one of our licensors were to initiate legal proceedings against a third party to enforce a patent covering one of our product candidates, the defendant could counterclaim that our patent is invalid or unenforceable. In patent litigation in the United States and in Europe, defendant counterclaims alleging invalidity or unenforceability are commonplace. Grounds for a validity challenge could be an alleged failure to meet any of several statutory requirements, for example, lack of novelty, obviousness or non-enablement. Third parties might allege unenforceability of our patents because during prosecution of the patent an individual connected with such prosecution withheld relevant information, or made a misleading statement. The outcome of proceedings involving assertions of invalidity and unenforceability during patent litigation is unpredictable. With respect to the validity of patents, for example, we cannot be certain that there is no invalidating prior art of which we and the patent examiner were unaware during prosecution, but that an adverse third party may identify and submit in support of such assertions of invalidity. If a defendant were to prevail on a legal assertion of invalidity or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our product candidates. Our patents and other intellectual property rights also will not protect our technology if competitors design around our protected technology without infringing our patents or other intellectual property rights.

Even if resolved in our favor, litigation or other legal proceedings relating to intellectual property claims may cause us to incur significant expenses and could distract our technical and management personnel from their normal responsibilities. In addition, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments, and if securities analysts or investors view these announcements in a negative light, the price of our common stock could be adversely affected. Such litigation or proceedings could substantially increase our operating losses and reduce our resources available for development activities. We may not have sufficient financial or other resources to adequately conduct such litigation or proceedings. Some of our competitors may be able to sustain the costs of such litigation or proceedings more effectively than we can because of their substantially greater financial resources. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could have an adverse effect on our ability to compete in the marketplace.

***We may not identify relevant third-party patents or may incorrectly interpret the relevance, scope or expiration of a third-party patent which might adversely affect our ability to develop, manufacture and market our product candidates.***

We cannot guarantee that any of our or our licensors' patent searches or analyses, including but not limited to the identification of relevant patents, analysis of the scope of relevant patent claims or determination of the expiration of relevant patents, are complete or thorough, nor can we be certain that we have identified each and every third-party patent and pending application in the United States, Europe and elsewhere that is relevant to or necessary for the commercialization of our product candidates in any jurisdiction. For example, in the United States, applications filed before November 29, 2000 and certain applications filed after that date that will not be filed outside the United States remain confidential until patents issue. Patent applications in the United States, EU and elsewhere are published approximately 18 months after the earliest filing for which priority is claimed, with such earliest filing date being commonly referred to as the priority date. Therefore, patent applications covering our product candidates could be filed by others without our knowledge. Additionally, pending patent applications that have been published can, subject to certain limitations, be later amended in a manner that could cover our product candidates or the use of our product candidates. After issuance, the scope of patent claims remains subject to construction as determined by an interpretation of the law, the written disclosure in a patent and the patent's prosecution history. Our interpretation of the relevance or the scope of a patent or a pending application may be incorrect, which may negatively impact our ability to market our product candidates. We may incorrectly determine that our product candidates are not covered by a third-party patent or may incorrectly predict whether a third party's pending application will issue with claims of relevant scope. Our determination of the expiration date of any patent in the United States, the EU or elsewhere that we consider relevant may be incorrect, which may negatively impact our ability to develop and market our product candidates. Our failure to identify and correctly interpret relevant patents may negatively impact our ability to develop and market our product candidates.

If we fail to correctly identify or interpret relevant patents, we may be subject to infringement claims. We cannot guarantee that we will be able to successfully settle or otherwise resolve such infringement claims. If we fail in any such dispute, in addition to being forced to pay monetary damages, we may be temporarily or permanently prohibited from commercializing our product candidates. We might, if possible, also be forced to redesign our product candidates in a manner that no longer infringes third-party intellectual property rights. Any of these events, even if we were ultimately to prevail, could require us to divert substantial financial and management resources that we would otherwise be able to devote to our business.

73

***Changes in patent laws or patent jurisprudence could diminish the value of patents in general, thereby impairing our ability to protect our product candidates.***

As is the case with other biotechnology companies, our success is heavily dependent on intellectual property, particularly patents. Obtaining and enforcing patents in the biotechnology and genetic medicine industries involve both technological complexity and legal complexity. Therefore, obtaining and enforcing biotechnology and genetic medicine patents is costly, time-consuming and inherently uncertain. In addition, the America Invents Act, or the AIA, which was passed in September 2011, resulted in significant changes to the U.S. patent system.

An important change introduced by the AIA is that, as of March 16, 2013, the United States transitioned from a "first-to-invent" to a "first-to-file" system for deciding which party should be granted a patent when two or more patent applications are filed by different parties claiming the same invention. Under a "first-to-file" system, assuming the other requirements for patentability are met, the first inventor to file a patent application generally will be entitled to a patent on the invention regardless of whether another inventor had made the invention earlier. A third party that files a patent application in the USPTO after that date but before us could therefore be awarded a patent covering an invention of ours even if we made the invention before it was made by the third party. This will require us to be cognizant going forward of the time from invention to filing of a patent application and diligent in filing patent applications, but circumstances could prevent us from promptly filing patent applications on our inventions.

Among some of the other changes introduced by the AIA are changes that limit where a patentee may file a patent infringement suit and providing opportunities for third parties to challenge any issued patent in the USPTO. This applies to all of our U.S. patents, even those issued before March 16, 2013. Because of a lower evidentiary standard in USPTO proceedings compared to the evidentiary standard in U.S. federal courts necessary to invalidate a patent claim, a third party could potentially provide evidence in a USPTO proceeding sufficient for the USPTO to hold a claim invalid even though the same evidence would be insufficient to invalidate the claim if first presented in a district court action.

Accordingly, a third party may attempt to use the USPTO procedures to invalidate our patent claims that would not have been invalidated if first challenged by the third party as a defendant in a district court action. It is not clear what, if any, impact the AIA will have on the operation of our business. However, the AIA and its implementation could increase the uncertainties and costs surrounding the prosecution of our or our licensors' patent applications and the enforcement or defense of our or our licensors' issued patents.

We may become involved in opposition, interference, derivation, inter partes review or other proceedings challenging our or our licensors' patent rights, and the outcome of any proceedings are highly uncertain. An adverse determination in any such proceeding could reduce the scope of, or invalidate, our owned or in-licensed patent rights, allow third parties to commercialize our technology or products and compete directly with us, without payment to us, or result in our inability to manufacture or commercialize products without infringing third-party patent rights.

Additionally, the U.S. Supreme Court has ruled on several patent cases in recent years either narrowing the scope of patent protection available in certain circumstances or weakening the rights of patent owners in certain situations, and there are other open questions under patent law that courts have yet to decisively address. In addition to increasing uncertainty with regard to our ability to obtain patents in the future, this combination of events has created uncertainty with respect to the value of patents, once obtained. Depending on decisions by Congress, the federal courts and the USPTO, the laws and regulations governing patents could change in unpredictable ways and could weaken our ability to obtain new patents or to enforce our existing patents and patents that we might obtain in the future. In addition, the European patent system is relatively stringent in the type of amendments that are allowed during prosecution, but, the complexity and uncertainty of European patent laws has also increased in recent years. Complying with these laws and regulations could limit our ability to obtain new patents in the future that may be important for our business.

*Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

The USPTO and European and other patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. In addition, periodic maintenance and annuity fees on any issued patent are due to be paid to the USPTO and European and other patent agencies over the lifetime of a patent. While an inadvertent failure to make payment of such fees or to comply with such provisions can in many cases be cured by additional payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance with such provisions will result in the abandonment or lapse of the patent or patent application, and the partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents within prescribed time limits. If we or our licensors fail to maintain the patents and patent applications covering our product candidates or if we or our licensors otherwise allow our patents or patent applications to be abandoned or lapse, it can create opportunities for competitors to enter the market, which would hurt our competitive position and could impair our ability to successfully commercialize our product candidates in any indication for which they are approved.

*We enjoy only limited geographical protection with respect to certain patents and we may not be able to protect our intellectual property rights throughout the world.*

Filing, prosecuting and defending patents covering our product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the United States can be less extensive than those in the United States. In-licensing patents covering our product candidates in all countries throughout the world may similarly be prohibitively expensive, if such opportunities are available at all. And in-licensing or filing, prosecuting and defending patents even in only those jurisdictions in which we develop or commercialize our product candidates may be prohibitively expensive or impractical. Competitors may use our and our licensors' technologies in jurisdictions where we have not obtained patent protection or licensed patents to develop their own products and, further, may export otherwise infringing products to territories where we and our licensors have patent protection, but enforcement is not as strong as that in the United States or the EU. These products may compete with our product candidates, and our or our licensors' patents or other intellectual property rights may not be effective or sufficient to prevent them from competing.

In addition, we may decide to abandon national and regional patent applications while they are still pending. The grant proceeding of each national or regional patent is an independent proceeding which may lead to situations in which applications may be rejected by the relevant patent office, while substantively similar applications are granted by others. For example, relative to other countries, China has a heightened requirement for patentability and specifically requires a detailed description of medical uses of a claimed drug. Furthermore, generic drug manufacturers or other competitors may challenge the scope, validity or enforceability of our or our licensors' patents, requiring us or our licensors to engage in complex, lengthy and costly litigation or other proceedings. Generic drug manufacturers may develop, seek approval for and launch generic versions of our products. It is also quite common that depending on the country, the scope of patent protection may vary for the same product candidate or technology.

The laws of some jurisdictions do not protect intellectual property rights to the same extent as the laws or regulations in the United States and the EU, and many companies have encountered significant difficulties in protecting and defending proprietary rights in such jurisdictions. Moreover, the legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents, trade secrets or other forms of intellectual property, which could make it difficult for us to prevent competitors in some jurisdictions from marketing competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions, whether or not successful, are likely to result in substantial costs and divert our efforts and attention from other aspects of our business, and additionally could put at risk our or our licensors' patents of being invalidated or interpreted narrowly, could increase the risk of our or our licensors' patent applications not issuing, or could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate, while damages or other remedies may be awarded to the adverse party, which may be commercially significant. If we prevail, damages or other remedies awarded to us, if any, may not be commercially meaningful. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license. Furthermore, while we intend to protect our intellectual property rights in our expected significant markets, we cannot ensure that we will be able to initiate or maintain similar efforts in all jurisdictions in which we may wish to market our product candidates. Accordingly, our efforts to protect our intellectual property rights in such countries may be inadequate, which may have an adverse effect on our ability to successfully commercialize our product candidates in all of our expected significant foreign markets. If we or our licensors encounter difficulties in protecting, or are otherwise precluded from effectively protecting, the intellectual property rights important for our business in such jurisdictions, the value of these rights may be diminished and we may face additional competition in those jurisdictions.

In some jurisdictions, compulsory licensing laws compel patent owners to grant licenses to third parties. In addition, some countries limit the enforceability of patents against government agencies or government contractors. In these countries, the patent owner may have limited remedies, which could materially diminish the value of such patent. If we or any of our licensors are forced to grant a license to third parties under patents relevant to our business, or if we or our licensors are prevented from enforcing patent rights against third parties, our competitive position may be substantially impaired in such jurisdictions.

***If we do not obtain patent term extension in the United States under the Hatch-Waxman Act and in foreign countries under similar legislation, thereby potentially extending the term of marketing exclusivity for our product candidates, our business may be materially harmed.***

The term of any individual patent depends on applicable law in the country where the patent is granted. In the United States, provided all maintenance fees are timely paid, a patent generally has a term of 20 years from its application filing date or earliest claimed non-provisional filing date. Extensions may be available under certain circumstances, but the life of a patent and, correspondingly, the protection it affords is limited. Even if we or our licensors obtain patents covering our product candidates, when the terms of all patents covering a product expire, our business may become subject to competition from competitive medications, including generic medications. Given the amount of time required for the development, testing and regulatory review and approval of new product candidates, patents protecting such candidates may expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

In the United States, a patent that covers an FDA- approved drug or biologic may be eligible for a term extension designed to restore the period of the patent term that is lost during the premarket regulatory review process conducted by the FDA. Depending upon the timing, duration and conditions of FDA marketing approval of our product candidates, one or more of our U.S. patents may be eligible for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984, or the Hatch-Waxman Act , which permits a patent term extension of up to five years for a patent covering an approved product as compensation for effective patent term lost during product development and the FDA regulatory review process. In the EU, our product candidates may be eligible for term extensions based on similar legislation. In either jurisdiction, however, we may not receive an extension if we fail to apply within applicable deadlines, fail to apply prior to expiration of relevant patents or otherwise fail to satisfy applicable requirements. Even if we are granted such extension, the duration of such extension may be less than our request. If we are unable to obtain a patent term extension, or if the term of any such extension is less than our request, the period during which we can enforce our patent rights for that product will be in effect shortened and our competitors may obtain approval to market competing products sooner. The resulting reduction of years of revenue from applicable products could be substantial.

***Our proprietary rights may not adequately protect our technologies and product candidates, and do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business, or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make products that are the same as or similar to our product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- others, including inventors or developers of our owned or in-licensed patented technologies who may become involved with competitors, may independently develop similar technologies that function as alternatives or replacements for any of our technologies without infringing our intellectual property rights;

- we or our licensors or our other collaboration partners might not have been the first to conceive and reduce to practice the inventions covered by the patents or patent applications that we own, license or will own or license;

- we or our licensors or our other collaboration partners might not have been the first to file patent applications covering certain of the patents or patent applications that we or they own or have obtained a license, or will own or will have obtained a license;

- we or our licensors may fail to meet obligations to the U.S. government with respect to in-licensed patents and patent applications funded by U.S. government grants, leading to the loss of patent rights;

- it is possible that our pending patent applications will not result in issued patents;

- it is possible that there are prior public disclosures that could invalidate our or our licensors' patents;

76

- issued patents that we own or exclusively license may not provide us with any competitive advantage, or may be held invalid or unenforceable, as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights, or in countries where research and development safe harbor laws exist, and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- ownership, validity or enforceability of our or our licensors' patents or patent applications may be challenged by third parties; and

- the patents of third parties or pending or future applications of third parties, if issued, may have an adverse effect on our business.

***We depend on proprietary technology licensed from others. If we lose our existing licenses or are unable to acquire or license additional proprietary rights from third parties, we may not be able to continue developing our products.***

We currently in-license certain intellectual property from COH and Caltech, and we have entered into a collaboration and license agreement with Novartis. In the future we may in-license intellectual property from other licensors. We rely on certain of these licensors to file and prosecute patent applications and maintain patents and otherwise protect the intellectual property we license from them. We have limited control over these activities or any other intellectual property that may be related to our in-licensed intellectual property. For example, we cannot be certain that such activities by these licensors have been or will be conducted in compliance with applicable laws and regulations or will result in valid and enforceable patents and other intellectual property rights. We have limited control over the manner in which our licensors initiate an infringement proceeding against a third-party infringer of the intellectual property rights, or defend certain of the intellectual property that is licensed to us. It is possible that the licensors' infringement proceeding or defense activities may be less vigorous than had we conducted them ourselves. The licensing and acquisition of third-party intellectual property rights is a competitive practice, and companies that may be more established, or have greater resources than we do, may also be pursuing strategies to license or acquire third-party intellectual property rights that we may consider necessary or attractive in order to commercialize our product candidates. More established companies may have a competitive advantage over us due to their larger size and cash resources or greater clinical development and commercialization capabilities. There can be no assurance that we will be able to successfully complete such negotiations and ultimately acquire the rights to the intellectual property surrounding the additional product candidates that we may seek to acquire.

***If we fail to comply with our obligations under our patent licenses with third parties, we could lose license rights that are important to our business.***

We are a party to license agreements with COH and Caltech, pursuant to which we in-license patents and technology for our product candidates. These existing licenses impose various diligence, milestone payment, royalty, insurance and other obligations on us. If we fail to comply with these obligations or otherwise materially breach a license agreement, our licensors may have the right to terminate the license, in which event we would not be able to develop or market the products covered by such licensed intellectual property. In addition, any claims asserted against us by our licensors may be costly and time-consuming, divert the attention of key personnel from business operations or otherwise have a material adverse effect on our business.

***Our reliance on third parties may require us to share our trade secrets, which increases the possibility that our trade secrets will be misappropriated or disclosed, and confidentiality agreements with employees and third parties may not adequately prevent disclosure of trade secrets and protect other proprietary information.***

We consider proprietary trade secrets, confidential know-how and unpatented know-how to be important to our business. We may rely on trade secrets and confidential know-how to protect our technology, especially where patent protection is believed by us to be of limited value. However, trade secrets and confidential know-how are difficult to protect, and we have limited control over the protection of trade secrets and confidential know-how used by our licensors, collaborators and suppliers. Because we expect to rely on third parties to manufacture HMI-102, HMI-103, HMI-202, HMI-203 and any future product candidates, and we expect to collaborate with third parties on the development of HMI-102, HMI-103, HMI-202, HMI-203 and any future product candidates, we may, at times, share trade secrets with them. We also conduct joint research and development programs that may require us to share trade secrets under the terms of our research and development collaborations or similar agreements. Under such circumstances, trade secrets and confidential know-how can be difficult to maintain as confidential.

To protect this type of information against disclosure or appropriation by competitors, our policy is to require our employees, consultants, contractors and advisors to enter into confidentiality agreements and, if applicable, material transfer agreements, consulting agreements or other similar agreements with us prior to beginning research or disclosing proprietary information. These agreements typically limit the rights of the third parties to use or disclose our confidential information, including our trade secrets. However, current or former employees, consultants, contractors and advisers may unintentionally or willfully disclose our confidential information to competitors, and confidentiality agreements may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. The need to share trade secrets and other confidential information increases the risk that such trade secrets become known by our competitors, are inadvertently incorporated into the technology of others, or are disclosed or used in violation of these agreements. Given that our competitive position is based, in part, on our know-how and trade secrets, a competitor's discovery of our trade secrets or other unauthorized use or disclosure would impair our competitive position and may have an adverse effect on our business and results of operations. Enforcing a claim that a third party obtained illegally and is using trade secrets and/or confidential know-how is expensive, time consuming and unpredictable, and the enforceability of confidentiality agreements may vary from jurisdiction to jurisdiction.

In addition, these agreements typically restrict the ability of our advisors, employees, third-party contractors and consultants to publish data potentially relating to our trade secrets, although our agreements may contain certain limited publication rights. Despite our efforts to protect our trade secrets, our competitors may discover our trade secrets, either through breach of our agreements with third parties, independent development or publication of information by any of our third-party collaborators. A competitor's discovery of our trade secrets would impair our competitive position and have an adverse impact on our business.

***If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our markets of interest and our business may be adversely affected.***

If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our markets of interest and our business may be adversely affected. We currently own one registered trademark and four pending trademark applications in the United States, as well as 17 registered trademarks and five pending trademark applications in other countries around the world. We may not be able to protect our rights to these trademarks and trade names, which we need to build name recognition among potential partners or customers in our markets of interest. At times, competitors may adopt trade names or trademarks similar to ours, thereby impeding our ability to build brand identity and possibly leading to market confusion. In addition, there could be potential trade name or trademark infringement claims brought by owners of other registered trademarks or trademarks that incorporate variations of our unregistered trademarks or trade names. Over the long term, if we are unable to successfully register our trademarks and trade names and establish name recognition based on our trademarks and trade names, then we may not be able to compete effectively and our business may be adversely affected. Our efforts to enforce or protect our proprietary rights related to trademarks, trade secrets, domain names, copyrights or other intellectual property may be ineffective and could result in substantial costs and diversion of resources and could adversely impact our financial condition or results of operations.

***We may need to license additional intellectual property from third parties, and such licenses may not be available or may not be available on commercially reasonable terms.***

The growth of our business may depend in part on our ability to acquire or in-license additional proprietary rights. For example, our programs may involve product candidates that may require the use of additional proprietary rights held by third parties. Our product candidates may also require specific formulations to work effectively and efficiently. These formulations may be covered by intellectual property rights held by others. We may develop products containing our compositions and pre-existing pharmaceutical compositions. These pharmaceutical products may be covered by intellectual property rights held by others. We may be required by the FDA or comparable foreign regulatory authorities to provide a companion diagnostic test or tests with our product candidates. These diagnostic test or tests may be covered by intellectual property rights held by others. We may be unable to acquire or in-license any relevant third-party intellectual property rights that we identify as necessary or important to our business operations. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all, which would harm our business. We may need to cease use of the compositions or methods covered by such third-party intellectual property rights, and may need to seek to develop alternative approaches that do not infringe on such intellectual property rights which may entail additional costs and development delays, even if we were able to develop such alternatives, which may not be feasible. Even if we are able to obtain a license under such intellectual property rights, any such license may be non-exclusive, which may allow our competitors access to the same technologies licensed to us.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of their former employers or other third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. Although we seek to protect our ownership of intellectual property rights by ensuring that our agreements with our employees, collaborators and other third parties with whom we do business include provisions requiring such parties to assign rights in inventions to us, we may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Even if we are successful, litigation could result in substantial cost and reputational loss and be a distraction to our management and other employees.

### Risks Related to Employee Matters and Managing Growth and Other Risks Related to Our Business

***The COVID-19 pandemic caused by the novel strain of coronavirus could adversely impact our business, including our preclinical studies and clinical trials.***

In December 2019, a novel strain of coronavirus causing the COVID-19 disease was reported to have surfaced in Wuhan, China. Since then, COVID-19 has spread to multiple countries, including the United States, where we have planned or ongoing preclinical studies and clinical trials. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 to be a global pandemic. On March 23, 2020, the governor of Massachusetts ordered the closure of all non-essential businesses effective March 24, 2020. On May 18, 2020, the governor issued an order outlining the phased reopening of workplaces and imposing workplace safety measures to address COVID-19. Because of the nature of our operations, we have been considered to be an essential business so, to date, our operations have only been partially affected by these orders. The pandemic and government measures taken in response have also had a significant impact, both direct and indirect, on businesses and commerce, as worker shortages have occurred, supply chains have been disrupted, and facilities and production have been suspended.

In response to the spread of COVID-19, most office-based employees continue to work from home, and we have limited the number of staff in our research and development laboratories and in our manufacturing facility to key personnel. For those employees on-site, we have developed shift schedules for our laboratories and manufacturing facility and a modified office layout and traffic flow pattern to increase spacing capabilities, reduce inter-office risks and allow for business continuity. We have increased cleaning protocols throughout our entire facility, limited visitors to only those who are critical to our ongoing operations and have cancelled all business travel. In addition, we have developed our own on-site COVID-19 surveillance testing for employees to help promote health and safety. Disruptions caused by the COVID-19 pandemic have resulted, and may continue to result, in delays in enrolling our Phase 1/2 pheNIX clinical trial. In addition, we could experience additional disruptions in conducting or completing the Phase 1/2 pheNIX trial or other planned preclinical and clinical trials and could incur unforeseen costs as a result of preclinical study or clinical trial delays. Many of our clinical sites are not currently accepting new patients for enrollment in clinical trials and have placed limitations on patients already enrolled in clinical trials from visiting the clinical sites for follow-up monitoring visits. While we have entered into arrangements with third parties to provide remote patient visits and monitoring, we may still experience delays with the pheNIX trial. All of our ongoing and planned preclinical studies at external CROs are progressing and we have accelerated shipments of reagents and supplies to avoid any disruption of activities. However, it is possible that the COVID-19 pandemic may have an impact in the future on our CROs' ability to complete critical studies required for the progression of these programs. Moreover, while we currently do not anticipate any interruptions in our manufacturing process, it is possible that the COVID-19 pandemic and response efforts may have an impact in the future on our and/or our third-party suppliers and CMOs' ability to manufacture our product candidates or materials needed for our preclinical studies and clinical trials. If the COVID-19 pandemic continues to spread in the United States and elsewhere, we may experience disruptions that could severely impact our business, preclinical studies and clinical trials, including:

- delays in receiving approval from local regulatory authorities to initiate our planned clinical trials;

- delays or difficulties in enrolling patients in our clinical trials;

- delays or difficulties in clinical site initiation, including difficulties in recruiting clinical site investigators and clinical site staff;

79

- delays in clinical sites receiving the supplies and materials needed to conduct our clinical trials, including interruption in global shipping that may affect the transport of clinical trial materials;

- changes in local regulations as part of a response to the COVID-19 pandemic which may require us to change the ways in which our clinical trials are conducted, which may result in unexpected costs, or to discontinue the clinical trials altogether;

- diversion of healthcare resources away from the conduct of clinical trials, including the diversion of hospitals serving as our clinical trial sites and hospital staff supporting the conduct of our clinical trials;

- interruption of key clinical trial activities, such as clinical trial site monitoring, due to limitations on travel imposed or recommended by federal or state governments, employers and others, or interruption of clinical trial subject visits and study procedures, the occurrence of which could affect the integrity of clinical trial data;

- risk that participants enrolled in our clinical trials will acquire COVID-19 while the clinical trial is ongoing, which could impact the results of the clinical trial, including by increasing the number of observed adverse events;

- interruptions or delays in preclinical studies due to restricted or limited operations at our research and development laboratory facility;

- delays in necessary interactions with local regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees;

- limitations in employee resources that would otherwise be focused on the conduct of our clinical trials, including because of sickness of employees or their families or the desire of employees to avoid contact with large groups of people;

- refusal of the FDA to accept data from clinical trials in affected geographies; and

- impacts from prolonged remote work arrangements, such as increased cybersecurity risks and strains on our business continuity plans.

The COVID-19 pandemic continues to rapidly evolve. The extent to which the pandemic impacts our business, preclinical studies and clinical trials will depend on future developments, which are highly uncertain and cannot be predicted with confidence, such as the duration of the pandemic, travel restrictions and social distancing in the United States and other countries, business closures or business disruptions, the ultimate impact of COVID-19 on financial markets and the global economy, and the effectiveness of actions taken in the United States and other countries to contain and treat the disease.

While the potential economic impact brought by and the duration of the COVID-19 pandemic may be difficult to assess or predict, the widespread pandemic has resulted in, and may continue to result in, significant disruption of global financial markets, which could reduce our ability to access capital and negatively affect our liquidity. In addition, the recession or market correction resulting from the spread of COVID-19 could materially affect our business.

***Our future success depends on our ability to retain our key personnel and to attract, retain and motivate qualified personnel.***

Our industry has experienced a high rate of turnover of management personnel in recent years. We are highly dependent on the development, regulatory, commercialization and business development expertise of Arthur Tzianabos, Ph.D., our President and Chief Executive Officer, and Albert Seymour, Ph.D., our Chief Scientific Officer, as well as the other principal members of our management, scientific and clinical teams. Although we have formal employment agreements with our executive officers, these agreements do not prevent them from terminating their employment with us at any time.

If we lose one or more of our executive officers or key employees, our ability to implement our business strategy successfully could be seriously harmed. Furthermore, replacing executive officers and key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to develop, gain regulatory approval of and commercialize product candidates successfully. Competition to hire from this limited pool is intense, and we may be unable to hire, train, retain or motivate these additional key personnel on acceptable terms given the competition among numerous pharmaceutical and biotechnology companies for similar personnel. We also experience competition for the hiring of scientific and clinical personnel from universities and research institutions. In addition, we rely on consultants and advisors, including scientific and clinical advisors, to assist us in formulating our research and development and commercialization strategy. Our consultants and advisors may be engaged by entities other than us and may have commitments under consulting or advisory contracts with other entities that may limit their availability to us. If we are unable to continue to attract and retain high quality personnel, our ability to develop and commercialize product candidates will be limited.

*We or the third parties upon whom we depend may be adversely affected by natural disasters public health emergencies and other natural catastrophic events, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.*

Natural disasters could severely disrupt our operations and have a material adverse effect on our business, results of operations, financial condition and prospects. If a natural disaster, public health emergency, such as the COVID-19 pandemic, power outage or other event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our manufacturing facilities, or that otherwise disrupted operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. The disaster recovery and business continuity plans we have in place may prove inadequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans, which could have a material adverse effect on our business. For example, following Hurricane Maria, shortages in production and delays in a number of medical supplies produced in Puerto Rico resulted, and any similar interruption due to a natural disaster affecting us or any of our third-party manufacturers could materially delay our operations.

**Risks Related to Our Common Stock**

*Our executive officers, directors and principal stockholders, if they choose to act together, will continue to have the ability to control or significantly influence all matters submitted to stockholders for approval.*

Our executive officers and directors and their respective affiliates, in the aggregate, hold shares representing approximately 26% of our outstanding voting stock as of September 30, 2020. As a result, if these stockholders choose to act together, they would be able to control or significantly influence all matters submitted to our stockholders for approval, as well as our management and affairs. For example, these persons, if they choose to act together, would control or significantly influence the election of directors, the composition of our management and approval of any merger, consolidation or sale of all or substantially all of our assets.

*A significant portion of our total outstanding shares are eligible, or will soon become eligible, to be sold into the market, which could cause the market price of our common stock to drop significantly, even if our business is doing well.*

Sales of a substantial number of shares of our common stock in the public market, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock. Based on filings with the SEC, as of November 6, 2020, holders of an aggregate of approximately 10.0 million shares of our common stock have rights, subject to specified conditions, to require us to file registration statements covering their shares or to include their shares in registration statements that we may file for ourselves or other stockholders, until the rights terminate pursuant to the terms of the investors' rights agreement, as amended, between us and such holders. We have also registered all shares of common stock that we may issue under our equity compensation plans, which can be freely sold in the public market upon issuance, subject to volume limitations applicable to affiliates and the lock-up agreements, if applicable.

Additionally, on November 9, 2020, we entered into a stock purchase agreement with Pfizer, pursuant to which Pfizer has agreed to purchase 5.0 million shares of our common stock through a private placement transaction. The closing of the private placement is expected to occur on or about November 10, 2020, subject to the satisfaction of customary closing conditions. The shares of common stock sold in the Pfizer private placement are subject to a one-year lock-up from closing, during which time Pfizer is prohibited from selling or otherwise disposing of such shares. Pfizer will also have rights, subject to specified conditions, to require us to file a Registration Statement on Form S-3 to register the shares of common stock sold in the Pfizer private placement. Once any such registration statement is declared effective, these shares can be freely sold on the public market.

*We are an "emerging growth company," and the reduced disclosure requirements applicable to emerging growth companies may make our common stock less attractive to investors.*

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, and may remain an emerging growth company until the last day of the fiscal year following the fifth anniversary of the closing of the initial public offering of our common stock. However, if certain events occur prior to the end of such five-year period, including if we become a "large accelerated filer," our annual gross revenues exceed $1.07 billion or we issue more than $1.0 billion of non-convertible debt in any three-year period, we will cease to be an emerging growth company prior to the end of such five-year period. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from certain disclosure requirements that are applicable to other public companies that are not emerging growth companies. These exemptions include:

- not being required to comply with the auditor attestation requirements in the assessment of our internal control over financial reporting;

- not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- reduced disclosure obligations regarding executive compensation; and

- exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

We cannot predict whether investors will find our common stock less attractive if we rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be reduced or more volatile. In addition, the JOBS Act provides that an emerging growth company can take advantage of an extended transition period for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of these accounting standards until they would otherwise apply to private companies. We have elected to take advantage of this extended transition period.

***Provisions in our restated certificate of incorporation and amended and restated bylaws and under Delaware law could make an acquisition of our company, which may be beneficial to our stockholders, more difficult and may prevent attempts by our stockholders to replace or remove our current management.***

Provisions in our restated certificate of incorporation and our amended and restated bylaws may discourage, delay or prevent a merger, acquisition or other change in control of our company that stockholders may consider favorable, including transactions in which you might otherwise receive a premium for your shares. These provisions could also limit the price that investors might be willing to pay in the future for shares of our common stock, thereby depressing the market price of our common stock. In addition, because our board of directors is responsible for appointing the members of our management team, these provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors. Among other things, these provisions include those establishing:

- a classified board of directors with three-year staggered terms, which may delay the ability of stockholders to change the membership of a majority of our board of directors;

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- the exclusive right of our board of directors to elect a director to fill a vacancy created by the expansion of the board of directors or the resignation, death or removal of a director, which prevents stockholders from filling vacancies on our board of directors;

- the ability of our board of directors to authorize the issuance of shares of preferred stock and to determine the terms of those shares, including preferences and voting rights, without stockholder approval, which could be used to significantly dilute the ownership of a hostile acquirer;

- the ability of our board of directors to alter our bylaws without obtaining stockholder approval;

- the required approval of the holders of at least two-thirds of the shares entitled to vote at an election of directors to adopt, amend or repeal our bylaws or repeal the provisions of our restated certificate of incorporation regarding the election and removal of directors;

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders;

- the requirement that a special meeting of stockholders may be called only by the chairman of the board of directors, the chief executive officer, the president or the board of directors, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors; and

- advance notice procedures that stockholders must comply with in order to nominate candidates to our board of directors or to propose matters to be acted upon at a stockholders' meeting, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of us.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the General Corporation Law of the State of Delaware, which prohibits a person who owns in excess of 15% of our outstanding voting stock from

merging or combining with us for a period of three years after the date of the transaction in which the person acquired in excess of 15% of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner. Furthermore, our restated certificate of incorporation specifies that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for most legal actions involving claims brought against us by stockholders. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and to have consented to the provisions of our restated certificate of incorporation described above.

We believe this provision benefits us by providing increased consistency in the application of Delaware law by chancellors particularly experienced in resolving corporate disputes, efficient administration of cases on a more expedited schedule relative to other forums and protection against the burdens of multi-forum litigation. However, the provision may have the effect of discouraging lawsuits against our directors, officers, employees and agents as it may limit any stockholder's ability to bring a claim in a judicial forum that such stockholder finds favorable for disputes with us or our directors, officers, employees or agents. The enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that, in connection with any applicable action brought against us, a court could find the choice of forum provisions contained in our restated certificate of incorporation to be inapplicable or unenforceable in such action. If a court were to find the choice of forum provision contained in our restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business, financial condition or results of operations.

*Our ability to use net operating losses and research and development credits to offset future taxable income may be subject to certain limitations.*

As of December 31, 2019, we had federal and state net operating loss carryforwards, or NOLs, of approximately $150.7 million and $157.3 million, respectively. Our NOLs arising before January 1, 2018 are subject to expiration and will expire at various dates through 2039. As of December 31, 2019, we also had federal and state research and development and other tax credit carryforwards, or credits, including the orphan drug credit, of approximately $21.2 million and $5.2 million, respectively, available to reduce future tax liabilities. The federal and state credits expire at various dates through 2039. These NOLs and credits could expire unused and be unavailable to offset future taxable income or income tax liabilities. In addition, in general, under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, a corporation that undergoes an "ownership change" is subject to limitations on its ability to utilize its pre-change NOLs or credits to offset future taxable income or income tax liabilities. For these purposes, an ownership change generally occurs where the aggregate change in stock ownership of one or more stockholders or groups of stockholders owning at least 5% of a corporation's stock exceeds 50 percentage points over a three-year period. Our existing NOLs or credits may be subject to limitations arising from previous ownership changes, if any. In addition, future changes in our stock ownership, many of which are outside of our control, could result in an ownership change. Our NOLs or credits may also be impaired under state law. Accordingly, even if we attain profitability, we may not be able to utilize a material portion of our NOLs or credits. Furthermore, under the TCJA, although the treatment of NOLs arising on or before December 31, 2017 has generally not changed, NOLs arising on or after January 1, 2018 and beyond may only be used to offset 80% of taxable income. This change may require us to pay federal income taxes in future years despite generating a loss for federal income tax purposes in prior years.

**General Risk Factors**

*The market price of our common stock may be volatile and fluctuate substantially, which could result in substantial losses for purchasers of our common stock.*

Our stock price is likely to be volatile. The stock market in general and the market for smaller biopharmaceutical companies in particular have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. As a result of this volatility, you may not be able to sell your shares of common stock at or above the price at which you purchased them. The market price for our common stock may be influenced by many factors, including:

- the success of competitive products or technologies;

- actual or expected changes in our growth rate relative to our competitors;

- results of clinical trials of our product candidates or those of our competitors;

- developments related to our existing or any future collaborations;

- regulatory actions with respect to our product candidates or our competitors' products and product candidates;

- regulatory or legal developments in the United States and other countries;

83

- development of new product candidates that may address our markets and make our product candidates less attractive;

- changes in physician, hospital or healthcare provider practices that may make our product candidates less useful;

- announcements by us, our collaborators or our competitors of significant acquisitions, strategic collaborations, joint ventures or capital commitments;

- developments or disputes concerning patent applications, issued patents or other proprietary rights;

- the recruitment or departure of key personnel;

- the level of expenses related to any of our product candidates or clinical development programs;

- failure to meet or exceed financial estimates and projections of the investment community or that we provide to the public;

- the results of our efforts to discover, develop, acquire or in-license additional product candidates or products;

- actual or expected changes in estimates as to financial results, development timelines or recommendations by securities analysts;

- variations in our financial results or those of companies that are perceived to be similar to us;

- changes in the structure of healthcare payment systems;

- market conditions in the pharmaceutical and biotechnology sectors;

- general economic, industry and market conditions; and

- the other factors described in this "Risk Factors" section.

***Because we do not anticipate paying any cash dividends on our common shares in the foreseeable future, capital appreciation, if any, would be your sole source of gain.***

We have never declared or paid any cash dividends on our common shares. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. As a result, capital appreciation, if any, of our common shares would be your sole source of gain on an investment in our common shares for the foreseeable future.

***We could be subject to securities class action litigation.***

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because biopharmaceutical companies have experienced significant stock price volatility in recent years. If we face such litigation, it could result in substantial costs and a diversion of management's attention and resources, which could harm our business.

***Recent U.S. tax legislation may materially adversely affect our financial condition, results of operations and cash flows.***

The Tax Cuts and Jobs Act of 2017, or the TCJA, has significantly changed the U.S. federal income taxation of U.S. corporations. The TCJA remains unclear in many respects and has been, and may continue to be, the subject of amendments and technical corrections, as well as interpretations and implementing regulations by the Treasury and Internal Revenue Service, which lessened or increased certain adverse impacts of the TCJA and may do so in the future. We continue to work with our tax advisors to determine the full impact that the TCJA will have on us. We urge our investors to consult with their legal and tax advisors with respect to the TCJA.

***We have incurred and expect to continue to incur increased costs as a result of operating as a public company, and our management will be required to devote substantial time to new compliance initiatives and corporate governance practices.***

As a public company, we have incurred and expect to continue to incur significant legal, accounting and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the listing requirements of the Nasdaq Global Select Market and other applicable securities rules and regulations impose various requirements on public companies, including establishment and maintenance of effective disclosure and financial controls and

corporate governance practices. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations have increased our legal and financial compliance costs and have made some activities more time-consuming and costly. For example, we expect that these rules and regulations may make it more difficult and more expensive for us to obtain director and officer liability insurance, which in turn could make it more difficult for us to attract and retain qualified members of our board of directors.

We are evaluating these rules and regulations, and cannot predict or estimate the amount of additional costs we may incur or the timing of such costs. These rules and regulations are often subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices.

Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, we are required to furnish a report by our management on our internal control over financial reporting. However, while we remain an emerging growth company, we will not be required to include an attestation report on internal control over financial reporting issued by our independent registered public accounting firm. To achieve compliance with Section 404 within the prescribed period, we have engaged in a process to document and evaluate our internal control over financial reporting, which has been both costly and challenging. We will need to continue to dedicate internal resources, engage outside consultants, adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing whether such controls are functioning as documented, and implement a continuous reporting and improvement process for internal control over financial reporting. Despite our efforts, there is a risk that we will not be able to conclude that our internal control over financial reporting is effective as required by Section 404. If we identify one or more material weaknesses, it could cause us to need to restate our previously issued financial statements and result in an adverse reaction in the financial markets due to a loss of confidence in the reliability of our financial statements.

***We may engage in acquisitions that could disrupt our business, cause dilution to our stockholders or reduce our financial resources.***

In the future, we may enter into transactions to acquire other businesses, products or technologies. If we do identify suitable candidates, we may not be able to make such acquisitions on favorable terms, or at all. Any acquisitions we make may not strengthen our competitive position, and these transactions may be viewed negatively by customers or investors. We may decide to incur debt in connection with an acquisition or issue our common stock or other equity securities to the stockholders of the acquired company, which would reduce the percentage ownership of our existing stockholders. We could incur losses resulting from undiscovered liabilities of the acquired business that are not covered by the indemnification we may obtain from the seller. In addition, we may not be able to successfully integrate the acquired personnel, technologies and operations into our existing business in an effective, timely and nondisruptive manner. Acquisitions may also divert management attention from day-to-day responsibilities, increase our expenses and reduce our cash available for operations and other uses. We cannot predict the number, timing or size of future acquisitions or the effect that any such transactions might have on our operating results.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

Not applicable.

**Item 3. Defaults Upon Senior Securities.**

Not applicable.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

Not applicable.

**Item 6. Exhibits.**

| Exhibit Number | Description | Form | File No. | Exhibit | Filing Date | Filed/Furnished Herewith |
|---|---|---|---|---|---|---|
| 3.1 | Restated Certificate of Incorporation of Homology Medicines, Inc. | 8-K | 001-38433 | 3.1 | 4/3/2018 | |
| 3.2 | Amended and Restated Bylaws of Homology Medicines, Inc. | 8-K | 001-38433 | 3.2 | 4/3/2018 | |
| 4.1 | Amended and Restated Investors' Rights Agreement, dated July 28, 2017, by and among Homology Medicines, Inc. and the investors named therein, as amended by Amendment No. 1 Amended and Restated Investors' Rights Agreement, dated November 6, 2020. | | | | | * |
| 10.1 | Second Amendment to Collaboration and License Agreement, dated October 30, 2020, between Homology Medicines, Inc. and Novartis Institutes for BioMedical Research, Inc. | | | | | * |
| 10.2† | Stock Purchase Agreement, dated November 9, 2020, by and between Homology Medicines, Inc. and Pfizer Inc. | 8-K | 001-38433 | 10.1 | 11/9/2020 | |
| 31.1 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | * |
| 31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | * |
| 32.1 | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002., | | | | | ** |
| 32.2 | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ** |
| 101.INS | Inline XBRL Instance Document- the Instance Document does not appear in the interactive data file because its XBRL tags are embedded within the Inline XBRL document | | | | | * |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | * |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | * |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | | | * |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | | | * |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | * |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | * |

\*     Filed herewith.

\*\*     Furnished herewith.

†    Portions of this exhibit have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K.

88

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

HOMOLOGY MEDICINES, INC.

Date: November 9, 2020                                By:              /s/ Arthur O. Tzianabos, Ph.D.

**Arthur O. Tzianabos, Ph.D.**
**President, Chief Executive Officer and Director**
*(principal executive officer)*

Date: November 9, 2020                                By:              /s/ Bradford Smith

**Bradford Smith**
**Chief Financial Officer, Treasurer and Secretary**
*(principal financial officer and principal accounting officer)*

89

**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

THIS AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT (this "**Agreement**"), is made as of July 28, 2017, by and among Homology Medicines, Inc., a Delaware corporation (the "**Company**"), each of the investors listed on <u>Schedule A</u> hereto (each, an "**Investor**," and together with any subsequent investors, or transferees, who become parties hereto as "Investors" in accordance with the terms hereof, the "**Investors**"), and, solely for purposes of Section 2 (other than Subsections 2.1 and 2.10), Subsection 4.1 and Section 6 (other than Subsection 6.6), California Institute of Technology ("**Caltech**").

<u>**RECITALS**</u>

**WHEREAS**, certain of the Investors (the "**Existing Investors**") possess registration rights, information rights, rights of first offer, and other rights pursuant to an Investors' Rights Agreement, dated as of December 22, 2015, between the Company and such Investors (as amended, the "**Prior Agreement**");

**WHEREAS**, the Company and the Existing Investors desire to amend and restate the Prior Agreement in its entirety and to accept the rights created pursuant to this Agreement in lieu of the rights granted to them under the Prior Agreement;

**WHEREAS**, concurrently with the execution of this Agreement, the Company and certain of the Investors are entering into a Series B Preferred Stock Purchase Agreement (as the same may be amended and/or restated from time to time, the "**Purchase Agreement**"), pursuant to which such Investors have agreed to purchase shares of Series B Preferred Stock (as defined below);

**WHEREAS**, the Company and Caltech are parties to a License Agreement, dated as of September 14, 2016 (as amended, the "**Caltech Agreement**"), pursuant to which the Company issued to Caltech 533,695 shares of Common Stock and the Company agreed to grant certain registration and participation rights; and

**NOW, THEREFORE**, the Company and the Existing Investors hereby agree that the Prior Agreement is amended and restated in its entirety as set forth herein, and all of the parties hereto further agree as follows:

1. <u>Definitions</u>. For purposes of this Agreement:

1.1 "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including without limitation any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

1.2 "**Caltech Registrable Securities**" means (i) the 533,695 shares of Common Stock held by Caltech on the date hereof, and (ii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares.

1.3 "**Common Stock**" means shares of the Company's common stock, $0.0001 par value per share.

1.4 "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or state law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon: (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto; (ii) an omission or

alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law.

1.5 "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly)**,** Common Stock, including options and warrants.

1.6 "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.7 "**Excluded Registration**" means (i) a registration relating to the sale of securities to employees of the Company or a subsidiary pursuant to a stock option, stock purchase, or similar plan; (ii) a registration relating to an SEC Rule 145 transaction; (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities; or (iv) a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered.

1.8 "**Form S-1**" means such form under the Securities Act as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.9 "**Form S-3**" means such form under the Securities Act as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.10 "**Founders**" means Saswati Chatterjee and Laura Smith.

1.11 "**GAAP**" means generally accepted accounting principles in the United States.

1.12 "**Holder**" means any holder of Registrable Securities who is a party to this Agreement.

1.13 "**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including, adoptive relationships, of a natural person referred to herein.

1.14 "**Initiating Holders**" means, collectively, Holders who properly initiate a registration request under this Agreement.

1.15 "**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

1.16 "**Key Employee**" means any executive-level employee (including, division director and vice president-level positions) as well as any employee who, either alone or in concert with others, develops, invents, programs, or designs any Company Intellectual Property (as defined in the Purchase Agreement).

1.17 "**Major Investor**" means (i) any Investor that, individually or together with such Investor's Affiliates, holds at least 7,000,000 shares of Registrable Securities after the Closing under the Purchase Agreement (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof) and (ii) for purposes of Section 4.1 only, Caltech for so long as they continue to hold all of the Caltech Registrable Securities.

1.18 "**New Securities**" means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

1.19 "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

1.20 "**Preferred Director**" means any director of the Company that the holders of record of the Preferred Stock, exclusively and voting together as a single class, are entitled to elect pursuant to the Restated Certificate.

1.21 "**Preferred Stock**" means, collectively, the Series A Preferred Stock and the Series B Preferred Stock.

1.22 "**Qualified IPO**" means an IPO in which the Company sells shares of its Common Stock with gross proceeds to the Company of at least $50,000,000 and the shares of Common Stock are listed for trading on the New York Stock Exchange or the NASDAQ National Market.

1.23 "**Registrable Securities**" means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) the Caltech Registrable Securities, provided, however, that such Caltech Registrable Securities shall not be deemed Registrable Securities and Caltech shall not be deemed a Holder for the purposes of Subsections 2.1, 2.10, 3.1, 3.2 and 6.6; and (ii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clauses (i) and (ii) above; excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Subsection 6.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Subsection 2.13 of this Agreement.

1.24 "**Registrable Securities then outstanding**" means the number of shares determined by adding the number of shares of outstanding Common Stock that are Registrable Securities and the number of shares of Common Stock issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.25 "**Requisite Investors**" means the holders of shares of Preferred Stock representing at least seventy-one and one-half percent (71.5%) of the voting power of the outstanding shares of Preferred Stock.

1.26 "**Restated Certificate**" means the Company's Amended and Restated Certificate of Incorporation, as amended and/or restated from time to time.

1.27 "**Restricted Securities**" means the securities of the Company required to be notated with the legend set forth in Subsection 2.12(b) hereof.

1.28 "**SEC**" means the Securities and Exchange Commission.

1.29 "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

1.30 "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.31 "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.32 "**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Subsection 2.6.

1.33 "**Series A Preferred Stock**" means shares of the Company's Series A Preferred Stock, $0.0001 par value per share.

1.34 "**Series B Preferred Stock**" means shares of the Company's Series B Preferred Stock, $0.0001 par value per share.

3

1.35 "**Voting Agreement**" means the Amended and Restated Voting Agreement of even date herewith by and among the Company, the Investors and the Key Holders, as amended and/or restated from time to time.

2. Registration Rights. The Company covenants and agrees as follows:

2.1 Demand Registration.

(a) Form S-1 Demand. If (i) at any time after the fourth (4th) anniversary of the date of this Agreement, the Company receives a request from Holders of at least thirty percent (30%) of the Registrable Securities then outstanding, that the Company file a Form S-1 registration statement with respect to at least twenty percent (20%) of the Registrable Securities then outstanding and having an anticipated aggregate offering price, net of Selling Expenses, which would exceed $20 million, or (ii) at any time or from time to time after one hundred eighty (180) days after the effective date of the registration statement for the IPO, the Company receives a request from Holders of Registrable Securities that the Company file a Form S-1 registration statement with respect to Registrable Securities having an expected aggregate offering price, net of Selling Expenses, which would exceed $5,000,000, then the Company shall (x) within ten (10) days after the date such request is given, give notice thereof (the "**Demand Notice**") to all Holders other than the Initiating Holders; and (y) as soon as practicable, and in any event within ninety (90) days after the date such request is given by the Initiating Holders, file a Form S-1 registration statement under the Securities Act covering all Registrable Securities that the Initiating Holders requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Subsections 2.1(c) and 2.3.

(b) Form S-3 Demand. If at any time when it is eligible to use a Form S-3 registration statement, the Company receives a request from a Holder or Holders of Registrable Securities then outstanding that the Company file a Form S-3 registration statement with respect to outstanding Registrable Securities of such Holder or Holders having an anticipated aggregate offering price, net of Selling Expenses, of at least $5,000,000, then the Company shall (i) within ten (10) days after the date such request is given, give a Demand Notice to all Holders other than the Initiating Holders; and (ii) as soon as practicable, and in any event within thirty (30) days after the date such request is given by the Initiating Holders, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Subsections 2.1(c) and 2.3.

(c) Notwithstanding the foregoing obligations, if the Company furnishes to Holders requesting a registration pursuant to this Subsection 2.1 a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Company's Board of Directors it would be materially detrimental to the Company and its stockholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act, then the Company shall have the right to defer taking action with respect to such filing, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly, for a period of not more than one hundred (100) days after the request of the Initiating Holders is given; provided, however, that the Company may not invoke this right more than once in any twelve (12) month period; and provided further that the Company shall not register any securities for its own account or that of any other stockholder during such one hundred (100) day period other than an Excluded Registration.

(d) The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(a) (i) during the period that is sixty (60) days before the Company's good faith estimate of the date of filing of, and ending on a date that is one hundred eighty (180) days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected two registrations pursuant to Subsection 2.1(a); or (iii) if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Subsection 2.1(b). The Company

4

shall not be obligated to effect, or to take any action to effect, any registration pursuant to Subsection 2.1(b) (i) during the period that is thirty (30) days before the Company's good faith estimate of the date of filing of, and ending on a date that is ninety (90) days after the effective date of, a Company-initiated registration, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or (ii) if the Company has effected two registrations pursuant to Subsection 2.1(b) in any twelve (12) month period. A registration shall not be counted as "effected" for purposes of this Subsection 2.1(d) until such time as the applicable registration statement has been declared effective by the SEC, unless the Initiating Holders withdraw their request for such registration, elect not to pay the registration expenses therefor, and forfeit their right to one demand registration statement pursuant to Subsection 2.6, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Subsection 2.1(d).

2.2 Company Registration. If the Company proposes to register (including, for this purpose, a registration effected by the Company for stockholders other than the Holders) any of its Common Stock under the Securities Act in connection with the public offering of such securities solely for cash (other than in an Excluded Registration), the Company shall, at such time, promptly give each Holder notice of such registration. Upon the request of each Holder given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Subsection 2.3, cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Subsection 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Subsection 2.6.

2.3 Underwriting Requirements.

(a) If, pursuant to Subsection 2.1, the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Subsection 2.1, and the Company shall include such information in the Demand Notice. The underwriter(s) will be selected by the Company and shall be reasonably acceptable to a majority in interest of the Initiating Holders. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Subsection 2.4(e)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting. Notwithstanding any other provision of this Subsection 2.3, if the underwriter(s) advise(s) the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, then the Initiating Holders shall so advise all Holders of Registrable Securities that otherwise would be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated among such Holders of Registrable Securities, including the Initiating Holders, in proportion (as nearly as practicable) to the number of Registrable Securities owned by each Holder or in such other proportion as shall mutually be agreed to by all such selling Holders; provided, however, that the number of Registrable Securities held by the Holders to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest one hundred (100) shares.

(b) In connection with any offering involving an underwriting of shares of the Company's capital stock pursuant to Subsection 2.2, the Company shall not be required to include any of the Holders' Registrable Securities in such underwriting unless the Holders accept the terms of the underwriting as agreed upon between the Company and its underwriters, and then only in such quantity as the underwriters in their sole discretion determine will not jeopardize the success of the offering by the Company. If the total number of securities, including Registrable Securities, requested by stockholders to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated among the selling Holders in proportion (as nearly as practicable to) the number of

5

Registrable Securities owned by each selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest one hundred (100) shares. Notwithstanding the foregoing, in no event shall (i) the number of Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, or (ii) the number of Registrable Securities included in the offering be reduced below twenty-five percent (25%) of the total number of securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above and no other stockholder's securities are included in such offering. For purposes of the provision in this Subsection 2.3(b) concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence.

(c) For purposes of Subsection 2.1, a registration shall not be counted as "effected" if, as a result of an exercise of the underwriter's cutback provisions in Subsection 2.3(a), fewer than fifty percent (50%) of the total number of Registrable Securities that Holders have requested to be included in such registration statement are actually included.

2.4 Obligations of the Company. Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a) prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to one hundred twenty (120) days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the Holder refrains, at the request of an underwriter of Common Stock (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such one hundred twenty (120) day period shall be extended for up to sixty (60) days, if necessary, to keep the registration statement effective until all such Registrable Securities are sold;

(b) prepare and file with the SEC such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as may be necessary to comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

(c) furnish to the selling Holders such numbers of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

(d) use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the selling Holders; provided that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(e) in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the underwriter(s) of such offering;

(f) use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

6

(g) provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h) promptly make available for inspection by the selling Holders, any underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

(i) notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed; and

(j) after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus.

In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act shall have become effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act.

2.5 Furnish Information. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 2 with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

2.6 Expenses of Registration. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to Section 2, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company; and the reasonable fees and disbursements, not to exceed $35,000 per registration, of one counsel for the selling Holders selected by the Holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities included in such registration ("**Selling Holder Counsel**"), shall be borne and paid by the Company; provided, however, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Subsection 2.1 if the registration request is subsequently withdrawn at the request of the Holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities to be registered (in which case all selling Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the Holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities agree to forfeit their right to one registration pursuant to Subsections 2.1(a) or 2.1(b), as the case may be; provided further that if, at the time of such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information then the Holders shall not be required to pay any of such expenses and shall not forfeit their right to one registration pursuant to Subsections 2.1(a) or 2.1(b). All Selling Expenses relating to Registrable Securities registered pursuant to this Section 2 shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.

2.7 Delay of Registration. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

2.8 Indemnification. If any Registrable Securities are included in a registration statement under this Section 2:

(a) To the extent permitted by law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, officers, directors, and stockholders of each such Holder; legal counsel and accountants for each

such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(a) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration.

(b) To the extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; provided, however, that the indemnity agreement contained in this Subsection 2.8(b) shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; and provided further that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under Subsections 2.8(b) and 2.8(d) exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or willful misconduct by such Holder.

(c) Promptly after receipt by an indemnified party under this Subsection 2.8 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Subsection 2.8, give the indemnifying party notice of the commencement thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Subsection 2.8, to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. The failure to give notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Subsection 2.8.

(d) To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either: (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Subsection 2.8 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this Subsection 2.8 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this Subsection 2.8, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim,

8

damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; provided, however, that, in any such case (x) no Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and provided further that in no event shall a Holder's liability pursuant to this Subsection 2.8(d), when combined with the amounts paid or payable by such Holder pursuant to Subsection 2.8(d), exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of willful misconduct or fraud by such Holder.

(e) Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f) Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this Subsection 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this Section 2, and otherwise shall survive the termination of this Agreement.

2.9 Reports Under Exchange Act. With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company shall:

(a) make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO;

(b) use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c) furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety (90) days after the effective date of the registration statement filed by the Company for the IPO), the Securities Act, and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); and (ii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

2.10 Limitations on Subsequent Registration Rights. From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities then outstanding, enter into any agreement with any holder or prospective holder of any securities of the Company that (i) would allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of the Registrable Securities of the Holders that are included; or (ii) allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; provided that this limitation shall not apply to any additional Investor who becomes a party to this Agreement in accordance with Subsection 6.9.

9

2.11 "Market Stand-off" Agreement. Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the IPO, and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports, and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2241 or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock held immediately before the effective date of the registration statement for the IPO or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Subsection 2.11 shall apply only to the IPO and shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, any securities of the Company purchased in the Company's IPO, any securities of the Company purchased in open market transactions, or the transfer of any shares to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, and shall be applicable to the Holders only if all officers and directors are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than one percent (1%) of the Company's outstanding Common Stock (after giving effect to conversion into Common Stock of all outstanding Preferred Stock). The underwriters in connection with such registration are intended third-party beneficiaries of this Subsection 2.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Subsection 2.11 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements, based on the number of shares subject to such agreements.

2.12 Restrictions on Transfer.

(a) The Preferred Stock and the Registrable Securities shall not be sold, pledged, or otherwise transferred, and the Company shall not recognize and shall issue stop-transfer instructions to its transfer agent with respect to any such sale, pledge, or transfer, except upon the conditions specified in this Agreement, which conditions are intended to ensure compliance with the provisions of the Securities Act. A transferring Holder will cause any proposed purchaser, pledgee, or transferee of the Preferred Stock and the Registrable Securities held by such Holder to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement.

(b) Each certificate, instrument, or book entry representing (i) the Preferred Stock, (ii) the Registrable Securities, and (iii) any other securities issued in respect of the securities referenced in clauses (i) and (ii), upon any stock split, stock dividend, recapitalization, merger, consolidation, or similar event, shall (unless otherwise permitted by the provisions of Subsection 2.12(c)) be notated with a legend substantially in the following form:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR A VALID EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED.

THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, AS AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

The Holders consent to the Company making a notation in its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer set forth in this Subsection 2.12.

(c) The holder of such Restricted Securities, by acceptance of ownership thereof, agrees to comply in all respects with the provisions of this Section 2. Before any proposed sale, pledge, or transfer of any Restricted Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction, the Holder thereof shall give notice to the Company of such Holder's intention to effect such sale, pledge, or transfer. Each such notice shall describe the manner and circumstances of the proposed sale, pledge, or transfer in sufficient detail and, if reasonably requested by the Company, shall be accompanied at such Holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, addressed to the Company, to the effect that the proposed transaction may be effected without registration under the Securities Act; (ii) a "no action" letter from the SEC to the effect that the proposed sale, pledge, or transfer of such Restricted Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (iii) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale, pledge, or transfer of the Restricted Securities may be effected without registration under the Securities Act, whereupon the Holder of such Restricted Securities shall be entitled to sell, pledge, or transfer such Restricted Securities in accordance with the terms of the notice given by the Holder to the Company. The Company will not require such a legal opinion or "no action" letter (x) in any transaction in compliance with SEC Rule 144; or (y) in any transaction in which such Holder distributes Restricted Securities to an Affiliate of such Holder for no consideration; provided that each transferee agrees in writing to be subject to the terms of this Subsection 2.12. Each certificate, instrument, or book entry representing the Restricted Securities transferred as above provided shall be notated with, except if such transfer is made pursuant to SEC Rule 144, the appropriate restrictive legend set forth in Subsection 2.12(b), except that such certificate instrument, or book entry shall not be notated with such restrictive legend if, in the opinion of counsel for such Holder and the Company, such legend is not required in order to establish compliance with any provisions of the Securities Act.

2.13 Termination of Registration Rights. The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Subsections 2.1 or 2.2 shall terminate upon the earliest to occur of:

(a) the closing of a Deemed Liquidation Event, as such term is defined in the Restated Certificate; and

(b) the third anniversary of the IPO.

3. Information and Observer Rights.

3.1 Delivery of Financial Statements. For so long as an aggregate of at least 7,000,000 shares of Registrable Securities remain outstanding (subject to adjustment for stock splits, dividends and the like with respect to the Preferred Stock), the Company shall deliver to each Major Investor, provided that the Board of Directors has not reasonably determined that such Major Investor is a competitor of the Company:

(a) as soon as practicable, but in any event within one hundred twenty (120) days after the end of each fiscal year of the Company (i) a balance sheet as of the end of such year, (ii) statements of income and of cash flows for such year, and a comparison between (x) the actual amounts as of and for such fiscal year and (y) the comparable amounts for the prior year and as included in the Budget (as defined in Subsection 3.1(e)) for such year, with an explanation of any material differences between such amounts and a schedule as to the sources and applications of funds for such year, and (iii) a statement of stockholders' equity as of the end of such year, all such financial statements audited and certified by independent public accountants of recognized standing selected by the Board of Directors of the Company (or the Audit Committee thereof);

(b) as soon as practicable, but in any event within thirty (30) days after the end of each fiscal year of the Company, a statement showing (i) all debt holders and (ii) the number of shares of each class and series of capital stock and securities convertible into or exercisable for shares of capital stock outstanding at the end of the period, the Common Stock issuable upon conversion or exercise of any outstanding securities convertible or exercisable for Common Stock and the exchange ratio or exercise price applicable thereto, and the number of shares of issued stock options and stock options not yet issued but reserved for issuance, if any, all in sufficient detail as to permit the Major Investors to calculate their respective percentage equity ownership in the Company;

11

(c) as soon as practicable, but in any event within thirty (30) days after the end of each of the first three (3) quarters of each fiscal year of the Company, (i) unaudited statements of income and cash flows for such fiscal quarter, and a comparison between (x) the actual amounts as of and for such fiscal quarter and (y) the comparable amounts for the prior quarter and as included in the Budget for such quarter, with an explanation of any material differences between such amounts and a schedule as to the sources and applications of funds for such quarter, and (ii) an unaudited balance sheet as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (a) be subject to normal year-end audit adjustments; and (b) not contain all notes thereto that may be required in accordance with GAAP);

(d) as soon as practicable, but in any event within thirty (30) days of the end of each month, an unaudited income statement for such month, and an unaudited balance sheet as of the end of such month, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(e) as soon as practicable, but in any event thirty (30) days before the end of each fiscal year, a budget and business plan for the next fiscal year (collectively, the "**Budget**"), prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months and, promptly after prepared, any other budgets or revised budgets prepared by the Company;

(f) with respect to the financial statements called for in Subsection 3.1(c) and Subsection 3.1(d), an instrument executed by the chief financial officer and chief executive officer of the Company certifying that such financial statements were prepared in accordance with GAAP consistently applied with prior practice for earlier periods (except as otherwise set forth in Subsection 3.1(c) and Subsection 3.1(d)) and fairly present the financial condition of the Company and its results of operation for the periods specified therein; and

(g) such other information relating to the financial condition, business, prospects, or corporate affairs of the Company as any Major Investor may from time to time reasonably request; provided, however, that the Company shall not be obligated under this Subsection 3.1 to provide information (i) that the Company reasonably determines in good faith to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in a form acceptable to the Company); or (ii) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

Notwithstanding anything else in this Subsection 3.1 to the contrary, the Company may cease providing the information set forth in this Subsection 3.1 during the period starting with the date sixty (60) days before the Company's good-faith estimate of the date of filing of a registration statement if it reasonably concludes it must do so to comply with the SEC rules applicable to such registration statement and related offering; provided that the Company's covenants under this Subsection 3.1 shall be reinstated at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective.

3.2 Inspection. For so long as an aggregate of at least 7,000,000 shares of Registrable Securities remain outstanding (subject to adjustment for stock splits, dividends and the like with respect to the Preferred Stock), the Company shall permit each Major Investor, provided that the Board of Directors has not reasonably determined that such Major Investor is a competitor of the Company, at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; provided, however, that the Company shall not be obligated pursuant to this Subsection 3.2 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

12

3.3 <u>Observer Rights</u>. The Company shall invite a representative of (i) 5AM Ventures IV, L.P., **(ii)** Deerfield Healthcare Innovations Fund, L.P. and Deerfield Private Design Fund, L.P., collectively (together, "**Deerfield**") and (iii) TLS Beta Pte. Ltd. to attend all meetings of its Board of Directors and any committee of its Board of Directors in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors at the same time and in the same manner as provided to such directors; provided, however, that such representative shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest, or if such designating Investor or its representative is a competitor of the Company.

3.4 <u>Termination of Rights</u>. The covenants set forth in <u>Subsection 3.1</u>, <u>Subsection 3.2</u> and <u>Subsection 3.3</u> shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event, whichever event occurs first.

3.5 <u>Confidentiality</u>. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this <u>Subsection 3.5</u> by such Investor), (b) is or has been independently developed or conceived by the Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to the Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this <u>Subsection 3.5</u>; (iii) to any existing or prospective Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business, provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, provided that the Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

4. <u>Rights to Future Stock Issuances</u>.

4.1 <u>Right of First Offer</u>. Subject to the terms and conditions of this <u>Subsection 4.1</u> and applicable securities laws, if the Company proposes to offer or sell any New Securities, the Company shall first offer such New Securities to each Major Investor. Any Major Investor (other than Caltech) shall be entitled to apportion the right of first offer hereby granted to it in such proportions as it deems appropriate, among (i) itself and (ii) its Affiliates, provided that each such Affiliate agrees to enter into this Agreement and each of the Voting Agreement and Right of First Refusal and Co-Sale Agreement of even date herewith among the Company, the Investors and the other parties named therein, as an "**Investor**" under each such agreement; provided that, Caltech may assign only its rights and obligations under this Subsection 4.1 in accordance with Subsection 6.1.

(a) The Company shall give notice (the "**Offer Notice**") to each Major Investor, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b) By notification to the Company within twenty (20) days after the Offer Notice is given, each Major Investor may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Common Stock then held by such Major Investor (including all shares of Common Stock then issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held by such holder) bears to the total Common Stock of the Company then outstanding (assuming full conversion and/or exercise, as applicable, of all Preferred Stock and other Derivative Securities) At the expiration of such twenty (20) day period, the Company

13

shall promptly notify any Major Investor that elects to purchase or acquire all the shares available to it (each, a "**Fully Exercising Investor**") of any other Major Investor's failure to do likewise. During the ten (10) day period commencing after the Company has given such notice, each Fully Exercising Investor may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of shares specified above, up to that portion of the New Securities for which the Major Investors were entitled to subscribe but that were not subscribed for by the Major Investors which is equal to the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of Preferred Stock and any other Derivative Securities then held, by such Fully Exercising Investor bears to the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held, by all Fully Exercising Investors who wish to purchase such unsubscribed shares. The closing of any sale pursuant to this Subsection 4.1(b) shall occur within the later of ninety (90) days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to Subsection 4.1(c).

(c) If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in Subsection 4.1(b), the Company may, during the ninety (90) day period following the expiration of the periods provided in Subsection 4.1(b), offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within thirty (30) days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the holders of Preferred Stock in accordance with this Subsection 4.1.

(d) The right of first offer in this Subsection 4.1 shall not be applicable to (i) Exempted Securities (as defined in the Restated Certificate); (ii) shares of Common Stock issued in the IPO; (iii) the issuance of shares of Preferred Stock to pursuant to the Purchase Agreement; and (iv) the issuance of up to 6,944,445 shares of Series B Preferred Stock to Novartis Institutes For Biomedical Research, Inc. or its affiliates ("**Novartis**") in connection with the Company entering into a collaboration arrangement with Novartis.

4.2 Directed IPO. If an IPO is undertaken, the Company will use its reasonable best efforts to cause the managing underwriter(s) of the IPO to designate a number of shares of the Common Stock to be offered in the IPO with an aggregate offering price of at least $10,000,000 (based on the price of the Common Stock in the IPO) for sale under a "directed shares program," and shall instruct such underwriter(s) to allocate such directed shares program to Deerfield. The shares designated by the underwriter(s) for sale under a directed shares program are referred to herein as "directed shares." Deerfield acknowledges that, despite the Company's use of its reasonable best efforts, the underwriter(s) may determine in their sole discretion that it is not advisable to designate all such shares as directed shares in the IPO, in which case the number of directed shares may be reduced or no directed shares may be designated, as applicable. Deerfield also acknowledges that notwithstanding the terms of this Agreement, the sale of any directed shares to Deerfield pursuant to this Section 4.2 will only be made in compliance with NASD Rules 2110 and 2790 and federal, state, and local laws, rules, and regulations. In the event the sale of directed shares to Deerfield pursuant to this Section 4.2 is prohibited by federal, state, or local laws, rules or regulations (as determined by either (a) the Company or (b) Deerfield), the Company shall undertake its reasonable best efforts to approve and execute a private placement of Common Stock with an aggregate amount of proceeds equal to $10,000,000 (with a per share purchase price equal to the public offering price of the Common Stock in the IPO) with Deerfield concurrent with the closing of the IPO on such terms and conditions as are standard for such transactions and reasonably acceptable to each of the Company and Deerfield.

4.3 Termination. The covenants set forth in Subsection 4.1 and Subsection 4.2 shall terminate and be of no further force or effect upon the earliest of (i) immediately before the consummation of the IPO (provided in the case of Subsection 4.2, that the Company complies with such Subsection in connection with such IPO), (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event.

5. Additional Covenants.

5.1 Insurance. The Company shall obtain, within ninety (90) days of the date hereof, from financially sound and reputable insurers, Directors and Officers liability insurance, with a limit of liability not less than three million

14

dollars ($3,000,000) in an amount and on terms and conditions satisfactory to the Board of Directors, and will cause such insurance policy to be maintained until such time as the Board of Directors determines that such insurance should be discontinued and shall not be cancelable by the Company without the prior approval by the Board of Directors.

5.2 <u>Employee Agreements</u>. The Company will cause (i) each person now or hereafter employed by it or by any subsidiary (or engaged by the Company or any subsidiary as a consultant/independent contractor) to enter into a nondisclosure and proprietary rights assignment agreement in a form reasonably acceptable to the Board of Directors; and (ii) each Founder and Key Employee to enter into a one (1) year nonsolicitation agreement, in a form reasonably acceptable to the Board of Directors. In addition, the Company shall not amend, modify, terminate, waive, or otherwise alter, in whole or in part, any of the above-referenced agreements or any restricted stock agreement between the Company and any employee, without the consent of the Board of Directors.

5.3 <u>Employee Stock</u>. Unless otherwise approved by the Board of Directors, all future employees and consultants of the Company who purchase, receive options to purchase, or receive awards of shares of the Company's capital stock after the date hereof shall be required to execute restricted stock or option agreements, as applicable, providing for (i) vesting of shares over a four (4) year period, with the first twenty-five percent (25%) of such shares vesting following twelve (12) months of continued employment or service, and the remaining shares vesting in equal monthly installments over the following thirty-six (36) months, and (ii) a market stand-off provision substantially similar to that in <u>Subsection 2.11</u>. In addition, unless otherwise approved by the Board of Directors, the Company shall retain a "right of first refusal" on employee transfers until the Company's IPO and shall have the right to repurchase unvested shares at cost upon termination of employment of a holder of restricted stock.

5.4 <u>Matters Requiring Investor Director Approval</u>. So long as the holders of Preferred Stock are entitled to elect a Preferred Director, the Company hereby covenants and agrees with each of the Investors that it shall not, without approval of the Board of Directors, which approval must include the affirmative vote of at least two Preferred Directors:

(a) make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company;

(b) make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee stock or option plan approved by the Board of Directors;

(c) guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(d) make any investment inconsistent with any investment policy approved by the Board of Directors;

(e) incur any aggregate indebtedness that is not already included in a budget approved by the Board of Directors, other than trade credit incurred in the ordinary course of business;

(f) otherwise enter into or be a party to any transaction with any director, officer, or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such Person;

(g) hire, terminate, or change the compensation of the executive officers, including approving any option grants or stock awards to executive officers;

(h) change the principal business of the Company, enter new lines of business, or exit the current line of business;

(i) sell, assign, license, pledge, or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business; or

(j) enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $500,000.

15

5.5 <u>Board Matters</u>. Unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the non-employee directors and observers for all reasonable out-of-pocket travel expenses incurred (consistent with the Company's travel policy) in connection with attending meetings of the Board of Directors. The Company shall cause to be established, as soon as practicable after such request, and will maintain, an audit committee (the "**Audit Committee**") and compensation committee (the "**Compensation Committee**"), each of which shall consist of three (3) non-management directors. The Audit Committee will have the authority to approve the Budget and all non-budgeted capital expenditures. The Compensation Committee will have the authority to approve all compensation plans, including the issuance of options, stock and other incentive compensation for employees earning more than $200,000 per year. Each non-employee director shall be entitled in such person's discretion to be a member of any Board committee. Each committee of the Board of Directors shall have at least one Preferred Director as a member.

5.6 <u>Successor Indemnification</u>. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, its Certificate of Incorporation, or elsewhere, as the case may be.

5.7 <u>Expenses of Counsel</u>. In the event of a transaction which is a Sale of the Company (as defined in the Voting Agreement of even date herewith among the Investors and the Company), the reasonable fees and disbursements, not to exceed $50,000, of one counsel for the Investors ("**Investor Counsel**"), in their capacities as stockholders, shall be borne and paid by the Company. At the outset of considering a transaction which, if consummated would constitute a Sale of the Company, the Company shall obtain the ability to share with the Investor Counsel (and such counsel's clients) and shall share the confidential information (including, without limitation, the initial and all subsequent drafts of memoranda of understanding, letters of intent and other transaction documents and related noncompete, employment, consulting and other compensation agreements and plans) pertaining to and memorializing any of the transactions which, individually or when aggregated with others would constitute the Sale of the Company. The Company shall be obligated to share (and cause the Company's counsel and investment bankers to share) such materials when distributed to the Company's executives and/or any one or more of the other parties to such transaction(s). In the event that Investor Counsel deems it appropriate, in its reasonable discretion, to enter into a joint defense agreement or other arrangement to enhance the ability of the parties to protect their communications and other reviewed materials under the attorney client privilege, the Company shall, and shall direct its counsel to, execute and deliver to Investor Counsel and its clients such an agreement in form and substance reasonably acceptable to Investor Counsel. In the event that one or more of the other party or parties to such transactions require the clients of Investor Counsel to enter into a confidentiality agreement and/or joint defense agreement in order to receive such information, then the Company shall share whatever information can be shared without entry into such agreement and shall, at the same time, in good faith work expeditiously to enable Investor Counsel and its clients to negotiate and enter into the appropriate agreement(s) without undue burden to the clients of Investor Counsel.

5.8 <u>Indemnification Matters</u>. The Company hereby acknowledges that one (1) or more of the directors nominated to serve on the Board of Directors by the Investors (each a "**Fund Director**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more of the Investors and certain of their affiliates (collectively, the "**Fund Indemnitors**"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to any such Fund Director are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Fund Director are secondary), (b) that it shall be required to advance the full amount of expenses incurred by such Fund Director and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement by or on behalf of any such Fund Director to the extent legally permitted and as required by the Company's Certificate of Incorporation or Bylaws of the Company (or any agreement between the Company and such Fund Director), without regard to any rights such Fund Director may have against the Fund Indemnitors, and, (c) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any such Fund Director with respect to any claim for which such Fund Director has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Fund Director against the Company.

16

5.9 <u>Right to Conduct Activities</u>. The Company hereby agrees and acknowledges that certain of the Investors and certain of their respective Affiliates are professional venture capital and private equity investment funds (collectively, the "**Funds**"), and as such invest in numerous portfolio companies, some of which may be deemed competitive with the Company's business (as currently conducted or as may be conducted in the future). The parties agree that no Fund or any Fund Affiliate investment fund or any of their Affiliates, or any of their or their Affiliates' partners, officers or representatives which manage or advise any such investment funds shall be considered a competitor of the Company solely as a result of such investment, management or advisory activities for purposes of this Agreement and the Company agrees that, to the extent permitted under applicable law, neither the Funds nor their Affiliates shall be liable to the Company for any claim solely arising out of, or solely based upon, (i) the investment by a Fund or any of their Affiliates in any entity competitive with the Company, or (ii) actions taken by any partner, officer or other representative of a Fund or Fund Affiliate to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; provided, however, that the foregoing shall not relieve (x) any of the Funds from liability associated with the unauthorized disclosure of the Company's confidential information obtained pursuant to this Agreement, or (y) any director or officer of the Company from any liability associated with his or her fiduciary duties to the Company.

5.10 <u>Tax Reporting</u>. The Company will comply with any obligation imposed on the Company to make any filing (including any filing on Internal Revenue Service Form 5471) as a result of any interest that the Company holds in a non-U.S. Person or any activities that the Company conducts outside of the U.S. and shall include in such filing any information necessary to obviate (to the extent possible) any similar obligation to which any shareholder would otherwise be subject with respect to such interest or such activity. The Company shall promptly provide each Investor with a copy of any such filing.

5.11 <u>Restrictions on Publicity</u>. Each Investor agrees not to discuss the Purchase Agreement (including the transactions contemplated thereunder), use the name or logo of the Company or its Affiliates, or refer to the Company or its Affiliates, directly or indirectly, in connection with the sale of the Preferred Stock, in any advertisement, press release, professional or trade publication, or in any other manner without the approval of the Board of Directors.

5.12 <u>Termination of Covenants</u>. The covenants set forth in this <u>Section 5</u>, except for <u>Subsections 5.6</u>, through <u>5.9</u>, shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event, whichever event occurs first.

6. <u>Miscellaneous</u>.

6.1 <u>Successors and Assigns</u>. The rights under this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee of Registrable Securities that (i) is an Affiliate of a Holder; (ii) is a Holder's Immediate Family Member or trust for the benefit of an individual Holder or one or more of such Holder's Immediate Family Members; or (iii) after such transfer, holds at least 20% of such Holder's shares of Registrable Securities immediately prior to such assignment or transfer; provided, however, that (x) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; and (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement, including the provisions of <u>Subsection 2.11</u>. For the purposes of determining the number of shares of Registrable Securities held by a transferee, the holdings of a transferee (1) that is an Affiliate or stockholder of a Holder; (2) who is a Holder's Immediate Family Member; or (3) that is a trust for the benefit of an individual Holder or such Holder's Immediate Family Member shall be aggregated together and with those of the transferring Holder; provided further that all transferees who would not qualify individually for assignment of rights shall have a single attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Agreement. Notwithstanding the foregoing, Caltech may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Company; provided, however, that Caltech may assign its rights under Subsection 4.1 (together with its obligations) to Osage University Partners after giving the Company prior written notice of such transfer or to any other entity approved in writing in advance by the Company, and such assignee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and

17

conditions of this Agreement, including without limitation the provisions of Subsection 2.11, and any other agreements between the Company and its stockholders applicable to the securities purchased by such assignee. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.2 Governing Law. This Agreement shall be governed by the internal law of the State of Delaware, without regard to any conflicts of laws principles that could result in the application of laws of any other jurisdiction.

6.3 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.4 Titles and Subtitles. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5 Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on Schedule A hereto (including any address designated to receive a copy of such communication, or to the principal office of the Company and to the attention of the Chief Executive Officer, in the case of the Company, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this Subsection 6.5. If notice is given to the Company, a copy shall also be sent to Peter N. Handrinos, Latham & Watkins LLP, 200 Clarendon Street, Boston, Massachusetts 02116, facsimile no.: (617) 948-6001, electronic mail: peter.handrinos@lw.com. If any notice or other communication given or made pursuant to this Agreement is required to be given to a group of parties pursuant to the terms hereof, such notice shall be sent to the members of such group substantially simultaneously (and in any event with a 24 hour period).

6.6 Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities then outstanding; provided that the Company may in its sole discretion waive compliance with Subsection 2.12(c) (and the Company's failure to object promptly in writing after notification of a proposed assignment allegedly in violation of Subsection 2.12(c) shall be deemed to be a waiver); provided further that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party; and provided further that the Company may update Schedule A hereto at any time to reflect any transfers of shares of the Company's capital stock or parties to be added to this Agreement, effected in accordance with the terms hereof, and to correct any errors in the information set forth therein, without the consent of the other parties hereto. Notwithstanding the foregoing, this Agreement may not be amended or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, termination, or waiver applies to all Investors in the same fashion (it being agreed that a waiver of the provisions of Section 4 with respect to a particular transaction shall be deemed to apply to all Investors in the same fashion if such waiver does so by its terms, notwithstanding the fact that certain Investors may nonetheless, by agreement with the Company, purchase securities in such transaction). The Company shall give prompt notice of any amendment or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, termination, or waiver. Any amendment, termination, or waiver effected in accordance with this Subsection 6.6 shall be binding on all parties hereto, regardless of whether any such party has consented thereto. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

18

6.7 <u>Severability</u>. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

6.8 <u>Aggregation of Stock</u>. All shares of Registrable Securities held or acquired by Affiliates (other than Affiliates of Caltech) shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

6.9 <u>Entire Agreement</u>. This Agreement (including any Schedules and Exhibits hereto) constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled. Upon the effectiveness of this Agreement, the Prior Agreement shall be deemed amended and restated and superseded and replaced in its entirety by this Agreement, and shall be of no further force or effect.

6.10 <u>Dispute Resolution</u>. Any unresolved controversy or claim arising out of or relating to this Agreement, except as (i) otherwise provided in this Agreement, or (ii) any such controversies or claims arising out of the Company's intellectual property rights for which a provisional remedy or equitable relief is sought, shall be submitted to arbitration by one arbitrator mutually agreed upon by the parties, and if no agreement can be reached within thirty (30) days after names of potential arbitrators have been proposed by the American Arbitration Association (the "**AAA**"), then by one arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement and who is chosen by the AAA. The arbitration shall take place in Boston, Massachusetts, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. There shall be limited discovery prior to the arbitration hearing as follows: (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses, and

(c) such other depositions as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with the Delaware Code of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Delaware or the Court of Chancery of the State of Delaware.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

6.11 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

6.12 <u>Acknowledgment</u>. The Company acknowledges that the Investors are in the business of venture capital investing and therefore review the business plans and related proprietary information of many enterprises, including enterprises which may have products or services which compete directly or indirectly with those of the Company. Nothing in this Agreement shall preclude or in any way restrict the Investors from investing or participating in any particular enterprise whether or not such enterprise has products or services which compete with those of the Company.

6.13 <u>Additional Investors</u>. Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Preferred Stock after the date hereof, any purchaser of such shares of Preferred Stock may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed an "Investor" for all purposes hereunder. No action or consent by the Investors shall be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

6.14 <u>Caltech</u>. Caltech hereby agrees that the rights granted to Caltech hereunder shall be deemed to fully satisfy the obligations of the Company under Sections 5.13 and 5.14 of the Caltech Agreement, and neither Section 5.13 nor Section 5.14 of the Caltech Agreement shall have any further force or effect.

[Remainder of Page Intentionally Left Blank]

20

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Investors' Rights Agreement as of the date first written above.

**HOMOLOGY MEDICINES, INC.**

By:  /s/ Arthur Tzianabos

Name:  Arthur Tzianabos, Ph.D.

Title:  President and Chief Executive Officer

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS:**
**5AM VENTURES IV, L.P.**

by 5AM Partners IV, LLC
its General Partner

By:  /s/ Scott Rocklage
Name:  Scott Rocklage
Title:  Managing Member

**5AM CO-INVESTORS IV, L.P.**

by 5AM Partners IV, LLC
its General Partner

By:  /s/ Scott Rocklage
Name:  Scott Rocklage
Title:  Managing Member

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS:**

ARCH VENTURE FUND VIII, L.P.

By: ARCH Venture Partners VIII, L.P., its General Partner

By: ARCH Venture Partners VIII, LLC, its General Partner

By:            /s/ Mark McDonnell
Name:        Mark McDonnell
Title:        Managing Director


ARCH VENTURE FUND VIII OVERAGE, L.P.

By: ARCH Venture Partners VIII, LLC, its General Partner

By:            /s/ Mark McDonnell
Name:        Mark McDonnell
Title:        Managing Director

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS:**

TLS BETA PTE. LTD.

By:        /s/ Khoo Shih
Name:      Khoo Shih
Title:     Authorized Signatory

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS:**

DEERFIELD HEALTHCARE INNOVATIONS FUND, L.P.

By: Deerfield Mgmt HIF, L.P., its General Partner

By: J.E. Flynn Capital HIF LLC, its General Partner

By:      /s/ David J. Clark

Name:    David J. Clark
Title:     Authorized Signatory


DEERFIELD PRIVATE DESIGN FUND III, L.P.

By: Deerfield Mgmt III, L.P., its General Partner

By: J.E. Flynn Capital III LLC, its General Partner

By:      /s/ David J. Clark

Name:    David J. Clark
Title:     Authorized Signatory

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

FIDELITY GROWTH COMPANY
COMMINGLED POOL
By:          Fidelity Management & Trust Co.

By:          /s/ Stacie M. Smith
Name:     Stacie M. Smith
Title:      Authorized Signatory

FIDELITY MT. VERNON STREET TRUST:
FIDELITY SERIES GROWTH COMPANY FUND

By:          /s/ Stacie M. Smith
Name:     Stacie M. Smith
Title:      Authorized Signatory

FIDELITY MT. VERNON STREET TRUST:
FIDELITY GROWTH COMPANY FUND

By:          /s/ Stacie M. Smith
Name:     Stacie M. Smith
Title:      Authorized Signatory

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

ROCK SPRINGS CAPITAL MASTER FUND LP

By:       Rock Springs General Partner LLC

By:       /s/ Kris Jenner
Name:  Kris Jenner
Title:    Managing Member

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

OSAGE UNIVERSITY PARTNERS II, L.P.

By:      Osage University GP II, LP, its general partner
By:      Osage Partners, LLC, its general partner

By:      /s/ William Harrington
Name:  William Harrington
Title:    Member


*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

VIDA VENTURES, LLC

By:          VV Manager, LLC., its Managing Member

By:          /s/ Clive D. Bode
Name:    Clive D. Bode
Title:     Manager

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

ALEXANDRIA VENTURE INVESTMENTS, LLC,
a Delaware limited liability company

By:        Alexandria Real Estate Equities, Inc.,
a Maryland corporation, managing member

By:        /s/ Aaron Jacobson
Name:     Aaron Jacobson
Title:       VP – Corporate Counsel

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

NOVARTIS INSTITUTES FOR BIOMEDICAL
RESEARCH, INC.

By:      /s/ Scott A. Brown
Name:    Scott A. Brown
Title:   VP, General Counsel

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

VIVO PANDA FUND, L.P.

By:      Vivo Panda, LLC, its general partner

By:      /s/ Mahendra Shah
Name:  Mahendra Shah
Title:    Managing Member

*[Signature Page to Investors' Rights Agreement]*

Case 1:23-cv-10858-AK    Document 91-11    Filed 06/08/23    Page 122 of 145

VIVO PANDA FUND, L.P.

By:      Vivo Panda, LLC, its general partner

By:      /s/ Mahendra Shah
Name:  Mahendra Shah
Title:    Managing Member

**INVESTORS**:

HBM HEALTHCARE INVESTMENTS
(CAYMAN) LTD.

By:      /s/ Jean Marc LeSieur
Name:   Jean Marc LeSieur
Title:   Director

*[Signature Page to Investors' Rights Agreement]*

**INVESTORS**:

MAVERICK PRIVATE OPPORTUNITIES
FUND, L.P.

By: Maverick Capital Ventures, LLC, its General Partner

By: Maverick Capital Advisors, L.P., its Manager

By:    /s/ Ginessa A. Avila
Name:   Ginessa A. Avila
Title:    Authorized Representative

MAVERICK ADVISORS FUND, L.P.

By: Maverick Capital Ventures, LLC, its General Partner

By: Maverick Capital Advisors, L.P., its Manager

By:    /s/ Ginessa A. Avila
Name:   Ginessa A. Avila
Title:    Authorized Representative

*[Signature Page to Investors' Rights Agreement]*

**For purposes of Section 6.14 and the rights and obligations referenced therein**:

CALIFORNIA INSTITUTE OF TECHNOLOGY
(Caltech)

By:      /s/ Fred Farina

Name:    Fred Farina

Title:    Chief Innovation & Corporate Partnership Officer

*[Signature Page to Investors' Rights Agreement]*

**SCHEDULE A**

**Investors**

5AM Ventures IV, L.P.
5AM Co-Investors IV, L.P.
Address:
2200 Sand Hill Road, Suite 110
Menlo Park, CA 94025

Alexandria Venture Investments, LLC
Address:
385 E. Colorado Blvd., Suite 299
Pasadena, CA 91101

ARCH Venture Fund VIII, L.P.
ARCH Venture Fund VIII Overage, L.P.
Address:
c/o ARCH Venture Partners VIII, L.P.
8755 W. Higgins Road, Suite 1025
Chicago, IL 60631
Attn: Mark McDonnell
Phone: [***]
Fax: [***]
Email: [***]

*With a copy, which shall not constitute notice, to*:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attn: [***]
Phone: [***]
Fax: [***]
Email: [***]

Deerfield Healthcare Innovations Fund, L.P.
Deerfield Private Design Fund III, L.P.
Address:
Deerfield Management Company, L.P.
780 Third Avenue, 37th Flr.
New York, NY 10017
Attention: Lawrence Atinsky
Tel: [***]Fax: [***]

*With a copy, which shall not constitute notice, to*:

Goodwin Procter LLP
100 Northern Ave.
Boston, MA 02210
Attn: [***]Phone: [***]

Fidelity Growth Company Commingled Pool
Address:
Mag & Co.
c/o Brown Brothers Harriman & Co.
Attn: Corporate Actions /Vault
140 Broadway
New York, NY 10005
Email: [***]

Fidelity Mt. Vernon Street Trust: Fidelity Series Growth Company Fund
Address:
State Street Bank & Trust
PO Box 5756
Boston, Massachusetts 02206
Attn: WAVELENGTH + CO Fidelity Mt. Vernon Street Trust: Fidelity Series Growth Company Fund
Email: [***]Fax number: [***]

Fidelity Mt. Vernon Street Trust: Fidelity Growth Company Fund
Address:
BNY Mellon
Attn: Stacey Wolfe
525 William Penn Place Rm 0400
Pittsburgh, PA 15259
Email: [***]
Fax number: [***]

HBM Healthcare Investments (Cayman) Ltd.
Address:
Governors Square, Suite #4-212-2
23 Lime Tree Bay Avenue
West Bay, Grand Cayman
Cayman Islands

Maverick Private Opportunities Fund, L.P.
Maverick Advisors Fund, L.P.
Address:
Maverick Capital, Ltd.
300 Crescent Court, 18th Floor
Dallas, TX 75201
Phone: [***]Fax: [***]
Email: [***]

Novartis Institutes For BioMedical Research, Inc.
Address:
Novartis Institutes for BioMedical Research, Inc.
250 Massachusetts Avenue
Cambridge, MA 02139
Attn: General Counsel

*With a copy, which shall not constitute notice, to*:

Hogan Lovells US LLP
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
Attn: [***]
Phone: [***]
Fax: [***]
Email: [***]

Osage University Partners II, L.P.
Address:
50 Monument Road, Suite 201
Bala Cynwyd, PA 19004
Attn: Beth Grafstrom

Rock Springs Capital Master Fund LP
Address:
650 South Exeter Street
Suite 1070
Baltimore, Maryland 21202
Attention: General Counsel
Email: [***]

TLS Beta Pte. Ltd.
Address:
Attn: Khoo Shih
60B Orchard Road
#06-18 Tower 2
The Atrium@Orchard
Singapore 238891

Vida Ventures, LLC
Address:
Tarrant Management, LLC
TPG Family Office
Attn: Sherri Conn
301 Commerce Street, Suite 3150

Fort Worth, TX 76102

[***]*With a copy, which shall not constitute notice, to*:

Vida Ventures
31 St James Avenue, Boston, MA 02116
Attn: Arjun Goyal
[***]


VIVO PANDA FUND, L.P.
Address:
505 Hamilton Avenue, Suite 207
Palo Alto, CA 94301
Attn: Mahendra Shah

**HOMOLOGY MEDICINES, INC.**

**AMENDMENT NO. 1 TO AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT & REGISTRATION RIGHTS WAIVER**

November 6, 2020

This Amendment No. 1 to the Amended and Restated Investors' Rights Agreement & Registration Rights Waiver (this "***Amendment and Waiver***") is entered into as of November 6, 2020 by and among Homology Medicines, Inc., a Delaware corporation (the "***Company***"), and certain stockholders of the Company party to the Investors' Rights Agreement (as defined below) (collectively, the "***Holders***").  Capitalized terms used and not defined herein shall have the meaning set forth in the Investors' Rights Agreement.

WHEREAS, the Company and the Holders previously entered into that certain Amended and Restated Investors' Rights Agreement, dated as of July 28, 2017 (the "***Investors' Rights Agreement***").

WHEREAS, Section 6.6 of the Investors' Rights Agreement provides that the Investors' Rights Agreement generally may be amended with the written consent of (i) the Company and (ii) the holders of at least seventy-one and one-half percent (71.5%) of the Registrable Securities outstanding (the "***Required Holders***");

WHEREAS, the Holders whose signatures appear on the signature pages attached hereto constitute the Required Holders under the Investors' Rights Agreement necessary to amend the Investors' Rights Agreement;

WHEREAS, on March 12, 2020, the Company filed with the Securities and Exchange Commission (the "***Commission***") under the Securities Act of 1933, as amended (the "***Securities Act***"), a Registration Statement on Form S-3 (Reg. No. 333-237131) covering the offer, issuance and sale of its shares of common stock and other securities (as so filed and as amended and/or supplemented from time to time, and, together with any related registration statement filed pursuant to Rule 462(b) under the Securities Act, the "***Registration Statement***");

WHEREAS, the Holders may be entitled to certain rights related to the registration of Registrable Securities, as set forth in the Investors' Rights Agreement, including without limitation, the registration rights set forth in Section 2.2 thereof (the "***Registration Rights***"); and

WHEREAS, the Holders whose signatures appear on the signature pages attached hereto constituted the Required Holders under the Investors' Rights Agreement necessary to waive the Registration Rights and related notice rights with respect to the filing of the Registration Statement with the Commission;

WHEREAS, the undersigned Holders, for and on behalf of all Holders, desire to (i) amend the Investors' Rights Agreement as set forth below and (ii) waive the Registration Rights as provided herein with respect to the Registration Statement and related notice rights as provided herein with respect to the filing of the Registration Statement with the Commission and any offering of securities thereunder.

NOW, THEREFORE, in consideration of the foregoing, the undersigned Holders hereby agree with the Company as follows:

1.    WAIVER OF NOTICE.

Effective immediately prior to the filing of the Registration Statement with the Commission, the undersigned Holders hereby waive, for and on behalf of all Holders, any and all rights to notice under the Investors' Rights Agreement or otherwise with respect to the Registration Statement, including without limitation, any amendments and supplements thereto and combined registration statements therewith, and any offering of securities thereunder.

US-DOCS\114529651.63

2.    **WAIVER OF REGISTRATION RIGHTS.**

Effective immediately prior to the filing of the Registration Statement with the Commission, the undersigned Holders hereby waive, for and on behalf of all Holders, the Registration Rights and all other related or similar rights under the Investors' Rights Agreement with respect to the Registration Statement, including without limitation, any amendments and supplements thereto and combined registration statements therewith, and any offering of securities thereunder.

3.    **AMENDMENTS**

(a)    The definition of "Registrable Securities" in subsection 1.23 of Section 1 of the Investors' Rights Agreement is hereby amended and restated in its entirety, effective as of the date of the IPO, to read as follows:

"1.23 "Registrable Securities" means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) the Caltech Registrable Securities, provided, however, that such Caltech Registrable Securities shall not be deemed Registrable Securities and Caltech shall not be deemed a Holder for the purposes of Subsections 2.1, 2.10, 3.1, 3.2 and 6.6; and (iii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the shares referenced in clauses (i) and (ii) above; excluding in all cases, however, (A) any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Subsection 6.1 and (B) any shares for which registration rights have terminated pursuant to Subsection 2.13 of this Agreement."

(b)    Section 2.13 of the Investors' Rights Agreement is hereby amended and restated in its entirety, effective as of the date of the IPO, to read as follows:

"2.13    Termination of Registration Rights. The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Subsections 2.1 or 2.2 shall terminate upon the earliest to occur of:

(a)    the closing of a Deemed Liquidation Event, as such term is defined in the Restated Certificate;

(b)    the third anniversary of the IPO;

(c)    such time at which all shares held by such Holder can be sold in any three (3) month period without registration or volume limitations in compliance with Rule 144 or another similar exemption, and

(d)    such time at which such Holder is not an affiliate (as defined under the Act) of the Company."

(c)    Section 2.10 of the Investors' Rights Agreement is hereby amended and restated in its entirety, effective as of the date of the IPO, to read as follows:

"2.10    Limitations on Subsequent Registration Rights. From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of a majority of the Registrable Securities then outstanding, enter into any agreement with any holder or prospective holder of any securities of the Company that (i) would allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of the Registrable Securities of the Holders that are included; or (ii) allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; provided that this limitation shall not apply to any additional Investor who becomes a party to this Agreement in accordance with Subsection 6.9."

US-DOCS\114529651.63

(d)     Section 3.5 of the Investors' Rights Agreement is hereby amended and restated in its entirety, effective as of the date of the IPO, to read as follows:

"3.5        <u>Confidentiality</u>. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement or in connection with the Company's attempt to amend or seek any waiver of the terms of this Agreement (including notice of the Company's intention to file a registration statement or to seek any amendment of or waiver thereunder), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this <u>Subsection 3.5</u> by such Investor), (b) is or has been independently developed or conceived by the Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to the Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; <u>provided</u>, <u>however</u>, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this <u>Subsection 3.5</u>; (iii) to any existing or prospective Affiliate, partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business, provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (iv) as may otherwise be required by law, provided that the Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure."

## 4.        MISCELLANEOUS.

Each of the undersigned Holders understands and acknowledges that the Company will proceed with offerings of securities under the Registration Statement in reliance on this Amendment and Waiver and in connection therewith hereby represents and warrants to the Company that: (i) such Holder has the full right, power and authority to execute and deliver this Amendment and Waiver, (ii) such Holder has not sold, transferred or otherwise disposed of any Registrable Securities prior to the date hereof, other than as set forth on such Holder's signature page hereto, and (iii) this Amendment and Waiver has been duly executed and delivered by such Holder and constitutes the legal, valid and binding obligation thereof.

Except as expressly set forth herein, no other terms or provisions of the Investors' Rights Agreement are amended or modified, and all such provisions and terms are hereby ratified and confirmed in all respects. This Amendment and Waiver may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute the same Amendment and Waiver.  This Amendment and Waiver is being signed by each undersigned Holder with respect to all Registrable Securities held by the same, as a shareholder of the Company and for all other purposes.  This Amendment and Waiver is irrevocable and shall be effective with respect to each of the undersigned Holders and all affiliates, successors, heirs, personal representatives, and assigns of the undersigned Holders. This Amendment and Waiver shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without reference to its principles of conflict of laws that would result in the application of the laws of any other jurisdiction.

*[the next page is the signature page]*

US-DOCS\114529651.63

**In Witness Whereof**, each undersigned Holder has executed this Amendment and Waiver as of the date first written above.

5AM VENTURES IV, L.P.

By: 5AM Partners IV, LLC,
its General Partner

By:        /s/ Scott Rocklage
Name:    Scott Rocklage
Title:      Managing Member

| Registrable Securities Held at IPO: | 5,176,357 |
|---|---|
| Registrable Securities Sold: | 1,138,711 |
| Total Registrable Securities Held on Date Hereof: | 4,037,646 |

5AM CO-INVESTORS IV, L.P.

By: 5AM Partners IV, LLC,
its General Partner

By:        /s/ Scott Rocklage
Name:    Scott Rocklage
Title:      Managing Member

| Registrable Securities Held at IPO: | 215,680 |
|---|---|
| Registrable Securities Sold: | 47,446 |
| Total Registrable Securities Held on Date Hereof: | 168,234 |

*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*

US-DOCS\114529651.6

**I**N **W**ITNESS **W**HEREOF, each undersigned Holder has executed this Amendment and Waiver as of the date first written above.

ARCH VENTURE FUND VIII, L.P.

By: ARCH Venture Partners VIII, L.P., its General Partner

By: ARCH Venture Partners VIII, LLC, its General Partner

By:      /s/ Mark McDonnell

Name:   Mark McDonnell
Title:    Managing Director

| | |
|---|---|
| Registrable Securities Held at IPO: | 4,871,868 |
| Registrable Securities Distributed in Kind: | 240,837 |
| Total Registrable Securities Held on Date Hereof: | 4,631,031 |

ARCH VENTURE FUND VIII OVERAGE, L.P.

By: ARCH Venture Partners VIII, LLC, its General Partner

By:      /s/ Mark McDonnell

Name:   Mark McDonnell
Title:    Managing Director

| | |
|---|---|
| Registrable Securities Held at IPO: | 1,196,827 |
| Registrable Securities Distributed in Kind: | 59,164 |
| Total Registrable Securities Held on Date Hereof: | 1,137,663 |

*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*

US-DOCS\114529651.6

**IN WITNESS WHEREOF**, each undersigned Holder has executed this Amendment and Waiver as of the date first written above:

TLS BETA PTE. LTD.

By:      /s/ Fida Alsagoff
Name:   Fida Alsagoff
Title:    Authorized Signatory

| | |
|---|---|
| Registrable Securities Held at IPO: | 2,595,293 |
| Registrable Securities Sold: | 0 |
| Total Registrable Securities Held on Date Hereof: | 2,595,293 |

*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*

US-DOCS\114529651.6

**IN WITNESS WHEREOF**, each undersigned Holder has executed this Amendment and Waiver as of the date first written above:

VIVO PANDA FUND, L.P.

By: Vivo Panda, LLC., its general partner

By:      /s/ Mahendra Shah
Name:   Mahendra Shah
Title:    Managing Member

| | |
|---|---|
| Registrable Securities Held at IPO: | 659,742 |
| Registrable Securities Sold: | 289,674 |
| Total Registrable Securities Held on Date Hereof: | 370,068 |

*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*

US-DOCS\114529651.6

IN WITNESS WHEREOF, each undersigned Holder has executed this Amendment and Waiver as of the date first written above:

NOVARTIS INSTITUTES FOR BIOMEDICAL
RESEARCH, INC.


By:        /s/ Scott A. Brown
Name:    Scott A. Brown
Title:      VP CAO

Registrable Securities Held at IPO:          1,979,226

Registrable Securities Sold:          0


Total Registrable Securities
Held on Date Hereof:          1,979,226


*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*

US-DOCS\114529651.6

**Acknowledged and Agreed:**

**HOMOLOGY MEDICINES, INC.**


By:      /s/ W. Bradford Smith
Name:    W. Bradford Smith
Title:   Chief Financial Officer


*[Homology Medicines, Inc. – Signature Page to Amendment and Waiver]*


US-DOCS\114529651.6

**SECOND AMENDMENT TO**
**COLLABORATION AND LICENSE AGREEMENT**

This Second Amendment to Collaboration and License Agreement (the **"Second Amendment"),** is entered into as of October 30, 2020 (the **"Second Amendment Effective Date")** by and between Homology Medicines, Inc., a corporation organized under the laws of the State of Delaware, having a business address at One Patriots Park, Bedford, MA 01730 (**"HMI"**), and Novartis Institutes for BioMedical Research, Inc., a corporation organized under the laws of the State of Delaware, having a business address at 250 Massachusetts Avenue, Cambridge, MA 02139 (**"NVS"**).  HMI and NVS are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, HMI and NVS are Parties to that certain Collaboration and License Agreement effective as of November 6, 2017, as amended by that certain Amendment to Collaboration and License Agreement effective as of December 17, 2018 (together, the "**Original Agreement**," and as further amended by this Second Amendment, the "**Agreement**");

WHEREAS, HMI and NVS desire to extend the Research Term with respect to the Exploratory Research Activities; and

WHEREAS, the Parties wish to amend the Original Agreement to reflect their agreement as stated above.

NOW, THEREFORE, the Parties agree to amend the Agreement as follows:

**1.      Definitions**

     **1.1      Existing Definitions**. Terms used herein without further definition shall have the same meanings ascribed to them as in the Original Agreement.


**2.      Amendments**

     **2.1**      Section 1.249 of the Original Agreement is hereby deleted and replaced in its entirety with the following:

"**Research Term**" means the period of time commencing on the Effective Date and concluding, (a) with respect to the Exploratory Research Activities, three years and six months from the Effective Date, and (b) with respect to the Target Research Activities, on the $5_{th}$ anniversary of the Effective Date, in each case of (a) and (b), as such period may be extended upon agreement of the Parties.

**3.      Miscellaneous**

     **3.1      Effectiveness**. Except as set forth in this Second Amendment, all terms and conditions of the Original Agreement are hereby ratified and shall remain in full force and effect. Amendments made pursuant to this Second Amendment shall be effective as of the Second Amendment Effective Date.

**3.2** **Conflicts**. In the event of a conflict between a provision of the Original Agreement and a provision of this Second Amendment, the provisions of this Second Amendment will control to the extent of such conflict.

**3.3** **Counterparts**. This Second Amendment may be executed in two or more counterparts, including by electronically transmitted signature page, each of which will be deemed an original and all of which together will constitute one instrument. This Second Amendment will be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

*(Remainder of page intentionally left blank.  Signature page follows.)*

IN WITNESS WHEREOF, the Parties have duly executed this Second Amendment as of the Second Amendment Effective Date.

**HOMOLOGY MEDICINES, INC.**

**NOVARTIS INSTITUTES FOR BIOMEDICAL RESEARCH, INC.**

By: /s/ Albert Seymour

By: /s/ Philip Gotwals

Name: Albert Seymour

Name: Philip Gotwals

Title: Chief Scientific Officer

Title: VP, Global Head, NIBR BD&L

**Exhibit 31.1**

**CERTIFICATION**

I, Arthur O. Tzianabos, Ph.D., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Homology Medicines, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2020

By:     /s/ Arthur O. Tzianabos, Ph.D.

**Arthur O. Tzianabos, Ph.D.**
**President and Chief Executive Officer**
*(principal executive officer)*

**Exhibit 31.2**

**CERTIFICATION**

I, Bradford Smith, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Homology Medicines, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2020                                    By:                         /s/ Bradford Smith
                                                                                                  **Bradford Smith**
                                                                             **Chief Financial Officer, Treasurer and Secretary**
                                                                             *(principal financial officer and principal accounting officer)*

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Arthur O. Tzianabos, Ph.D., President and Chief Executive Officer of Homology Medicines, Inc. (the "Company"), hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2020 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

November 9, 2020                                      By:                    /s/ Arthur O. Tzianabos, Ph.D.

                                                              **Arthur O. Tzianabos, Ph.D.**
                                                        **President and Chief Executive Officer**
                                                              *(principal executive officer)*

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Bradford Smith, Chief Financial Officer of Homology Medicines, Inc. (the "Company"), hereby certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2020 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

November 9, 2020                                         By:    _____/s/ Bradford Smith_____

                                                                                **Bradford Smith**
                                                                **Chief Financial Officer, Treasurer and Secretary**
                                                                *(principal financial officer and principal accounting officer)*