UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL C. PIZZUTO, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HOMOLOGY MEDICINES, INC., ARTHUR O. TZIANABOS, W. BRADFORD SMITH, ALBERT SEYMOUR, THERESA MCNEELY, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 1:23-cv-10858-AK<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Angel Kelley<br><br>Leave to File 25-Page Opposition Memo Granted on May 9, 2023 |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT...............................................................................................1

STATEMENT OF FACTS....................................................................................................2

ARGUMENT .......................................................................................................................5

    I.     THE COMPLAINT PLEADS ACTIONABLE FALSE AND MISLEADING
           STATEMENTS .....................................................................................................6

         A.     Defendants Misled Investors by Disclosing Only the Positive Data from
               Part 1 of the pheNIX Study Without Also Disclosing the Negative Data. . 6

         B.     Homology Used Its Investor Relations Department to Disseminate False
               and Materially Misleading Information to Market Analysts.......................9

         C.     Defendants Concealed that Safety Issues from HMI-102's "Steroid
               Regimen" Were Still Unresolved. ..............................................................12

         D.     The Alleged False Statements Are Not "Opinions" or "Puffery". ............14

    II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ..........16

         A.     The Complaint Pleads Defendants' Scienter..............................................16

         B.     The Complaint Adequately Pleads Corporate Scienter.............................21

    III.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION................22

    IV.   THE COMPLAINT STATES A SECTION 20(a) CLAIM ................................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A123 Sys., Inc. Sec. Litig.*,
930 F. Supp. 2d 278 (D. Mass. 2013) .................................................................................. 25

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ............................................................................................... 14

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................ 20

*Bergeron v. Ridgewood Sec. Corp.*,
610 F. Supp. 2d 113 (D. Mass. 2009) ................................................................................. 15

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021) ................................................................................. 23

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ..................................................................... 11, 16, 23

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ......................................................................... 5, 10, 16, 20

*Corban v. Sarepta Therapeutics, Inc.*,
2015 WL 1505693 (D. Mass. Mar. 31, 2015) ....................................................................... 8

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ..................................................................................... 19

*Dahhan v. OvaScience, Inc.*,
321 F. Supp. 3d 247 (D. Mass. 2018) ............................................................................ 16, 20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................................................... 22

*Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres Therapeutics, Inc.*,
2018 WL 1567614 (D. Mass. Mar. 30, 2018) ...................................................................... 11

*Gerneth v. Chiasma, Inc.*,
2018 WL 935418 (D. Mass. Feb. 15, 2018) ......................................................................... 10

*Grigous v. Gónzales*,
460 F.3d 156 (1st Cir. 2006) .............................................................................................. 25

*Hill v. Gozani,*
    651 F.3d 151 (1st Cir. 2011) ....................................................................................... 7

*In re Allaire Corp. Sec. Litig.,*
    224 F. Supp. 2d 319 (D. Mass. 2002) ...................................................................... 12

*In re Ariad Pharm., Inc. Sec. Litig.,*
    842 F.3d 744 (1st Cir. 2016) ..................................................................................... 9

*In re Biogen IDEC, Inc. Sec. Litig.,*
    2007 WL 9602250 (D. Mass. Oct. 25, 2007) ........................................................... 8

*In re Bos. Scientific Corp., Sec. Litig.,*
    2022 WL 17823837 (D. Mass. Dec. 20, 2022) ....................................................... 24

*In re Brooks Automation, Inc. Sec. Litig.,*
    2007 WL 4754051 (D. Mass. Nov. 6, 2007) ........................................................... 22

*In re Cabletron Sys., Inc.,*
    311 F.3d 11 (1st Cir. 2002) ......................................................................... 7, 11, 22

*In re Credit Suisse-AOL Sec. Litig.,*
    465 F. Supp. 2d 34 (D. Mass. 2006) .................................................................. 22, 24

*In re Delcath Sys., Inc. Sec. Litig.,*
    36 F. Supp. 3d 320 (S.D.N.Y. 2014) ....................................................................... 10

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.,*
    705 F. Supp. 2d 86 (D. Mass. 2010) ....................................................................... 24

*In re Innocoll Holdings Pub. Co. Sec. Litig.,*
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ......................................................... 21

*In re Nature's Sunshine Prods. Sec. Litig.,*
    486 F. Supp. 2d 1301 (D. Utah. 2007) .................................................................... 18

*In re PTC Therapeutics, Inc. Sec. Litig.,*
    2017 WL 3705801 (D.N.J. Aug. 28, 2017) ....................................................... 13, 19

*In re Sepracor, Inc. Sec. Litig.,*
    308 F. Supp. 2d 20 (D. Mass. 2004) .................................................................... 8, 12

*In re Transkaryotic Therapies, Inc. Sec. Litig.,*
    319 F. Supp. 2d 152 (D. Mass. 2004) ............................................................. *passim*

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.,*
    838 F.3d 76 (1st Cir. 2016) ..................................................................................... 19

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)..................................................................................... 22

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
  36 F.3d 170 (1st Cir. 1994) ......................................................................................... 6

*Marcus v. J.C. Penney Co.*,
  2015 U.S. WL 5766870 (E. D. Tex. Sept. 29, 2015) ............................................... 24

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
  716 F.3d 229 (1st Cir. 2013) ....................................................................... 22, 23, 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................. 5, 6

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  928 F.3d 151 (1st Cir. 2019) ................................................................................... 20

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008) ............................................................................. 5, 9, 16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................................. 14

*Parmelee v. Santander Consumer USA Holdings*,
  2018 WL 276338 (N.D. Tex. Jan. 3, 2018)............................................................... 23

*Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*,
  2021 WL 4459218 (D. Md. Sept. 29, 2021) ............................................................... 8

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*,
  2005 WL 1365465 (D.N.J. June 7, 2005) ........................................................... 18, 19

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987) ........................................................................................ 6

*Rosen v. Textron, Inc.*,
  321 F. Supp. 2d 308 (D. R.I. 2004)........................................................................... 15

*Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*,
  445 F.Supp.2d 170 (D. Mass. 2006) ..................................................................... 6, 15

*SEC v. Bio Defense Corp.*,
  2019 WL 7578525 (D. Mass. Sept. 6, 2019), *aff'd sub nom. SEC v. Morrone*,
  997 F.3d 52 (1st Cir. 2021) ...................................................................................... 16

*SEC v. Liberty*,
  2021 WL 664834 (D. Me. Feb. 19, 2021)............................................................. 16, 17

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ......................................................... 21

*Southwire Co. v. Ramallo Bros. Printing, Inc.*,
540 F. Supp. 2d 307 (D. P.R. 2008) ..................................................................... 25

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
775 F. Supp. 2d 227 (D. Mass. 2011) ................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................... 16

*Travelers Cas. & Sur. Co. of Am. v. Vazquez Colon*
2021 WL 4267883 (D. P.R. Sept. 15, 2021)*reconsidered on other grounds*,
2022 WL 4484054 (D. P.R. Sept. 27, 2022) ........................................................... 25

*Wortley v. Camplin*,
333 F.3d 284 (1st Cir. 2003) ............................................................................... 22

## STATUTES

15 U.S.C. § 78j(b) ............................................................................................. 5, 24, 25

15 U.S.C. § 78t(a) .............................................................................................. 5, 24, 25

15 U.S.C. § 78u-4(b)(2)(A) ...................................................................................... 16

## RULES AND REGULATIONS

17 C. F. R. § 240.10b-5 ............................................................................................. 7

Fed. R. Civ. P. 9(b) .................................................................................................... 5

Fed. R. Civ. P. 15 ..................................................................................................... 25

## PRELIMINARY STATEMENT

Homology and its chief officers violated the federal securities laws by providing investors with a materially misleading description of HMI-102, a drug designed to treat phenylketonuria ("PKU"), and the data obtained from the "pheNIX" clinical trial. With patient data in-hand proving that HMI-102 was ineffective and severely dangerous, Defendants fed misinformation to analysts at top investment banks to minimize fallout caused by negative data that had been leaked by a pivotal pheNIX trial patient. Instead of being honest, Defendants told investors that the HMI-102 study data supported the advancement of the pheNIX trial to subsequent phases. The truth ultimately came to light when the FDA shutdown the entire trial over critical safety concerns. For thousands of investors, this decision came too late and only after Defendants used their fraudulent statements to raise millions of dollars in new investor money.

Defendants move to dismiss Plaintiffs' complaint largely on the basis that the challenged statements were not false or misleading. Defendants' argument cannot be squared with Plaintiffs' well-pled facts, which show that Defendants made positive statements regarding clinical trial data while in possession of negative clinical trial data that contradicted those statements. Moreover, Plaintiffs allege in detail the content of the negative clinical trial data, establishing that Defendants knew HMI-102 was ineffective and severely dangerous by the start of the Class Period. When a company chooses to disclose information to the public, it must do so in a manner that will not mislead investors. Defendants failed to do that here.

Defendants further argue that Plaintiffs have not pled a strong inference of scienter, but there is ample support for scienter when evaluating all the facts alleged. Defendants had in their possession, at all relevant times, the materially adverse trial data. Additionally, Defendants knew that modifications made to HMI-102's "steroid regimen" were insufficient, given that the increased safety precautions still fell short of those being used by Homology in its other clinical

1

trials and by industry peers. Defendants' efforts to conceal negative information from the public by feeding false information to sell-side analysts and numerous equity offerings and partnership announcements bolster the inference of scienter, as they evidence motive and opportunity to commit fraud.

Defendants also contend that Plaintiffs fail to allege loss causation. They are wrong. Homology made a series of disclosures during the Class Period that, as alleged, partially corrected Defendants' prior statements and caused losses to investors as the risks relating to HMI-102 began to materialize. These disclosures culminated in the FDA's decision to shut down the pheNIX trial altogether over safety concerns. Under First Circuit law, these allegations are more than sufficient to adequately plead loss causation.

## STATEMENT OF FACTS[1]

**Background.** Homology's lead drug candidate was HMI-102. ¶45. In June 2019, Homology commenced its first clinical trial for HMI-102 (the "pheNIX" trial). ¶¶49, 53. The pheNIX trial consisted of two parts: the first part was a "dose-escalation" phase where Homology would test a low-dose, mid-dose, and high-dose of HMI-102 on a very limited number of patients (two patients per dose or cohort) to identify a correct dosage; and then a second part called the "dose-expansion" phase in which Homology would test HMI-102 at a determined dose on a broader population. ¶¶50-51. The primary endpoint for the pheNIX study (or, put differently, how Homology would evaluate HMI-102's effectiveness) was a "meaningful reduction in phenylalanine levels" without "treatment emergent adverse events." ¶52. The success of the pheNIX study was imperative because Homology intended to use it when seeking approval for

---

[1] Unless otherwise defined or stated, (i) all capitalized terms used herein have the meanings as provided in the Amended Complaint (the "Complaint" or "¶_") (ECF No. 46); and (ii) all internal citations and quotation marks are omitted and emphasis is added.

HMI-102 with the FDA. ¶¶3, 46, 51.

**December 2019.** By December 2019, before the start of the Class Period, Homology was well into the dose-escalation phase of the trial, having already completed the low- and mid-dose cohorts (with two patients in each cohort). ¶54. On December 17, 2019, Homology released initial clinical data for three of the four patients (according to Homology, data from the fourth patient had been unavailable as of the data cutoff date of December 2, 2019). ¶¶54-55. According to market analysts, the low-doses failed to demonstrate an effective response, or "dose-response effect," in terms of lowering patient phenylalanine levels while the mid-dose data provided only slightly better results but was not determinative. ¶¶56-57. Thus, the success of HMI-102 and the pheNIX trial rested on the remaining mid-dose patient (who had been dosed but the results not revealed) and the outcome of the high-dose patients that had yet to come. ¶¶4, 58.

**March and April 2020.** On March 11, 2020, Homology administered its first high-dose of HMI-102 to "Patient 5." ¶¶59-60. On April 15, 2020, Homology provided Patient 5 with her test results. ¶61. Patient 5 posted her results on Facebook (the "April 15, 2020 Facebook Post"), writing that HMI-102 (i) did ***not*** lower her phenylalanine levels, (ii) caused significant liver toxicity, and (iii) required immediate intervention with additional steroid medication that had not been part of the pheNIX trial protocol. ¶¶61-62. The April 15, 2020 Facebook Post was abruptly removed from public view. ¶65. At the same time, Defendant McNeely, Homology's Chief Communications Officer, contacted sell-side analysts to assure them that "[n]othing fundamental changed" for Homology, HMI-102, or the pheNIX trial. ¶¶66, 68. This was not true. Given that HMI-102 had failed to demonstrate efficacy in the low- and mid-dose cohorts, the high-dose cohort was increasingly pivotal for the success of the pheNIX trial and, given Patient 5's results, the likelihood of the pheNIX trial succeeding was now significantly lower. ¶¶63, 65. Nevertheless,

3

these analysts, including those from well-known investment banks such as Oppenheimer and Baird, accepted Homology's representations and broadcasted them to the public. ¶¶6, 66-67, 69.

**November 2020.** On November 6, 2020, Homology disclosed the pheNIX data from the dose-escalation phase of the trial. ¶72. The data revealed that HMI-102 was not effective for Patient 4 (the remaining mid-dose patient) and Patient 5 in the high-dose cohort. ¶72. At the same time, however, Defendants concealed material adverse information about HMI-102, namely adverse safety effects and the need to revise the "steroid regimen" that was part of the pheNIX study protocol. ¶¶73, 125-26. Homology told investors the pheNIX data supported progressing to the dose-expansion phase. ¶¶73, 78. Just three days later, on November 9, 2020, Homology disclosed a $60 million equity investment from Pfizer Inc. ¶79. Homology's announcement of the investment reiterated its decision to advance the pheNIX trial into the dose-expansion phase based on "the positive clinical data from the dose-escalation phase." *Id.* Defendants initially told the market they would provide data from the study in late-2021 but ultimately extended that timeframe to the back half of 2022. ¶80. In the absence of that data, investors were left with nothing but Defendants' false representations about the pheNIX data, which analysts relied upon when writing about the company. ¶¶83-84. Homology also raised an additional $50 million in capital through a follow-on offering to the public during this timeframe. ¶80.

**January 2022.** On January 28, 2022, Homology announced a deal with Oxford Biomedica plc for an investment of $130 million that successfully extended Homology's "operational runway" by two years into the future all the way to the first quarter of 2023. ¶¶9, 85-86.

**February 2022.** Less than one month later, on February 18, 2022, investors eventually found out that Defendants had been lying to them. Homology announced that it was shutting down the pheNIX trial immediately pending a "clinical hold" from the FDA in order to address critical

safety concerns relating to HMI-102's toxicity and accompanying steroid regimen. ¶¶88-92, 94. Homology subsequently admitted that it knew HMI-102's "steroid regimen" was insufficient and that it had been using an updated course of treatment in its other clinical trials. ¶¶10, 94-96. The revelation of the "clinical hold" prompted an immediate decline in Homology's stock price of more than 32%. ¶93. In total, between the start of the Class Period on March 12, 2020 and the ultimate revelation concerning the FDA's clinical hold on February 18, 2022, Homology's stock price declined from $17.91 per share to $2.60 per share, representing a market capitalization loss of over 85% or over $500 million. ¶11.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead: "(1) a material misrepresentation or omission [(falsity)] . . . ; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.,* 22 F.4th 1, 6 (1st Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)). Allegations of securities fraud must also satisfy the pleading requirements of Rule 9(b) and the PSLRA. *See id.* Section 20(a) of the Exchange Act extends liability for Section 10(b) violations to those who "directly or indirectly[ ] control[ ] any person liable" for the alleged violations. 15 U.S.C. § 78t(a). To prevail, plaintiffs must allege a primary violation of Section 10(b) and the defendants' control over the primary violator. *See Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 93-94 (1st Cir. 2008). Defendants challenge Plaintiffs' pleading of falsity, scienter, and loss causation, and argue no primary violation to support liability under Section 20(a).

I.      THE COMPLAINT PLEADS ACTIONABLE FALSE AND MISLEADING
        STATEMENTS

To satisfy falsity, Plaintiffs must demonstrate "a defendant made a statement that was *misleading* as to a *material* fact." *Matrixx*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). The "disclosure required by the securities law is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994). "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Id.* Furthermore, "[i]f … a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987). Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.,* 445 F.Supp.2d 170, 175–76 (D. Mass. 2006).

Defendants' false and misleading statements fall into three distinct categories: (1) those that occurred prior to November 2020 wherein Defendants misrepresented the data from Part 1 of the pheNIX trial in light of Patient 4 and Patient 5's results (¶¶97-105, 113-22, 158-60); (2) those made to market analysts wherein Defendants lied about the severity of Patient 5's negative data (¶¶106-112, 158-60); and (3) those made after November 2020 wherein Defendants falsely claimed that the data collected from Part 1 of the pheNIX trial supported advancement into Part 2 and/or that the steroid regimen used alongside HMI-102 was safe (¶¶123-57, 158-60).

A.      **Defendants Misled Investors by Disclosing Only the Positive Data from Part
        1 of the pheNIX Study Without Also Disclosing the Negative Data.**

By March 12, 2020, the start of the Class Period, Defendants had in-hand Patient 4's safety and efficacy data *which failed to show an effective dose-response*. ¶¶99-102, 105. Moreover,

6

Patient 4 suffered from a "Grade 3 ALT elevation," which indicated increased liver toxicity as a result of the drug. ¶73. Defendants did not, however, disclose this information to the public. Instead, Defendants provided investors with only positive information about Patients 1, 2 and 3, stating that "safety data from Cohorts 1 and 2 showed HMI-102 was well-tolerated" and "[e]fficacy data from the first patient in Cohort 2 indicated a dose-response effect.. . ." *See* ¶¶98, 104 (Statements 1-3).[2] Similarly, when discussing the pheNIX trial data in subsequent quarterly reports on May 7 and August 10, 2020, Defendants continued to represent that "[p]reliminary safety data from three subjects in Cohorts 1 and 2 showed HMI-102 was well-tolerated" and "[e]fficacy data from the first patient in Cohort 2 suggested a dose response effect." *See* ¶¶114, 118, 121 (Statements 6-9). Defendants made these statements even though the data from every patient *after* the "three subjects in Cohorts 1 and 2" was negative. ¶¶115-16, 119, 122.

Defendants contend that these were true, nonactionable, statements and they were under "no duty to disclose *every* piece of patient data in real time." MTD at 10-12, 14-15.[3] But such misleading partial truths are expressly prohibited under the federal securities laws. While there is no affirmative duty to disclose any and all material information, Rule 10b-5 forbids omissions of material facts necessary in order to make the statements made not misleading. 17 C.F.R. 240.10b-5(b); *see In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002) ("While a company need not reveal every piece of information that affects anything said before, it must disclose facts, if any, that are needed so that what was revealed [before] would not be so incomplete as to mislead."). Thus, "'companies can control what they have to disclose under [the securities laws] by controlling what they say to the market.'" *Hill v. Gozani*, 651 F.3d 151, 152 (1st Cir. 2011) (quoting *Matrixx*,

---

[2] Plaintiffs object to Defendants' out of context presentation of the alleged false statements in Appendix A (ECF No. 90-1), and use Defendants' numbering solely for the Court's convenience.
[3] Citations to "MTD at __" refer to Defendants' Motion to Dismiss (ECF No. 90).

563 U.S. at 45). As such, once Defendants *chose* to tout positive data from Patients 1, 2 and 3, they had an obligation to also disclose the negative data from Patients 4 and 5 that they had in-hand. *See In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 33-34 (D. Mass. 2004); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 160-162 (D. Mass. 2004).[4]

Defendants do not dispute Patient 4 and Patient 5's data, or that they had it in their possession when they made the above statements. *See* MTD at 14-15. Rather, Defendants argue that because the statements were "expressly limited to specific data, they cannot be rendered misleading by clinical data that occurred after the cut-off date." *Id.* The "cut-off date" to which they refer was December 2, 2019, months *before* the start of the Class Period. Thus, Defendants cannot rely on *In re Biogen IDEC, Inc. Sec. Litig.*, 2007 WL 9602250, at *12 (D. Mass. Oct. 25, 2007), or *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015). In *Biogen IDEC*, the court rejected plaintiffs' allegations where the "cut-off date was well before the indications of PML that were allegedly present at the earliest factually supported time of November of 2004." 2007 WL 9602250, at *12. Similarly, in *Corban*, the court rejected plaintiffs' allegations because defendants "disclosed the trial results and its interpretations of those results with respect to *both* the intent-to-treat (ITT) population as well as with respect to a modified intent-to-treat population (mITT), that is, the population with the two patients excluded." 2015 WL 1505693 at *5 (emphasis in original). Because Defendants discussed *only* the favorable data from Patients 1, 2 and 3, while deliberately concealing the negative data from Patients 4 and 5, they misled investors as to HMI-102's efficacy and safety, creating the false impression that the negative data did not exist and/or did not contradict the data shared.

---

[4] Defendants' reliance on *Emps.' Ret. Sys. of City of Baton Rouge v. Macrogenics, Inc.*, 2021 WL 4459218, at *10-11 (D. Md. Sept. 29, 2021) is misplaced as it states nothing to the contrary.

Two First Circuit decisions are instructive here. First, in *Miss. Pub. Emps.' Ret. Sys.*, Boston Scientific's CEO, LaViolette, stated that the problem with a device had been "fixed" but failed to mention that a third recall of another 3,000 stents would be announced a week later. 523 F.3d at 91. The court found that "[t]he investors with whom LaViolette was speaking with in the conference call would very well have wanted to know about the existence of an upcoming recall in addition to hearing [his] assurances that the TAXUS problems were in the past." *Id*. Likewise, investors were entitled to know that the data from Patients 1, 2 and 3 was *not* reflective of the overall trial data and, in fact, results from the mid- and high-dose Patients 4 and 5 showed a lack of efficacy and increased safety risks.

In the second decision, *In re Ariad Pharm., Inc. Sec. Litig.,* 842 F.3d 744, 753 (1st Cir. 2016), Ariad executives expressed optimism about their drug's approval with a favorable label, noting pancreatitis as "the most prevalent" serious adverse event and "low rates of cardiovascular issues." Yet weeks prior, Ariad learned that the FDA had rejected its proposed label due to an 8% rate of serious cardiovascular events. *Id.* Accordingly, the Court held that it was misleading for Ariad to "cite pancreatitis as the most prevalent serious adverse event." *Id*. Moreover, the *Ariad* court found that expressing positivity on a discreet point of data while failing to disclose the overall picture was materially misleading. *Id*. Homology similarly misled investors by repeatedly stating that HMI-102 was well-tolerated and effective based on only the positive data from Patients 1, 2 and 3 while concealing the negative data from Patients 4 and 5. *See id.* ("While management may have held out hope of achieving this result, the expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors.").

**B. Homology Used Its Investor Relations Department to Disseminate False and Materially Misleading Information to Market Analysts.**

On April 16, 2020, in response to Patient 5's leaked study results, Defendant McNeely

reached out to sell-side analysts and told them that "[n]othing fundamental changed for FIXX [Homology]." ¶106 (Statement 4). Not so. The "fundamental[s]" for Homology, the pheNIX study, and HMI-102 had in fact "changed" materially by the time this statement was made. ¶107. According to market analysts, the success of the high-dose cohort in the pheNIX trial was critical given the weak results from the low- and mid-dose cohorts. ¶¶56-58. Thus, Patient 5's data, which was the first set of data from the high-dose cohort, was of the utmost importance considering that it showed HMI-102 was both ineffective and dangerous at the high-dose. ¶¶62-63, 107.

Despite this, Defendants contend that McNeely's statement was accurate and therefore not actionable. MTD at 13-14. This argument runs contrary to the facts alleged and legal precedent. Indeed, given that Patient 5 did not have a dose response and suffered severe liver toxicity, the pheNIX study results were now substantially less supportive of HMI-102's clinical benefit as compared to the prior data. ¶¶107-08. *See Transkaryotic,* 319 F. Supp. 2d at 160-61 ("the failure to disclose FDA's serious criticism is a material omission, particularly in light of the company's race [ ] for FDA approval as well as the emphasis [the company] placed on what its clinical trials revealed about the efficacy of [the drug]"); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-33 (S.D.N.Y. 2014) (denying dismissal where defendants misled investors by providing data from "Drug Group" while omitting negative data from "Control Group"). Thus, Defendants cannot credibly argue McNeely's statement is not actionable. *See Carbonite,* 22 F.4th at 8; *Gerneth v. Chiasma, Inc.,* 2018 WL 935418, at *5 (D. Mass. Feb. 15, 2018) ("While the parties hotly dispute the severity of the FDA's reservations at the pre-NDA meetings and thus their materiality, the Court cannot consider that disputed issue of fact on a motion to dismiss.").

McNeely's representations about Patient 5's data surfaced in an April 20, 2020 Baird analyst report *referencing conversations with management*. ¶110 (Statement 5). Defendants claim

that this statement is not actionable because Plaintiffs have not specified what the analyst was told. MTD at 19. They are wrong. Defendants may be held liable for an analyst's statements "where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree." *Cabletron,* 311 F.3d at 37-38. "Entanglement also includes situations where company officials 'intentionally foster a mistaken belief concerning a material fact." *Id.*

Plaintiffs "establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue." *Cabletron*, 311 F.3d at 37-38. The Baird analyst wrote that he "recently addressed market concerns regarding [Patient 5's] Facebook post" and "[h]aving spoken with FIXX management, [they] continue[d] to favor the risk/reward dynamic for the mid-20 pheNIX update and thus reiterate[d] [their] FIXX Outperform rating and $32 price target." ¶¶65-69, 110-11. The "risk/reward dynamic" referred to whether the pheNIX trial data had thus far demonstrated HMI-102's ability to provide a clinical benefit to patients, meaning that its efficacy outweighed its risks. ¶112. And, given McNeely's statements to the Oppenheimer analyst (including her statement that she "[w]ill be speaking with folks today") (¶106), it is clear that McNeely (or some other member of Homology's "management") made the same misrepresentations to the Baird analyst (¶111). Thus, Defendants are liable for the false statements in the Baird analyst report. ¶¶65-69, 112; *see Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 257 (D. Mass. 2006) (statements in *New York Times* article actionable where "a Wave spokesperson . . . inform[ed] the *New York Times* that IBM computers with built-in Wave security would be available in the fourth quarter"); *see also Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres Therapeutics, Inc.,* 2018 WL 1567614, at *7 (D. Mass. Mar. 30, 2018) (analyst statements "satisf[ied] the entanglement test

11

because they adopt expectations of the Phase 2 study's success based on Defendants' presentations of the successful Phase 1b/2 data"); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 339-40 (D. Mass. 2002) (liability where analyst "recently spent time with [Allaire management]" showing that "information was supplied by the Defendants").

### C. Defendants Concealed that Safety Issues from HMI-102's "Steroid Regimen" Were Still Unresolved.

On November 6, 2020, Homology announced the dose-escalation phase supported advancing the trial to the dose-expansion phase. ¶¶72-73. Importantly, when making this statement, Defendants told investors that the adverse safety events observed in the dose-escalation phase of the trial would be "managed with a modified steroid regimen" going forward. ¶124 (Statements 10-11). Defendants repeated this statement in various forms through the remainder of the Class Period, claiming that "we've taken all the learnings from that dose escalation phase and applied that to the dose expansion phase" (¶137, Statement 16), "the learnings around the administration of steroids . . . and the changes we've made really are paying dividends for us" (¶138, Statement 17), "we need to beef up a little bit at the front end, the prophylactic steroid regimen" (¶141, Statement 18), and "[w]e have a prophylactic steroid regimen here that's been very successful in mitigating any kind of untoward safety profile" (¶150, Statements 21-22). *See also* ¶¶128, 131, 134, 144, 147, 153, 156 (Statements 12-15, 19-20, 23-25). In truth, the severe safety risks resulting from the "steroid regimen" had not yet been resolved. *See* ¶¶88-96, 160.

Defendants contend that these statements are true and therefore not actionable. MTD at 12-13, 15-17. They are wrong. Where a drug company misleads the market as to the true risks concerning its operations, liability will follow. *See Transkaryotic,* 319 F. Supp. 2d at 160-62 (failure to disclose adverse clinical trial data and negative FDA review letter were material omissions directly affecting the drug's marketability); *In re Sepracor*, 308 F. Supp. 2d at 28, 34

(denying defendants' motion to dismiss, in part, finding information regarding a drug's adverse side effects was material, given the potential risk to the drug's marketability); *see also In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*13-14 (D.N.J. Aug. 28, 2017) (statement that "totality of data" supported approval is a false statement of fact when only 25% of patients saw clinical benefit). Defendants promoted Homology's advancement into Part 2 of the pheNIX trial while improperly concealing known deficiencies and safety risks associated with the "steroid regimen" used in Part 1 and continued into Part 2. Indeed, increasing the steroids used in the pheNIX trial posed severe safety risks for patients, as evidenced by conflicting with industry norms, Homology's use of a different "steroid regimen" in its other trials, and its revision of the pheNIX "steroid regimen" to match its other trials following the FDA's decision to shut down the trial. *See*, *e.g.*, ¶¶125-26, 139, 151, 157, 160.

Defendants also contend that they should not be held liable for failing to predict the FDA's clinical hold. MTD at 15-17. Plaintiffs do not allege this. Instead, Defendants should be held liable because their statements concealed that HMI-102's "steroid regimen" was unacceptably dangerous and would need to be modified given the existing standard of care (as evidenced by Homology's "steroid regimen" in the pheEDIT trial). *See*, *e.g.*, ¶¶132, 135, 145, 154. Defendants cannot avoid liability on this point simply because they disclosed that "undesirable side effects … could cause us or regulatory authorities to interrupt, delay or halt clinical trials." MTD at 16. The cautionary language to which Defendants refer speaks entirely of as-yet-unrealized risks and nothing alerts the market that the pheNIX study was actively using a "steroid regimen" known to be insufficient and unsafe. *See Transkaryotic,* 319 F. Supp. 2d at 161 (defendants' statement that "a request for additional data *could* encompass a request for additional clinical studies, [ ] is a far cry from disclosing that FDA had in fact recommended additional clinical studies").

13

**D.      The Alleged False Statements Are Not "Opinions" or "Puffery".**

Defendants argue that certain false statements are not actionable "expressions of opinion" reflecting what Defendants "believe[d]." MTD at 18-19 (referring to Statements 11 and 13). Defendants' argument misconstrues Plaintiffs' allegations. As alleged, these statements are misleading because they concealed ongoing safety concerns relating to the "steroid regimen" and Homology's ability to advance the pheNIX trial to the dose-expansion phase; consequently, liability does not depend on whether Defendants "believe[d]" the doses used in the dose-expansion phase would, or would not, "reduc[e] overall steroid exposure." *See* ¶¶128-29 (Statement 13); *see also* ¶¶124-26 (Statement 11). Defendants also refer to several other statements as "opinions", but these statements do not even include the "we believe" or "we think" phrases that precede "opinions." MTD at 18-19 (referring to Statements 1-3, 6, 8, 20, 24, 25). Even if they did, "those magic words can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors. Thus, [Defendants'] view would punch a hole in the statute for half-truths in the form of opinion statements." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192-93 (2015); *accord Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

The facts of this case are similar to those in *Transkaryotic* where the court found the following opinion statements to be actionable: (1) "We believe the approval of Replagal in the U.S. remains a when not if proposition," and (2) "We believe that the totality of our renal and cardiac data is compelling and we believe that Replagal can be approved on this data." 319 F. Supp. 2d at 161-62. The *Transkaryotic* court held that "they are statements of present belief that are material and are conceivably in direct contradiction to known facts about the FDA's position

14

with respect to TKT's data and application for marketing approval" and, therefore, "inappropriate to dispose of . . . on a motion to dismiss." *Id.* Similarly, Defendants misrepresented HMI-102's safety profile and accompanying "steroid regimen" while knowing it was dangerous and presented an acute risk to the advancement of the pheNIX trial to the dose-expansion phase. *See* ¶¶158-60.

Defendants also pluck certain parts of statements out of context and contend, without any analysis, that the words are sufficiently vague so as to constitute nonactionable corporate optimism. *See* MTD at 18 (referring to Statements 1, 3, 6-9, 20-21, 24-25). But whether a statement amounts to puffery is really a question of materiality, and only if the materiality of the statement is so obvious that reasonable minds could not differ is the issue appropriately resolved as a matter of law. *Rosenbaum*, 445 F. Supp. 2d at 176 ("Generally, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact."). These statements, which discuss the pheNIX trial results and the safety profile of HMI-102, were relied upon by market analysts when valuing Homology and assessing HMI-102's risks. *See*, *e.g.*, ¶56 (BTIG noting that "initial results" were "supportive of HMI-102's potential"), ¶¶74-75 (RBC and Oppenheimer relying on Defendants' statements concerning support for Part 2 of study), ¶¶83-84 (Oppenheimer and Chardan repeating Defendants' "well-tolerated" statements). Thus, Defendants lack credibility when arguing that they were immaterial as a matter of law. *See Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D. R.I. 2004) ("[W]hether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made."); *see also Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 135 (D. Mass. 2009) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

## II.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

To establish scienter, plaintiffs must "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Carbonite*, 22 F.4th at 8 (quoting *Kader v. Sarepta Therapeutics, Inc.,* 887 F.3d 48, 57 (1st Cir. 2018)). The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This is met when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The Court must consider the facts collectively, "not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*; *see Miss. Pub. Emps.' Ret. Sys.*, 523 F.3d at 86 (same). "When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018).

### A.    The Complaint Pleads Defendants' Scienter.

"The First Circuit has considered many different types of evidence as relevant to show scienter, and has permitted plaintiffs to combine various facts and circumstances indicating fraudulent intent." *Brumbaugh*, 416 F. Supp. 2d at 252-53. Indeed, scienter can be established by direct or circumstantial evidence. *See SEC v. Bio Defense Corp.*, 2019 WL 7578525, at *24 (D. Mass. Sept. 6, 2019), *aff'd sub nom. SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021). "At the pleading stage, [c]ourts have found allegations of recklessness sufficient where a defendant had knowledge of facts or access to information that contradicts [his] public statements, or failed to review or check information that [he] had a duty to monitor, or ignored obvious signs of fraud. *SEC v. Liberty*, 2021 WL 664834, at *6 (D. Me. Feb. 19, 2021).

The Complaint, construed in the light most favorable to Plaintiffs, includes a panoply of allegations collectively giving rise to a strong inference of scienter. First, the pheNIX trial was an

16

"open-label" study, meaning that both the researchers and participants were aware of the treatment being administered. ¶162. Further, based on the pheNIX trial protocol, Homology received phenylalanine measurements as they were taken in order to monitor HMI-102's efficacy and safety. *Id.* As a result, Defendants had in their possession, at all relevant times during the Class Period, material adverse information concerning Patient 4 and Patient 5's pheNIX trial data. ¶¶53-54, 58-61, 99-102, 105, 115-16, 119, 122, 163. Indeed, Defendants' knowledge of Patient 4's pheNIX trial data is evidenced by the fact that Homology dosed Patient 4 between December 2 and 17, 2019, *i.e.*, *before* the start of the Class Period. ¶¶54-55, 57, 99-101, 164. Similarly, Defendants' knowledge of Patient 5's pheNIX trial data is evidenced by the fact that Homology dosed Patient 5 on March 11, 2020 and she received her phenylalanine test results on April 15, 2020. ¶¶59-61. Defendants' knowledge is further evidenced by McNeely's explicit reference, on April 16, 2020, to Patient 5's April 15, 2020 Facebook Post wherein she described her response to HMI-102 and recounted her conversations with clinicians at Homology's investigation site. ¶¶62-67, 164-65. While in possession of the information contained within Patient 5's April 15, 2020 Facebook Post, McNeely and other Individual Defendants made contradictory public statements to analysts and investors claiming that the pheNIX study data demonstrated a clinical benefit for HMI-102. ¶¶66-77, 166. The fact that Defendants made these false and/or materially misleading statements while in possession of the material, adverse information concerning Patient 5's response to HMI-102, gives rise to a strong, cogent and compelling inference of scienter. ¶167.

Scienter is further evidenced by Defendants' attempt to conceal the information contained in Patient 5's Facebook post. ¶174. Within a few hours of Patient 5 posting her April 15, 2020 Facebook Post, the post was either taken down or made private so that the public could not view it. Patient 5 had previously been public and completely transparent with her posts and details about

17

treatment. ¶¶65, 174. The removal of the April 15, 2020 Facebook Post marked an abrupt change in conduct, which was likely the result of explicit directives from Homology and/or its agents and employees. ¶174. Once the post was removed from public view, McNeely and others at Homology (including the named John Does) proceeded to materially downplay the adverse information shared by Patient 5 in private conversations with sell-side analysts. ¶¶69, 175. McNeely, in particular, concealed the material adverse information that had previously been shared by Patient 5 by telling analysts at Oppenheimer and Baird that, for example, there had been no "fundamental change[]" for Homology and the pheNIX data even though McNeely knew this was untrue. ¶¶67-69. The effort to conceal, cover-up, and downplay the material, adverse information about the pheNIX study data and HMI-102 demonstrates intent on the part of Defendants and, therefore, strengthens the alleged inference of scienter. ¶¶174-76; *see In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah. 2007) (attempt to "cover-up" information "is strong proof of scienter"); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V.*, 2005 WL 1365465, at *13 (D.N.J. June 7, 2005) ("strong inference" of scienter where defendant conducted a "coverup" interview).[5]

Additionally, Defendants made false and/or materially misleading statements about the dose-expansion phase of the pheNIX trial while knowing that the modifications Homology had made to the steroid regimen for the dose-expansion phase were insufficient in terms of preventing adverse safety events. ¶¶77-83, 168. Defendants modified the steroid regimen initially after

---

[5] Defendants argue that all negative patient data from Part 1, including from Patients 4 and 5, was disclosed on November 6, 2020 (MTD at 21), but that is inaccurate as "the presentation continued to conceal the adverse safety data from Patient 5 and, in particular, the extent of HMI-102's toxicity and the need to modify its accompanying steroid regimen. In pertinent part, Homology disclosed that Patients 4 and 5 exhibited Grade 3 alanine aminotransferase or ALTs, which were managed with 'increased steroids,' and that HMI-102's safety data supported advancing to the expansion phase of the pheNIX study, *i.e.*, Part 2 of the study." ¶72.

completing the dose-escalation phase of the trial by incorporating the use of rescue steroids, *i.e.*, longer post-infusion immunosuppression treatment. ¶78. However, this was not sufficient to protect patients from dangerous toxicity outcomes. ¶169. Defendants knew this, as evidenced by Tzianabos' statement during the June 15, 2021 conference call admitting that "we need to beef up a little bit at the front end, the prophylactic steroid regimen." ¶¶140-42, 169. When the FDA implemented a clinical hold over the pheNIX trial in February 2022, Defendants ultimately responded by adding an immunosuppressive course of steroids involving the use of a T-cell inhibitor. ¶¶94, 170. This was the steroid regimen that Homology had previously incorporated into the trial protocol for pheEDIT, which was approved by the FDA in October 2021. ¶¶96, 170. It was also the steroid regimen used by industry peers, such as Rocket Pharmaceuticals and Freeline Therapeutics. *Id.* Defendants knew that the steroid regimen being used in the pheNIX trial was different and less effective than the one approved for the pheEDIT trial yet concealed the risks that it posed to investors in terms of worsening regulatory headwinds. *See* ¶170; *see also* ¶¶171-72. Their conduct in this regard gives rise to a strong inference of scienter. ¶173; *see PTC Therapeutics,* 2017 WL 3705801, at *18-19 (finding strong inference of scienter when "viewed holistically" notwithstanding Defendants' argument that it was not plausible company would file NDA it knew would fail).

Courts may also impute scienter to individual defendants where "[f]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004); *see*, *e.g., Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.,* 838 F.3d 76, 82 (1st Cir. 2016) ("[T]he importance of a particular item to a defendant can support an inference that the defendant is 'paying close attention' to that item," if "that close attention would

have revealed an incongruity so glaring as to make the need for further inquiry obvious."). Defendants cannot credibly dispute knowledge of the materially adverse, non-public information that contradicted their public statements about HMI-102 and the pheNIX study due to the fact that HMI-102 was Homology's lead drug candidate and the pheNIX study was integral to its plan to commercialize the drug. ¶¶45-52. Indeed, analysts routinely focused on HMI-102 as the main driver behind Homology's value. ¶¶186-88; *see OvaScience*, 321 F. Supp. 3d at 255 ("The importance of [the fertility treatment] supports the inference that [top executives] knew of the Company's sales and inability to sell 1,000 cycles.").[6]

The First Circuit's decision in *Carbonite* is instructive. 22 F.4th at 8-10. In *Carbonite*, the court held that defendants had the requisite scienter based on "two specific plugs from top management" despite the product "never once [doing] what it [was] supposed to do," and allegations in the complaint that did not "leave open the possibility that . . . management was somehow in the dark about [its] true status." *Id.* at 9, 10. On those facts, there was a "strong inference" that the executive defendants "either inquired about [the product] before deciding to promote it to investors or were reckless in failing to do so." *Id.* at 10. Here, Defendants repeatedly discussed the pheNIX trial, demonstrating their familiarity with the data and its implications.

Moreover, Plaintiffs' allegations of motive and opportunity bolster the inference of scienter. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002). Defendants raised millions of dollars while in possession of materially adverse, non-public information that contradicted the public statements they were making to investors. ¶¶177-84. Homology first

---

[6] Defendants' reliance on *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019) (MTD at 22), is misplaced as Plaintiffs do not contend that their core operations allegations alone are sufficient to establish scienter. Additionally, unlike here, the complaint in *Metzler* "failed to allege that *anyone* in the company was aware of facts contrary to the allegedly misleading public statements…." *Cf. Carbonite*, 22 F.4th at 10 (emphasis in original).

negotiated a deal with Pfizer for $60 million in January 2021. ¶¶79, 178. It then conducted a follow-on offering selling stock to the public for net proceeds of $49.7 million. ¶¶80, 178. Then, at the very end of the Class Period, Homology closed a deal with Oxford Biomedica for $130 million that prevented it from running out of money. ¶¶85-86, 179-80. At that point, Defendants had effectively delayed the announcement of the pheNIX data from the dose-expansion phase of the trial. Although investors were unaware of it at the time, Defendants knew internally that the trial was at risk due to the dangerous "steroid regimen" being utilized. Instead of changing the protocol voluntarily, Defendants concealed the truth about the steroid regimen long enough to close the deal with Oxford Biomedica and ensure that the company would have enough cash to survive without having to access the capital markets under adverse conditions. Defendants' deception during this period demonstrates intent on their part and, in turn, scienter in connection with the false and/or materially misleading statements they made during the Class Period. ¶¶177-85; *see Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure. And Skiadas has alleged that Defendants had that incentive in this case. That allegation supports Skiadas' theory of scienter."); *In re Innocoll Holdings Pub. Co. Sec. Litig.*, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020) (scienter supported by defendant's fear of losing job because company was on verge of insolvency).[7]

### B.    The Complaint Adequately Pleads Corporate Scienter.

Under First Circuit law, principles of agency compel a finding that the Individual

---

[7] The Court should disregard Defendants' argument that Plaintiffs make the "unsupported assertion" "that Defendants somehow knew the FDA *would* issue a clinical hold on Phase 2..." (MTD at 21), *as this was not alleged in the Complaint*. Rather, Plaintiffs alleged that "Defendants knew that the pheNIX study data revealed serious risks and dangers, which *could* necessitate a clinical hold." ¶157.

21

Defendants' scienter is imputed to the company. *See Cabletron*, 311 F.3d at 40 ("The scienter alleged against the company's agents is enough to plead scienter for the company."). Homology's public statements about HMI-102 and the pheNIX trial were critical to its reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Homology's corporate officials knew of the falsity of the statements at the time of publication. The Individual Defendants (including any John Does) were acting within their normal scopes of employment when making the fraudulent statements described above. Consequently, their scienter is imputed to Homology under common law principles of agency. *See In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *12 (D. Mass. Nov. 6, 2007).

## III.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

To plead loss causation, Plaintiffs must "allege[] a causal connection between the [D]efendants' material misrepresentations and the drop in [Homology's] share price." *Mass. Ret. Sys. v. CVS Caremark Corp.,* 716 F.3d 229, 237 (1st Cir. 2013). "[T]he touchstone of loss causation analysis is a proximate cause inquiry." *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45 (D. Mass. 2006). Loss causation allegations are evaluated under "'ordinary'— not heightened— pleading requirements." *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.,* 775 F. Supp. 2d 227, 244 (D. Mass. 2011). Indeed, pleading loss causation "should not prove burdensome," as a plaintiff need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Further, the Supreme Court recognized that the truth may "leak[] out" over time, therefore, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 261 (5th Cir. 2009) (citing *Dura*, 544 U.S. at 342). Moreover, loss causation is generally a question of fact, left to the jury to resolve. *Wortley v.*

*Camplin,* 333 F.3d 284, 295 (1st Cir. 2003).

Plaintiffs easily meet this standard. The Complaint adequately alleges Defendants' fraud was partially revealed through a series of incremental disclosures that occurred on April 15, 2020, ¶¶194-95 (27.8% drop); August 10, 2020, ¶¶196-98 (12.3% drop); November 6, 2020, ¶¶199-202 (20.8% drop); April 6, 2021, ¶¶204-06 (22.7% drop); and February 18, 2022, ¶¶208-11 (32.6% drop). *See CVS*, 716 F.3d at 240-42 (allegations of a corrective disclosure associated with a drop in share price shows loss causation); *Brumbaugh,* 416 F. Supp. 2d at 256 (allegations of false statements, corrective disclosure, and 17% share price drop sufficient to plead loss causation).

Specifically, the Complaint alleges that throughout the Class Period, Defendants concealed material information about the safety, efficacy, and overall clinical benefit of HMI-102, including the adequacy of the "steroid regimen" utilized in the pheNIX trial, the associated safety risks, and material risk posed to commercialization. The truth began to emerge with Patient 5's April 15, 2020 Facebook Post revealing a materially adverse development in the pheNIX trial data (¶¶54-55, 58-64, 194-95); and continued to emerge on August 10, 2020, with Homology's delayed disclosure of additional pheNIX trial data to the public (¶¶71, 196-98). *See CVS*, 716 F.3d at 240 (finding loss causation met as plaintiffs are not required to plead "complete corrective disclosures" or a "direct admission that a previous statement is untrue."); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140 (D. Conn. 2021) (finding delay of SEC filing supported loss causation); *Parmelee v. Santander Consumer USA Holdings*, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018) (same). Then, on November 6, 2020, Defendants revealed to investors that HMI-102 was, in fact, less effective and more dangerous than previously represented, disclosing that Patient 4 and 5's data did not show a meaningful dose response and confirmed Patient 5 had experienced Grade 3 ALT elevation (¶¶72-77, 199-201). The truth continued to leak out with

23

Homology's April 6, 2021 announcement of a follow-on offering, signaling to investors that Homology continued to face significant yet undisclosed obstacles in terms of advancing HMI-102 to commercialization (¶¶204-06). *See Marcus v. J.C. Penney Co.*, 2015 U.S. WL 5766870, at *7 (E. D. Tex. Sept. 29, 2015) (finding loss causation sufficiently pled concerning announcement of $800 million offering). Investors learned the full truth on February 18, 2022, when Homology announced that the FDA placed a clinical hold on the pheNIX trial "due to the need to modify risk mitigation measures in the study in response to observations of elevated liver functions tests." ¶¶88, 208. Analyst reports confirmed this point, concluding that Homology's disclosure operated as a correction to Defendants' previous false and/or materially misleading statements. ¶¶209-10.

These disclosures "as a whole, plausibly revealed to the market that [Homology] had problems[,]" undermining Defendants' misstatements and omissions during the Class Period concerning the pheNIX trial data and the clinical benefit of HMI-102. *CVS*, 716 F.3d at 240. That is enough to plead loss causation. *See id.* at 243 (In assessing loss causation, "it is appropriate to look for indications of the market's contemporaneous response to [defendant's] statements" revealing the truth, including a stock price decline and analysts' reactions.); *see also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.,* 705 F. Supp. 2d 86, 95 (D. Mass. 2010) ("A plaintiff may also establish loss causation by alleging that … defendants' misstatements and omissions concealed [a] risk … that materialized and played some part in diminishing the market value of the security."); *see e.g., In re Credit Suisse-AOL,* 465 F. Supp. 2d at 47 n.13-14.

## IV.  THE COMPLAINT STATES A SECTION 20(a) CLAIM

Defendants fail to assert any legal argument for dismissal of Plaintiffs' Section 20(a) claim. Rather, Defendants incorrectly presume dismissal is warranted based on arguments against primary violations of Section 10(b). Plaintiffs have, however, adequately pleaded a claim under Section 10(b). *See In re Bos. Scientific Corp., Sec. Litig.*, 2022 WL 17823837, at *31 (D. Mass.

Dec. 20, 2022) (rejecting "Defendants' sole contention [] that Plaintiff's purported failure to plead a Section 10(b) claim successfully precludes Section 20(a) liability."). Any other arguments Defendants could have raised have been waived. *See Travelers Cas. & Sur. Co. of Am. v. Vazquez Colon* 2021 WL 4267883, at \*12 (D. P.R. Sept. 15, 2021) (rejecting legal argument presented for the first time on reply), *reconsidered on other grounds*, 2022 WL 4484054 (D. P.R. Sept. 27, 2022); *see also Grigous v. Gónzales,* 460 F.3d 156, 163 (1st Cir. 2006) ("An argument not seriously developed in the opening brief" is waived); *Southwire Co. v. Ramallo Bros. Printing, Inc.,* 540 F. Supp. 2d 307, 312 n. 5 (D. P.R. 2008) ("To the extent that [defendants] address the issue in its reply, it does so too late.").

## CONCLUSION

For the above reasons, Defendants' motion should be denied in its entirety. Alternatively, Plaintiffs request any dismissal be without prejudice, so they may seek leave to amend.[8]

| | |
|---|---|
| Dated:  July 13, 2023 | Respectfully submitted, |

<div style="margin-left:40%">

*/s/ Daryl Andrews*
Daryl Andrews (BBO# 658523)
Andrews DeValerio LLP
P.O. Box 67101
Chestnut Hill, MA 02467
Tel: (617) 999-6473
Email: daryl@andrewsdevalerio.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

POMERANTZ LLP
Brenda Szydlo (admitted *pro hac vice*)
Dean Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100
Facsimile: (917) 463-1044

</div>

---

[8] "Rule 15 counsels permitting a third bite at the apple at this early stage of the litigation." *A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 287 (D. Mass. 2013).

Email: bszydlo@pomlaw.com
dferrogari@pomlaw.com

*Counsel for Plaintiffs and Co-Lead Counsel
for the Proposed Class*

LEVI & KORSINSKY, LLP
Adam M. Apton (admitted *pro hac vice*)
55 Broadway, 4th Floor
New York, NY 10006
Tel.: (212) 363-7500
Facsimile: (212) 363-7171
aapton@zlk.com

*Counsel for Plaintiffs and Co-Lead Counsel
for the Proposed Class*

PORTNOY LAW FIRM
Lesley F. Portnoy
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Tel.: (310) 692-8883
Email: lesley@portnoylaw.com

*Additional Counsel for Jason Rofeh*

## CERTIFICATE OF SERVICE

I, Daryl Andrews, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: July 13, 2023

*/s/ Daryl Andrews*
Daryl Andrews