UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
MICHAEL C. PIZZUTO,                    )
Individually and On Behalf of          )
all Others Similarly Situated,         )
                                       )
          Plaintiff,                   )
                                       )  Civil Action
v.                                     )  No. 1:23-cv-10858-AK
                                       )  Pages 1 to 50
HOMOLOGY MEDICINES, INC., et al.,)
                                       )
          Defendants.                  )
                                       )


BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE


MOTION HEARING


March 4, 2024
2:31 p.m.


John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210


Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Plaintiffs:

    LEVI & KORSINSKY LLP
    By: Adam Apton, Esq.
    1101 30th Street, N.W., Suite 115
    Washington, DC 20007
    202-524-4290
    aapton@zlk.com

    POMERANTZ LLP
    By: Dean Paul Ferrogari, Esq.
    600 Third Avenue, Floor 20
    New York, New York 10016
    212-661-1100
    dferrogari@pomlaw.com

    ANDREWS DEVALERIO
    By: Daryl DeValerio Andrews, Esq.
    P.O. Box 67101
    Chestnut Hill, Massachusetts 02467
    617-999-6473
    daryl@andrewsdevalerio.com


On Behalf of the Defendants:

    LATHAM AND WATKINS LLP
    By: Colleen C. Smith, Esq.
    12670 High Bluff Drive
    San Diego, California 92130
    858-523-5400
    colleen.smith@lw.com

    LATHAM & WATKINS
    By: Meryn C.N. Grant, Esq.
    355 S. Grand Avenue, Suite 100
    Los Angeles, California 90071
    213-485-1234
    meryn.grant@lw.com


              Proceedings reported and produced
               by computer-aided stenography.

P R O C E E D I N G S

THE CLERK:  All rise.

THE COURT:  You may be seated.

THE CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Angel Kelley presiding.  Today is March 4th, 2024.  Civil Action 23-10858, Michael Pizzuto versus Homology Medicines, Inc., et al., will now be heard before this Court.

THE COURT:  Good afternoon, Counsel.  Would you please state your appearances for the record.  Let's start with counsel for plaintiff.  That would be all of you, I think.

MR. APTON:  Good afternoon, Your Honor.  Adam Apton from Levi & Korsinsky for the plaintiffs.

MS. ANDREWS:  Good afternoon, Your Honor.  Daryl Andrews with Andrews DeValerio.  We're liaison or local counsel for plaintiff.

MR. FERROGARI:  Dean Ferrogari, Pomerantz LLP, counsel for plaintiffs and co-lead counsel for the class.

MS. SMITH:  Good afternoon, Your Honor.  Colleen Smith of Latham and Watkins on behalf of the defendants.

MS. GRANT:  Meryn Grant, also of Latham and Watkins, on behalf of defendants.

THE COURT:  Very good.

MS. SMITH:  And Your Honor, we're joined by our client as well, Mr. Paul Alloway.

THE COURT:  Thank you for joining us.

And you, too, or no?

THE GALLERY:  No.  I work for the clerk's office.

THE COURT:  Very good.  I wanted to acknowledge you if you were here as a party on this case.  All right.

So let's see.  We have a couple of motions, a motion to dismiss and motion to take judicial notice.  How would you like to begin?

MS. SMITH:  However the Court would like to proceed.  I believe it's our motion, so happy to take the laboring oar, if that's what the Court would prefer.

THE COURT:  That's fine.  Because I pretty much understand the facts of the case, but let's -- let me just grab it.  Let's deal with the request to take judicial notice.  And why don't you talk to me about Exhibit number 14.

MS. SMITH:  Sure thing, Your Honor.

With the Court's permission on the request for judicial notice, Ms. Grant is going to argue that particular motion.

THE COURT:  Very good.

MS. GRANT:  So --

THE COURT:  That's the form.

MS. GRANT:  Form 8-K filed with the SEC on June 13th, 2022.  We believe this is proper for judicial notice because it is an SEC filing, and we are relying on it solely for the

purpose of what was publicly disclosed and not for the truth of any matter asserted.

THE COURT:  Okay.  Doesn't it postdate the class period?

MS. GRANT:  It does postdate the class period, and we're not relying on it for any facts still but rather to show the absence of allegations on that particular issue.

THE COURT:  All right.  And why don't I take your -- if you have additional arguments that you'd like to make with regards to the request for judicial notice on the other exhibits, I'll take that now, and then I'll get plaintiffs' response to everything.

MS. GRANT:  I think the only thing that I would say on the June 13th, 2022 Form 8-K is we're not really relying on it for the merits of any particular argument in the motion to dismiss, but we did feel like it was important in color and proper for judicial notice.  And with that, I think for the rest of them I'll stand on the papers.

THE COURT:  All right.  Thank you.

Counsel?

MR. APTON:  Good afternoon, Your Honor.  Adam Apton again for plaintiffs.  Exhibit 14 is perhaps by far the one that is most inappropriate, if I may say so.  It relates to events that occurred after the class period.  At most, these sorts of documents are sometimes noticed to show what was of

public information or known by the public at certain points in time during a class period.

This is after the class period.  For all intents and purposes, everything that happened after the class period is truly -- there's no bearing -- there's no reason to show what the public knew or should have known after the class period.  As we put in our opposition to the request for judicial notice, the only reason this is in there is to perhaps influence Your Honor into reading into this and inferring some facts that the clinical hold was perhaps not important or was lifted shortly after.  Not so.

The exhibit says nothing about why the clinical hold was implemented in the first place, and to draw any inference otherwise as to the merits of the clinical hold would be respectfully inappropriate at this stage of the proceedings, Your Honor.

I would like to again reiterate my arguments as to notice of Exhibits 2, 4, and 8.  Again, for the reasons in our papers, Exhibit 2 contains materials from an advisory meeting conducted by the FDA.  We don't incorporate those materials.  I don't even know what those materials are.  We reference only the fact that an advisory meeting occurred.

Exhibits 4 and 8, also not referred to in the complaint, to the extent they contain relevant information in defendants' opinion, then that would be something that they can

marshal at summary judgment, not the pleading stage, Your Honor.

Thank you.

THE COURT: Okay. Thank you.

Attorney Grant, just tell me what is it that I'm to take from Exhibit 4? What's the significant information?

MS. GRANT: Exhibit 4 is part --

THE COURT: 14, I'm sorry.

MS. GRANT: Oh, 14.

THE COURT: My apologies.

MS. GRANT: It goes to the color around and the allegations around what the meaning of the clinical hold is. Plaintiff alleges that the clinical hold was issued based on a theory that it evidenced severe safety issues, and that is not borne out by the actual issuance or announcement of the clinical hold, only their conclusory allegations, and then also not borne out when the clinical hold is lifted.

So while it's not essential to the merits of our motion, we thought it provided further color around the absence of allegations regarding what the clinical hold meant and what the purpose of issuing it was.

THE COURT: All right. Thank you.

Attorney Smith, I assume you're handling the motion to dismiss.

MS. SMITH: Yes, that's correct, Your Honor.

THE COURT:  All right.  Why don't you begin.

MS. SMITH:  Great.  Thank you, Your Honor.  And of course, at any point in time during my argument if the Court has questions or if there is an area the Court is particularly interested in, obviously --

THE COURT:  I'll jump in.

MS. SMITH:  Thank you, Your Honor.

So there are three grounds for dismissal of this complaint.

In most securities cases, we're arguing at the motion to dismiss stage falsity and scienter.  This case is unique in that there is a third ground for dismissal, which is loss causation.  I'll go through each of those.

First, the complaint does not plead any false or misleading statement.  Homology -- I'll provide a bit more color for the Court, but Homology was an emerging biotechnology company engaged in gene therapies.  As I'm sure the Court knows from sitting here in the District of Massachusetts, biotechnology companies at the emerging stage are of course a risky investment.  This is the most risky of that particular area.  This is gene therapy.  It's a very novel experimental treatment.  Those risks were fully disclosed to investors, and that's important context here.  None of the statements that are challenged in this case are false or misleading.  I'll go through sort of each of those as well.

Secondly, plaintiffs do not plead any facts supporting the necessary strong inference of scienter.  This is not a case with any confidential witnesses or former employees.  This is not a case in which plaintiffs allege any stock sales by any defendants.  There's absolutely no motive in this case for anyone to have misled the market or to lie.  And when there's no motive and no stock sales, the Court should scrutinize the scienter allegations with a high level of rigor.  That's what we would submit the Court should do here.  There was no reason whatsoever for anyone at the company to mislead investors, and they did not.

And then, third, the facts as pled do not support loss causation.  Now, it is, as I've said, it's not always the case that at the motion to dismiss stage loss causation provides a ground for dismissal.  Here it does for two reasons.  One is because the various alleged corrective disclosures do not actually correct anything or because they aren't the revelation of any new information, and I'll go through those.

So Your Honor, I did prepare a demonstrative.  I've provided a copy to Mr. Apton.  I understand Mr. Apton may have an objection to the demonstrative.  So before I point the Court to it, I'll give him a chance, if he wants, to lodge his objection.  But I'd love to be able to go through just briefly some of the key points in this with Your Honor.

MR. APTON:  Your Honor, my friend has correctly

represented that I do object to this.  I received it just a few moments ago.  I will say that it references at least one exhibit that we just discussed about wherein in the context for the request for judicial notice, which I object to.  I don't think this adds anything, but again, I didn't have much time to look at it and think about it.

THE COURT:  I'm going to allow her to use it.  If it helps me to understand the arguments, I'll accept it.

MS. SMITH:  Thank you, Your Honor.

THE COURT:  Counsel, you can point out anything you would like to along the way.

MS. SMITH:  Wonderful.  Thank you, Your Honor.

So the first slide in the demonstrative is taken from Exhibit 4, a presentation made by Homology during the class period.  And I offer this to the Court just as a jumping off point to provide a brief explanation of what exactly Homology was engaged in here with respect to the clinical trial that's at issue, the pheNIX trial.

That was the first ever trial of the gene therapy treatment for a condition called PKU.  And the technology at issue was adeno-associated virus technology, essentially the use of viruses as vehicles to convey the therapy -- the technology, HMI-102, to the patient to transform that patient's genetic material in such a way to -- as to treat what is otherwise a genetic disease.  So that's essentially what we're

talking about, very cutting edge technology.  This was, again, the first trial of this particular technology in this treatment, and only a few patients are involved here.  This is a pretty small trial.  It's a Phase 1 and then a Phase 2 trial.

And the Phase 1 trial was for the purpose of determining what is the right dose.  There were six patients total in the trial of Phase 1.  Each patients 1 and 2, 3 and 4, 5 and 6 each received different doses of Homology's gene therapy treatment at an escalating level, right?  It's designed to sort of test what is the right dose.  That would then be tested in a second phase, the dose escalation phase, wherein Homology would take the learnings from Phase 1 of the trial and apply those to Phase 2 of the trial, the goal of which is to expand the number of patients who would be treated.

So the class period starts with -- and if I could turn Your Honor to slide 3, which is a timeline, I think is the most helpful thing here.  The class period starts on March 12th, 2020.  That's the first alleged misstatement.  But we need to go back to the beginning -- we need to go back a little bit further to really understand the allegations here.

The first key date is December 17th, 2019.  On that date Homology disclosed data as of the data cut in early December for patients 1, 2, and 3.  And plaintiffs don't challenge the statements made in December of 2019.  They don't say that Homology had misled the public by deciding to issue an

update as of the December data cut, right?  So I think that's the first important point, is to the extent plaintiffs are arguing that it was false or misleading for Homology to make an interim report of the results from the Phase 1 pheNIX trial, they actually don't challenge that statement, right?  So they can't be arguing that.  They can't be saying Homology should not have issued an interim set of results based on this first data cut.

THE COURT:  Is the interim report you're talking about the March 12th, 2020, or are you talking about, aside from that date, the in-the-moment contemporaneous reporting?

MS. SMITH:  Great question, Your Honor.  So the interim report is December 17th, 2019.  So what Homology did on that day is to say, we took a snapshot of the results for patients 1, 2, and 3 as of I believe it's December 3rd, 2019. We are reporting to the market what our results are as of this particular date, December 3rd.  That was reported on December 17th.  And what Homology told the market that day is here's what we know now as of December 3rd.

MR. APTON:  2nd.

MS. SMITH:  Thank you.  December 2nd.  Thank you.

And we're not reporting anything else right now. We're only giving you what we know for patients 1, 2, and 3. We will report the remainder of the results for Phase 1 in mid-2020.  That's what Homology disclosed in December of 2019.

And again, that's not a challenged statement.  Plaintiffs don't say that that was false or that Homology shouldn't have done that.

And Homology was very clear on that day that it wasn't reporting results for patient 4, who, remember, is part of that mid-dose cohort, and it wasn't going to report results for patients 5 or 6.  They hadn't been dosed yet at that point in time.  And it also wasn't going to update the data for patients 1 and 2 until it gave that full readout in the middle of 2020.  That's what was disclosed in December, and I think that's important because it sets the table for what comes next.

March 12th is the first alleged false statement date.

THE COURT:  Let me just confirm.  1 and 2 is one dose level, 3 and 4 is another, and then 5 and 6?

MS. SMITH:  Correct.

THE COURT:  So this is 1 through 3.  So you have got two different dose levels?

MS. SMITH:  That's correct, Your Honor.  Exactly right, yes, the low dose, and then patient 3 from the mid-dose.  Now, patient 4 from the mid-dose had been dosed -- had just been dosed as of this point in time.

THE COURT:  So they're not dosed at the same time?  It's just in a particular period.

MS. SMITH:  That's right, not dosed at the same time but it's the same dose level, so they call it a cohort.

Patient 4 had just been dosed so the company didn't think it wasn't -- it was sort of premature to report data for patient 4 because it would have only had data for about a week and a half.  And by the way, if Homology had disclosed the data for patient 4 as of this data cut, it would have been sort of more positive than it was at later points in time.

You know, the company didn't want to disclose such preliminary data, right, which was why patient 4 was excluded, and it told the market that.  The market knows what it has and what it doesn't have and what's coming later.  Again, none of that is challenged.

On March 12th, 2020, that's when Homology issues the 10-K for 2019.  And as I know Your Honor is aware, the 10-K is of course reporting on the company's experience in 2019, including all of its clinical activities.  And in its reporting for the 2019 10-K, Homology simply reiterates, we had this data cut, we provided the results in November or, sorry, in December, we're just reiterating it.  That's all it's doing. It doesn't say anything about patient 4, and again -- or 5 or 6, and again, tells the market, we will provide you with an update in the middle of 2020.  We're not saying anything else right now about any of the data.  We'll update you in the middle of 2020.

That statement gets repeated in May of 2020 because, again, that's the next quarter.  So the company is issuing its

10-K, then it issues its 10-Q, repeats the same statement in May, and then in August of 2020, the same thing.  So essentially each quarter the company has to make its normal quarterly reporting it's saying, we read out this data in December.  We're going to tell you more soon.

August 2020 is a little bit different in that the company had expected to read out the full Phase 1 trial in the middle of 2020, which is what it told investors originally.  In August of 2020, Homology says, we got a little bit delayed because of the pandemic, so we're not going to read out our data until later this year.  So there is a slight delay in the readout.  That's additional information as reported on August 10.  But at every turn the company says we're not going to tell you anything more about this study until we get to the end of it and we give you the complete data readout, which is very consistent, of course, with how these clinical trials are reported.

The law is clear that the company does not have a duty to provide realtime updates on the experience of each patient in the study every time it speaks.  It wouldn't, of course, make sense.  And by the way, this is not a situation where Homology is out there issuing 8-Ks to tout its prior results.  It's just including this in its normal annual and quarterly reporting.  It's reminding people these are the studies we have, here's the data we have reported to you, here's what

we're going to report to you in the future, that's it.  We're not saying anything else about this study right now.

And the most instructive cases, Your Honor, are cited in our briefs.  There is the *Biogen* case from this Court in 2007.  I know there are several *Biogen* cases, but this is the 2007 case in which the Court notes that the company is not obligated to report data after a cutoff date.

And the most instructive is the *Sarepta* case, also from this Court and the First Circuit.  In the *Sarepta* case, just as here, what *Sarepta Therapeutics* had done was to tell investors what it was telling them and what it wasn't telling them, and that's exactly what Homology did here.  They were reporting an interim data cut.  This is for patients 1, 2, and 3.  We're not telling you what the experience of those patients is after the data cut, and we're not telling you about patients 4, 5, and 6.

The *Karyopharm Therapeutics* case is also on point, same idea.  Just by virtue of talking about the results from one clinical trial or one piece of the clinical trial, the company is not obligated then to sort of continue updating the data when it's going to have a later data readout.

So ultimately the company, if you're looking on the timeline slide, Your Honor, ultimately Homology reports the full Phase 1 results for patients 1 through 6 on November 6th, 2020, doing just as it promised, telling investors what the

results were for Phase 1.

It's a complete readout.  All of the efficacy and safety data are presented.  This is actually presented by the company in press release but also presented by the company and the doctors who are running the trial in a full presentation.  This is the full data, and the plaintiffs don't dispute that the full data from Phase 1 was disclosed on that date.

THE COURT:  So this was the one that was promised in mid-2020 that was delayed?

MS. SMITH:  Correct.  That's right, Your Honor.  That's exactly right.

So we have the company -- again, just to close it out -- providing data from an interim data cut in December of 2019.  Plaintiffs don't challenge that.

Homology then telling investors the trial is still ongoing.  We're going to give you the full data readout in 2020, and it does exactly that.

Now, what the plaintiffs allege is that during that period of time Homology and its executives had some of the data from the patients as they were going through the trial, but at no point did the company say it was going to disclose that in realtime, right?  There's a reason why the data needs to be accumulated and evaluated and reported out at a specific point in time, and that's exactly what the company did.  So nothing was hidden and nothing was disclosed.  Everything was disclosed

exactly as promised.  And again, the case law is clear, there's no duty to disclose that kind of interim in realtime data.

That's the key issue for the first part of the class period.  I do want to come back to April 15th, 2020, which is sort of in the middle of this part of the story.

On April 15th, 2020, a patient who is alleged to be patient 5 made -- that's the Facebook post.  She was dosed on March 11th and then received her results, and that's what she posted on Facebook publicly on April 15th, 2020.  The market reacted -- it was getting information it shouldn't have had, right?  Like the patient was posting her own data that she really shouldn't have been sharing publicly, but she did and of course analysts reacted to that.  They were able to get a sneak peek of her experience as of that point in time.

THE COURT:  Was she doing it prior to April 15th or that was the first time?

MS. SMITH:  So not -- I don't believe it's alleged, but she was engaged in some posting on Facebook prior to April 15th but not her, my understanding, not her results that are alleged in the complaint, which is why analysts had picked up on that, right?  That's why they saw her results.

So she posts.  The market has a reaction to that because that is, you know, interesting information for analysts to know, right?  How was the experience of this patient in this high-dose cohort.  It's then removed.

Now, this is more of a scienter issue, but the plaintiffs allege that this is some grand cover-up, that Homology was responsible for the post being removed. That's speculation. There are no confidential witnesses that say that was the case, no facts alleged whatsoever.

THE COURT: And her identity is known because you are able to pull her Facebook up, right?

MS. SMITH: Yes. Of course the company knows who it is.

THE COURT: But it's known to plaintiffs as well, right?

MS. SMITH: Correct. That's right, Your Honor. Well, I'll let plaintiffs speak for herself, but she was posting on Facebook. So no facts indicating that Homology was responsible for that patient's information being removed from Facebook.

The other thing I just want to speak to is there can't be a cover-up because, remember, she doesn't get dosed until March 11th. The only statement the company makes at all on this topic between March 11th and April 15th is its annual report on March 12th. And the plaintiffs don't allege that Homology had any information at all about patient 5's reaction to the dose within 24 hours of her having been dosed. So again, this isn't a situation where Homology is out there saying everything is great with patient 5 or with all of our patients, we're hiding her results. They're not even speaking

to the market.  They may have their data, but they're not talking to the market about it.  So there's no cover-up with anything to do with her.  So I just wanted to put that to rest. That's the first part of the class period.

Now, for the second part, the plaintiffs' falsity theory changes a little bit, and that starts with November 6th, 2020.  And again, Your Honor will remember, that's when the company announces its full Phase 1 results.  During the course of that announcement, the company explains what it's going to do with that information.  As promised, it's going to roll now into the Phase 2 part of the study.

And the company says based on the data we received from Phase 1, we think this is good enough for us to continue into Phase 2.  That's an expensive proposition for the company. If the data were not good enough from Phase 1 to justify rolling into Phase 2, presumably the company would say we're not going to waste our money on this, right?  We've got other things that we're developing.  We'd rather focus our money into those efforts.  They don't do that.  They say, we think the data from Phase 1 is good enough to progress to Phase 2, and that's exactly what the company does.

Also on that call the company explains, we learned some things from Phase 1, and we're going to incorporate those learnings into what we do in Phase 2.  And among the learnings, it's selection of the dose and the company selects ultimately

two doses to proceed with as well as an immunosuppressive regime.  That's typically steroids.  These are -- gene therapies are known to sort of have these toxicities.  And so Homology and others engaged in this space are using steroids to mitigate the toxicities that are known.  That was done in Phase 1.

Homology says we learned some things in Phase 1 about the steroid regime.  We're going to make some changes for Phase 2.  They don't say how, what they're going to do.  They just say we're going to incorporate the learnings from Phase 1 to Phase 2.

THE COURT:  One of the questions I do have for plaintiffs is why wouldn't they move into Phase 2?  What information that they had that they should not have?  So just think about it, and when it's time to respond, you can answer that question.  Go ahead.

MS. SMITH:  So those are the two kind of new pieces of information that come out on November 6th that plaintiffs allege are false or misleading.  So there's really two falsity theories.  One is you told people you were moving into Phase 2 but you didn't have sufficient basis to do that.  The data weren't good enough, you shouldn't have done that.

And the other is you told people you were changing your steroid regime knowing that the steroid regime that you were sort of modifying to was insufficient.  Those are, as I

understand it, the two falsity theories for the second half of the class period.

Now, the first one can be easily dispensed with.  The allegation is -- and I think I have a quote of it, actually.  The statements were purportedly false or misleading, and this is quoting, because they, quote, perpetuated the false perception that the Part 1 pheNIX data was positive and supporting -- supportive of advancing into the dose expansion phase, end quote.  That's what was supposedly false or misleading about the statements.

Now, that one to me I think is easily dispensed with because the company did in fact progress into Phase 2 just as promised.  The plaintiffs may think the company shouldn't have done that, but that's a judgment that the company gets to make, right?  The plaintiffs don't get to decide whether the data are sufficiently positive to move into Phase 2 or not.  The company gets to make that decision, and that's the -- that is the decision the company in fact made.  Nobody disputes that Homology actually did progress into Phase 2.  So if the statements are false or misleading because they somehow conveyed to investors that the data were sufficient to move into Phase 2, it's hard -- I find it hard to see how that is false because of the way the facts played out, right?  The company did in fact move into Phase 2.

The second theory, again, is that Homology supposedly

continued to conceal the fact that this steroid regimen Homology used was insufficient, and that its modified steroid regimen posed significant safety risks.

Now, here again, what was disclosed to the market is all of the data from Phase 1.  So to the extent anybody wanted to know anything about the safety experience from the patients of Phase 1, that's out there, right, as of November 6th?  The company is saying we learned some things and we're going to change our steroid regime going forward.  It says nothing about whether that regime was sufficient in the past, and to the extent anyone has any questions about that, the data are out there.  And Homology doesn't promise that going forward its new steroid regime is going to be perfect, right?

This is a super experimental, highly risky area.  We learned some things, we're going to make some changes.  We think that's going to be better in Phase 2, but they don't know, right?  Homology is not promising that its steroid regime is going to be perfect by any stretch of the means.  So it's hard to see how that, too, supports a falsity theory.

Now, at most, that might be a difference of opinion.  Plaintiffs may in retrospect believe that Homology's view about the sufficiency of the steroid regime or the changes that it made or its view about whether or not it should have moved into Phase 3, you know, was different.  The plaintiffs apparently have a difference of opinion about what Homology ultimately

did, but that's really a difference of opinion after the fact based on hindsight.  It can't be the basis for securities fraud.

On -- and still looking at the key dates, now the disclosure supposedly for the steroid regimen is the February 18th, 2022 clinical hold issued by the FDA.  Critically there are no allegations whatsoever that anybody at Homology knew the FDA was going to issue a clinical hold, not February of 2022, ever.  It was just as much of a surprise to the company as it was to anybody else.

Now, in a traditional securities fraud case you might see allegations that the company had received feedback from the FDA that it was concerned about the safety of the trial, that it was thinking about issuing a clinical hold.  None of that exists here.  It comes out of the blue for the company just as much as everybody else.

And by the way, the company had warned investors this was a possibility.

If the Court would look at the next slide.

While Homology didn't know that the FDA was going to issue a clinical hold, what Homology did know is that it was operating in a highly risky space and that the FDA was paying close attention to gene therapies and gene therapy trials.  So it specifically warned investors in several places in both its 2019 and 2020 10-K that the FDA could suspend or permanently

discontinue the clinical study.  It could issue a clinical hold.  We don't know that it's going to do that, but this is on the list of things that could happen.  That risk was warned of and, it turns out, immaterialized unfortunately, but it's not a risk that was unknown to investors and it's certainly one they were clearly warned of.  So those are the key falsity points.

I am going to transition into scienter.  I'll just pause there for a second and see if Your Honor has any questions on the falsity.

THE COURT:  No, I'm fine.  But did you want to jump in now or just after all the arguments?

MR. APTON:  To speak about falsity, Your Honor?

THE COURT:  Yes.

MR. APTON:  What would Your Honor prefer?  I could go either way.

THE COURT:  It doesn't matter to me.

MR. APTON:  I'll let Ms. Smith finish.

THE COURT:  All right.  Thank you.

MS. SMITH:  Okay.  So on scienter, this is a very poorly executed fraud, if it were a fraud.  There are no stock sales.  Again, no stock sales whatsoever by any of the named individual defendants, and there are four.  There are also no scienter allegations at all as to any of the four individual defendants except for one, Ms. McNeely, and I'll talk about her in a little bit.

So there's no incentive for any of these defendants to mislead the market or lie. The only motive theory the plaintiff has is with respect to some investments in an offering. So there are two investments, one by Pfizer -- that's back in 2019 -- and one by -- actually, let me check the date on that. It's either late 2019 or early 2020, so I don't want to get that wrong. I can check that. There's an Oxford Biomedica investment in 2022. Those are investments, not stock sales. So those are companies saying we want to invest in you, Homology. This is the amount we'd like to invest. In the case of Oxford, it's $130 million. But that is a different thing than buying the company stock. So the notion that Homology would have an incentive to increase its stock value to attract those investors, that actually -- it doesn't hold because they're not making -- they're not buying stock. They're just making an investment in the company. That, of course, comes with due diligence. Plaintiffs don't allege that Pfizer and Oxford did not conduct due diligence. So that's an important fact on those.

The third is the stock offering, and that is in April of 2021. Oh, thank you. The Pfizer announcement is November 2020. Thank you.

The stock offering is in April of 2021.

THE COURT: There were investments prior, I'm assuming?

MS. SMITH:  Yes, Your Honor.  That's not part -- in the complaint, but yes, the company would have needed to raise money for this.

The secondary stock offering occurs on April 6th, 2021.  And importantly, that's after the full Phase 1 data are released.  So to the extent the argument is that somehow Homology was concealing patient-level data in order to inflate the stock price to sell stock, it certainly wasn't doing that for this offering because this offering was after.  All of that patient level data is disclosed in November of 2020, but that can't be the theory.

And again, as is common with all emerging biotechnology companies, Homology told investors very clearly in multiple disclosures it was going to have to raise money.  We expect to raise money.  That was a consistent disclosure throughout.  So nothing unusual there.

And the case law is quite good on the mere sort of need to raise money, need to raise capital is not sufficient by itself to support scienter.  It's not motive to commit fraud.

The Facebook post, again, there are no allegations establishing any connection at all between the removal of the Facebook post and Homology, so that falls apart.

And I want to come back here to Ms. McNeely.  So Ms. McNeely is the one who made the statement.  So there's the Facebook on April 15th, an analyst reaches out to Ms. McNeely,

who is essentially IR, and says, what's going on with this? She says, as Your Honor I'm sure knows, nothing fundamental has changed for Homology. She doesn't say anything more specific --

THE COURT: Except for the stock price or something like that.

MS. SMITH: Except for the stock price, yes. Your Honor knows the statement well. What she's saying is we're going to keep continuing on our path. We're continuing to do what we do. The clinical trial is going on. Nothing has changed. We are going to continue going on about our business. She's not making any specific representation about anything with respect to any of the patients' experience with respect to efficacy or safety. It's a highly general statement.

And what the plaintiffs allege in the complaint is that that statement was false because in fact patient 5 -- the data that was released for patient 5 showed that actually the efficacy results had fundamentally changed, but again, that's just plaintiffs' interpretation of what the implication of that data was. It really is nothing more than that. So the statement is both vague, not saying anything about any patient's data, nothing fundamental has changed. The company is continuing to do what it does. And the falsity theory doesn't hang together. So that is the only individual who's called out from the plaintiff. Of course, Ms. McNeely is not

alleged to have sold any stock, is not alleged to have any motive to commit fraud.

There's reference to the core operations inference in the briefing. This isn't really a core operations inference case, Your Honor. As I'm sure Your Honor knows, core operations inference comes into play when you're talking about a big company, you know, Amazon, let's say, and there's no connection between the defendants who are speaking who are making the false statements and the alleged omitted facts, and plaintiffs will often rely on the core operations inference to close that gap and to say, well, this is so essential to the business, the CEO must have known this fact. That's not really what's going on here. It's sort of an inapplicable -- I mean, it's a small company. It's not an issue where, you know, there's a question about who knew what. It's a matter -- this isn't one of those kinds of cases, right? It's not the kind of case in which the mere fact of this being a core operation can give rise to scienter so it's not really a good fit.

Finally, on scienter, I just say, the more compelling inference is good faith. This is a company that's disclosing information at appropriate points in time, isn't endeavoring to mislead the market, is attempting to develop a drug in a highly experimental space, is reacting to data as it comes in, modifies the steroid regime to the best of its ability, but there's no -- the inference from those facts are good faith,

not fraud. There's no fraudulent inference to be taken from that.

Finally, and just briefly, Your Honor -- and thank you, by the way, for allowing me having so much time on this. I greatly appreciate it -- loss causation. So as I said, this is a unique case in which loss causation is actually a strong argument at the motion to dismiss stage.

The last slide of the demonstrative that I provided to the Court just highlights what we understand to be the five alleged corrective disclosure dates, the dates on which the fraud was supposedly revealed. The first is April 15th, 2020, the Facebook post. That isn't corrective of anything because the company had not spoken at all about data for patient 5. So patient 5's experience and results couldn't have corrected anything the company said previously. The company didn't speak about patient 5 or patient 4 or any patient after December 2019. So it can't -- it can't have corrected a prior false statement, and remember, patient 5 wasn't even dosed until after or, you know, on the eve of the company's annual report. That's the first corrective disclosure.

The second alleged corrective disclosure is August 10th, 2020. That's the company's quarterly announcement. Nothing new is disclosed there about the patient data that is the focus of the alleged omissions in the first part of the class period. The only new information that's disclosed on

August 10th relative to this case -- there's all kinds of other information, right, financial information, et cetera, but relevant to this case is the fact that the company is going to delay its readout of Phase 1. But that, again, doesn't -- that's not a falsity theory here, right? The plaintiffs are not alleging that Homology knew it was going to have to delay that readout and misled investors about the timing of the readout. That's not a theory here. So that can't be corrective of any fraud.

November 6th, 2020, is, again, the release of the full Phase 1 results. That's just the disclosure of new information, which isn't, again, corrective of anything the company previously said. Instead, the company was saying, look, we're not going to tell you this information until we do the readout, which is exactly what it did. So nothing corrective there.

The April 6th, 2021 stock offering is an alleged corrective disclosure. That's a little bit of a head scratcher. That's just a stock offering. The stock price does drop on that day, but that's because it's an offering. An offering is priced to $7 and change, which is below what it had previously been trading at. Normal for a stock offering, right, for the price to be a little bit lower to where it was previously trading because they are going to sell a bunch of stock. So that's what's happening there. But no new data are

disclosed on that date.  It's just the date of the stock offering, so that can't be corrective.

And then, finally, the February 18th, 2022 clinical hold announcement, again, that's the materialization of the disclosed risk.  No new data are disclosed.  It's just, you know, it's bad news and the stock price drops, to be sure, but it's not the revelation of any fraud.  So we would submit loss causation provides a basis for dismissal as well.

With that, Your Honor, thank you again for the time.  Appreciated.  No further arguments, but I'll hopefully have a chance to respond.

THE COURT:  Counsel, up to you.

MR. APTON:  Thank you, Your Honor.

So if I can start with falsity, and just to level set, this was a Phase 1/2 trial.  It was going to be broken up into two parts.  One, find the right dose.  Two, test that dose among a broader population of people.

Where the company started off was it designed a trial that would have three cohorts, a low dose, a medium dose, and a high dose.  We start the case kind of right in the middle of this mid-dose.  The first two patients in the low dose have been tested.  The first patient in the mid-dose has been tested, so patients 1, 2, and 3 we have data.  Analysts say that this data is meh, equivocal at best.  It doesn't show an effective response, there's some elevated safety signals, we're

concerned; thus, there was heavy focus on what was to come in patient 4, which was number 2 in mid-dose, and then the two patients in high dose.  So that's why patient 5 in this case, the Facebook poster, happened to be so important.

December of 2019, the company comes out with its first readout, patients 1, 2, and 3.  As counsel said, patient 4 had been dosed but the data wasn't ready.  That's fine.  We don't allege it's a misrepresentation.  Certainly we wouldn't.  At that point in time the data is very young.  There's not a lot of it.  Three months later, 12 to 14 additional doses later, every single one showed no effectiveness in this patient 4.

So December 2019 patient 4 is dosed, by March he or she has between 12 or 14 doses.  Every single dose but the first one was not effective.  And that's why in March when the company's discussing with the market its data for the first three patients, we allege that that statement is misleading.  Why?  Because they're sitting on data, negative data from patient 4, which, as I said earlier, is very important, almost as important as patient 5, and they say nothing.

We cite in our case -- or cite in our brief the *Boston Scientific* case.  In that case the CEO had discussed the status of a recall telling investors that everything was wrapped up -- I'm paraphrasing slightly -- knowing that a recall -- another recall was just around the bend.  I see that situation as analogous to the one we have here.

We have the company, Homology, touting its data for the first three patients knowing that patient 4 is problematic. Counsel said that the data for the first three patients was only discussed in their 10-Q and 10-K filings, suggesting that, you know, perhaps it was mundane or an innocuous announcement. Not so.  It was actually in a press release, too.

Our first misrepresentation, paragraph 98, March 12, 2020 press release congratulating the company, congratulating themselves, touting the status of their pheNIX trial in the first three patients, not saying anything about the 12 to 14 doses for patient 4 that had already proved not effective.  I should point out, Your Honor, this --

THE COURT:  So the March 2020, they're reporting on the three, not the fourth patient?

MR. APTON:  That's correct, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. APTON:  And, again, even though they're only reporting on those three, by not disclosing the fourth, that's a misleading statement.  The company can control -- any company can control what it wants to disclose to the market and what duties it there has arising from those disclosures.  Once defendants chose to tout positive data for patients 1, 2, and 3, they had an obligation not to mislead the market as to what data for patient 4 said.  We cite *Sepracor* and *Transkaryotic* in our brief for that proposition.

We move on, Your Honor, through the class period. We're now in April. We have the patient 5 post.

THE COURT: So let me just inquire. The annual report, was that -- I see here on the chart that's March 2020, not December 17th. December 17th was just sort of the data cut preliminary results.

But the November one, will report more in mid-2020, that gets delayed to November. But that's not an annual report, the November; is that right, Counsel?

MR. APTON: That's right, Your Honor.

In December of 2019, the company makes an announcement just to disclose data from the first three. In March -- on March 12, 2020, it issues both a press release as well as the annual report discussing again the data from just the first three, concealing the data for patient 4, and then the class period continues, and we move forward.

Is there anything about the timeline --

THE COURT: No, no. Thank you. I just wanted clarification on the annual report.

MR. APTON: Yes, Your Honor.

So Your Honor, in April of 2020 we have patient 5 post her data on Facebook. It's taken off almost immediately. The data, though, prompts a significant move in the market. People following Homology stock take note of what patient 5 has to say about her phenylalanine levels, about the toxicity she endured,

about the additional course of steroids she was told to take, the stock price drops. I mean, this is major news about the pheNIX trial. Because, again, this was the first dose -- the first patient to be dosed in the high-dose cohort. Up until this point, all the data so far was not really effective, potentially dangerous, very important as to what the high dose cohort was going to reveal.

And here we have in full color that patient 5, the first patient in the high-dose cohort, had a bad response. It was not effective. She was in severe risk. They were calling her, leaving messages, so on and so forth.

Naturally, analysts reach out. Homology IR says nothing fundamental has changed. Now plaintiffs, we interpret that to mean, as it says in black and white, that the risk/reward profile of the drug is still as it was prepatient 5, nothing fundamental has changed. Counsel disputes my interpretation of that Facebook post. I don't think that's appropriate for a motion to dismiss, certainly when the writing, as it says, is pretty clear, in my opinion. She's reassuring analysts, she's reassuring the public that the risk profile for the drug is as it was, that they should not be concerned by what patient 5 had to say. That was a public statement. The analyst who reported on it certainly relied on management. And under the cases we cite, *Cabletron*, *Brumbaugh*, Ser --

THE COURT:  Why do you come to the conclusion that it relates to the risk profile?

MR. APTON:  Well, the point of patient 5, the whole takeaway, the context, the content of patient 5's Facebook post is that her results -- the drug did not do anything for her phenylalanine levels and that she suffered severe toxicity. She had to take an unexpected unanticipated treatment of steroids, and that was the nature of the post.  That was the content of the post.  So anyone who read that, certainly that's what they're focused on.  They're looking at, oh, wow, HMI-102 seems to be ineffective and dangerous at the high dose.  We were tracking this high dose very closely.  We now see the data.  This is a problem for the risk/reward profile of the drug, the company, the investment.  HMI-102 was Homology's lead drug candidate.  Any analyst tracking this company was highly focussed on the pheNIX trial.

This gets at the core operations theory that counsel was referencing earlier, though perhaps they're not disputing, that everyone was aware of what was going on in the trial. Again, Your Honor, this was an open label trial so defendants knew what was going on as the data was coming in.  They were checking the safety, they were familiar with the progress of the trial.

Those statements made by the analyst were made with information from defendants under the entanglement theory,

under *Cabletron* and *Brumbaugh* and *Seres Therapeutics*.  Those count as defendants' statements.  Certainly analogous to the fact patterns in those cases where just reference in The New York Times article to conversations with management was enough to do it.  Here we see it in black and white, again the emails that we have in our complaint.

So between those two categories of statements, the analyst statements and the statements about patient 4, we have patient 4 and patient 5 data showing that this drug is not effective and dangerous at the mid- and high-dose cohorts.  We also know that the company's trial protocol or study protocol, specifically the steroid regimen that they were going to give to patients to combat the toxicity created by this drug, was problematic.  That information, Your Honor, is what should have given the company either pause before going to Phase 2 here or part 2 of the study or at least altering their disclosures around their decision to go forward.  They said nothing.  They provided the data.  They said that they were going to take what they learned and move forward, but the truth is, they did not know what steroid regimen should be used going forward.  And that's how we get to the second part of this class period.

So everything before November 2020 is very much focused on what the patient 4 and patient 5 data was and how the company presented it or concealed it.  Everything after November 2020 is very much focused on what the company said

about the steroid regimen it was using in this next phase, next part of the trial.

Prior to November 2020, the company reported just those first three patients knowing full well that patient 4 and patient 5 had negative data.  After November 2020, notwithstanding the disclosure of this first part and the patient data, they went forward but they didn't have a plan. They didn't have the steroid regimen worked out.

THE COURT:  And what's the significance of the type of steroid regimen that they utilized?

MR. APTON:  Well, if you have a steroid regimen that's incorporated into your trial protocol and you test for that and you get good results, then you can use that as a registrational trial.  You can use that to support your application to the FDA to get marketing approval.  If you're still tinkering with it, you're going to need to do another trial, you are going to need to test that in a subsequent trial.  And it delays things dramatically.  It costs money, it costs time, and it costs investor interest.

Now, had they taken a beat and done another let's call it a Phase 1/2B and incorporated a different steroid regimen or actually used the one that was ongoing in their pheEDIT, p-h-eEDIT trial, perhaps they would not have gone on a clinical hold, but they went forward.  They tried Decadron.  They tried different steroids.  They didn't get it worked out.  And in the

interim, they concealed that from investors.  These risks materialized, and I'll get to that.  It's an important point in the loss causation point aspect of this argument, the materialization of the risk.

So -- now, counsel has spoken a lot about scienter. We know here that the company certainly had in its possession the data from patient 4 and patient 5 at all points in time before November 2020.  And we know that they had the data in their possession about the steroid regimen that they were using after November 2020.  It was an open label trial.  We know that they dosed patient 4 before the class period started, and we know that they had the patient 5 data as early as April.

I allege that the patient 5 Facebook post was taken down at the behest of Homology.  I think that's a very fair inference to draw from the facts alleged.

THE COURT:  Why couldn't you determine that?

MR. APTON:  Oh.  Well --

THE COURT:  Because her identity is known, right?

MR. APTON:  No, Your Honor, it's not known.  Her account was -- went to -- moved to private almost immediately after she posted that April 15th Facebook post.  And the issue was is that she was apparently posting publicly beforehand more innocuous messages about how her enrollment was with the trial. But her actual data, once it was posted publicly, it was removed almost instantaneously.

THE COURT:  So the patient 5 name is not disclosed in the Facebook post?

MR. APTON:  That's right.  Yes.

THE COURT:  Is it some fictitious name or some...

MR. APTON:  It's blurred out in the source that we have.

THE COURT:  Okay.

MR. APTON:  The point, though, is not necessarily that we need to have a cover-up here.  That's kind of secondary to everything.  We know that the company had in its possession the data that was adverse to what it was saying publicly.  That is enough to show an inference of scienter.  If you have access to information contemporaneously that contradicts materially the statements you're making publicly, that's enough to at least be deemed deliberately reckless for the purposes of pleading scienter.

With respect to the loss -- sorry, strike that, Your Honor.

Counsel raised some points about no stock sales, no motive to mislead investors.  We know that this company had just recently canceled its very lucrative financing agreement with Novartis.  Its net losses and accumulated deficit was approaching a half billion dollars, 500 million.  The company in order to raise new money, whether it be through investor deals or stock sales, it needed to keep bad news out of the

public realm, and that's exactly what it did.

In paragraphs 177 to 184, we identify each fundraise relative to the negative news that was known internally.  That negative news specifically being paragraphs 72 to 77 and then 88 to 96.  And as I mentioned earlier about the core operations, this is, yes, a small company, but this pheNIX trial was critically important to Homology's success.  And that's why we assert that in our complaint.  There should be no mistake that everyone high up at this company was closely following this news, especially when the director of IR was out talking to South Side analysts.

With respect to loss causation, Your Honor, this is a materialization of the risk-type case, meaning that the corrective disclosure does not need to mirror what the false statement was.  We have a risk here, that risk being that the HMI-102 drug was less effective and more toxic than the company let on.  That risk materialized over the course of the class period, first with the patient 5 Facebook post, next analysts questioning whether the lack of further information meant that they were hiding something -- I'm referring to the August 10th 10-Q.  The November 6th data report certainly cleared things up for the market a little bit, though it continued to misrepresent the issues or deficiencies with their steroid regimen.

Moving on to the secondary offering -- this was three

weeks after the company said it had enough money to last for the next 12 months.  So a secondary offering so soon after such a representation, it sounded alarm bells from investors.

And then, finally, the FDA clinical hold, that was the culmination of exactly what was withheld from the market all along.  This drug was not effective and very dangerous.  That's why the FDA issued a clinical hold.

Your Honor, that's all I have --

THE COURT:  So it's not that -- you're not alleging that they knew that the FDA was going to issue a clinical hold?

MR. APTON:  No, I can't allege that.  I mean -- yeah.  All I can allege, though, is that there was an FDA advisory committee conference convened as to these types of drugs, so it was definitely, you know, of attention or a focus of the FDA.  But no, I can't fault defendants for not knowing that a clinical hold would be issued.  I mean, surely they warn about it.  All drug companies warn about adverse regulatory action.  But the issue here is that that risk warning or that risk of adverse regulatory action came about from facts that had been concealed, specifically the dangerousness of the drug, the lack of effectiveness, patient 4 and patient 5, the steroid regimen.

THE COURT:  Are there any allegations that information regarding patients 1 through 3 were untruthful?

MR. APTON:  No, Your Honor, and we don't start the class period before -- I mean, that information came to the

market.  Patients 1, 2, and 3, they were discussed in that December of 2019 statement, which we don't allege is false or misleading.

THE COURT:  Okay.

MR. APTON:  It's only when they -- sorry, Your Honor. It's only when they continued to discuss the results of this trial while being in possession -- not just recently in possession but in possession of data that was accumulated over months that directly contradicted their prior statements, that's where they went into trouble.  So those statements between March of 2020 and November 2020, that's as bad as it gets, Your Honor.

THE COURT:  Thank you.

MR. APTON:  Thank you, Your Honor.

THE COURT:  Counsel, anything you want to say in response as we wrap up?

MS. SMITH:  Thank you, Your Honor.

Just briefly I want to clarify, if the Court doesn't mind, a couple of things.  So first, on the March 12th, 2020 disclosure, just so we're clear, it's an annual report accompanied by a press release, but those are all together.  So what the press release is saying is we're announcing our annual report.  Here's our annual report.  It's coming -- you know, it's a much larger document, but it's coming with the press release.  So those are the same thing.

And the actual announcement on March 12th is, this is part of our accomplishments from 2019. Again, it's an annual report for 2019. The company is saying here are all the things we did in 2019. One of those things was the readout in December of 2019, and we're just telling you we did that. And then in the very same disclosure the company says, again, this was as of December 2nd, 2019, and also says, "The dose escalation part of the trial is ongoing and Homology expects to provide an update midyear 2020 once a dose is selected." That's paragraph 98 of the complaint, which is a quote from the press release, which is in turn a quote from the annual report. So again, perhaps beating a dead horse, but the company is just saying, we had these results, we'll tell you sort of the rest of the story in mid-2020.

If it were true, if it were true that a company could never refer back to prior study results, that would be a strange outcome here. What essentially plaintiffs are arguing for is Homology disclose the data in December of 2019 from the first data cut, which they don't allege is false. Their position is you can't talk about that anymore. You literally cannot say anything at all about that data cut in your annual report, in your quarterly report, in your next quarterly report because if you do that, you have an obligation to disclose the data from the next phase of the trial, which is not the law. Those are the cases previously cited.

On the nothing fundamental has changed statement, I think Your Honor is aware of this, that's paragraph 109 of the complaint. It says nothing about risk/reward. The risk/reward analysis, that's coming from the analyst, not the company, and the analyst is making a bet. And guess what, if he's right, there may be high reward. This is a very risky area, but it's a bet in a high risk area and that's all he's saying. We're willing to tolerate this high risk because we think this has promise, but that's not coming from the company. I think that's fairly clear from the document.

Just on the steroid regimen briefly, Exhibit 8, which is a question and answer conference call on November 6th, 2022, the same day that the company releases its Phase 1 results, there's a doctor -- so both Homology and its independent -- the independent doctors who have run the trial actually talk about the steroid regimen, and the doctor tries to provide the analyst with some color about the steroid regimen that was conducted in Phase 1. They say they're going to take the learnings from that and proceed to Phase 2, but they don't -- could I have this? Sorry. They don't make any promises about how that's going to come out. Again, they actually don't know, right? This is a new cutting-edge area. One of the quotes on page 11 of that transcript, the doctor says --

MR. APTON: Sorry, Your Honor. This is one of the exhibits that we objected to in your RJI opposition.

THE COURT:  Okay.  Thank you.  I'll make a note.

MS. SMITH:  Just to point out for Your Honor, page 11 at the top, the doctor says, "We'll be incorporating these key learnings into the expansion phase of the trial, including patient selection, immunosuppressive regimen" -- that's the steroids -- "patient monitoring as well as endpoints.  We look forward to providing an update once the expansion phase begins."  There are other quotes like this.  But essentially what they're saying is we're putting this together, we're going to try it, we're going to see if it works, no promises, we'll update you once we start doing this work.  So the company certainly doesn't promise it's going to be effective.  And this is a Phase 2 trial, not a Phase 3 trial.  So the extent to which it can be a registrational trial is debatable because typically those are Phase 3 trials, something the market would know.  So, Your Honor, there's discussion in that exhibit throughout about the steroid regimen and what the company was hoping to do going forward with no promises made.

I guess the final thing I'd just like to address is the changes for the immunosuppressive regime that was going to be used for the pheEDIT trial.  I think Your Honor may remember this, but there was supplemental briefing on the motion to dismiss on this issue.  The pheEDIT trial was approved by the FDA in October of '21, but the first patient was not dosed in that trial until December of 2022, long after the class period.

So to the extent plaintiffs' allegation is Homology should have incorporated learnings from this other trial, it couldn't have done that. It hadn't gotten off the ground, so that argument as well doesn't work. And of course it makes sense that in this experimental area the company would be potentially trying some different things.

So that's all I have, Your Honor, unless you have any other questions.

THE COURT: I don't. Thank you.

MR. APTON: Your Honor, could I just add two points? One, with respect to the content of the misleading statements, the March press release, the annual report, the August announcement, the May announcement, it's all about the context of these statements. I mean, these -- the company was harping on the data from these first three patients for months after the data cutoff, and it really was touting recent accomplishments, you know, it's proud of the efficacy data from the first patient in cohort 2. Again, this is months after they have patient 4 and patient 5 in hand, yet they're still talking about these first three patients as recent accomplishments.

And number 2, Your Honor, with respect to the steroid regimen that was used in the pheEDIT trial, yes, counsel is right, the FDA approved the investigational new drug application in October 2021, which meant that the protocol was

submitted at least 30 days beforehand.  So the steroid regimen that was part of that trial was known and applied for and submitted in September 2021 at the latest.

Thank you, Your Honor.  That's paragraph 81.

THE COURT:  Thank you.  All right.  Thank you very much for your time.  The Court will take it under advisement, and you'll get a decision hopefully sooner rather than later.  Thank you.

MS. SMITH:  Thank you so much, Your Honor.  Thank you for your time as well.

MR. APTON:  Thank you, Your Honor.

THE CLERK:  We're adjourned.

(Adjourned at 3:41 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 19th day of March, 2024.




/s/ Linda Walsh
Linda Walsh, RPR, CRR
Official Court Reporter